Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB #074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital,<br><br>Defendants. | Case No. 3:02-cv-00339-MO (Lead Case)<br>Case No. 3:21-cv-01637-MO (Member Case)<br><br>PLAINTIFFS' RESPONSE IN OPPOSITION TO COUNTIES' BRIEF REGARDING JUDICIAL AUTHORITY |

| | |
|---|---|
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON,<br><br>Plaintiffs,<br><br>v.<br><br>DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, PATRICK ALLEN, Director of the Oregon Health Authority, in his individual and official capacity,<br><br>Defendants. | Case No. 3:21-cv-01637-MO (Member Case) |

## I.   INTRODUCTION

Plaintiffs file this response at the direction of this Court (Dkt. 299) to more fully respond to the Marion and Washington County Counsel's (hereinafter "County Counsel") brief challenging this Court's authority to modify its permanent injunction by "overriding state law to facilitate compliance with the United States Constitution." Dkt. 290 at 1.

Plaintiffs appreciate what may be seen as the spirit behind County Counsel's motion: a sincere attempt to best understand what steps Defendants have taken to achieve compliance with the injunction and why Plaintiffs asked this Court to override state law and implement the neutral expert's narrow recommendation limiting competency restoration lengths of stay. County Counsel spends nearly half their brief suggesting several other alternatives to reach compliance. *Id.* at 9-16. Their long list of suggestions reminds Plaintiffs of our contempt motions three years ago when we similarly asked about all reasonable alternatives to reach compliance. *See e.g.* Dkts 91 at 10 (in May 2019, Plaintiffs point to Defendants' admissions that they are "out of ideas" and so asked this Court "to direct Defendants to issue a plan for compliance including providing aggressive and definitive benchmarks."), and 106 at 14 (in June 2019, Plaintiffs suggest community-based services as another alternative).

County Counsel's principle question is whether overriding state law to reduce restoration wait times is "the least intrusive approach possible and to support that approach with certain findings." Dkt. 290 at 1. By asking this question, County Counsel reveal their lack of knowledge regarding the tremendous amount of change that has happened over the past several years including an altered state hospital, a global pandemic, and, most notably, the appointment of Dr. Debra Pinals as the Court's neutral expert tasked to issue recommendations for compliance and develop the long-awaited compliance plan with definitive benchmarks. Dkt. 240, Dkt 261-1 and 2. After reviewing hundreds of records and studying the system closely for nearly a year, Dr. Pinals recommended Oregon modify its "duration of competency restoration" at the state hospital "consistent with clinical data, case law, and legislation in other states that focus restoration on its intended purpose." Dkt. 261-2. Dr. Pinals also noted the state hospital was becoming a warehouse for pretrial detainees with mental illness instead of its intended purpose of providing limited competency restoration services. Declaration of Emily Cooper (hereinafter "Cooper Decl."), Exhibit 1, p. 20.

Given the state's continued lack of compliance and the related risk of harm to pretrial detainees, this Court entered an order to both implement Dr. Pinals' specific recommendation imposing restoration lengths of stay and limit the duration of the order until either compliance with the constitution is reached or by September 1, 2023. Dkt. 271 ¶¶3-5. The scope of this remedial authority is consistent with established law and the record before this Court.

## II.    ARGUMENT

### A. Clarification of the Applicable Law

County Counsel do not address much of the legal authority Plaintiffs cite as the legal basis for this Court to enter a remedial order to achieve compliance with its permanent injunction and

the Constitution. *See* Dkt. 265 (citing to *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995), *United States v. Donnelly*, 41 F.4th 1102, 1107 (9th Circuit 2022), *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) and *Youngberg v. Romero,* 457 U.S. 307, 325 (1982)).[1] Instead, every County Counsel citation pertains to a defendant's objections to a court-imposed relief (e.g. Washington State appealed the timeliness of initial evaluation in *Trueblood v. Washington State Dept. of Social and Health Serv.*, 822 F.3d 1037, 1043 (9th Cir. 2016); the City and County of San Francisco appealed the contempt order in *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 864 (9th Cir. 1992). Here, the Defendants did not oppose the motion to restrict restoration lengths of state.

County Counsel go on to cite to two cases that are distinguishable from the present case. First, County Counsel cite to *Trueblood* to argue state law should be the framework for remedying the current constitutional violation. Dkt. 290 at 4-8. However, there, the Ninth Circuit held that district courts should consider "less restrictive alternatives" before entering remedial orders and took note that Washington had recently amended its statutes to require admission of competency patients in 14 days rather than seven. *Id.* at 1045-46. The *Trueblood* opinion did *not* purport to establish that a federal court can *never* issue remedial orders whenever a state legislature has recently passed some kind of legislation, just that a remedial order should incorporate analysis of whether recent legislation would address the constitutional harm. There, the Court took issue with the remedial order where its scope exceeded the findings of *both* the plaintiff and defense experts. 822 F.3d at 1045 (criticizing the scope of the order where "even

---

[1] It appears Plaintiffs and County Counsel agree on one case that is applicable here, *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), and the consideration of the less restrictive options. *See* Dkt. 290 at 4-5 and Dkt. 265 at 11-12. Notably, the *Stone* Court did "not rule out the possibility that such action [overriding state law] may be necessary in the future." *Id.* at 863. Here, unlike in *Stone,* Defendants have been out of compliance with the court's permanent injunction for three years and several other more restrictive measures – namely, placing a moratorium on misdemeanants' referrals and forcing discharge of all patients deemed to no longer meet hospital level of care – have not been pursued but instead remain on the table for future consideration. Instead, only the narrowly tailored court relief to reduce restoration lengths of stay was sought to compel compliance.

Plaintiffs' Response in Opposition to Counties' Brief Regarding Judicial Authority
Page 4

Trueblood's expert" did not support it). Here, this Court kept its order within the bounds of its expert's report and recommendations. Had the district court in *Trueblood* similarly relied on extensive findings of a court-appointed expert, its order might have fared better on review.

Second, County Counsel cites to *Rizzo v. Goode*, 423 U.S. 362 (1976), as a basis for limiting this Court's authority. Dkt. 290 at 2. There, the facts are also distinguishable. *Rizzo* Plaintiffs were seeking to fashion a remedy "designed to minimize this kind of [police] misconduct on the part of a handful of its employees." 423 U.S. at 378. Where *Rizzo* addressed scattered police abuses "fairly typical of (those) afflicting police departments in major urban areas," *id.* at 375, in the present case virtually *no* aid-and-assist defendant has been admitted in a timely way for years. The *Rizzo* Supreme Court was careful to rely exclusively on the "facts of this case" from the "settled rule that in federal equity cases, 'the nature of the violation determines the scope of the remedy.'" *Id.* Here, we have a systemic failure to meet constitutional standards in virtually all cases, not isolated acts by a handful of rogue state employees. The scope of this Court's remedy must be broad enough to mitigate the daily violations of the constitutional rights. *Rizzo* might have come out differently if the evidence had showed that every person arrested by the Philadelphia Police Department had their constitutional rights violated.

### B. Overriding State Law's Restoration Times Was the Least Intrusive Approach to Insure Compliance as Supported by the Record

1. <u>County Counsel's argument regarding an insufficient record is inaccurate</u>

County Counsel argue this Court lacked sufficient information to consider "the least intrusive approach or make the requisite findings." Dkt. 290 at 1. This Court cited to "the papers filed in support of this motion" in its order to implement the neutral expert's recommendations." Dkt. 271 at 1. Those papers include:

- Dr. Pinals' January 2022 report with 50 data sources including bed capacity reports, state contracts, county funding, state progress reports, hospital level of care (HLOC) policies and procedures. Dkt. 261-1
- Dr. Pinals' June 2022 report with 65 data sources including twice weekly data from Oregon State Hospital, Oregon Judicial Department memoranda, lists of states and length of stay for restoration, legislative alerts regarding SB 295, motions to intervene to enforce SB 295, and a death report of a person who was found unable to aid and assist but who died in Washington County Jail awaiting transport to OSH. Dkt. 261-2 pg. 2-5.
- Dr. Pinals' September 2022 report with over 35 data sources including data dashboards reflecting admission wait lists, patients found to no longer require hospital level of care, state hospital bed capacity, projections based on limiting restoration lengths of stay and the related discharge planning. Cooper Decl., Exhibit 1.
- Data regarding the impact SB 24 and SB 295 had on reducing the pace of hospital admissions. *See e.g.* Dkt. 264 ¶ 6, Exhibit 1
- Defendants monthly progress reports. *See* e.g. ECF No. 240, Dkt. 261 and 261-1.
- A summary of state restoration statutes published in Journal of the American Academy of Psychiatry and the Law. Dkt. 261-2 p. 14.

In addition to these hundreds of pages of documents, Dr. Pinals singled out reducing hospital competency restoration stays in her June 2022 report based on ten years' worth of data from Oregon State Hospital. Dkt. 261-2 pgs. 13-14, 27- 31. After summarizing the decades' long data, Dr. Pinals concluded that limiting restoration stays would allow the state hospital to serve hundreds of additional patients every year including those waiting in jail over seven days for admission. *Id.* at p. 13. Here, there is an extensive record for this Court to rely upon to render its decisions. To the extent the Court wishes to reissue its September order by citing to the pertinent parts of Dr. Pinals' reports that support the scope of its order, Plaintiffs do not object.

As a general matter, courts routinely find that recommendations from an expert are adequate justification for remedial injunctions consistent with those recommendations. *See, e.g., Stone*, 968 F.2d at 863 (approvingly citing the district court decision allowing "the City to consider the Special Master's recommendations and formulate its own plan" as "consistent with comity and institutional competence concerns"); *United States v. Washington*, 853 F.3d 946, 973-75 (9th Cir. 2017) (finding trial court adequately tailored relief in requiring the removal of

certain salmon barriers, in part by relying on expert testimony that such barrier removal got the best "bang for the buck"); *Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir. 1986)(holding "district court's choice of remedy" in prison litigation was "proper exercise of discretion" where it was supported by expert testimony). County Counsel present no contrary expert evidence impeaching Dr. Pinals' reports, nor do they provide the Court with case law showing that courts relying on similar expert testimony abuse their discretion in setting remedial orders.

2. <u>Recent legislation has had no appreciable impact on the demand for finite state hospital capacity.</u>

County Counsel ask this Court to defer to SB 295 and ORS 161.371 as a "framework for addressing the issues surrounding the treatment of mentally ill Oregonians that is significantly less intrusive than the measures proposed by this court." Dkt. 290 at 5. It is unclear if County Counsel have read either Plaintiffs supplemental briefing (Dkt. 265 at 6-8), the data projections after SB 295 passed (Wehr Declaration ¶ 6), or Dr. Pinals' reports discussing the lack of appreciable change to the demand for hospital beds even after this legislation was passed. For example, in Dr. Pinals' January 2022 Report, she references SB 295 repeatedly and how stakeholders ranging from OJD, DOJ, OHA, OSH, and defense attorneys have reported "little traction" has been made despite these changes to the law. Dkt. 261-1 p. 11, 14, 19, and 20. Ultimately, the data itself demonstrates neither SB 295 nor ORS 161.371 was able to provide a workable framework to ensure compliance with the constitution. *See* Wehr Decl. at ¶ 6.

3. <u>Oregon State Hospital is at capacity and building a third state hospital will not happen in the short term ensuring timely compliance.</u>

Instead of referencing the record before this Court, County Counsel offer some "potential alternatives" to remedy the violation of the Court's permanent injunction. Dkt. 290 at 9. These purported alternatives begin with a recommendation for Oregon State Hospital (OSH) to provide

more beds within its existing facilities based on misplaced assertions that more beds "appear to exist". *Id.* County Counsel misread a 2005 data point from a 2022 chart showing an "average daily population" to claim that there should be 850 beds to serve patients. *Id.* at 10. Again, it is unclear if County Counsel read Dr. Pinals reports. Citing to the "Net Bed Capacity Report," Dr. Pinals notes a total licensed capacity for 743 beds but an active capacity of 706 beds. Dkt. 261-1, p. 7 and 14; *see also* Dr. Pinals Third Report (Cooper Decl. Ex. A at 7)("The census at OSH remains nearly at capacity without major shifts from prior reports.") The reduction from nearly 850 daily population to closer to 700 is due to several factors including the closure of several outdated facilities. *See* Wehr Decl. ¶¶ 9-11.

In addition to misunderstanding state hospital capacity, County Counsel fail to explain why building a new state hospital can happen soon, thereby being a reasonable alternative to ensure compliance with the constitution and this Court's injunction. The Court can reasonably infer that construction of new facilities will take years, during which time the counties propose no meaningful redress for the ongoing constitutional harms. A plan to address years' long constitutional violations by requiring people to endure them for years more is no plan at all.

    4.    <u>Efforts to contract with private providers for additional bed capacity are needed but will not be adequate on their own.</u>

County Counsel wrongly allege, "The parties also fail to provide timelines or costs for contracting with private providers such as Telecare or Cascadia" so that this Court may determine "if this alternative is inadequate." Dkt. 290 at 12. Enforcement of county contracts and related efforts to expand system capacity was an ongoing topic throughout the parties' settlement talks. For example, in Dr. Pinals June 2022 Report, she notes both the "contractual requirements reviews" and the ongoing consultations to issue this recommendation:

> OHA should review existing contracts with the CCOs [Community Care Organizations] and CMHP's [County Mental Health Providers] to determine the scope of the existing

> contractual obligations to serve the Aid and Assist and GEI population. I understand these discussions are also happening in the legislative workgroups, but a focus on this population in particular is imperative and urgent. For example, OHA should explain to both CCOs and CMHPs that transport back to community from OSH through Non-Emergency Transport Provider (NEMT) is a Medicaid funded service, and OHA should work further with OJD to review this option given OJDs interest in this as a potentially helpful addition to increase timely transports from OSH. OHA should provide monthly updates on this in its regular progress reports to the Neutral Expert.

Dkt. 261-2 at 26. In addition to this work happening, County Counsel also fail to acknowledge that Defendants did enter into a contract with the Northwest Regional Re-entry Center (NWRRC) to provide additional capacity.

    5.    <u>Validated 2022 wait time data indicates consistent lack of compliance with a seven-day deadline.</u>

County Counsel allege that this Court relied upon Plaintiffs' representation of current wait times being nearly 40 days raising "some question about the validity of this number." Dkt. 290 at 12-13. The average wait time for admission in July 2022 was 39.2 days. *See* Wehr Declaration ¶ 12. Dr. Pinals also noted the continued high demand for state hospital admissions in her September 2022 report: "A&A orders continue to remain high with some lighter months but overall orders per month are at a higher base rate than historic numbers and continue to climb…. to achieve Mink compliance and Olmstead requirements this trend continues to need addressing." *Id.* at 7-8.

    6.    <u>Oregon State Hospital has already suspended the 30-Day Hold.</u>

County Counsel goes on to cite to Dr. Pinals' June report regarding ending the practice of holding patients thirty days after the restoration clinical finding (e.g. "able," "med never," "not able," and "never able") and the parties' failure to explain "why this limited alternative was inadequate." Dkt. 290 at 1-14. However, County Counsel fail to discuss the nuance of her recommendation; namely, her recommendation focused exclusively on the patients who are determined "able." Here is Dr. Pinals' recommendation in its entirety:

> "By June 2022, OHA should re-establish prior policy and discharge .370 defendants back to the committing county upon a forensic evaluation of "able." For now, those individuals opined as "never able," or "med never" *should be further studied* for potential process change to support direct community discharge, if clinically appropriate, with CMHP assistance rather than routing back to jail. *This will require further discussion*. For those individuals for whom an evaluator opines they are "able" OHA should stop its temporary policy established during the pandemic of keeping defendants up to 30 days past the evaluation where a party has contested that finding. This has contributed to extended lengths of stay for many individuals. Although it is understood that the official finding is based on an adjudication, for most cases as noted in the data above, when there are external evaluations, they agree with the original forensic review."

*Id* (emphasis added). Dr. Pinals is also considering the other clinical alternatives County Counsel raised including bed utilization (see June Report p. 22) and shortening evaluation timelines for hospital level of care (HLOC) reviews (indeed evaluation efficiencies are reflected in her second and third recommendations in her January Report; in June, she recommended: "Continue to examine community barriers to preventing unnecessary admissions and diverting individuals from admission and from HLOC when those levels of care or placements are not clinically appropriate, maximizing the utilization of hospital beds for those in need of a hospital to support their recovery.) Ultimately, Plaintiffs' understanding of Dr. Pinals' work is that her recommendations focused on which alternatives will mitigate the harm to individuals waiting in jail in the short term, how the state may reach compliance sooner and what requires further discussion to ensure clinical appropriateness. Dr. Pinals clearly explained her recommendation of imposing maximum lengths of stay based on legal considerations, clinical data, and the practice of other states. This is a sufficient record for this Court to rely upon to issue its ruling.

7. <u>Jail based restoration requires an override of state law.</u>

Finally, County Counsel raises "one other potential alternative" as the state hospital "providing some limited services to persons waiting in local jails." Defendants fail to acknowledge that, by operation of Oregon law, a person subject to a 370 order is committed "to the custody of the superintendent of a state mental hospital…". Or. Rev. Stat. § 161.370(2)(a).

From the moment the state court judge signs the order, the person is in the legal custody of the Defendants. Thus, County Counsel appear to undercut their own argument that this Court failed to consider less intrusive compliance alternatives when they argue that Defendants could provide pretrial detainees with any competency restoration services including but not limited to medication management, requiring an override of state law. If overriding a state law is an option for County Counsel, it is unclear why continuing to hold individuals in county jails is preferable. Through this suggestion, County Counsel proposes undermining the entire purpose of this case.

### III. The Parties Directly Affected by the Court Order in This Matter - OSH and OHA - Do Not Object to the Scope, Justification, or Tailoring of the Order

The premise of the County Counsel arguments around the Court's authority, *see* Dkt. 290 at 2-5, appeals to general doctrines arising from federalism and the limited role of federal courts. *See, e.g., Stone*, 968 F.2d at 861 ("[F]ederal courts should always seek to minimize interference with legitimate state activities in tailoring remedies."). None of the cases cited or discussed by the counties address the unique set of circumstances at issue here: Defendant parties subject to the order of the court are state agencies, and the state agencies do not object to the Plaintiffs motion and the resulting exercise of the Court's remedial authority. County Counsel appear to admit that their relative interest is only in the downstream, indirect effects of the September order, but nowhere explain why the counties have the authority to address the state's interests better than state agencies already before the Court. *See* Dkt. 290 at 6-9.

Federalism concerns apply where "the exercise of authority by state officials is attacked," and "federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo*, 423 U.S. at 378. "Our federalism" is a doctrine of "proper respect for state functions" and recognition of our nation as "a Union of separate state governments." *Younger v. Harris*, 401 U.S. 37, 44

(1971). The exercise of authority by OHA and OSH officials is the subject matter of this litigation and the September Order. OHA and OSH have their own sense of the "special delicacy" of their role in this matter. *Cf. Perry v. Schwarzenegger*, 630 F.3d 898, 905 (9th Cir. 2011) (holding Imperial County had no standing to intervene in marriage case to take a position adverse to California's, because marriage is a "matter of statewide concern rather than a municipal affair"). Neither Marion County nor Washington County are one of the fifty states; thus, their intervention on behalf of the state and questioning this Court's authority is improper.

The counties have only put themselves forward as amici in this case. Amici do not have the capacity to raise issues not raised by parties. *United States v. City of Los Angeles*, 288 F.3d 391, 400 (9th Cir. 2002) (amici lack capacity "to raise issues or arguments formally"). County Counsel have not sought, much less obtained, permission from the court to intervene.

The proposed remedies that would supposedly avoid the federalism problems identified by the counties include having this court order the state to create more hospital beds and to provide restoration services in jails. Dkt. 290 at 9-10, 14. According to counties' logic, having a federal court enmesh itself deeper in the operations of the state hospital and overriding state law to force OHA to operate their services in ways that the state agencies do not endorse, would somehow vindicate federalism interests. Despite the counties' efforts to have a federal court coerce the state agencies to operate in the way the counties would prefer (often involving state agency resources rather than county or community-based alternatives), this overture bears no resemblance to the basic concept of federalism. The parties actually standing before the Court who are directly affected by the September order do not claim that the Order's scope was unnecessary or excessive. The Court should discount the appeals from a non-party to protect Defendants' interests in ways Defendants neither advance nor embrace on their own account.

## IV.     Conclusion

The record before this Court is replete with information and data.  Dr. Pinals has spent nearly a year studying Oregon's system including reviewing hundreds of data sources, meeting with dozens of stakeholders, and issuing her recommendations (Dkts. 261-, -2 and Cooper Decl. Ex. 1).  Most recently, she participated in stakeholder meetings to discuss this Court's recent modification and ultimately recognized the improper use of the aid and assist system:

> It should be noted that there have been many excellent questions raised about Judge Mosman's orders. Many of them have to do with issues of homelessness, availability of ACT [Assertive Community Treatment] teams and other supports for individuals in the community. In hearing these questions from stakeholders, it appears even more clear that the Oregon system, like others across the United States, has come to rely on Aid and Assist processes as a means to access general supports and care for people with serious mental illness, intellectual and developmental disorders, substance use disorders and other conditions in need, rather than entirely for its intended purpose, which is to restore defendants in order to be criminally prosecuted at all.

Cooper Decl. Ex. 1 at 19-20. Dr. Pinals concludes without restoration limits "there will be the ongoing potential to keep defendants in restorative service indefinitely, with rising costs and diminishing gain..." *Id.* at 20.  Without these limits, there will be over two hundred and fifty individuals waiting in jail for these services by December 2023.  Wehr Decl. Ex. 3.  With the limitation, no one will wait longer than seven days by February 2023.  *Id.*

DATED this 3rd day of November, 2022.

| DISABILITY RIGHTS OREGON | LEVI MERRITHEW HORST PC |
|---|---|
| /s/ Emily Cooper<br>Emily Cooper OSB # 182254<br>ecooper@droregon.org<br>Thomas Stenson, OSB # 152894<br>tstenson@droregon.org<br>511 SW 10th, Suite 200<br>Portland OR 97205<br>Tel:    (503) 243 2081 | /s Jesse Merrithew<br>Jesse Merrithew OSB # 074564<br>jesse@lmhlegal.com<br>610 SW Alder Street, Suite 415<br>Portland, Oregon 97205<br>Telephone: (971) 229-1241<br><br>*Counsel for Plaintiffs* |