Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

Jesse Merrithew OSB #074564
jesse@lmhlegal.com
**Levi Merrithew Horst PC**
610 SW Alder Street, Suite 415
Portland, Oregon 97205
(971) 229-1241
*Counsel for Plaintiff, Metropolitan Public Defender*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital,<br><br>Defendants. | Case No.  3:02-cv-00339-MO (Lead Case)<br>Case No.  3:21-cv-01637-MO (Member Case)<br>Case No. 6:22-cv-01460-MO (Member Case)<br><br>PLAINTIFFS' MOTION TO CLARIFY ORDER ON INTERVENTION |

JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON,

        Plaintiffs,

     v.

DOLORES MATTEUCCI, Superintendent of the Oregon State Hospital, in her individual and official capacity, PATRICK ALLEN, Director of the Oregon Health Authority, in his individual and official capacity,

        Defendants.

Case No.  3:21-cv-01637-MO (Member Case)

## CERTIFICATION UNDER LOCAL RULE 7-1

Plaintiffs' counsel certifies that they contacted counsel for the Defendants and the Intervenors. The State Defendants do not oppose the motion to clarify, but the Hospital Corporations oppose the motion.

## PLAINTIFFS' MOTION TO CLARIFY OR AMEND ORDER ON INTERVENTION

*Mink* Plaintiffs Metropolitan Public Defender (MPD) and Disability Rights Oregon (DRO) respectfully move this court to clarify or amend its order granting intervenor status to Hospital Corporations.  Dkt. 299.  Intervenor Hospital Corporations filed a motion to intervene in this matter on September 28, 2022, both on their own behalf and on behalf of third parties, patients civilly committed to their hospitals. Dkt. 281. Plaintiffs MPD and DRO opposed that motion on October 12, 2022, both on the general topic of intervention and on the question of whether intervenors could properly represent the interests of civilly committed patients. Dkt. 296. On October 13, 2022, this Court issued an order that read: "The Health Systems' Motion to Intervene (281) is GRANTED." Dkt. 299. The Court's Order did not explain whether it was

granting the Hospital Corporation's motion to intervene on their own behalf or on behalf of civilly committed patients. Plaintiffs MPD and DRO now ask the Court to clarify that point.

Hospital Corporations[1] have filed a related pleading in a consolidated matter, an amended complaint against Pat Allen as the head of the Oregon Health Authority. Dkt. 327. That pleading purports to seek standing by the Hospital Corporations on their own behalf and on behalf of the civilly committed patients. *Id*. Plaintiff DRO presented a brief supporting the motion to dismiss the Hospital Corporations' complaint in *Legacy Emanuel Hospital*, acting as putative amicus curiae and explaining the substantial conflicts of interest between the Hospital Corporations and their civilly committed patients. *Legacy Emanuel Hospital* Dkt. 32-1.

As a companion to that briefing, *Mink* Plaintiffs ask this Court to clarify whether Hospital Corporations have been permitted to intervene in *Mink*, not just on their own behalf, but on behalf of their patients. To the extent that the Court intended to allow the Intervenors to appear on behalf of third parties, *Mink* Plaintiffs ask the court to amend that order or to reconsider that order. This motion is brought pursuant to the Court's inherent authorities to clarify, modify, and rescind its orders. *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am*., 784 F.2d 1472, 1474-75 (9th Cir. 1986) ("[A] district court retains the inherent equitable power to rescind, modify, clarify, or enforce" its orders.").

*Mink* Plaintiffs ask the Court to consider the briefing in *Legacy Emanuel Hospital*, the Plaintiffs' original opposition to the Hospital Corporations' motion to intervene, and this motion

---

[1] Hospital Corporations in the *Legacy Emanuel Hospital* case include essentially the same parties as the Hospital Corporations in *Mink* and are represented by the same attorneys. St. Charles Health System is one of the plaintiffs in *Legacy Emanuel Hospital*, but not one of the intervenors in *Mink*. *Mink* Plaintiffs are not aware of any material difference in terms of the positions of the Hospital Corporations that have intervened in *Mink* and the Hospital Corporations who are plaintiffs in *Legacy Emanuel Hospital*, so both collections of parties will be referred to as Hospital Corporations unless context requires otherwise.

in rendering its decision. *Mink* Plaintiffs will summarize but not restate the arguments and citations made elsewhere. We respectfully ask this court to clarify or to amend its October 13, 2022 order to restrict the role of Hospital Corporations to raising claims on their own behalf and to hold that Hospital Corporations lack standing to advance the third-party claims of civilly committed patients. Dkt. 299.

## MEMORANDUM OF LAW

As previously noted, a putative intervenor in the Ninth Circuit must show their application is timely, that they have a "significantly protectable interest" relating to the property or transaction at issue, that the disposition of this action may impair or impede the ability to protect the interest, and that the interest is not adequately protected by the parties to the action. *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). Moreover, the Supreme Court has made clear that an intervenor must establish Article III standing, including Article III's injury-in-fact requirement. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("[A]n intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing.").

With respect to the Intervenor Hospital Corporations and their third-party standing claims, the request to be allowed to intervene in a 20-year-old piece of litigation *and* to represent the interests of a third-party embraces efforts to engage in two different highly disfavored civil procedure steps at the same time. Established case law shows third-party standing to be highly disfavored. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *Miller v. Albright*, 523 U.S. 420, 445 (1998)*; Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987). Courts are likewise highly skeptical of efforts to intervene late in the

process of ongoing litigation. *Alisal Water*, 370 F.3d at 922; *California Dep't of Toxic Substances Control v. Com. Realty Projects, Inc*., 309 F.3d 1113, 1119 (9th Cir. 2002).

**A.     Legal Intervention Standards**

       1.     <u>Hospital Corporations Failed to Timely Intervene</u>

Plaintiffs stand by and cite to their prior briefing on intervention. Dkt. 296. The arguments regarding the untimely nature of the motion to intervene remain valid and important. Dkt. 296, at 3-6. The third-party claims on behalf of civilly committed patients are equally untimely as the claims of Hospital Corporations themselves.

       2.     <u>Hospital Corporations Fail to Show a Significantly Protectable Interest</u>

With regards to whether the civilly committed patients have a "significantly protectable interest" in the *Mink* litigation, the current third-party injury alleged by Hospital Corporations appears to stem from two sources: 1) OHA's 2019 policy regarding the prioritization of admissions to the Oregon State Hospital (OSH), and 2) the maltreatment of civilly committed patients while housed by the Hospital Corporations. Neither of those issues fundamentally relate to nor could be resolved by altering any order in *Mink*. While Hospital Corporations seek amendment of this Court's September 1, 2022 order, they also concede that admissions of civilly committed patients to the state hospital were sharply limited, not as a result of the September 1 order, but as a result of the independent actions of the Oregon Health Authority (OHA) and OSH years earlier. *See, e.g.,* Dkt. 284, at 23 (noting that the September 1 order "incorporates OSH's existing practice"). Vacating or rescinding any portion of the September 1 order would not alter OHA's or OSH's practices in admitting patients to the state hospital. Whatever interests the Hospital Corporations' civilly committed patients have in affecting the admissions priorities would not be protected by rescission of the September 1 order.

The only other third-party "interest" alleged by Hospital Corporations is that Section 3 of the order "imposes discharge timelines for OSH patients regardless of their clinical status and whether they are ready for discharge to the community." Dkt. 284, at 23. However, those timelines apply to *aid-and-assist detainees*, not to the civilly committed patients. The interests of aid-and-assist detainees are already represented by the Plaintiffs in *Mink*. Hospital Corporations cannot seek relief or raise claims regarding the rights of people with mental illness already represented by another attorney and on whom the Hospital Corporations have made no assertion of third-party standing. The speculative, remote chain of causation posited by Hospital Corporations that the timing of releases of aid-and-assist patients under Section 3 will have some cognizable indirect negative effect on civilly committed patients because of the general limited and interrelated nature of mental health resources is not adequate to constitute a significant protectable interest. *Alisal Water Corp.*, 370 F.3d at 920 (mere generalized interest in the limited availability of funds was not a basis to allow a litigant's creditor to intervene where the putative intervenor's interest was "several degrees removed" from present matter).

Other than seeking amendment of this Court's August 16th order and September 1st order, Hospital Corporations have not sought any other relief in the *Mink* case, either on their own behalf or on behalf of the patients. Hospital Intervenors take no steps to protect any other interests those patients might have nor could they, given their conflicts of interest.

3.    <u>Hospital Corporations Fail to Show Patients' Interest Not Adequately Protected by Parties to the Action</u>

The final prong of the main intervention test is that a party in intervention must show that the interests of the party in intervention are not already "adequately protected by parties to the action." *Alisal Water*, 370 F.3d at 919. Had the Court intended to allow third-party standing for Hospital Corporations, it would be remarkable to allow that third-party standing without a single

comment about whether Disability Rights Oregon (DRO) or Metropolitan Public Defender (MPD) adequately represents the interests of civilly committed people, since both entities serve as the attorneys and direct representatives of people facing civil commitment proceedings (DRO in Multnomah County and MPD in Washington County).

In addition to the role of two organizational plaintiffs in *Mink* as the actual attorneys for people facing civil commitments, DRO is a federally designated protection and advocacy system, specifically created for the purpose of representing the interests of people with mental illnesses, as particularly recognized by the Ninth Circuit in this specific case. *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003). Plaintiff DRO's special role to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness" is not only the law of the Ninth Circuit but the law *of this case.* 42 U.S.C. 10805(a)(1)(B); *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("law of case" doctrine holds that court generally precluded from reconsidering an issue already decided by same court or higher court in identical case). Departure from that rule would require some written rationale for finding why Plaintiff DRO, after being deemed an adequate representative of the rights of people with mental illnesses in Oregon in this case, could not be considered an adequate representative of civilly committed patients in this matter. The absence of such an explanation and the brevity of the order on intervention indicate to plaintiffs that the Court did not intend to approve third-party standing by Hospital Corporations to represent the interests of patients.

MPD and DRO are both adequate parties to assert the interests of civilly committed patients, to the extent that their interest are at stake in this matter. They both have an existing attorney-client relationship with civilly committed patients in two of the most populous counties in Oregon. MPD has a longer history as a legal representative of civilly committed patients,

while DRO has a unique statutory basis to represent the civilly committed patients. Unlike Hospital Corporations, neither *Mink* Plaintiff has substantial conflicts of interest or adverse financial interests with civilly committed patients.

The only real argument on this point raised by Hospital Corporations is that, in their opinion, the rights and interests of civilly committed patients are not being represented. Dkt. 281, at 23 (complaining that "existing parties to this case have already demonstrated that they will not, and do not, adequately represent the interests of civilly committed patients"). That logic presupposes that the desired outcomes identified by the Hospital Corporations correctly assess the interests and rights of civilly committed patients, which for reasons discussed below, the Court should have grave cause to doubt.

In assessing the actual interests of civilly committed patients, the Court should consider the reality that Hospital Intervenors admit: that civilly committed patients and aid-and-assist patients are not two starkly different classes of patients, but largely the same group of people with mental illnesses, involved in the justice system, and subject to court orders restraining their liberty. *See* Dkt. 281, at 25 (noting that "all involuntarily committed patients," under aid-and-assist, GEI, or civil commitment "are quite literally the same people in many instances."). If the population of people with mental illness engaged with the legal system is a single population, then it is not really possible for DRO or MPD to favor one group of people with mental illness over another or to neglect the interests of one group or the other. Patients currently on civil commitment are at substantial risk of being on aid-and-assist commitment in the future, and vice versa.

In the context of the current limitations of mental health resources, DRO and MPD have correctly judged two things. First, a person with mental illness who might be subject to either an

aid-and-assist commitment in the future or a civil commitment in the future would prefer to avoid a lengthy stay in the county jail. While a lengthy stay in a community hospital might be undesirable for some patients, that person with mental illness would rather have a system that minimizes time spent in jail, even if that comes at the expense of a risk of spending more time in a community hospital. Second, that practical reality has legal significance. The Due Process interest in avoiding a prolonged incarceration in jail is more significant than the interest in avoiding a prolonged stay in a private hospital versus the state hospital. A hospital room, even when it is undesirable or inappropriate, is simply categorically different from a jail cell.[2] Plaintiffs MPD and DRO do not refuse to advance the interests of civilly committed patients by recognizing legal and practical realities.

The Plaintiffs MPD and DRO's discussion of this temporary prioritization is limited to the present circumstances and the current shortfall in placements for "all involuntarily committed patients" in Oregon. Plaintiffs MPD and DRO have not relented in seeking to hold OHA and OSH accountable and to ensure that, across the long term, adequate resources are developed 1) to ensure adequate community placements and services exist to minimize the number of people with mental illness are placed in any kind of involuntary commitment and 2) to ensure that, when commitment is ordered, prompt and appropriate treatment is available. Considering that Plaintiffs MPD and DRO also have no financial conflict of interest or aversion to seeing that private hospitals play their part in the interim and in the long-term, their role advocating for

---

[2] Oregon mental health law recognizes and supports this obvious distinction between a hospital and a jail. A person facing civil commitment can be held in a community hospital or nonhospital facility while awaiting a hearing, ORS 426.235, and can be committed to a community hospital or nonhospital setting if it is determined to be an appropriate placement. ORS 426.005(1)(c). However, a person facing civil commitment can *never* be placed in a jail cell while awaiting commitment proceedings or as a form of commitment. ORS 426.140(1).

people with mental illness, including people in civil commitment, is more appropriate given the lack of conflicts and established jurisprudence regarding our standing.

### B. Hospital Corporations Do Not Have Standing and Cannot Assert Third-Party Standing to Advocate for Patients' Interests

Hospital Corporations do not claim to have standing on their own to assert the rights of their patients but claim that they have third-party standing to do so. Dkt. 281, at 20-21. A party must show that they have standing to intervene. *Town of Chester*, 137 S. Ct. at 165; *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1234 (9th Cir. 2017). Because standing to intervene "is assessed based on the claims asserted . . . and the type of injury alleged," Hospital Corporations must demonstrate separate standing to bring claims on behalf of patients. *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 910 (9th Cir. 2020). Since Hospital Corporations lack standing in their own right to do so, their capacity to intervene on behalf of the patients depends on their capacity to meet all the requirements of third party standing: injury in fact, a close relationship with the third party, and some hindrance of the third-party's access to the court. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

A party cannot show a "close relationship" with the third party if they harbor a conflict of interest. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081-82 (9th Cir. 1987). Plaintiff DRO's amicus memorandum in the *Legacy Emanuel Hospital* case adequately outlined the substantial conflicts of interest that surround Hospital Corporations' attempts to represent the interests of their patients. *Legacy Emanuel Hospital* Dkt. 32-1. Hospital Corporations have obvious conflicts of interest in attempting to refuse care to the patients they seek to represent, not the traditional

alignment of interests where a physician seeks to ensure they can provide treatments to their patients. *Id.* at 6-9. The inadequacy of behavioral health treatment in their hospitals is not the product of impossibility or legal restriction, but the choices that Hospital Corporations make in deciding how their hospitals are "equipped, staffed, and intended" to serve patients. *Id.* at 9-10. Hospital Corporations' descriptions of their own services document serious violations of patient rights and clear means for Hospital Corporations to mitigate the harm to their patients. *Id.* at 10-14. Hospital Corporations repeatedly describe their civilly committed patients as undesirable burdens on their finances and operations in their own pleadings. *Id*. at 14-15. They similarly use terminology and arguments that disparage and harm the interests of their patients, by dramatizing and emphasizing their dangerousness. *Id.* at 15-17. They make obvious errors in assessing what is actually in the interests of their patients. *Id.* at 17-19. They have failed to show more than a conclusory assertion of hindrance to the patients' access to the Court. *Id.* at 19-21.

Hospital Corporations have used similar inflammatory and derogatory language to describe the people they purport to represent in the *Mink* matter. Much of the derogatory language emphasizing the dangerousness of the patients Hospital Corporations serve is restated in the *Mink* pleadings. Hospital Corporations chose to recite verbatim in a motion in *Mink*, complete with all-caps emphasis, a passage from the *Legacy* complaint in which a psychiatrist described a patient as "ONE OF THE MOST DANGEROUS patients" the provider had treated in "30 plus years as a psychiatrist." Dkt. 284, at 19. Elsewhere, they complain that "care providers and other patients are routinely assaulted (be it kicked, punched, shoved, bitten, or subjected to sexual advances)" by civilly committed patients. *Id.* at 20. In their reply on the same motion, Hospital Corporations state the "high acuity and criminal history of many of these patients create a significant safety risk for the Hospitals' staff and patients." Dkt. 316, at 20.

Hospital Intervenors filed a declaration discussing a patient transported from OSH to Unity Hospital, "during which time he hit a staff person 28 times," who was then civilly committed and admitted to OSH under the expedited admission process after staying at Unity for two weeks. Dkt. 317, at 3. The declaration also traced civil commitments to "worsening violence-in-the-workplace," "increased staff turnover[,] and deteriorating financial sustainability." *Id* . at 4. Most stark, Hospital Corporations argue that it is "inevitable that more patients will be discharged,"[3] remarking "the worst is yet to come," citing patients "indicted for violent felonies who will soon be released" and mentioning two "indicted for murder" soon to be released.[4] Dkt. 315, at 23.

The endless drumbeat of disparaging language clearly intended to induce fear in the Court of people with mental illness is at odds with the stated intent of Hospital Corporations to encourage OHA to foster more long-term placements. Such rhetoric in public pleadings would discourage any reader from wanting long-term placements housing such individuals in their communities. In *Mink* as in *Legacy Memorial Hospital*, Hospital Corporations repeatedly emphasize the dangerousness of their patients, often discussing their criminal charges even where the underlying criminal case has nothing to do with the course of treatment. While this focus may prove advantageous in putting forward Hospital Corporations' *own* claims regarding

---

[3] Although it appears Hospital Corporations are specifically referring to the release of aid-and-assist detainees from OSH in this passage, their rhetoric and anecdotes make it clear that these patients are the same as the civilly committed patients they claim to represent. In the supporting declaration, four anecdotes are told about patients recently released from aid-and-assist detention at OSH. Dkt. 317, ¶¶2-6. Two of the patients in the anecdotes were then civilly committed, and the declarant speculates that the other two will decompensate and "likely" return on a civil commitment.

[4] Beyond the extraordinary rhetoric, the factual reliability of these assertions is seriously in doubt. The allegations about future patients likely to be released contain no citation to admissible evidence at all. After the submission of the Hospital Corporations' declarations, Defendants submitted a declaration that these assertions were in error and that the cases referenced were in fact detainees released after being found "never able" and that the September 1 order had no bearing on their release. Dkt. 320. Hospital Corporations failed to rebut this and have produced no further evidence of the veracity of these allegations a month later.

civilly committed patients being an expensive nuisance to them, this excessive focus on their patients as dangerous and disruptive is obviously at odds with the patients' interests to receive therapeutic mental health care in the least restrictive setting consistent with their care needs.

## CONCLUSION

Hospital Corporations complain that OHA "foist[s] responsibility for the entire civil commitment system onto acute care hospitals," and seeks through its pleadings in *Mink* and *Legacy* to foist that responsibility right back on OHA. Dkt. 284, at 21. They reject the "burden of providing care for 'unfit' patients. . . ." *Id.* at 22. While Hospital Corporations are free to bring legal action to divest themselves of the financial and operational burdens of caring for undesirable patients, they cannot purport to represent the interests of civilly committed patients at the same time they disparage them. No one would hire an attorney to represent them by referring to the client with phrases like "the worst is yet to come." The Court should not allow Hospital Corporations to take up the patients' claims.

Hospital Corporations have neither shown that the nominal interests of patients that they pursue constitutes a significant protectable interest, nor that the present organizational plaintiffs are unable to adequately pursue the interests of the patients. Because Hospital Corporations lack traditional standing regarding another person's rights and cannot assert third-party standing on behalf of their patients, Hospital Intervenors fail to show the required standing to intervene on behalf of the patients For the reasons stated above, *Mink* Plaintiffs MPD and DRO ask the Court to clarify its order on intervention to exclude the possibility of third-party standing and to prevent Hospital Corporations from asserting the interests of their civilly committed patients.

//

//

DATED December 23, 2022.

LEVI MERRITHEW HORST PC

/s *Jesse Merrithew*
Jesse Merrithew OSB # 074564
jesse@lmhlegal.com
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

*Counsel for Plaintiffs Metropolitan Public Defender,*
*Jarrod Bowman, and Joshawn Douglas-Simpson*

DISABILITY RIGHTS OREGON

/s *Emily Cooper*
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:     (503) 243 2081
FAX:   (503) 243 1738

*Counsel for Plaintiff Disability Rights Oregon*