**Eric J. Neiman, OSB #823513**
Eric.Neiman@lewisbrisbois.com
**Emma P. Pelkey, OSB #144029**
Emma.Pelkey@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800
Facsimile: 971.712.2801

**Thomas R. Johnson, OSB #010645**
TRJohnson@perkinscoie.com
**Alex Van Rysselberghe, OSB #174836**
AVanRysselberghe@perkinscoie.com
PERKINS COIE, LLP
1120 NW Couch Street, Tenth Floor
Portland, OR 97209
Telephone: 503.727.2000
Facsimile: 503.727.2222

*Attorneys for Intervenors and Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDERS INCORPORATED, and A.J. MADISON, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK ALLEN, in his official capacity as Director of Oregon Health Authority, DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, <br><br> Defendants, <br><br> and | Case No. 3:02-cv-00339-MO (Lead Case) <br> Case No. 3:21-cv-01637-MO (Member Case) <br> Case No. 6:22-CV-01460-MO (Member Case) <br><br> **REPLY IN SUPPORT OF MOTION TO DISSOLVE OR MODIFY THE SEPTEMBER 1, 2022 INJUNCTION** <br><br> **By Intervenors and Plaintiffs Legacy Emanuel Hospital & Health Center d/b/a Unity Center for Behavior Health, Legacy Health System, PeaceHealth, and Providence Health & Services – Oregon** <br><br> ***Oral argument: November 21, 2022, 1:30 PM*** |

REPLY IN SUPPORT OF MOTION
TO DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

159036593.6

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH, LEGACY
HEALTH SYSTEM, PEACEHEALTH, and
PROVIDENCE HEALTH & SERVICES –
OREGON,

       Intervenors.

---

JAROD BOWMAN, JOSHAWN
DOUGLAS-SIMPSON,

       Plaintiffs,

    v.

DOLORES MATTEUCCI, Superintendent of
the Oregon State Hospital, in her individual
and official capacity, PATRICK ALLEN,
Director of the Oregon Health Authority, in
his individual and official capacity,

       Defendants,

   and

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH LEGACY
HEALTH SYSTEM, PEACEHEALTH, and
PROVIDENCE HEALTH & SERVICES,

       Intervenors.

Case No. 3:21-cv-01637-MO (Member Case)

---

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

       Plaintiffs,

    v.

PATRICK ALLEN, in his official capacity as
Director of Oregon Health Authority,

       Defendant.

Case No. 6:22-CV-01460-MO (Member Case)

REPLY IN SUPPORT OF MOTION
TO DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION

159036593.6

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

# Table of Contents

**Page**

I.  Introduction ........................................................................................................ 1

II.  The Court should reject the Parties' arguments regarding which Rule applies ............ 4

III.  The Court should dissolve the Injunction or at least modify Sections 2.b. and 3 ......... 6

A.  Section 2.b. of the September 1 Injunction should be dissolved. .................................... 9

B.  Section 3 of the September 1 Injunction should be dissolved or at least modified. ...... 13

IV.  Hospitals have provided sufficient evidence to revisit the September 1 Injunction ... 20

V.  Conclusion ....................................................................................................... 22

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

## Table of Authorities

Page

CASES

Bowman v. Matteucci,
No. 3:21-cv-01637, 2021 WL 5316440 (D. Or., Nov. 15, 2021) ....................................10, 23

Clark v. Coye,
60 F.3d 600 (9th Cir. 1995) ......................................................................................6, 7, 12

Dombrowski v. Pfister,
380 U.S. 479 (1965)...............................................................................................................6

Legacy Health System, et al. v. Patrick Allen,
No. 6:22-cv-01460, ECF No. 1 (Sept. 28, 2022) ........................................................ passim

Ohlinger v. Watson,
652 F.2d 775 (9th Cir. 1980) ........................................................................................11, 23

Orantes-Hernandez v. Gonzales,
No. 82-01107, 2006 U.S. Dist. LEXIS 95388 (C.D. Cal. Oct. 11, 2006)...............................5

Spallone v. United States,
493 U.S. 265 (1990)...............................................................................................................6

Stone v. City & Cnty of San Francisco,
968 F.2d 850 (9th Cir. 1992) ...................................................................................... passim

Trueblood v. Wash. State Dept. of Social & Health Servs.,
822 F.3d 1037 (2016)......................................................................................................6, 12

Valdivia v. Schwarzenegger,
599 F.3d 984 (9th Cir. 2010) .................................................................................................7

STATUTES

ORS 161.370.........................................................................................................................15

ORS 161.371....................................................................................................................14, 20

ORS 426.010.........................................................................................................................11

ORS 426.060.........................................................................................................................11

ORS 426.225.........................................................................................................................11

TABLE OF AUTHORITIES - ii

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

159036593.6

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 60 ................................................................4, 5

Federal Rule of Civil Procedure 65 ................................................................4, 5

OAR 309-033-0520(3).........................................................................................18

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

159036593.6

Intervenors and Plaintiffs Legacy Emanuel Hospital & Health Center d/b/a Unity Center for Behavioral Health, Legacy Health System, PeaceHealth, and Providence Health & Services – Oregon ("Hospitals") hereby reply to the Responses to Hospitals' Motion to Dissolve or Modify the September 1, 2022 Injunction filed by Defendants Patrick Allen and Dolores Matteucci ("Defendants") and Plaintiffs Disability Rights Oregon, Metropolitan Public Defender Services, Inc., A.J. Madison, Jarod Bowman, and Joshawn Douglas-Simpson ("Plaintiffs").

## I.    Introduction

As this Court has observed, in litigation involving sprawling social problems, it is common for litigants to offer only piecemeal solutions to the greater puzzle.  ECF 273 at 3–4.

This case concerns a sprawling social problem: Oregon's statewide behavioral health crisis relating to individuals with mental illness.  But the parties throughout most of this litigation—the State, and two nonprofits representing criminal defendants—are just a few of many stakeholders involved.  Those parties have litigated the rights of aid-and-assist ("AA") and guilty-except-for-insanity ("GEI") patients, which is only one piece of the greater puzzle.

Although that piece is important, any workable and sustainable solution to this greater problem requires a comprehensive and collaborative approach that considers all necessary and impacted stakeholders.  Oregon's behavioral health crisis impacts a third population of patients, who have been absent from this litigation so far: civil commitment patients.

Each year, more than 500 civilly committed individuals require treatment in Oregon. And as detailed recently in a lawsuit filed by Hospitals, *see* Complaint for Declaratory and Injunctive Relief, *Legacy Health System, et al. v. Patrick Allen*, No. 6:22-cv-01460, ECF No. 1 (Sept. 28, 2022) ("Hospital Action"), these patients suffer ongoing constitutional harm, as do the community hospitals that are forced by the State to care for those patients.  In short, the Oregon Health Authority ("OHA") has been civilly committing these patients to involuntary detention and treatment, but refusing to transfer them to the Oregon State Hospital ("OSH") or a similarly

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 1

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

equipped long-term treatment facility for appropriate restorative treatment, as required by law. Instead, OHA simply leaves the patient in the acute care hospital that first received them. *Id.* But acute care hospitals are not designed to provide long-term, restorative treatment that patients need for the duration of their civil commitment. Rather, acute care hospitals are designed to provide stabilizing treatment to manage acute symptoms of patients experiencing severe mental health crises, before restorative treatment begins. Thus, where patients are abandoned in acute care hospitals, they do not get the long-term care and treatment they need and are entitled to by law. This violates patients' constitutional liberty rights, not to mention Hospitals' property rights. *Id.* (asserting claims based on violations of patients' Due Process rights and violations of Hospitals' Due Process and Takings rights).

Because Oregon's complex behavioral health system is interconnected, what affects AA and GEI patients also affects civil commitment patients (as well as the system as a whole). Here, Plaintiffs and Defendants coordinated efforts to devise an order, the September 1 Injunction, that left this Court with a single option—one that effectively takes over Oregon's behavioral health system and directly impacts both civil commitment patients and the acute care hospitals that commonly care for them. ECF 252; 271. One provision of the Injunction does so expressly: Section 2.b. bars virtually all civil commitment patients from being admitted into OSH, except in rare cases where they meet OSH's expedited admission criteria by actually injuring hospital staff, patients, or others in the hospital, or causing substantial property destruction (and even when this standard is met they are sometimes denied admission). ECF 271 at 2.[1] It also fails to provide alternative appropriate long-term placement options for the majority of civilly committed patients who do not qualify for expedited admission.

Another provision, Section 3, causes AA patients who are still acutely ill to be discharged prematurely from OSH without a safe discharge plan or place to go. *Id.* at 3–4. Once

---

[1] In citing to documents in the record with an ECF number, Hospitals use the ECF page number at the top-center of the page rather than the motion page number at the bottom-left of the page.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 2

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

discharged, these mentally ill individuals often will end up in the civil commitment system, where OHA violates their constitutional rights by abandoning them in acute care hospitals for long periods of time.  In many cases, acute care hospitals have held civilly committed individuals for weeks, months, or even the patient's entire 180-day commitment period (and sometimes additional recommitment periods).

When Plaintiffs and Defendants urged this Court to adopt the September 1 Injunction, no one considered the harm to civilly committed individuals because no mention was made of their rights or how the Injunction would impact them.  Instead, the parties, in cooperation, limited the issues and evidence they put forward to get a mutually desired and convenient result, which in turn left the Court with a one-sided narrative and an incomplete record.  Because of the parties' coordinated efforts, this Court did not have the benefit of adversarial proceedings in which a party advanced the rights of either civil commitment patients or the acute care hospitals who are compelled to treat them on a long-term basis.  In fact, the parties did not address the impacts of the September 1 Injunction on the civil commitment population at all.  *See* ECF 252; 263; 265.  Nor did the court-appointed expert, Dr. Pinals, consult with any community hospitals or meaningfully study, let alone discuss, the civil commitment population in any of her reports.  *See* ECF 262-1; 262-2.  No one addressed whether the proposed injunction would result in violations of Oregon's civil commitment laws or the constitutional rights of civilly committed individuals, who have had their liberty taken away while being denied a right to effective treatment.

In short, the way in which the issue was presented to this Court by the parties was choreographed to achieve a mutually convenient result for them.  In rushing this Court to enter an unprecedented injunction, the parties failed to communicate to this Court that it was not only taking over the state hospital and overriding state law, but it was effectively taking over Oregon's behavioral health system and the role of the judiciary.  This led the Court to enter a

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 3

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

sweeping injunction based on an incomplete and flawed factual record, without any input from the key stakeholders, and without considering any of the other less intrusive measures available to achieve compliance with the *Mink* Injunction.

The Hospitals are now parties in this litigation (partly because Defendants saw it appropriate to consolidate the Hospital Action with this litigation) and advocating both for their rights and the rights of the patients they are caring for. *See* ECF 301; 315. As parties, the interests of Hospitals and patients they care for must be considered. The inclusion of these important stakeholders, and the *Amici* who are also affected by the ruling, necessitates revisiting the September 1 Injunction.

For the reasons discussed in Hospitals' Motion (ECF 284) and below, the September 1 Injunction should be dissolved or modified[2] insofar as it unnecessarily results in violations of civil commitment patients' (and Hospitals') rights, and otherwise valid and neutral Oregon laws.

## II.    The Court should reject the Parties' arguments regarding which Rule applies

Hospitals have moved to dissolve or modify the September 1 Injunction under Federal Rule of Civil Procedure 65(b)(4) ("Motion to Dissolve" or "Motion"). ECF 284. Rule 65(b)(4) provides a suitable framework for revisiting the September 1 Injunction. After all, the September 1 Injunction imposes temporary injunctive relief that adversely impacts Hospitals, and Hospitals received no formal notice of the Injunction. *See* FRCP 65(b) (governing injunctive orders issued "without written or oral notice to the adverse party").

Plaintiffs, however, disagree that Rule 65 applies. ECF 310 at 2–4. They argue that Hospitals should have instead brought their motion under Rule 60. Plaintiffs ask this Court to

---

[2] In Defendants' Response to Hospitals' Motion to Dissolve, Defendants state that Hospitals seek to "completely" dissolve the September 1 Injunction. ECF 309 at 2. That mischaracterizes Hospitals' Motion. Hospitals seek to "dissolve *or modify*" the September 1 Injunction, as the title of the Motion expressly states. ECF 284.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 4

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

disregard the substance of Hospitals' Motion merely because Hospitals cited the "wrong" rule.
*Id.*

The Court should decline to do so.  Rule 65 is an entirely suitable framework under
which to revisit the September 1 Injunction.  Hospitals have been adversely impacted by the
Injunction and received no formal notice of it—and they are now parties to this case.  *See* FRCP
65(b).  The presence of new parties, who are adversely impacted by the Injunction, warrants
revisiting the Injunction under Rule 65.

That said, Rule 60 also provides a workable approach for this Court to revisit the
September 1 Injunction.  Rule 60 authorizes relief from an order for numerous reasons, including
"inadvertence," "surprise," "misrepresentation . . . by an opposing party," where "applying it
prospectively is no longer equitable," or "any other reason that justifies relief."  FRCP 60(b).
The changed circumstances here warrant relief under those factors.  Plaintiffs and Defendants do
not dispute that, in proposing the September 1 Injunction to the Court, they provided no
information about the Injunction's impact on the civil commitment population (or the counties or
community hospitals that commonly care for such patients).  Neither Plaintiffs nor Defendants
dispute that Dr. Pinals never considered those matters and did not prompt the Court to do so.  *See*
FRCP 60(b)(1), (3) (authorizing relief due to "inadvertence" or "surprise" by the Court or
"misrepresentation . . . by an opposing party").  Moreover, Hospitals are now parties in this case,
representing new interests, and bringing more complete information to the Court's attention.
These factors justify relief under Rule 60.  *See* FRCP 60(b)(5), (6) (authorizing relief because
"applying [the order] prospectively is no longer equitable" or for "any other reason that justifies
relief").

In any event, this Court expressly invited briefing about the September 1 Injunction, so
Plaintiffs' arguments about the applicable Rule for consideration are academic at best.  This
Court has inherent authority to consider and reassess its equitable relief.  *Orantes-Hernandez*

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 5

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

*v. Gonzales*, No. 82-01107, 2006 U.S. Dist. LEXIS 95388, at *5 (C.D. Cal. Oct. 11, 2006) ("A court has power to enforce, modify or dissolve an injunction it has entered.") (citing *U.S. v. Swift & Co.*, 286 U.S. 106, 114 (1932)); *Dombrowski v. Pfister*, 380 U.S. 479, 492 (1965) ("[D]istrict courts retain power to modify injunctions in light of changed circumstances").

    Here, this Court invited briefing about a "doctrinal question" of federalism:

> Assum[ing] that it is obedience to state laws that is causing our defendants' inability to adhere to the U.S. Constitution, . . . does . . . a federal court in my shoes have the power to order noncompliance with what I'll call textually neutral state laws?

ECF 272 at 12. For the reasons discussed in Hospitals' Motion and below, principles of federalism and comity justify dissolving or modifying the September 1 Injunction. *See Stone v. City & Cnty of San Francisco*, 968 F.2d 850, 855 (9th Cir. 1992) ("Issues touching on federalism and comity may be considered *sua sponte*.").

## III.    The Court should dissolve the Injunction or at least modify Sections 2.b. and 3

    As Plaintiffs and Defendants have noted, cases like *Stone* and *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) discuss the applicable principles of federalism. *See* ECF 265 at 11–12 (citing *Stone* and *Clark*); ECF 263 at 2 (referring to Plaintiffs' briefing regarding federalism issues); *see also Spallone v. United States*, 493 U.S. 265, 276 (1990); *Trueblood v. Wash. State Dept. of Social & Health Servs.*, 822 F.3d 1037, 1045 (2016). And, as Plaintiffs and Defendants recognize, those principles say that this Court sometimes *can* supplant state law via an injunction—*but only* to "achieve compliance with . . . the Constitution" through the "the least intrusive measures" necessary. ECF 265 at 11–12. Thus, if the Court's injunction either (1) fails to "achieve compliance with . . . the Constitution" or (2) uses more than the "least intrusive measures" necessary, the injunction is not permitted by applicable doctrine. *See Clark*, 60 F.3d at 604.

    As the *Amici* Judges recognized, the Court may override valid state laws only if necessary to remedy the violation and, if so, only if the relief is narrowly tailored, extends no

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 6

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

further than necessary, uses the least intrusive measures, balances the potential for harm to third parties, and gives appropriate consideration to principles of federalism.  ECF 280-1 at 20. Neither the record the parties put before the Court, nor the findings of this Court, meet the requirements for allowing Defendants to ignore its legal obligations under Oregon law.

In asking this Court to override unquestionably neutral and valid Oregon laws, the key case relied on by Plaintiffs is *Stone*.[3]  But *Stone* does not support the unprecedented relief Plaintiffs requested.  Instead, it does the opposite.

In *Stone*, the Ninth Circuit considered a case where a district court had authorized a sheriff to override state laws by ordering the early release of certain inmates from overcrowded jails.  968 F.2d at 850.  While the court recognized the well-settled proposition that "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme," it did not end its inquiry there.  *Id.* at 862.  Instead, the court went on to conclude that "the district court went too far under the[] circumstances in allowing the Sheriff to override state laws and state court sentences," *id.* at 864, by, among other things, authorizing the sheriff to release jail inmates who had served 50% of their sentences in an effort to address jail overcrowding and bring the city back into compliance with the consent decree.  The court explained that because "the district court did not make any findings that other alternatives were inadequate," it "should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions."  *Id.* at 864.

---

[3] As the *Amici* Judges noted, several of the cases Plaintiffs cited resulted in the Ninth Circuit reversing lower court determinations to override state law.  *See Stone*, 968 F.2d at 865 ("[t]hat portion of its order allowing the Sheriff to override applicable state law . . . is VACATED"); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010) (district court failed to make express determination that state ballot proposition violated constitutional rights or injunction was necessary to remedy constitutional violation, order vacated and remanded to so determine and reconcile state and federal law); *Clark*, 60 F.3d at 603 ("The problem here, however, is that there has never been a judicial determination that [a California law] conflicts with applicable federal law.").

Here, as in *Stone*, neither the Court's findings, nor the record upon which they were based, is sufficient to permit the Court to allow Defendants to ignore otherwise neutral and valid Oregon laws. While Hospitals agree that Defendants need to comply with the *Mink* Injunction, disregarding state law is a drastic step and should not be taken unless absolutely necessary. As explained below, because the Court made no findings that the September 1 Injunction is necessary, narrowly tailored, or that other less intrusive measures (of which there are many) are inadequate, it should not have been entered.

The September 1 Injunction should be dissolved or modified because at least two provisions, Sections 2.b. and 3, are unlawful and violate applicable doctrine and principles of federalism. For one, both Sections 2.b. and 3 do not achieve compliance with the Constitution, instead resulting in further violations of it. Section 2.b. keeps virtually all civil commitment patients from being admitted to OSH and provides for no other alternative long-term placements for them,[4] thereby resulting in those patients being left indefinitely in acute care hospitals where they do not receive the appropriate kind of long-term care and treatment they need to recover. This violates civilly committed patients' Due Process liberty rights (and, further, the Hospitals' property rights under the Due Process and Takings Clauses). Section 3, meanwhile, results in the automatic discharge of acutely ill AA patients at OSH who are not ready to be discharged. Those patients, who have nowhere to go, are frequently brought to Hospitals' emergency departments and put on the civil commitment track, where the above constitutional violations arising from civil commitments begin anew.

Sections 2.b. and 3 are also not the least intrusive measures necessary to achieve compliance with the *Mink* Injunction. Critically, Dr. Pinals never recommended a measure like Section 2.b., and certainly did not find that such a provision was necessary to achieve timely compliance with the *Mink* Injunction. Nor did Dr. Pinals conclude that a provision as rigid as

---

[4] The State has never argued that adequate treatment options exist outside of OSH. That, of course, is a problem for which the State is responsible.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 8

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Section 3—which allows no exceptions even for patients who are not yet ready for discharge—was necessary to achieve timely *Mink* compliance. Dr. Pinals did recommend, meanwhile, other measures for achieving *Mink* compliance, which are less drastic (and which were also adopted by the September 1 Injunction). *See* ECF 262-2 at 20–27 (recommending 18 different "priority activities" for achieving compliance with the *Mink* Injunction that are "largely within the purview of OHA/OSH or the Plaintiffs and would not require legislative changes"). Nothing has shown that those less-intrusive measures are insufficient by themselves to achieve *Mink* compliance.

      A.      **Section 2.b. of the September 1 Injunction should be dissolved.**

Section 2.b. of the September 1 Injunction orders that OSH "shall not admit persons civilly committed unless they meet the criteria in the civil admission expedited admissions policy." ECF 271 at 2.

As discussed in the Hospitals' Motion, this provision makes it nearly impossible for civilly committed individuals to be admitted into OSH and there are virtually no alternative options because there are rarely beds available at secure residential treatment facilities (and only two in the state are approved to be locked, to use seclusion and restraint, and to involuntarily medicate). *See* ECF 282, Declaration of Alicia Beymer in Support of Motion to Intervene ("Beymer Decl.") ¶¶ 4–7; *see also* Declaration of Ron Lagergren in Support of Motion to Dissolve or Modify September 1, 2022 Injunction ("Lagergren Decl.") ¶ 10. Historically, civil commitment patients were sent to OSH for long-term treatment, which provided a meaningful opportunity for patients to recover and return to the community. But, as years passed and the State prioritized AA and GEI patients in connection with this litigation, OHA failed to create additional capacity elsewhere for civilly committed patients to receive long-term treatment in appropriate settings. Beymer Decl. ¶¶ 4, 7. Now, instead of OHA transferring the vast majority of civilly committed patients to OSH for treatment as it did in the past, or to an appropriate long-

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 9

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

term placement, OHA simply abandons them in acute care hospitals.  Acute care hospitals lack

the necessary resources and facilities to provide the type of long-term treatment these individuals

require to receive the help they need and deserve over the course of their period of commitment.

*Id.* at ¶ 3.[5]

OHA's actions violate patients' constitutional rights, as detailed in the Hospitals' Action;

they likewise violate the Hospitals' rights under the Due Process and Takings Clauses.[6]  And

because Section 2.b. results in further violations of the Constitution, it does not justify

supplanting state law.  As a result, this Court lacks the authority to impose Section 2.b. under

applicable doctrine and principles of federalism.  *See Bowman v. Matteucci*, No. 3:21-cv-01637,

2021 WL 5316440, at *2 (D. Or., Nov. 15, 2021) ("When satisfying constitutional guarantees,

---

[5] As explained in Hospitals' Motion, community hospitals are designed to provide stabilizing treatment to manage the acute symptoms of patients experiencing severe mental health crises, typically before civil commitment occurs.  Beymer Decl. ¶ 8; Lagergren Decl. ¶ 7.  Such treatment typically involves emergency care, highly restrictive settings, and constant monitoring.  Beymer Decl. ¶ 8.  But, once stabilized, civilly committed patients suffer in such highly restrictive environments and can often decompensate.  *Id.* ¶ 9.  Instead, civilly committed patients need long-term treatment, which aims to do more than simply manage the patient's symptoms—it aims to address the patient's mental illness itself with the goal of enabling the patient to recover from their illness and return to the community.  *Id.* ¶¶ 8–9.  Long-term treatment requires a calmer, less stressful, less-restrictive environment where patients are not confined to their rooms most of the day and have more independence, peer support, socialization, and opportunities to develop life and health skills.  *Id.*  Acute care hospitals are simply not designed, equipped, staffed, or intended to provide long-term treatment for individuals who are civilly committed.  *Id.* ¶ 8.

[6] Hospitals are nonprofits that stay afloat financially through reimbursements by insurance companies, the State, or federal programs like Medicaid and Medicare.  Lagergren Decl. ¶ 11.  Providing acute behavioral healthcare for patients with acute mental illnesses is expensive, especially when a patient remains at a hospital for long periods of time.  *Id.*  As Hospitals will establish in the Hospital Action, OHA has abandoned numerous civil commitment patients in Hospitals' care, yet has provided unjustly low reimbursement for civil commitment patients that does not come close to covering the true cost of those patients' care.  *Id.*  As a consequence, the Hospitals suffer steep annual losses, putting a massive strain on not only the behavioral healthcare services they provide but also patient care generally, while otherwise threatening the viability of the Hospitals' essential role as acute care hospitals within Oregon's behavioral health system.  *Id.*

REPLY IN SUPPORT OF MOTION TO DISSOLVE OR MODIFY THE SEPTEMBER 1, 2022 INJUNCTION - 10

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Defendants cannot rob Peter to pay Paul."); *see also Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980) ("Lack of funds, staff, or facilities cannot justify the State's failure to provide [institutionalized patients] with [the] treatment necessary for rehabilitation.").[7]

Moreover, as Hospitals noted in their Motion, Section 2.b. is not even necessary to achieve compliance with the *Mink* Injunction. Dr. Pinals never recommended limiting admission of civil commitment patients to OSH to those who qualify for expedited admission. *See* ECF 284 at 23; *see generally* ECF 262-1 (Dr. Pinals' first report); 262-2 (second report); 313-1 (third report). She identifies no instance in which an AA patient was delayed admission to OSH because a civil commitment patient was occupying a bed after a non-expedited admission. The scope of her work was focused exclusively on the AA and GEI populations and did not extend to the civil commitment population; her reports contain no analysis whatsoever regarding civil commitment patients. Because of that limited scope, Dr. Pinals consulted with no Hospitals, which are critical stakeholders in Oregon's behavioral health system and now parties to this case.[8]

---

[7] De-prioritizing civil commitment patients also violates Oregon statutes, as discussed in Hospitals' Motion. ECF 284 at 17–18. For instance, it violates ORS 426.060(2), which requires OHA to direct civilly committed persons "to the facility best able to treat" them. It also violates ORS 426.225, which requires a civilly committed patient to be admitted to OSH where the patient seeks voluntary admission. And as the *Amici* Counties raised, it violates ORS 426.010, which provides that OSH campuses "shall be used as state hospitals for the care and treatment of persons with mental illness who are assigned to the care of the institutions by the authority or who have previously been committed to the institutions."

[8] Had Dr. Pinals consulted with Hospitals and other acute care hospitals, she would have learned that the expedited admission policy that OSH has been enforcing for the last few years requires hospital staff and others to be *actually injured*, or substantial property to be *actually destroyed*, before a civilly committed patient can even be considered for admission to OSH. *See* Beymer Decl. ¶ 5–6. Dr. Pinals would have learned that even actual assaults on hospital staff and other patients are rarely sufficient to allow a civilly committed patient to gain admission to OSH. *Id.* Dr. Pinals would have learned that, due to OHA's failure to create capacity, civilly committed patients are being confined in restrictive settings without access to appropriate long-term treatment for several weeks, to several months, up to the entire 180-day commitment, and, in some cases, through recommitment periods as well. *See id.* ¶ 7.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 11

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Plaintiffs and Defendants apparently came up with Section 2.b. by themselves and simply included it alongside other provisions that were recommended by Dr. Pinals. *Compare* ECF 262-1; 262-2 (Dr. Pinals' first and second reports) *with* EFC 270 (proposed September 1 Injunction). While Plaintiffs and Defendants framed their proposed order as a request to implement Dr. Pinals' recommendations, their proposed order in fact expanded into matters she never addressed. They proposed Section 2.b. without support in the record and without consulting acute care hospitals or counties. Hospitals called out this lack of record support in their Motion, *see* ECF 284 at 23; neither Plaintiffs nor Defendants have disputed it. *See* ECF 309; 310. On this provision of the Court's Injunction, there was a complete lack of a factual record or adversarial testing.

The lack of support in the record is an independent reason to dissolve Section 2.b. Federal injunctions are "scrutinize[d] . . . closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." *Clark*, 60 F.3d at 604. "The district court will be deemed to have committed an abuse of discretion . . . if its injunction requires any more of state officers than demanded by federal constitutional or statutory law." *Id.* The district court must make "findings that other alternatives were inadequate." *Stone*, 968 F.2d at 864 (citing *Spallone*, 493 U.S. at 280); *see also Trueblood*, 822 F.3d at 1045 (vacating an injunction that went "beyond what [the plaintiff] requested" after the court "did not consider any less restrictive alternatives" and "did not identify any reason why [the state] should be held to such a restrictive rule").

This Court has made no finding that Section 2.b., specifically, is necessary to achieve compliance with the *Mink* Injunction. *See Stone*, 968 F.2d at 864 (district court abused its discretion by entering injunction overriding state law without finding that "other alternatives were inadequate"). Nor have Plaintiffs or Defendants addressed Section 2.b. specifically. ECF

REPLY IN SUPPORT OF MOTION TO DISSOLVE OR MODIFY THE SEPTEMBER 1, 2022 INJUNCTION - 12

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

309; 310.  This is unsurprising, given the lack of record support that Section 2.b. is essential to achieve *Mink* compliance and that less intrusive measures are insufficient.

Indeed, as *Amici* Marion and Washington Counties noted in their Amicus Brief Regarding Judicial Authority, "OSH's existing practice" before the September 1 Injunction was to not accept civil commitment patients unless the individual meets the criteria for expedited admission.  ECF 290 at 9 n.2 (citing Declaration of Nicholas Ocón ¶ 7).  Accordingly, the "practical implication" of Section 2.b. does nothing to bring OSH closer to compliance with the requirements of the underlying *Mink* Injunction, and is therefore more intrusive than necessary. *Id.*  The *Amici* Counties have posited, and Hospitals agree, that the only fathomable reason that Section 2.b. exists is "a tacit acknowledgement" by Defendants—who have been generally refusing all civil commitment patients for years except when the patient qualifies for expedited admission—that "barring civilly committed patients from OSH is a violation of their constitutional rights"; Section 2.b., therefore, appears to be an effort by Defendants to "bar future [civil rights] actions brought by civilly committed patients against [D]efendants while the Order [ECF 271] is in effect."  ECF 290 at 9 n.2.

For the reasons above, Section 2.b. results in further violations of the Constitution and is not the least intrusive exercise of federal power.  The Court should dissolve the September 1 Injunction or, at least, vacate Section 2.b.

**B.    Section 3 of the September 1 Injunction should be dissolved or at least modified.**

Section 3 of the September 1 Injunction likewise should be vacated or modified. Section 3 implements rigid maximum stay limits for AA patients being treated and evaluated at OSH.  ECF 271 at 3.  Patients with misdemeanor charges must be discharged, without exception, after 90 days; patients with nonviolent felony charges must be discharged, without exception,

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 13

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

after six months; and patients with violent felony charges must be discharged, without exception, after one year.[9]  *Id.*

Hospitals appreciate the need of OSH to make more beds available for AA patients (but query why this has not been done in response to the various injunctions in the *Mink* case). However, because Section 3 is so mechanical, it results in new violations of the Constitution that are just as urgent as the crisis that led to its implementation.

Section 3 permits no exceptions for patients who, at the time of discharge, still require a hospital level of care ("HLOC") or who are otherwise dangerous to themselves or others.[10] Unstable or unrestored patients have a right to remain in the hospital.  When such acutely ill patients are discharged, they go to one of two places.  Some are discharged to the streets, where they often decompensate, suffer an acute mental health crisis, and try to hurt others or themselves.  After experiencing such a crisis or trying to (and sometimes succeeding at) hurting someone, they are picked up by the police and taken to one of Hospitals' emergency departments.  Upon arriving in Hospitals' emergency departments, AA patients discharged from OSH sometimes begin civil commitment proceedings.  Meanwhile, other acutely ill patients who are not discharged to the streets are brought to Hospitals' emergency departments directly, at which point civil commitment proceedings may begin.[11]

---

[9] Section 3 allows Defendants to disregard the requirements of ORS 161.371.  That statute makes clear that it is the role of the court to determine whether a patient is ready to be discharged from OSH when the patient has not reached the jurisdictional maximum time at OSH.  Specifically, the court decides if a hospital level of care is necessary due to public safety concerns and the acuity of symptoms, and whether appropriate community restoration services are present and available in the community.  Section 3 ignores this important step and the role of the judiciary in determining whether a patient is ready to discharge from OSH from a public safety perspective.

[10] In other words, it does away with the protections put into place by ORS 161.371.

[11] As discussed in Hospitals' Motion to Intervene, ECF 281 at 18, Defendants have expressly stated that it is their plan that many acutely ill AA patients discharged prematurely from OSH be civilly committed.  An OHA memo entitled "Mosman Ruling Frequently Asked Questions"—the purpose of which is to explain how OHA intends to implement the September 1 order—states

As explained above and in Hospitals' other filings, once AA patients are civilly committed, they cannot get back into OSH and are abandoned by the State in acute care hospitals that cannot provide the long-term treatment they need.  *See* Beymer Decl. ¶¶ 3–4, 7. Accordingly, individuals' constitutional rights are violated again—but this time as civil commitment patients rather than as AA patients.  (As noted, Hospitals' rights under the Due Process and Takings Clauses are violated, also.)

This outcome is not speculative.  It has already been happening, even in the short time since Hospitals' filed their Motion on September 28.  As illustrated below, Hospitals have already begun experiencing an influx of OSH patients who are sent there, with little to no notice and no discharge plan, because they have nowhere else to go.  The high acuity and criminal history of many of these patients create a significant safety risk for the Hospitals' staff and patients.

---

nine times that patients discharged from the state hospital can and will be civilly committed. Oregon Health Authority, Mosman Ruling Frequently Asked Questions at 3-4 (Sept. 16, 2022), available at https://www.oregon.gov/oha/OSH/Documents/OSH-mink-mosman-FAQ.pdf.  For instance, in response to the question, "Will OSH discharge patients to the street?," OHA explains, "If the person is discharged based solely on the end of the length of inpatient restoration set out in the [September 1] order, the court will still need to . . . determine whether the person should be . . . civilly committed[.]"  *Id.* at 3–4.  Addressing the question, "What will happen to clients who are not stable when the clock expires?," OHA says that the committing court "makes a determination under ORS 161.370(2)(c), which can include initiation of civil commitment where the person poses a risk to themselves or others or is unable to provide for their own basic needs[.]"  *Id.* at 5.  In response to the question, "Why doesn't the court order allow for case-by-case exceptions?," OHA explains that "there are mechanisms in place [to recommit] people who have more serious charges, or who are a danger to themselves or others," including that "the court may initiate civil commitment proceedings which can also commit a person for an additional 180 days (or more, if recommitted)."  *Id.* at 2–3.  In response to the question, "Where will a patient be released if their committing county does not have any secure residential treatment facility (SRTF) capacity?," OHA offers "initat[ion of] civil commitment" for a person determined to be "still unfit" after discharge from the state hospital.  *Id.* at 3.  The nine-page memo makes this point nine times.  Of course, the memo does not say what happens to individuals once they are civilly committed.  The answer is: OHA leaves them in community hospitals indefinitely, despite that community hospitals are not appropriate facilities to provide long-term treatment to civilly committed patients.  *See* Beymer Decl.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 15

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

- Unity has seen at least four patients who were released from OSH pursuant to the September 1 Injunction order in this case.  Lagergren Decl. ¶ 2.  In October 2022, a patient suffering from paranoid schizophrenia was transported from OSH directly to Unity on a magistrate's hold and detainer.  *Id.* ¶ 3.  He was a highly acute patient who spent a significant amount of time in seclusion at OSH due to potential violence.  *Id.* Unity received no notice of the transfer from OSH.  *Id.*  One day before the transfer, Union County staff notified Unity that it would take place.  *Id.*  When Unity reached out to OSH for more information, OSH explained that this was a violent patient who had spent a large amount of time in seclusion, even at OSH.  *Id.*  OSH verbally agreed that if the patient was civilly committed, he would be allowed back into OSH as an expedited admission.  *Id.*  The patient was at Unity for nearly two weeks, during which time he hit a staff person 28 times.  *Id.*  He was ultimately civilly committed and returned to OSH under the expedited admission process.  *Id.*

- In November 2022, a schizophrenic patient charged with arson was discharged from OSH to Washington County Jail, and subsequently placed on a magistrate's hold and warrant of detention and sent to Unity.  *Id.* ¶ 4.  Unity and the Washington County commitment investigator found that he was not an imminent threat to himself or others and did not meet the criteria for a civil commitment.  *Id.*  Washington County Jail refused to take him back and he was discharged to a hotel in Washington County.  *Id.*  His whereabouts are currently unknown.  *Id.*  This patient will likely go untreated in the community, leading to decompensation, which creates a high risk of either reoffending and ending up in jail or being readmitted to an acute hospital care under a civil commitment.  *Id.*

- In October 2022, a schizophrenic patient who had been charged with unlawful use of a weapon and attempted assault was discharged from OSH to Clackamas County Jail.  *Id.* ¶ 5.  While at OSH, he was continuing to evidence paranoia and delusional thoughts.  *Id.*

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 16

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

The Clackamas County Sheriff's Office placed him on a magistrate's hold and warrant of detention and transferred him to Unity in early November 2022. *Id.* There was no advance notice to Unity. *Id.* He lacks insight into mental illness and stated that he will stop medications in the future. *Id.* He is currently admitted to Unity under a civil commitment. *Id.*

- In November 2022, a patient with schizoaffective disorder was released from OSH to Multnomah County Detention Center, where he was placed on a magistrate's hold and transferred to Unity solely based on his history at OSH. *Id.* ¶ 6. He does not have a detainer in place. *Id.* He is also not presenting with any acute symptoms at Unity and currently does not meet the criteria for a civil commitment. *Id.* Unity received no notice in advance of receiving this patient, and has no OSH records or information about the patient's criminal record. *Id.* A residential treatment facility is recommended for this patient; however, it takes months to be admitted to one. *Id.* Since this patient is not exhibiting acute symptoms needing continued acute hospital treatment, he will be released back to the community with limited outpatient supports. *Id.* Without robust supports, this patient is at risk of decompensating and returning to the hospital and likely needing a commitment. *Id.*

- Providence has also started to receive prematurely discharged patients from OSH. On October 28, Providence St. Vincent Medical Center received an OSH patient with no notice whatsoever. Declaration of Robin Henderson ¶ 3. Nineteen months ago, this patient had tried to attack a woman locked in a car by banging a homemade spear against her car window. *Id.* After being charged with a felony for unlawful use of a weapon, he had remained at OSH for a year and a half, where he was forcibly medicated with anti-psychotic medication in the hopes that he could be restored to competency and face a jury. *Id.* But on October 25, he was suddenly discharged from OSH due to the

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 17

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Injunction.  *Id.*  On October 27, he returned to court to resolve the criminal charges stemming from the attack.  *Id.*  The hearing was one of the first of its kind because the court was faced with a situation of what to do with a patient who has been prematurely discharged from OSH who still requires treatment but has nowhere to go.  *Id.*  The county could not take over his treatment because he was declining care and there were no beds available at any of the secure residential treatment facilities, and certainly none that would involuntarily medicate (as mentioned above, there are only two such facilities in the entire state).[12]  *Id.*  With no options available, the court dropped his charges and filed papers to civilly commit him.  *Id.*  He was transported directly from court to Providence St. Vincent Medical Center.  *Id.*  After being evaluated, he was determined not to be dangerous to self or others and discharged.  *Id.*  As the patient had no placement after OSH abruptly discharged him, presumably he is now back on the streets.  *Id.*

Hospitals do not have access to OHA's discharge list, but it is inevitable that more patients will be discharged.  As the *Amici* District Attorneys and attorneys for the *Amici* Counties have indicated, the worst is yet to come.  *See* ECF 290 at 6–8.  There are patients at OSH who have been indicted for violent felonies and who will soon be released; Hospitals are aware of at least two individuals in Washington County who were indicted for murder who will soon be released from OSH under the September 1 Injunction.  *Id.* at 6–7.  As the *Amici* Counties noted, due to the Injunction's rigidity—which does not account for whether patients are clinically appropriate for discharge—these individuals will be discharged to the community, without any consideration of whether discharge is in their best interests, whether they present a public safety

---

[12] There are currently only two Class One secure residential treatment facilities in Oregon.  A Class One facility is approved "to be locked to prevent a person from leaving the facility, to use seclusion and restraint, and to involuntarily administer psychiatric medication."  OAR 309-033-0520(3).

risk, whether they present a risk to the patients and staff of community acute care hospitals, and whether there are appropriate community restoration services available.[13]

While there is an undisputed need to make more beds available at OSH for AA and GEI patients (which, as evidenced by various injunctions in *Mink*, OHA has known about for years and done little to remedy), Section 3 need not be so mechanical that it discharges acutely ill and dangerous individuals without exception. Importantly, Dr. Pinals never concluded that such a rigid system is necessary to achieve timely compliance with *Mink*. *See* ECF 262-1; 262-2. Rather, Dr. Pinals primarily recommended expediting discharges of AA patients who were *not* classified as requiring HLOC. ECF 262-1 at 19; 262-2 at 22, 25 (recommending that OSH prioritize early review and discharge patients who no longer require HLOC). Thus, it is unnecessary to put patients and the public at risk, and cause further violations of the Constitution, to comply with *Mink*. There is no need to discharge acutely ill patients from OSH who require HLOC or who present a danger to themselves or others.

True, Dr. Pinals recommended a "legislative change" to enact new Oregon law that implements the above time limits. ECF 262-2 at 28. But Dr. Pinals did not include that recommendation in any of her 18 "priority activities" to achieve timely compliance with the *Mink* Injunction. *Id.* at 20–27 (recommending 18 different "priority activities" that are "largely within the purview of OHA/OSH or the Plaintiffs and would not require legislative changes"). Dr. Pinals merely concluded that the timelines under Section 3 were "likely . . . helpful" to achieve *Mink* compliance. *Id.* at 27. But "likely . . . helpful" is not "necessary," and "necessary" is what federalism requires. *Stone*, 968 F.2d at 862 ("[O]therwise valid state laws or court orders

---

[13] The increased volume of civilly committed patients resulting from this Court's Injunction has not only increased the risk of violence to providers and other patients, but it has also resulted in increased additional need for one-to-one care (meaning one staff being placed with one patient around the clock). It has also decreased overall unit capacity, thus decreasing the ability to meet community needs. Lagergren Decl. ¶ 9.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 19

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

cannot stand in the way of a federal court's remedial scheme if the action is *essential* to enforce the scheme." (emphasis added)).

Neither Plaintiffs nor Defendants address why Dr. Pinals' other 18 "priority" recommendations—all which appear less intrusive than supplanting Oregon law—will not achieve timely compliance with *Mink*. Nor have Plaintiffs or Defendants addressed why Section 3 cannot allow for exceptions for acutely ill patients who require HLOC or who are dangerous to themselves or others.[14] Indeed, the *Amici* Counties suggested such a less intrusive measure in their Amicus Brief Regarding Judicial Authority. *See* ECF 290 at 14–15. Neither Plaintiffs nor Defendants have addressed why this less-intrusive measure will not achieve *Mink* compliance. *See* ECF 309; 310.

Because Section 3 violates the Constitution and is not the least intrusive measure to achieve *Mink* compliance, it should be dissolved or modified under federalism principles.

## IV.    Hospitals have provided sufficient evidence to revisit the September 1 Injunction

Neither Plaintiffs nor Defendants meaningfully respond to the substance of Hospitals' Motion. They do not dispute, among other things, that (1) they did not brief the Court about the civil commitment population, (2) Dr. Pinals neither analyzed nor opined on the needs of the civil commitment population, and (3) the September 1 Injunction includes a provision that Dr. Pinals never recommended about the civil commitment population. *See* ECF 309; 310. Nor do they dispute that community hospitals were completely excluded from the process that led to the injunction. Rather than address the substance or merits of Hospitals' position, Plaintiffs and Defendants argue only that Hospitals "have failed to adduce any admissible evidence to support their motion." ECF 310 at 2; *see also* ECF 309 at 3–5.

The Court should disregard this argument, for several reasons. For one, much of the evidence that Hospitals rely on here (in the Declarations of Ron Lagergren and Robin

---

[14] This is precisely what ORS 161.371 protects against.

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Henderson) did not even exist until after Hospitals filed their Motion on September 28, 2022. Obviously, Hospitals could not have cited that evidence in their original Motion, as it did not exist yet.

Further, as Plaintiffs concede, *see* ECF 310 at 5–6, Hospitals have submitted and rely on the Declaration of Alicia Beymer. *See* ECF 282. Ms. Beymer, as the Chief Administrative Officer of PeaceHealth's Sacred Heart Medical Center University District, is certainly competent to testify about the matters discussed in Hospitals' Motion, which concern the administration and care of civil commitment patients at her and similar community hospitals. *See id.*

Plaintiffs' and Defendants' only other argument is that this Court should simply ignore Hospitals' Motion because the Hospitals have not yet had the opportunity to prove the underlying Constitutional violations alleged in the Hospital Action. But it would be unfair to disregard Hospitals' arguments on this basis. Hospitals only recently filed the Hospital Action, on September 28, 2022. This case therefore remains at the early pleadings stage; Defendants have not even responded to Hospitals' complaint. So, of course, Hospitals have not yet able to prove their Constitutional claims.

It would be especially inequitable for Defendants to avoid Hospitals' arguments regarding the September 1 Injunction on this basis. It was, after all, *Defendants* who wanted to consolidate Hospitals' Constitutional claims with the rest of the issues in *Mink*/*Bowman*. Defendants cannot both pull Hospitals' separate claims into this matter (over Hospitals' objection) and, simultaneously, argue that this Court should disregard Hospitals' interests and claims when imposing injunctions that directly impact Hospitals and their patients.

Hospitals need not prevail in their lawsuit before this Court may consider Hospitals' and their patients' constitutional interests, especially when entering orders that directly affect them. Now that Defendants have brought Hospitals into this case as parties, this Court must consider

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 21

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

Hospitals' interests equally with those of the other parties.  That requires revisiting the September 1 Injunction.

## V.    Conclusion

Back in August, when Plaintiffs asked this Court to enter the September 1 Injunction, they admitted that they were "concerned that people with mental illness continue to lack sufficient community behavioral health resources including those ordered for civil commitment languishing in local hospitals."  ECF 252 at 6.  Plaintiffs also said they did not want to "overly rely[] on civil commitment."  *Id.* at 11.  Yet the September 1 Injunction expressly does just that by including unnecessary provisions that affect the civil commitment population and community hospitals caring for such patients and funneling high acuity AA patients either back onto the streets or into the civil commitment system.

Based on the patterns already emerging, the practical effect of the September 1 Injunction will be to move a significant number of unstable individuals from OSH to acute care hospitals that are not designed, equipped, staffed, or intended to provide long-term treatment for individuals who are civilly committed and are already struggling with civilly committed patients who are ready to leave but have nowhere to go.  This will exacerbate the current behavioral health crisis for civilly committed patients, who already cannot receive appropriate long-term treatment in acute care hospitals, causing patients to be discharged to the streets and in many cases sent to jail to start the cycle all over again.

It will also negatively impact the ability of acute care hospitals to serve patients in the community and in emergency departments who are suffering from acute mental health crises and waiting to be admitted.  Hospitals' workforce entered the behavioral health field because, above all else, they want to help others.  Lagergren Decl. ¶ 7.  But since the fall of 2019, and especially since the September 1 Injunction, there has been a drastic change in patient population and care model expectations.  *Id.* ¶¶ 3–6, 8.  This has not only negatively impacted overall hospital

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 22

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

operational performance, but diminished staff engagement resulting in increased staff turnover and deteriorating financial sustainability. *Id.* ¶ 8. Staff have been increasingly subjected to worsening violence in the workplace, lengthening adult inpatient hospital stays, and moral distress in not being able to find appropriate discharge services and placements for the civil commitment patient population. *Id.*

It is no solution—indeed, it is unlawful—to simply shift the problems facing AA patients to another population of mentally ill patients. *Ohlinger*, 652 F.2d at 779; *Bowman*, 2021 WL 5316440, at *2 ("When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul."). Moreover, Dr. Pinals never recommended such a solution. Although the parties framed their unopposed motion to adopt the September 1 Injunction as a request to implement Dr. Pinals' recommendations, they in fact took significant liberties in representing her recommendations to the Court.

According to what Dr. Pinals actually recommended, there are many other less intrusive measures that can be implemented that are sufficiently likely to achieve timely compliance with the *Mink* Injunction. Federalism dictates that the least-intrusive measures must be tried first or, at the very least, must be considered and found by the Court to be insufficient to achieve *Mink* compliance. *See Stone*, 968 F.2d at 864 (reversing the district court's injunction because the district court "should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions," and holding that the court abused its discretion where it made no findings that alternative, less-intrusive means were inadequate before overriding state law).

Hospitals recognize the need to achieve timely compliance with *Mink*. But Defendants cannot be permitted to simply shift constitutional crises to civil commitment patients and Hospitals. Because the September 1 Injunction does that, unnecessarily, it should be dissolved or modified with respect to Sections 2.b. and 3.

REPLY IN SUPPORT OF MOTION TO
DISSOLVE OR MODIFY THE
SEPTEMBER 1, 2022 INJUNCTION - 23

LEWIS BRISBOIS BISGAARD & SMITH LLP
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222

DATED: November 17, 2022           LEWIS BRISBOIS BISGAARD & SMITH LLP


By:   *s/ Eric J. Neiman*
           Eric J. Neiman, OSB #823513
           Emma P. Pelkey, OSB #144029
           Telephone: 971.712.2800
           Facsimile: 971.712.2801


PERKINS COIE, LLP


By:   *s/ Thomas R. Johnson*
           Thomas R. Johnson, OSB #010645
           Alex Van Rysselberghe, OSB #174836
           Telephone: 503.727.2000
           Facsimile: 503.727.2222

           *Attorneys for Intervenors and Plaintiffs*

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
888 SW Fifth Avenue, Suite 900
Portland, Oregon 97204-2025
Telephone: 971.712.2800 • Fax 971.712.2801

**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000 • Fax: +1.503.727.2222