IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

---

**DISABILITY RIGHTS OREGON et al.,**

      Plaintiffs,

  v.

**PATRICK ALLEN et al.,**

      Defendants,

  and

**LEGACY EMANUEL HOSPITAL et al.,**

      Intervenors.

No. 3:02-cv-00339-MO (Lead Case)
No. 3:21-cv-01637-MO (Member Case)
No. 6:22-cv-01460-MO (Member Case)

**OPINION AND ORDER**

---

**JAROD BOWMAN et al.,**

      Plaintiffs,

  v.

**DOLORES MATTEUCCI et al.,**

      Defendants,

  and

**LEGACY EMANUEL HOSPITAL et al.,**

      Intervenors.

No. 3:21-cv-01637-MO (Member Case)

---

**LEGACY EMANUEL HOSPITAL et al.,**

      Plaintiffs,

  v.

**PATRICK ALLEN,**

      Defendant.

No. 6:22-cv-01460-MO (Member Case)

---

MOSMAN, J.,

This matter comes before me on Intervenors' Motion to Dissolve or Modify [ECF 284][1] my September 1, 2022, Order to Implement Neutral Expert's Recommendations [ECF 271] (the "September 1 Order"). Plaintiffs, Defendants, Amici Judges, and Amici Counties submitted additional briefing. On November 21, 2022, I held a hearing on the motion at which Intervenors, Amici Judges, Amici Counties, Amici District Attorneys, Plaintiffs, and Defendants presented their arguments. After clarifying several aspects of the September 1 Order on the record, I TOOK UNDER ADVISEMENT Intervenors' Motion. For the reasons below, I DENY Intervenors' motion with leave to renew.

## BACKGROUND

This litigation began over two decades ago. Defendants who were declared unable to aid and assist ("A&A") in their own defense were being held in jail for lengthy periods of time, despite orders to transfer them to Oregon State Hospital ("OSH"). For such persons, being in jail rather than at OSH was a humanitarian crisis. In May 2002, Judge Owen M. Panner found that the continued to jailing of such persons violates those defendants' due process rights under the Constitution's Fourteenth Amendment. Findings of Fact and Conclusions of Law [ECF 47]. He issued an injunction (the "2002 Injunction") requiring Oregon to admit these persons into OSH or another treatment facility within seven days of their being declared unfit. J. [ECF 51].

In 2019, Plaintiffs moved for Defendants to be found in contempt for violating the 2002 Injunction. They alleged that from at least October 2018, Defendants have not been in compliance with the seven-day requirement. Mot. for Order to Show Cause [ECF 91]. Litigation progressed through multiple hearings, conferences, appeals, and attempts at settlement. In the meantime,

---

[1] All ECF references are to the lead case, 3:02-cv-00339-MO, unless otherwise noted.

persons found "guilty except for insanity" ("GEI") filed a parallel action in this court. Similar to plaintiffs in the original matter, they alleged that the state held them for months in jail despite orders from Oregon Circuit Court Judges to commit them OSH. *See* Compl., *Bowman et al. v. Matteucci et al.*, 3:21-cv-01637-MO [ECF 1].

Nearly a year ago, Plaintiffs and Defendants came to an agreement. They jointly moved to consolidate both cases and appoint Dr. Debra Pinals as a neutral expert in both matters. Stipulated Mot. to Appoint Neutral Expert [ECF 238]. Dr. Pinals is a scholar and practitioner in the field of public mental health services and the criminal justice system. The Parties agreed to have Dr. Pinals provide recommendations to address OSH's capacity issues and create a plan for both long- and short-term compliance with the 2002 Injunction for GEI and A&A patients. I granted the Parties' motion. Order Consolidating Cases and Appointing a Neutral Expert [ECF 240]. From December 2021 onward, the Parties have worked with Dr. Pinals to meet with stakeholders, analyze data, and craft a set of changes to achieve compliance. Dr. Pinals provided reports in January and June to track progress.

In August 2022, the Parties jointly moved for an order to implement Dr. Pinals' recommendations "without delay." Order to Implement Neutral Expert's Recommendations [ECF 252]. They expedited their request because several Oregon Circuit Court Judges sought to hold one of the Defendants, Oregon Health Authority ("OHA"), in contempt for failing to admit individuals to OSH. According to Plaintiffs, one judge even threatened to jail an OHA official as a sanction. *Id.* at 10. In light of this situation, I held an expedited hearing. *See* Mins. of Proceedings [ECF 255]. I granted in part the Parties' proposed order, but only to the extent it did not require contravening state law. Op. and Order [ECF 256] (the "August 16 Order"). I also

enjoined any contempt proceedings that interfered with Defendants' attempts to comply with the 2002 Injunction. *Id.*

After the August 16 Order, the Parties provided supplemental briefing in support of a full adoption of the neutral expert's recommendations. Amici Counties and Amici District Attorneys joined the action, arguing against fully adopting the recommendations and seeking to dissolve the August 16 Order. After another hearing with Parties and Amici, I granted in full Plaintiffs' and Defendants' joint motion and ordered implementation of the neutral expert's recommendations, including recommendations that arguably override state law. *See* Mins. of Proceedings [ECF 269]; September 1 Order.

Amici Judges and Intervenors then joined this action. Like Amici Counties and Amici District Attorneys, they argued against implementing the neutral expert's recommendations and sought to dissolve the August 16 and September 1 Orders. Intervenors filed the motion before me and simultaneously brought a separate lawsuit. *See* Compl., No. 6:22-cv-01460-MO, *Legacy Health System et al. v. Allen* [ECF 1]. In both their motion and their lawsuit, they allege various constitutional violations committed by the state of Oregon against their civilly committed patients and themselves. They allege these violations stem from OHA's failure to ensure meaningful treatment for these patients in terms of adequate access to OSH.

I held a hearing on the August 16 Order on October 25, 2022, and dissolved that order in its entirety. Mins. of Proceedings [ECF 306]. I also consolidated the Intervenors' new case with the existing two. After further briefing from parties, I held oral argument on the motion to dissolve or modify the September 1 Order. Mins. of Proceedings [ECF 322].

In this opinion, I set out my rationale for finding that the September 1 Order was justified because less intrusive means have failed to remedy the ongoing constitutional violations.

## LEGAL STANDARD

A party seeking modification or dissolution of an order "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution" of that order. *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

As a baseline, "[p]rinciples of federalism counsel against awarding affirmative injunctive and declaratory relief that would require state officials to repeal an existing law and enact a new law proposed by plaintiffs." *M.S. v. Brown*, 902 F.3d 1076, 1089 (9th Cir. 2018). But a district court "may . . . choose a remedial measure that conflicts with state law [if]. . . that measure is necessary to remedy the violation." *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1402–03 (9th Cir. 1997); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010).

This means that even "otherwise valid state laws . . . cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992). Contravening valid state laws is especially permissible "when the least intrusive measures [have] fail[ed] to rectify the problems." *Id.* at 861. For these cases, "more intrusive measures are justifiable." *Id.* Where there is a history of repeated past constitutional violations, "[a] remedy may go beyond" the "specific conditions that violate the Constitution." *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982); *see also Hook*, 107 F.3d at 1403 (violation of state law merited "in the light of" a history of noncompliance). Yet these remedies must take into account the costs of compliance and the steps state government officials are already taking; courts should generally defer to the policy choices of such officials. *Id.*; *see also Stone*, 968 F.2d at 860.

In short, for a federal court to override state law, the court must find that other, less-intrusive alternatives are inadequate. *Stone*, 968 F.2d at 852.

## DISCUSSION

Intervenors and Amici raise serious challenges to the September 1 Order.  In their briefing, they suggest a number of ways to fix the current crisis.  They argue that these alternatives are less intrusive than the recommendations implemented in the September 1 Order and are thus the correct, constitutional path forward.  As discussed above, I am required to find that any less-intrusive alternatives to the September 1 Order are inadequate to remedy the constitutional violations at issue here.  To make that finding, I must examine what Plaintiff and Defendant have tried, what Intervenors and Amici propose, and what the September 1 Order requires.  This will allow me to determine if any untried, less intrusive possibilities are adequate.

### A. Alternatives Tried

As noted, litigation in this case resumed in May 2019.  During the course of those three and a half years—and despite herculean efforts by all involved—constitutional violations against defendants suffering from mental illness have not been abated.  The actions taken by Plaintiffs and Defendants catalogue well-thought out, less-intrusive alternatives that were tried and have failed.

Plaintiffs initially sought to hold Defendants in contempt for their violation of the 2002 Injunction.  They asked that Defendants be required to submit a plan for compliance and suggested multiple elements to potentially be included.  These suggestions included aggressive benchmarks, hiring an expert to provide recommendations, educating state courts, addressing prolonged lengths of stay for patients who could be released due to no longer needing hospital levels of care, and expanding community-based restoration and preventative services.  Mot. for Order to Show Cause [ECF 91] at 10–11.

Even at that time, Defendants had publicly stated that they "had no solution" and were "out of ideas" to fix the crisis that had been ongoing since October 2018.  *Id.* at 5, 10.  They argued

they had taken "all reasonable steps available to comply." Resp. to Mot. for Order to Show Cause [ECF 103] at 2. These steps included raising the total number of available beds in the face of ever-increasing demand, mixing populations within units to make more space, and seeking additional funding for a new units and community solutions. *Id.* at 4–8. OHA also allocated resources for jail diversion and crisis treatment services in order to lessen the flow of individuals coming into the system. *Id.* at 9. In addition to all these endeavors, Defendants also worked with community partners to increase services, collaborated with counties, created an expedited admission procedure, and proposed legislative changes. *Id.* at 9–10.

In light of these arguments, I did not find Defendants in contempt. But I did order regular briefings and hearings on efforts towards fixing the problem. *See, e.g.*, Min. Order [ECF 127]; Mins. of Proceedings [ECF 139]. In the midst of efforts to improve the situation, a global pandemic struck. The necessary safety restrictions, requirements, and modifications added additional variables to the already-difficult equation of achieving compliance. *See* Order of Modification to Inj. [ECF 167]. For example, a COVID-19 outbreak at OSH required OHA to completely pause admissions for over a month. *See, e.g.*, Defs.' Req. to Pause Admissions Further [ECF 194].

In 2021, orders to commit A&A patients repeatedly hit new record highs. Defs.' Req. to Pause Admissions Further [ECF 198]. Operating at the "functional[] . . . limit of the beds that can be made available," there was not enough space at OSH. *Id.* at 3. Plaintiffs responded that I should "order release of individuals to avoid constitutional violations" and asked me to "supersede" the Oregon Legislature and Oregon Judges. Pls.' Resp. to Defs.' Req. to Pause Admission [ECF 201] at 3. I refused. Min. Order [ECF 202]. Later that year, OSH was further plagued by staffing

shortages. Pls.' Mot. to Restore Inj. [ECF 215] at 7. These shortages required the National Guard to called in to alleviate the lack of personnel. *Id.*

After a second round of settlement conferences held by my learned colleague, Judge Beckerman, the Parties agreed on a path forward. OHA hired Dr. Pinals to create a comprehensive plan for compliance. Stipulated Mot. to Appoint Neutral Expert [ECF 238]. Dr. Pinals is a professor at both the Law and Medical Schools of the University of Michigan and has led reform efforts similar to the one here in at least three states. It does not seem possible to match Dr. Pinals's combination of education, experience, and effort. She spent over six months reviewing OHA data, meeting with a broad group of stakeholders from various constituencies, and writing two reports that totaled over fifty pages before the Parties moved to implement her recommendations. Neutral Expert First Report ("First Report") [ECF 262-1]; Neutral Expert Second Report ("Second Report") [ECF 262-2]. These reports describe what had been done and what steps should be taken to end the constitutional violations.

These reports, and her third, are full of less-restrictive alternatives the Parties have tried that have failed to achieve compliance. Neutral Expert Third Report ("Third Report") [ECF 313-1]. To counteract staffing challenges, OSH has and continues to operate several accredited training programs for medical professionals to recruit and retain new staff. First Report at 8–9. They have also requested more staffing to handle increased demand. *Id.* at 14. To decrease the number of people needing to go to OSH in the first place, OHA has helped fund community restoration services and jail diversion programs in collaboration with counties and other partners. *Id.* at 9. OHA has also proposed a provider rate increase to encourage existing behavioral health providers to expand capacity in other settings. Third Report at 18. And to create more capacity at OSH, OHA even opened new units at its Junction City Campus in November 2021. *Id.* at 11. This was

possible because the Oregon Legislature allocated $1.3 billion directly to this issue. To date, none of these have solved the crisis.

## B. Alternatives Proposed

Intervenors and Amici propose other steps that should be taken instead of the September 1 Order. They contend these alternatives are less-restrictive means of ending the ongoing constitutional violations. I discuss what I take to be their main arguments below.

### (1) Amici

Amici's first argument is to wait. First, they contend that OSH's admissions pause during the pandemic is still causing delays that will eventually work their way through the system. They also point to the fact that the Oregon Legislature recently revised the statute that provides the current framework for admittance and discharge requirements for defendants with mental health issues. They argue that this new framework should be given time to work instead of being modified by the September 1 Order.

But the only major difference the September 1 Order imposes is shortened discharge times. *Compare* ORS § 161.371(5)(a) *with* September 1 Order at (3)a.–b. Dr. Pinals's research and recommendations show why these shortened discharge times may be among the most effective ways to reach constitutional compliance, with little sacrificed in terms of system-wide outcomes. Second Report at 13 (analyzing ten years of data to show how limiting patients' stays in OSH could have freed up additional beds to serve over 150 more patients annually); Third Report at 12 (finding that, of the thousands of people treated at OSH over a ten year period, only about five people per year on average were prosecuted and convicted who spent over one year in treatment); Second Report at 29 (noting that, with some caveats, clinical studies of inpatient restoration report restoration to be most likely between ninety days and six months); *id.* at 28 (recommending the

discharge time limits found in the September 1 Order).  As to the pandemic, those admissions pauses at OSH took place nearly a year ago.  And it does not seem likely that waiting will improve anything at this point.

Next, Amici make several arguments about increasing capacity through various means. These suggestions include requiring OHA to open another facility, contract with private providers for more beds, and increase its staffing to treat more patients.  However, OHA has already taken, or tried to take, many of these steps.  Another facility has been opened.  Rate increases have been proposed to encourage more private providers to offer needed services.  Staffing measures have been implemented in the face of a state-wide shortage of professionals.

What's more, the measures Amici suggest are highly intrusive.  They order the state of Oregon to make significant policy choices about how to spend sizable amounts of state resources. And they require the state to spend those funds in highly particular ways.  In addition, these options would take many months—if not years—to implement at a scale that would achieve the desired result of constitutional compliance.  In that sense, the intrusiveness would stretch for longer than the handful of months it is projected to take for the beneficial effects of the September 1 Order to be fully realized.

Finally, Amici make a handful of particular proposals to tweak OSH's admissions and discharge processes in ways other than those discussed in the order.  Some of these suggestions have already been implemented by Defendants, per Dr. Pinals's recommendation.  For example, OSH had been holding patients for thirty days after a determination was made as to their ability to aid and assist.  Amici proposed ending this practice.  OSH has already done so, as Dr. Pinals recommended.  Second Report at 22.

Other suggestions relate to fine-tuning the treatment of individuals needing a Hospital Level of Care ("HLOC"), a moratoria on admissions for those charged with misdemeanors, and further coordination of admissions, treatment, and discharges with community resources. Dr. Pinals addressed all of these ideas in her reports. *See, e.g.*, Third Report at 14 (discussing and making recommendations regarding HLOC patients); Second Report at 32 (doing the same regarding misdemeanants and community restoration options). She found that some of these ideas might be useful or required further analysis. As such, they may yet be implemented as part of the path towards compliance. And some of these ideas—in particular, a moratoria on misdemeanant admissions—almost certainly would also require contravening state law or policy. In that sense, some of these suggestions would not be any less intrusive than the September 1 Order.

**(2) Intervenors**

Intervenors are Oregon's largest health systems and operate community hospitals across the state. Their main contention is that the September 1 Order will lead to negative consequences that will directly affect them and cause additional constitutional violations. Because the September 1 Order shortens the maximum time that patients can spend at OSH, Intervenors argue that these patients will be released before they are ready to be returned to their communities. Untreated to the extent they should be, these patients will decompensate. And the September 1 Order also bars civilly committed ("CC") patients from admission to OHA unless they meet the expedited admissions criteria. September 1 Order at (2)b. So with more patients decompensating, and without OSH as an option to which to return, Intervenors believe Oregon state courts will instead order patients to be civilly committed—at Intervenors' hospitals.

Intervenors argue this impermissibly prioritizes GEI and A&A patients over CC patients and violates those patients' (and Intervenors') constitutional rights. According to Intervenors,

hospital settings are not appropriate for CC patients because they are designed to stabilize and manage acute symptoms. They do not provide long-term care and help patients recover from their mental illness. This allegedly creates a constitutional violation because CC persons must be provided "with access to mental health treatment that gives them a realistic opportunity" to be "cured or improve the mental condition for which they were confined." *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000). Intervenors also claim that having more CC patients in their facilities will lead to more violence against their employees and divert resources away from other areas of care.

To remedy this alleged violation, Intervenors contend that the September 1 Order should be modified. They argue that the provision that requires CC patients to meet the expedited admission criteria should be removed. They also suggest changes to the admission and discharge criteria for HLOC patients.

Although Dr. Pinals did not meet with these particular Intervenors in preparing her reports, she did understand the civil commitment process and took it into account when making her recommendations. *See, e.g.*, First Report at 3–4 (showing review of documents related to the civil commitment process); *id.* at 9 (describing a meeting with OHA staff at which CC patients were discussed). Furthermore, Intervenors, at least one Amici, and Dr. Pinals all agree that the provision of the September 1 Order that requires CC patients to meet the expedited admission criteria merely formalizes a longstanding OHA policy. Decl. of Alicia Beymer, Chief Administrative Office for PeaceHealth Sacred Heart Medical Center ¶ 4 [ECF 282]; Decl. of Nicholas Ocón, Behavioral Health Division Manager, Washington County ¶ 7 [ECF 278]; Second Report at 15 (noting that CC patients have had limited access to OSH).

Without addressing the merits of the constitutional question, it stands to reason that GEI and A&A patients—who have been charged with a crime—will in most cases be more dangerous to others than CC patients. It therefore makes sense to prioritize their admission to OSH and only allow highly dangerous CC patients access. That is exactly what the expedited admission criteria does. With limited resources, choices must be made. The requirement that CC patients must meet the expedited admissions policy is therefore a necessary part of the September 1 Order and an important piece of the solution to the ongoing constitutional violations.

## C. Alternative in Progress

I have now considered all of the measures taken to achieve compliance with the 2002 Injunction, up to the point of the September 1 Order. I have also considered the alternatives suggested by Intervenors and Amici. With the greatest respect for everyone's work done to this point, I find that all less-intrusive means have failed to rectify the constitutional violations.[2] This justifies more intrusive measures. And at this point, the alternatives proposed by Intervenors and Amici appear to be inadequate to address the crisis. Their submissions, at this point, have not shown any significant change in facts or law warrants revision or dissolution of the September 1 Order. After a four-year history of noncompliance and nearly $1.3 billion spent, the Constitution demands a more intrusive solution.

That solution is the September 1 Order, including its provisions that arguably infringe on state law. But as the state itself acknowledged at oral argument,

> [T]he subject of how the State Hospital can best meet its obligations has been the
> subject of litigation for some years now, and the request was made by the plaintiffs
> in the past for this Court to enter an order that would override state law, and at that

---

[2] I have also found some of the proposals to be, in fact, more intrusive.

time we have always been able to come back to this Court and say, hang on, we
have ideas for things that we can do within the system, within the structure that has
been created, and my clients have really moved heaven and earth with an awful lot
of things coming at them to keep moving forward. . . . OHA is continuing to move
heaven and earth. . . . [W]e did not oppose the motion this time because we have
run out of the ability to tell you we have a plan for coming back into compliance
under the system as it is now.  We don't have a reason to tell you that we can do
this without something like this Court's September 1st order.

November 21, 2022 Oral Argument Tr. [ECF 328] at 62–63.

      In upholding this order, I must consider the costs of compliance and the steps state
government officials are already taking.  As much as possible, I should generally defer to the policy
choices of such officials.  Here, the state has chosen to rely on a neutral expert.  That expert has
stated that:

[I]t is my opinion, with agreement of the parties, that as a total package the prior
recommendations hold the most realistic potential for long-term and sustainable
achievement of . . . compliance. . . .  The data projections support that the recent
court orders hold further promise for a more expedited remedy that will help the
state achieve the seven-day . . . admission parameters.

Third Report at 12.  In particular, she noted that the September 1 Order's "prioritization of
admissions to those meeting expedited clinical criteria" and the "shorten[ing] [of] the maximum
duration of restoration allowable at OSH" were "consistent with the recommendations set forth in
my Second Report[,] . . . with clinical experience[,] and other state examples . . . ." *Id.* at 15.

As such, I deny Intervenors' Motion to Dissolve or Modify the September 1 Order. But I do so with leave to renew. The September 1 Order must be given time to work and for its effects to materialize. If all goes to plan, it will enable the state to achieve compliance with the Constitution next year, for the first time in nearly half a decade. However, if it does not, other measures will be needed. For now, the solution to this state-wide humanitarian crisis remains a work in progress.

## CONCLUSION

For the reasons stated on the record and above, I DENY Intervenors' Motion to Dissolve or Modify [ECF 284] the September 1 Order, with leave to renew.

IT IS SO ORDERED.

DATED this _____ day of January, 2023.

MICHAEL W. MOSMAN
Senior United States District Judge