Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges Matthew
Donohue, Jonathan Hill, and Nan Waller

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | | |
|---|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | ) ) ) ) | Case No. 3:02-cv-00339-AN (Lead Case) Case No. 3:21-cv-01637-AN (Member Case) Case No. 6:22-cv-01460-AN (Member Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION |
| SAJEL HATHI, in her official capacity as head of the Oregon Health Authority, and SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| JAROD BOWMAN and JOSHAWN DOUGLAS-SIMPSON, | ) ) ) | Case No. 3:21-cv-01637-AN (Member Case) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |

Page 1 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

SARA WALKER, Interim Superintendent )
of the Oregon State Hospital, in her )
official capacity, DOLORES MATTEUCCI, )
in her individual capacity, SAJEL HATHI, )
Director of the Oregon Health Authority, in )
her official capacity, and PATRICK ALLEN, )
in his individual capacity, )
　　　　　　　　　　　　　　　　　 )
　　　　　Defendants. )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
LEGACY EMANUEL HOSPITAL & )    Case No. 6:22-cv-01460-AN (Member Case)
HEALTH CENTER d/b/a UNITY CENTER )
FOR BEHAVIORAL HEALTH, LEGACY )
HEALTH SYSTEM; PEACEHELATH; and )
PROVIDENCE HEALTH AND SERVICES )
OREGON, )
　　　　　　　　　　　　　　　　　 )
　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　 )
　　　　　v. )
　　　　　　　　　　　　　　　　　 )
SAJEL HATHI, in her official capacity as )
Director of the Oregon Health Authority, )
　　　　　　　　　　　　　　　　　 )
　　　　　Defendant. )

## I.    INTRODUCTION

Presiding Judge Matthew Donohue (Benton County), Presiding Judge Jonathan Hill

(Tillamook County), and Judge Nan Waller (Multnomah County) ("*Amici* Judges") offer the

following perspectives and data in advance of next week's status conference for whatever use the

Court deems appropriate.

## II.    BRIEF BACKGROUND

*Amici* Judges—then five, now three—became involved in this decades-old litigation

shortly after the Court issued an order on August 16, 2022, enjoining any state court action

Page 2 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

seeking to hold those associated with the cases in contempt for their inability to comply with

Judge Panner's 2002 permanent injunction. (Dkt. 256.) The August 16 Order also denied

plaintiffs' unopposed request to relieve defendants from following certain Oregon statutes

respecting admission to and discharge from the Oregon State Hospital (OSH), with Judge

Mosman writing, in part, as follows:

> "There is a key distinction to be made between protecting Defendants'
> ability to work towards solutions to the admittance crisis—what the 2002
> injunction was put in place to actualize—and blatantly authorizing noncompliance
> with specific provisions of state law they no longer wish, for good reason, to
> comply with. Protecting respects the executive and its role in implementing
> policy positions; authorizing noncompliance tramples on the role of the state
> legislature to write laws, a job of which I am neither capable nor for which I was
> appointed. * * *

> "* * * Paragraphs two and three [of the proposed order (Dkt. 252-1)]
> provide for specific solutions—those discussed above [regarding admission
> restrictions and restoration time limits]—that require Defendants to directly
> disregard state law requirements. This I cannot order for the reasons I have
> stated, although I encourage Defendants to work with other parts of the Oregon
> Executive Branch, as well as the Legislative and Judiciary, to implement these
> changes as soon as possible and by whatever means are determined to be most
> expeditious and effective." (Dkt. 256 (bracketed text added).)

Two weeks later, the Court reached a different conclusion and entered plaintiffs'

proposed order in full—overwriting Oregon law by limiting OSH admissions and setting

inpatient restoration time limits for aid and assist defendants—after determining that

> "a compelling case has been made for a factual crisis requiring immediate action
> in these things, that even as this has played out while diligent people have worked
> hard to get to this point, you know, lives have been lost. And so I view it as of the
> utmost importance to undertake this drastic step, on that for someone of my
> judicial philosophy is a very drastic step, but it has been compelled by facts on the
> ground." (Dkt. 272 Tr. at 11; Dkt. 271 (the "September 1 Order).)

Page 3 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

At the same time, the Court solicited briefing on two questions: (1) does "a federal court in my shoes have the power to order noncompliance with what I'll call textually neutral state laws?" and (2) "is it necessary to excuse compliance with those state laws in order for defendants to be able to come into compliance with the U.S. Constitution?"  (Dkt. 272 Tr. at 13.)

*Amici* Judges offered briefing (Dkt. 280-1) and oral argument (Dkt. 328) in response to the Court's request.  (In the meantime, the Court had dissolved the August 16 order, including the injunction against state court contempt proceedings.  (Dkt. 306.))  In brief, the judges

(1) raised concerns that, with defendants earlier having stated they "no longer are in a position to oppose the Court exercising its authority in this case" or "to oppose the relief that plaintiffs are requesting" (Dkt. 273 Tr. at 10-11), lack of adversity between the parties could be negatively affecting the advocacy being provided to the Court (Dkt. 280-1 at 9-10 & n. 2);

(2) found the analysis and result in the August 16 Order consistent with both precedent and federalism considerations (*id*. at 5, 15-17);

(3) believed that, on the record before the Court, the September 1 Order was neither demonstrably necessary nor narrowly drawn, failed to balance public safety considerations and the potential for third-party harm, and permitted "plaintiffs' and defendants' limited set of interests in this process" to prevail over longstanding statutory policy determinations with respect to who can be admitted to OSH and for how long (*id*. at 22-27 (quotation at 27)); and

Page 4 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

(4) suggested at argument—in November 2022—that "on the cusp of a full legislative

session convening in several weeks [with] changes in leadership[, that t]his is an

appropriate time" for the Court to consider the imposition of contempt to as a way to

prompt "defendants [to] go to the legislature and ask for * * * additional resources so

that they could meet the capacity that [OHA and OSH], according to plaintiff, should

have expected." (Dkt. 328 Tr. at 29 (bracketed text added).)

Contempt did not follow and two legislative sessions (one full, the other short) have

come and gone without any enactment seeking to address the matters at issue in this litigation.

Moreover, at least to the extent *Amici* Judges are aware, there presently is no working draft of a

bill for the 2025 session.

Fast forward to this Court's most recent status conference, held over the summer.[1]  For its

part, plaintiff Metropolitan Public Defenders (MPD) noted that "[s]tate court judges around the

state are getting frustrated again because the State is not in compliance and we're going to need

new solutions." (Dkt. 507 Tr. at 8-9.)[2]  As for solutions, between increasing capacity or reducing

referrals to OSH, MPD repeated that

---

[1]     The intervening months and years found the *Amici* Judges' involvement focusing
primarily on (1) attempting to steer the parties toward Oregon's state courts as the forum of first
resort for enforcing both the Court's September 1 Order and its July 2023 amended version of
that order (Dkt. 416) (*see*, *e.g.*, Dkts. 365, 385, 435) and (2) actively participating in the multiple
mediation sessions held before Judge Beckerman.

[2]     According to the Oregon Health Authority's *Mink-Bowman* compliance dashboard, OSH
fell out of compliance in June with the average number of days to admission increasing steadily
therafter:  June—13.3 days; July—19.2; August—21.2; September—26.1; October—26.9.  *See*
https://www.oregon.gov/oha/osh/pages/mink-bowman.aspx.

Page 5 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

> "our preference is that the referral numbers go down, and that they go down by more folks getting treatment in the communities that they live in rather than being sent to the hospital, because that's what the clinicians say is the most appropriate way to get people to recovery and sustained recovery from their mental illness." (*Id*. Tr. at 8.)

*Amici* Judges, likewise acknowledged

> "the frustration that judges are feeling now.  They have been since the entry of the first remedial order in September of 2022.  And primarily the concern is that the statutes vest in the judges a lot of discretion as to what to do, but functionally, with the lack of resources, particularly with respect to community restoration at the back end, it becomes very difficult to exercise discretion in any meaningful way because there's simply no resources available that are appropriate for a number of these discharged defendants to be sent to."  (*Id*. Tr. at 18.)

The judges also, however, reiterated the same concern they had raised in 2022, namely, there seems to be a disconnect between the policy of Oregon with respect to the restoration of defendants unable to aid and assist and the more "limited interests" of each plaintiff and defendants (and even the Neutral Expert), and query the extent as a matter of federalism the Court should be seeking to advance those preferences rather than longstanding Oregon policy when ensuring compliance with the Due Process Clause:

> "[T]he plaintiffs have preferences, [MPD's counsel] stated, to have the referrals go down. * * * The policy of the State of Oregon suggests a different emphasis, * * * because under state law, which has now been kind of overwritten by this Court in its remedial orders, you can have up to three years or the maximum extent of the penalty for the charge that's at issue for which the State has the option of trying to continue to restore these defendants so they can aid and assist in their defense and the prosecution can continue.

> "[T]hat seems to reflect a significant investment, and so long as the State can do that * * * and not violate defendant[s'] constitutional rights, * * * that seems to be kind of the question about does capacity really need to -- going up

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR  97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

really need to be kind of an elemental part of the discussion going forward." (*Id*. Tr. at 18-19.)[3]

In short, from the *Amici* Judges' perspective, the Court in many ways finds itself in the same position today that it was two years ago: the number of aid and assist admissions are increasing; OSH is unable to keep up; and the Court is faced with the difficult decision whether to **further** relieve defendants of their state law obligations consistently with plaintiffs' policy preferences in the hope that compliance can be restored and will be maintained or, when compared against considerations of federalism and further impacts to the public, victims, the justice system, and criminal defendants themselves, to seek some other enforcement mechanism that will bring the state—which, once again is sitting on the cusp of a full legislative session—into compliance with constitutional requirements.[4]

All the foregoing notwithstanding, and in the hope of providing the Court with the fullest amount of information possible upon which to base its decision, *Amici* Judges present below updated statistical analyses with respect to data they have been providing to the Neutral Expert,

---

[3]     Oregon's three-year maximum restoration limit was enacted a little over 30 years ago. *See* Or Laws 1993, ch 238, § 3. Before that, commitment was "for so long as such unfitness shall endure." *See* Or Laws 1971, ch 743, § 52(2).

[4]     The parties', clinicians', and state's policy preferences aside, no one has argued that Oregon no longer needs a state hospital. In other words, there seems to be agreement that some segment of the population will need that level of care at some point and for some period. If so, then the fact that the capacity of the state hospital has decreased by 41%—from 980 beds in 2010 (https://www.oregonlive.com/politics/2010/11/state_leaders_to_dedicate_new.html) to 577 in 2024 (https://www.oregon.gov/oha/HSD/AMH/DataReports/Behavioral-Health-Residential-Facility-Study-June-2024.pdf at 36) while Oregon's population has increased by 9% between the 2010 and 2020 censuses (https://www.census.gov/quickfacts/fact/table/OR/PST045223 seems both incongruent and relevant to the Court's consideration.

Page 7 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

Judge Beckerman, and/or the parties for some time. The data comes from the Oregon Judicial Department and is attached to this submission in the form it was received—which details its empirical methodology—and also is summarized below.

### III.    DATA

A. <u>Nature and Seriousness of the Problem</u>

As noted above, OHA data shows OSH fell out of compliance in June 2024 and, in each month thereafter, has become further noncompliant. The average number of days for admission now stands at 26.9, far beyond the seven-day constitutional benchmark. (*See supra* at 5 n. 2.) Indeed, the current level of delay approaches that with which Judge Panner was confronted in 2001 and 2002 (31.98 days based upon a review of 105 records; Dkt. 47 at 7 ¶ 15) and prompted plaintiff MPD to move (unsuccessfully) for a finding of contempt in May 2019 (noting defendants had failed to provide statewide data but anecdotal evidence showed MPD's clients were "taking approximately one month to be transported;" Dkt. 85 at 6).

The question, then, is why? That we collectively experienced a pandemic at the outset of the decade would seem relevant. OJD data does show a significant drop in the number of felony and misdemeanor cases filed in 2020, 2021, and 2022, but with felony filings continuing to fall in 2023 and misdemeanor cases increasing by six percent or so:

#### *OREGON CIRCUIT COURTS – CASES FILED*

|  | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Felony | -8.7% | -9.0% | -0.8% | -2.1% |
| Misdemeanor | -22.1% | -7.9% | -0.8% | +6.1% |
| Procedural | -12.4% | +15.9% | +2.1% | +0.3% |

Page 8 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

Or, looking at raw numbers, there were 24,283 felony and 40,143 misdemeanor cases filed in 2020 but only 21,454 felony and 38,913 misdemeanor cases filed in 2023. *See* https://app.powerbigov.us/view?r=eyJrIjoiZjNlNjNkYTMtOWMzNy00MDM4LWE0ODgtYmQ5ZWQ2OTVjY2MwIiwidCI6IjYxMzNlYzg5LWU1MWItNGExYy04YjY4LTE1ZTg2ZGU3MWY4ZiJ9.

Those numbers, frankly, do not suggest there should be an increase in the number of aid and assist commitments to OSH over time. Yet, on a yearly basis recently and as demonstrated in the attached OJD document "***Aid & Assist Commitments to the Oregon State Hospital, By Month***," that is precisely what has happened. (Attachment at 1-3.) Working from that document, there were 962 commitments in 2022, 1119 commitments in 2023, and 969 commitments so far for 2024 with two months to go. Or, as stated in the document itself:

> "Oregon's circuit courts committed an average of 75 aid & assist defendants per month in the twelve months prior to Judge Mosman's remedial order in September 2022, and committed an average of 93 defendants per month in the 26 months after Judge Mosman's order." (Attachment at 2.)

Looking elsewhere, could it be that Oregon's circuit court judges are committing more unfit defendants to OSH as opposed to first seeking restoration in a community setting? OJD data demonstrates that is not the case. To the contrary, there has been a 10 percentage point ***decrease*** in the percentage of defendants found unfit whose initial circuit court placement was commitment to OSH—from a high of 77% in 2021 to a present low of 67% for the first ten months of 2024. (*See* OJD Document "***Number of Defendants Found Unfit to Proceed and Percent Committed to the Oregon State Hospital***;" Attachment at 4-5.) At the same time, while Oregon judges are committing a lower percentage of unfit defendants to OSH initially, it remains

Page 9 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

that the number of unfit criminal defendants in Oregon courts has increased substantially over the last four years—from 762 in 2020 (which may be anomalous due to the pandemic) to 1,362 in 2023 (a number on track to be exceeded, but perhaps not by much, in 2024), or an approximate 79% overall increase.  (*See* Attachment at 5.)

Explanations for that startling figure are beyond any OJD data set.  Again, there was a pandemic (defendants, however, were failing to meet constitutional standards well before the first COVID infection; *see supra* at 8 (30-day wait times in May 2019 according to MPD (anecdotal)); Oregon experimented with decriminalizing substance abuse (Ballot Measure 110 (2020); there has been a rise in houselessness comparable to the percentage increase in unfit criminal defendants—in Portland alone, a 65% jump between 2015 and 2023 (from 1,887 to 6,297 individuals)—*see* https://www.portland.gov/wheeler/homelessness; and, particularly after entry of the September 1 Order, criminal defense attorneys may have become more aware about fitness issues generally (and strategically as well).

More likely, it is an aggregation of the above that has created, as media account after media account relates, Oregon's and our nation's mental health "crises."  *See*, *e.g.* Ben Botkin, *Multnomah County judge in center of Oregon's mental health crisis*, Lund Report (Sept. 12, 2023) (https://www.thelundreport.org/content/multnomah-county-judge-center-oregons-mental-health-crisis); Amelia Templeton, *Oregon's many mental health crises*, OPB (March 14, 2023) (https://www.opb.org/article/2023/03/14/oregon-mental-health-services-problems/).

Finally, discernable simply as a matter of the number of times the captions in these consolidated cases have changed over the last year, both OSH and OHA have experienced

Page 10 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

significant turnover and, as a matter of the hydraulics of the restoration system, their potential

causative role in the marked increase in wait times for admission cannot be overlooked. In fact,

OJD data (*see **Fitness Findings and New Charges for Defendants After Commitment to the***

***Oregon State Hospital is Terminated***; Attachment at 6-10) shows a significant decrease in

OSH's ability to restore defendants to competency in the 26 months that have elapsed since entry

of the September 1 Order while the throughput of those individuals has risen by nearly 40%

(from 68.1 terminated commitments per month on average to 94.1). Specifically:

- the monthly number of defendants with commitment terminated without regaining
  fitness doubled (from 27.8 per month to 56.0 per month);

- the percent of defendants who were found fit to proceed at the end their
  commitment to OSH decreased from 59% to 40%, ***a 19 percentage point overall***
  ***decrease in restoration efficacy***; and, more particularly,

  - o  61% of defendants with Measure 11 felony charges were restored
     compared to 79% from September 2021 through August 2022 (an 18-
     percentage point decrease);

  - o  only 42% of defendants whose most serious charge was a non-Measure 11
     felony were restored versus 64% before the September 1 Order (down 22
     percentage points); and

  - o  29% of defendants who did not have a felony charge (misdemeanor or
     contempt) were restored in the last 26 months (versus 42% before). (*See*
     Attachment at 8-9.)

Of course, from the caregivers at OSH, to *Amici* Judges and their colleagues, to

prosecutors and defense attorneys alike, as well friends, families, and their communities

Page 11 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

at large—not to mention the defendants themselves—those figures (1) are not numbers
but people and (2) are deeply troubling.[5]

What *Amici* Judges do not know is whether those untenable results are the product of
OSH not doing its job as well as it did before because of staffing or some other issue, the
restoration time limits as set out in the Court's remedial orders simply being insufficient, a
combination of the two, or some other causative agent.[6]

B.  A Few Serious Consequences of the Problem

The steep decline in restoration success is not the only downstream consequence *Amici*
Judges have observed.  Empirically, there are at least two others.  (Anecdotally, they are legion.)
First is the rate of recidivism:  how many defendants (allegedly) are reoffending after discharge
from OSH?  Quoting from OJD's analysis:

> "Comparing the number of new criminal cases filed per month between
> September 2021 and August 2022 for defendants with a commitment terminated

---

[5]     Indeed, *Amici* Judges initially presented similar, earlier data to the Court's Neutral Expert
in October 2023 as part of the Court's "efficacy review" and, in her Eighth Neutral Expert
Report, Dr. Pinals described that issue and other "downstream consequences" as "very
significant."  (*See* https://www.oregon.gov/oha/OSH/reports/Oregon-Mink-Bowman-8th-
Neutral-Expert-Pinals-Report.pdf. at 22).  At the same time, she offered that, "in my opinion,
more time is needed for the system to adjust, rebuild itself after the pandemic, and equilibrate to
the Mosman order to understand whether these downstream effects can be improved."  (*Id*.)
That report is dated December 18, 2023.

[6]     It also should be noted that, after *Amici* Judges first provided their data to Dr. Pinals and
the parties, OHA produced its own statistics that, across certain metrics, appeared to vary from
OJD's.  The judges analyzed OHA's data and remained confident that OJD's numbers were both
correct and/or the most analytically significant.  They also understand that OHA might have new
data and analysis, but they have not yet seen it.  In any event, the judges hope defendants will
provide the Court with any potentially relevant statistical analyses they might have.  The goal
here is to get it right.

Page 12 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

in the previous six months with the number of such cases filed per month between September 2022 and October 2024 shows that, in the latter period, new ***felony*** cases filed within 6 months of termination ***increased 46%*** (from 5.3 per month to 7.8 per month), and new ***misdemeanor cases went up 90%*** (from 10.4 per month to 19.8 per month)"

(Attachment at 10 (emphasis added).)  Those increases, in a word, are alarming.

Second are the number of defendants, through last month, who have had their cases dismissed after being discharged from OSH due to reaching the applicable restoration time limit set out in the Court's remedial orders:

| MOST SERIOUS CHARGE | # OF DEFENDANTS |
|---|---|
| Murder | 4 |
| Class A Felony | 58 |
| Class B Felony | 25 |
| Class C Felony | 167 |
| Other Felony | 1[7] |
| Class A Misdemeanor | 230 |
| Class B Misdemeanor | 21 |
| Contempt | 26 |
| Probation Violation | 11 |
| | _____ |
| TOTAL | 543 |

---

[7]    The offense was unlawful possession of a weapon by an inmate, which had been charged as an unclassified felony.  Also, Class C Misdemeanors, with their 30-day maximum sentence, ORS 161.615(3), are no longer eligible for commitment to OSH.  *See, e.g.*, ORS 161.371(5)(a)(B) (period of commitment may not exceed "[a] period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted").

Page 13 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

## IV.     CONCLUSION

At the Court's last status conference, it stated: "We don't know exactly what the legislature will do, and that's a huge component, because if they make this a priority and fully funded it, maybe no one would be here." (Dkt. 507.)  With that statement, *Amici* Judges concur entirely.  Still, the question remains:   How to convince the political branches of Oregon's government to make the mental health crisis as it relates to the justice-involved population—one of Oregon's most ignored—the priority it needs to be . . . now.  Too much time has passed, too little ground has been gained (and, even then, lost), and the consequences to everyone involved—and public health and safety as well—are too great to accept progress measured in years and a collection of studies and informational legislative hearings.

Respectfully submitted November 15, 2024.

_____ */s/ Keith M. Garza*_____
Keith M. Garza, OSB No. 940773

Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges

Page 14 – *AMICI* JUDGES' STATUS CONFERENCE SUBMISSION

## Aid & Assist Commitments to the Oregon State Hospital, By Month
*Oregon Judicial Department*
*September 2021 – October 2024*

### Overview

If a court determines that a defendant lacks fitness to proceed with a criminal case, one potential action is commitment to the Oregon State Hospital (OSH) for services to restore the defendant's ability to aid & assist in their own defense.

This document shows the number of aid & assist defendants Oregon's circuit courts committed to OSH each month in the twelve months before and the 26 months after Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case.

Since Judge Mosman's remedial order in September 2022, the number of commitments has fluctuated between a low of 69 defendants committed in July 2023 and February 2024 and a high of 125 defendants committed in July 2024.

### Method

The statistics in this document are based on information from the Oregon Judicial Department's Odyssey case management system.

The number of aid & assist commitments in a month is the number of defendants who, in that month:

- Had an order issued on one of their cases committing the defendant to OSH for restoration services

  and

- Were not already committed to OSH on another case at the time of the order

### Data Challenges and Assumptions

The chart on page 3 shows the number of aid & assist defendants committed to OSH each month by Oregon's circuit courts.

Each month's number excludes defendants who remained committed to OSH under orders issued in prior months, and therefore represents the number of new defendants committed to OSH that month.

Over time, the number of defendants *committed* to OSH should be similar to the number of aid & assist defendants *admitted* to OSH, but the number of circuit court commitments in a month may differ from the number of aid & assist admissions due to any of the following reasons.

- **Delays in Admission:** Because it takes time for defendants to be transported to Salem and admitted to OSH, some defendants who are committed to OSH in one month might not be admitted until a subsequent month.

- **Defendants Not Admitted to OSH:** While most defendants committed to OSH are eventually admitted, any defendants who are committed by a circuit court and not admitted to OSH – for example, defendants denied admission due to not being eligible under Judge Mosman's remedial order – would cause the number of defendants committed and the number admitted to differ.

- **Municipal Court Commitments:** Some municipal courts handle aid & assist cases and commit defendants to OSH.  While defendants committed to OSH by municipal courts may be included in OSH admission data, such commitments are not included in this report.

- **Duplicate Party Records:** Aid & assist defendants are sometimes committed to OSH on multiple cases, and this report counts defendants committed on multiple cases only once as long the cases have a single Odyssey party record.  OJD works to minimize the number of duplicate party records in its system, but defendants who do have duplicate records in Odyssey may be over-counted in this report.

## The Data

The chart on the following page shows the number of defendants committed to OSH for aid & assist restoration services by Oregon's circuit courts each month between September 2021 and October 2024.

Oregon's circuit courts committed an average of 75 aid & assist defendants per month in the twelve months prior to Judge Mosman's remedial order in September 2022, and committed an average of 93 defendants per month in the 26 months after Judge Mosman's order.

Since Judge Mosman's remedial order in September 2022, the number of defendants committed each month has fluctuated between a low of 69 defendants in July 2023 and February 2024 and a high of 125 defendants in July 2024.



Aid & Assist Commitments to the Oregon State Hospital, by Month
For Defendants Committed by Oregon's Circuit Courts
September 1, 2021 through October 31, 2024
Commitments to OSH
125
100
75
50
25
0
58
59
87
71
75
61
83
81
82
81
77
90
84
88
91
70
104
78
98
105
95
85
69
106
91
102
96
90
88
69
88
93
123
92
125
97
84
110
September
October
November
December
2021
January
February
March
April
May
June
July
August
September
October
November
December
2022
January
February
March
April
May
June
July
August
September
October
November
December
2023
January
February
March
April
May
June
July
August
September
October
2024
Month

## Number of Defendants Found Unfit to Proceed
## and Percent Committed to the Oregon State Hospital
### Oregon Judicial Department
### January 2020 – October 2024

### Overview

After a court determines that a defendant lacks fitness to proceed with a criminal case, the court must determine an appropriate action for the defendant.

One potential action after a defendant is found unfit to proceed is commitment to the Oregon State Hospital (OSH) for restoration services. This document contains data on the number of defendants found to lack fitness to proceed in Oregon's circuit courts each year since 2020, and the percent of those defendants for whom the court's initial action was commitment to OSH.

### Method

The numbers in this document are drawn entirely from the Oregon Judicial Department's Odyssey case management system.

The numbers of *Defendants Found Unfit to Proceed* in the table on page 5 represent the number of defendants each year who were found to lack fitness to proceed on a circuit court case, excluding defendants who, at the time of the order finding the defendant unfit, already lacked fitness to proceed on another case.

The number of *Defendants Whose Initial Placement Was Commitment to the Oregon State Hospital* in the table on page 5 is the number of the defendants found unfit to proceed for whom the first placement ordered by the court – other than any orders for the defendant to remain in custody temporarily while the court determined an appropriate action – was commitment to OSH.

### Data Challenges and Assumptions

It is critical to note that the number and percentage of defendants whose ***initial*** placement was commitment to OSH do ***not*** include defendants who were ordered into community restoration when they were found unfit to proceed but were later committed to OSH because community restoration services were not successful.

It is also important to be aware that the numbers in this document include only Oregon's circuit courts, and so do not include defendants found unfit to proceed by municipal courts.

For these reasons, the number of defendants whose initial placement was commitment to OSH each year should be lower than the total number of aid & assist defendants admitted to OSH that year.

**The Data**

The table below shows number of defendants found unfit to proceed in Oregon's circuit courts by year, from January 2020 through October 2024.  The table also shows the number and percent of defendants found unfit to proceed each year for whom the court's initial placement action was commitment to OSH.

| Table 1: Initial Placement Decisions for Defendants Found Unfit to Proceed *For Defendants Found Unfit to Proceed in Oregon Circuit Courts Between 1/1/2020 and 10/31/2024* | | | |
|---|---|---|---|
| **Year** | **Defendants Found Unfit to Proceed** | **Defendants Whose Initial Placement Was Commitment to the Oregon State Hospital (OSH)** | **Percent of Defendants Whose Initial Placement Was Commitment to OSH** |
| 2020 | 762 | 570 | 75% |
| 2021 | 977 | 750 | 77% |
| 2022 | 1,103 | 843 | 76% |
| 2023 | 1,362 | 957 | 70% |
| 2024 (Jan - Oct) | 1,177 | 786 | 67% |

Although the number of defendants whose initial placement was commitment to OSH increased each year from 2020 to 2023, the increases were due to an increase in the total number of defendants found unfit to proceed rather than an increase in the percentage of defendants that the circuit courts committed to OSH.

The percent of defendants initially committed to OSH in Oregon's circuit courts ranged between 75% and 77% from 2020 to 2022 before falling to 70% in 2023 and 67% in the first ten months of 2024.

# Fitness Findings and New Charges for Defendants After Commitment to the Oregon State Hospital Is Terminated
## Oregon Judicial Department

## Overview

This document shows circuit court data on fitness to proceed findings when commitment to the Oregon State Hospital (OSH) is terminated, and on new criminal cases filed within six months of commitment being terminated.

Comparing data from the twelve months before Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case (September 2021 through August 2022) with data from the following 26 months (September 2022 through October 2024) shows that, in the latter period:

- The percent of defendants who were found fit to proceed at the end their commitment to OSH decreased from 59% to 40%

- The monthly number of defendants with commitment terminated without regaining fitness doubled (from 27.8 per month to 56.0 per month)

- The monthly number of new felony cases filed within six months of a defendant's commitment being terminated increased 46% (from 5.3 per month to 7.8 per month)

- The monthly number of new misdemeanor cases filed within six months of a defendant's commitment being terminated increased 90% (from 10.4 per month to 19.8 per month)

In the 26 months following Judge Mosman's remedial order, the percent of defendants found fit to proceed at the end of their commitment to OSH was:

- 61% for defendants with Measure 11 felony charges

- 42% for defendants whose most serious charge was a non-Measure 11 felony

- 29% for defendants who did not have a felony charge

## The Data/Method

The numbers in this document are drawn entirely from the Oregon Judicial Department's (OJD's) Odyssey case management system.

Defendants who have been found to lack fitness to proceed and committed to OSH for restoration services are counted as having their commitment terminated when all cases on which they were committed have an event entered – such as an order finding the

defendant fit to proceed, an order for community restoration, or a dismissal judgment – that indicates that they are no longer committed to OSH.

## Data Challenges and Assumptions

OJD does not have access to admission or discharge data from OSH, and the numbers in this document are based solely on information on when the court terminated the commitment.  This may differ from the date that a defendant was discharged by OSH.

Similarly, OJD's data on fitness findings are based on court determinations as to whether defendants regained fitness to proceed, and may be different from an analysis of the opinions of OSH forensic evaluators prior to discharge.

Finally, the numbers in this document depend on accurate data entry by court staff, particularly in ensuring that defendants with multiple aid & assist cases have a single Odyssey party record.  OJD attempts to minimize the number of duplicate records in its system, but defendants who were committed to OSH on multiple cases with duplicate party records may be counted multiple times in these numbers.

For these reasons, the numbers in this document may differ from numbers compiled with OSH data.

## Commitments Terminated and Fitness Findings

Table 2 (page 8) shows information on monthly aid & assist commitments terminated in the twelve months before and the 26 months after Judge Mosman's remedial order in the federal *Mink/Bowman* case, including the number and percentage of those defendants who were found fit to proceed on at least one of their cases.

Defendants are counted as found fit to proceed if the court found the defendant fit on any their cases, either at the time the commitment was terminated or prior to any order to release the defendant from custody.

Defendants who were not found fit to proceed until after an order to release them from custody are *not* counted as found fit in Table 2, as they are presumed to have lacked fitness to proceed when commitment was terminated and to have regained fitness while on community restoration.

Comparing data for September 2021 through August 2022 with data for September 2022 through October 2024 shows that the percent of terminated defendants who were found fit dropped from 59% to 40%, and that the number of terminated defendants who were not found fit on any of their cases increased from 27.8 defendants per month to 56.0 defendants per month.

| Table 2: Aid & Assist State Hospital Commitments Terminated, Per Month<br>*In Oregon Circuit Courts*<br>*Between September 1, 2021 and October 31, 2024* | | | |
|---|---|---|---|
| | Commitment Termination Date | | Change |
| | September 2021 – August 2022 | September 2022 – October 2024 | |
| Total Commitments Terminated, Per Month | 68.1 | 94.1 | **+38%** |
| Commitments Terminated - Defendant Found Fit, Per Month | 40.3 | 38.1 | **-5%** |
| Commitments Terminated - Defendant Not Found Fit, Per Month | 27.8 | 56.0 | **+101%** |
| Commitments Terminated - Percent of Defendants Found Fit | 59% | 40% | **-19 percentage points** |

### Commitments Terminated and Fitness Findings, By Charge Type

A major change caused by Judge Mosman's remedial order was the implementation of new limits on how long defendants could remain at OSH for restoration services. The new limits in Judge Mosman's remedial order were:

- One year for defendants charged with a Measure 11 felony

- Six months for defendants whose most serious charge was a non-Measure 11 felony

- The lesser of 90 days or the maximum sentence for defendants who were not charged with a felony

Table 3 (page 9) shows that, for each of the three charge categories, OSH was less successful at restoring defendants to fitness in the 26 months after the Judge Mosman's remedial order than in the twelve months prior to the remedial order.

In the 26 months following Judge Mosman's remedial order, 61% of Measure 11 defendants were found fit when their commitment was terminated, compared with 42% of defendants whose most serious charge was a lesser felony and 29% of defendants who were not charged with a felony.

| | Percent of Defendants Found Fit at Termination | | Change |
|---|---|---|---|
| **Table 3: Percent of Defendants Found Fit to Proceed When Commitment to OSH Is Terminated, By Charge Type** *In Oregon Circuit Courts* *Between September 1, 2021 and October 31, 2024* | | | |
| **Most Serious Charge** | **September 2021 – August 2022** | **September 2022 – October 2024** | |
| Measure 11 Felony | 79% | 61% | **-18 percentage points** |
| Non-Measure 11 Felony | 64% | 42% | **-22 percentage points** |
| Misdemeanor or Contempt | 42% | 29% | **-13 percentage points** |
| Total – All Charge Types | 59% | 40% | **-19 percentage points** |

## New Cases Filed Within Six Months of Termination

Table 4 (page 10) shows the monthly number of new criminal cases filed for defendants who had an aid & assist commitment to OSH terminated in the six months before the new case was filed.

New criminal cases include cases filed between September 1, 2021 and October 31, 2024 where:

- the defendant in the new case had the same first name, last name, and at least one other matching identifier (date of birth, state identification number, social security number, or driver's license number) as a defendant who had an aid & assist commitment terminated in the prior six months

  and

- at least one of the alleged offenses on the case occurred after the commitment was terminated

| Table 4: New Criminal Cases Filed Per Month for Defendants Who Had an Aid & Assist Commitment to the Oregon State Hospital Terminated in the Previous Six Months *For New Cases Filed in Oregon Circuit Courts Between September 1, 2021 through October 31, 2024* | | | |
|---|---|---|---|
| | **New Case Filed Date** | | **Change** |
| | **September 2021 – August 2022** | **September 2022 – October 2024** | |
| New Felony Cases Filed, Per Month | 5.3 | 7.8 | **+46%** |
| New Misdemeanor Cases Filed, Per Month | 10.4 | 19.8 | **+90%** |

Comparing the number of new criminal cases filed per month between September 2021 and August 2022 for defendants with a commitment terminated in the previous six months with the number of such cases filed per month between September 2022 and October 2024 shows that, in the latter period, new felony cases filed within 6 months of termination increased 46% (from 5.3 per month to 7.8 per month), and new misdemeanor cases went up 90% (from 10.4 per month to 19.8 per month).

## Defendants with All Cases Dismissed After *Mink/Bowman* Discharge Notice, by Most Serious Charge Degree
### *Oregon Judicial Department*
### *September 1, 2022 – October 31, 2024*

### Overview

In September 2022, Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case limited the time that defendants can be at the Oregon State Hospital (OSH) for aid & assist restoration services to:

- One year for defendants charged with a Measure 11 felony

- Six months for defendants whose most serious charge is a non-Measure 11 felony

- The lesser of 90 days or the maximum sentence for defendants who are not charged with a felony

This document shows data on defendants who had all the cases on which they were committed to OSH dismissed after OSH filed a notice (hereafter referred to as a *Mink/Bowman* discharge notice) that the defendant would be discharged under the timelines in Judge Mosman's remedial order.

### Method

The statistics in this document are based on events entered in the Oregon Judicial Department's Odyssey case management system.

Defendants on whom *Mink/Bowman* discharge notices have been filed count as having all their cases dismissed if both of the following are true:

- The defendant was not found fit to proceed on any of the cases on which a *Mink/Bowman* discharge notice was filed

- All cases or probation violations on which a *Mink/Bowman* discharge notice was filed were dismissed

The most serious charge degree for each defendant is identified by looking at all the cases on which the *Mink/Bowman* discharge notice was filed, and identifying the degree of the most serious charge that was pending when the notice was filed.

Although *murder* is not a charge degree, murder charges are categorized separately from other unclassified felonies due to provide clarity as to what type of unclassified felony was dismissed.

## Data Challenges and Assumptions

The statistics in this document are based entirely on information from Odyssey, and therefore include only defendants in Oregon's circuit courts.  Some of Oregon's municipal courts also handle aid & assist cases, but data from those courts are not included in this report.

The results count defendants who had *Mink/Bowman* discharge notices filed on multiple cases at the same time only once, even if multiple cases were dismissed.  This means that the number of individual cases dismissed is higher than the numbers of defendants in the table below.

It is also important to note that not all dismissals occurred immediately upon on discharge from OSH.  Some defendants whose cases were ultimately dismissed may have remained in custody for a time while the court waited to see whether appropriate services to became available, or may have been released to community restoration prior to having their cases dismissed.

## The Data

The table below shows the number of defendants who were not found fit to proceed and had all the cases on which OSH filed a *Mink/Bowman* discharge notice dismissed, by the most serious charge that was pending when the discharge notice was filed.

Through October 31, 2024, a total of 543 defendants with a *Mink/Bowman* discharge notice filed had all their cases dismissed without being found fit to proceed.

| Table 5: Defendants with All Cases Dismissed After Mink/Bowman Discharge Notice, By Most Serious Charge Degree *September 1, 2022 through October 31, 2024* | |
|---|---|
| **Most Serious Charge Degree** | **Number of Defendants** |
| Murder | 4 |
| Felony Class A | 58 |
| Felony Class B | 25 |
| Felony Class C | 167 |
| Other Felony | 1 |
| Misdemeanor Class A | 230 |
| Misdemeanor Class B | 21 |
| Contempt | 26 |
| Probation Violation | 11 |
| **Total** | **543** |