Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges Matthew
Donohue, Jonathan Hill, and Nan Waller

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| DISABILITY RIGHTS OREGON, | ) | Case No. 3:02-cv-00339-AN (Lead Case) |
| METROPOLITAN PUBLIC DEFENDER | ) | Case No. 3:21-cv-01637-AN (Member Case) |
| SERVICES, INC., and A.J. MADISON, | ) | Case No. 6:22-cv-01460-AN (Member Case) |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | *AMICI* JUDGES' JANUARY 2025 |
| | ) | STATUS CONFERENCE MEMO |
| SAJEL HATHI, in her official capacity | ) | |
| as head of the Oregon Health Authority, | ) | |
| and SARA WALKER, in her official | ) | |
| capacity as Interim Superintendent of the | ) | |
| Oregon State Hospital, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JAROD BOWMAN and JOSHAWN | ) | Case No. 3:21-cv-01637-AN (Member Case) |
| DOUGLAS-SIMPSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |

Page 1 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

SARA WALKER, Interim Superintendent )
of the Oregon State Hospital, in her )
official capacity, DOLORES MATTEUCCI, )
in her individual capacity, SAJEL HATHI, )
Director of the Oregon Health Authority, in )
her official capacity, and PATRICK ALLEN, )
in his individual capacity, )
)
      Defendants. )
)
)
LEGACY EMANUEL HOSPITAL & )    Case No. 6:22-cv-01460-AN (Member Case)
HEALTH CENTER d/b/a UNITY CENTER )
FOR BEHAVIORAL HEALTH, LEGACY )
HEALTH SYSTEM; PEACEHELATH; and )
PROVIDENCE HEALTH AND SERVICES )
OREGON, )
)
      Plaintiffs, )
)
      v. )
)
SAJEL HATHI, in her official capacity as )
Director of the Oregon Health Authority, )
)
      Defendant. )

## I.    INTRODUCTION

Presiding Judge Matthew Donohue (Benton County), Presiding Judge Jonathan Hill

(Tillamook County), and Judge Nan Waller (Multnomah County) ("*Amici* Judges") submit the

following memorandum in advance of the January 24, 2025, status conference for the above

matters. Because defendants will not have responded to plaintiff DRO's motion for an order to

show cause before the conference and also intend to request an evidentiary hearing in an effort to

avoid contempt, the judges at this point have limited their submission to (1) updating the OJD

Page 2 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

data they earlier provided and (2) briefly revisiting a well-traveled Ninth Circuit federalism/comity decision that seems more and more on point in light of the pending motion practice and the course these cases have taken over the last two and half years.[1]

## II.  SUPPLEMENTARY DATA

For the November 2024 status conference, *Amici* Judges presented the Court with data across five metrics:  aid and assist commitments to OSH by month; percent of unfit defendants initially committed to OSH; recidivism post-OSH commitment; OSH restoration success; and all-charge case dismissals following *Mink-Bowman* discharges.  (Dkt. 525.)  That data showed, respectively (1) a general increase in OSH commitments over time with month-to-month fluctuation; (2) a decrease of approximately 10 percentage points in initial judicial commitments to OSH; (3) a marked decrease – ***19 percentage points across all charge categories*** – in OSH's ability to restore defendants; (4) significant increases in recidivism, the number of defendants receiving new charges within six months of an OSH discharge (***46% increase in felonies; 90% increase in misdemeanors***); and (5) more than 500 defendants having had all charges dismissed after timing out under Court's remedial orders.

*Amici* Judges have appended to this submission updated data from OJD—same categories, same methodologies—complete through the end of 2024 so the Court has current information.  The data continues to show, with little variation, significant harm to victims, their

---

[1]     The Court also should know that counsel for the judges will not be able to attend the status conference due to an unavoidable family medical matter out of state.  Suffice it to say, if the Court would like any additional information or analysis, *Amici* Judges will do their best to provide it.

Page 3 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

communities, defendants, and the Oregon criminal justice system itself as byproducts of the September 2022 and July 2023 remedial orders. Of potential cause for greater concern is a six percent increase during the last two months of 2024 in new misdemeanor cases filed per month, a 96% overall increase compared with the year before entry of the first remedial order. (*See* Table 4.) Also, Oregon judges dismissed all charges against another 36 defendants in November and December after those defendants had timed-out at OSH, including four defendants with Class A felony charges, three with Class B felony charges, and 11 with Class C felony charges. (*See* Table 5.)

## III.     BRIEF DISCUSSION

The decision to which the *Amici Judges* refer the Court is *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). It has been cited more than 500 times and has been relied upon in these cases by Judge Mosman (Dkt. 256 at 3-5), the parties (Plaintiffs (Dkt. 252 at 8-9; 260 at 12, 14; and, most recently in the motion for a show cause order itself, Dkt. 540 at 2, 21); Defendants (Dkt. 103 at 11-12)), and *amici* (Marion and Washington counties (Dkt. 276 at 4-5, 8-9) and judges (Dkt. 280-1 at 7, 8, 16)). With the Court on the cusp of considering additional remedial sanctions against defendants, the Ninth Circuit's well-thought-out opinion has taken on even greater relevance.

### A.  *Facts and Proceedings Below*

*Stone* involved jail overcrowding and a 1978 action by pretrial detainees in one of San Francisco's jails brought against the municipality and its sheriff, mayor, and department of public health. Four years later, a consent decree was entered; three years after that, a contempt

Page 4 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

Law Office of Keith M. Garza
P.O. Box 68016
Oak Grove, OR 97268
(503) 344-4766 (phone) / (503) 344-4767 (fax)

motion was filed; a year later, the district judge ordered defendants to follow the decree, but not contempt, and appointed a special master to recommend actions to ensure compliance. 968 F.2d at 852. The efforts of the master, the court, and the parties—which included providing the defendant sheriff with enhanced release authority but did not authorize the disregard of any applicable state laws—ultimately resulted in "a long period of compliance." *Id*. at 853 & n. 2. Sounds familiar.

By 1987, the jail once again was overcrowded. Additional motion practice ensued. A show cause order, but not contempt followed because, although overcrowding remained, the court found the city had demonstrated "'substantial progress[,]'" ***going so far as to build an additional jail facility***. Instead, the defendant sheriff was given even more release authority "to reach the population limits," ultimately "allowing him to release inmates [who had served at least 90%, then 80%, and finally 70% of their sentences] even when such release contravened applicable state laws." *Id*. (bracketed text added). Reminiscent in some respects (including that the city, like defendants here at least tacitly, had agreed to the "state-law-override provisions," *id*. at 859) but not in others (the actual building out of capacity by the defendants).

No surprise the sheriff made "liberal use of these policies," but ultimately to no avail. *Id*. Additional contempt hearings were held, and continued, and "[f]inally, at a status conference the court ordered the imposition of fines of $300 per inmate per day" if there was no compliance by March 15, 1989. *Id*. The threat worked (the defendants moved detainees among various jails), and the court denied the contempt motion but extended the decree. A nearly two-year period of compliance followed. When that came to an end, another contempt motion was filed, the

Page 5 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

proceedings were continued for six months or so and, in December 1991, the court finally held

the city in contempt and imposed the daily $300 fines. *Id*. However (and analogous to the

request plaintiff DRO makes here: seeking both contempt <u>and</u> additional state law overrides), the

court also "expanded the [defendant] Sheriff's powers to reduce population levels by allowing

him to release prisoners who had served 60% and then 50% of time served (including both felons

and misdemeanants) and added that the sheriff "'***shall not be bound by state laws*** which restrict

participation of inmates in" work furlough, work in lieu of incarceration, electronic home

detention, or parole placement programs. *Id*. & n. 3 (emphasis added). The city appealed.

### B. *The Ninth Circuit's Response*

1. <u>Federalism and Comity Principles</u>

Much as with the cases here, none of the parties to the litigation thought it necessary to

discuss the impacts of the district court's rulings with respect to California's sovereign interests.

Instead, it was left to the city's District Attorney to file an *amicus* brief urging the Ninth Circuit

to invalidate portions of the district court's contempt order as violative of federalism

considerations. *Id*. at 854. Distilled into bullet points, the following is what Judge Choy wrote

on behalf of the panel:

- "[F]ederal courts should always seek to minimize interference with legitimate state activities in tailoring remedies. *Id*. at 861.

- "In employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'" *Id*. (citations omitted).

- Sometimes, "if the action is essential to enforce [the federal court's remedial] scheme," "otherwise valid state laws or court orders cannot stand in the way[.]" *Id*. at 862 (bracketed text borrowed).

Page 6 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

- Moreover, "'[a]uthorizing and directing local government institutions to devise and implement remedies not only protects the functions of those institutions but also places the responsibility for solutions to the problems * * * upon those who have themselves created the problems.'"  *Id*. at 863 (ellipsis in text omitted).

- All of that taken together and "somewhat ironically [when, among other things, "the federalism concerns are great",] ***contempt sanctions are a less intrusive alternative*** to rearranging the structure of state government via * * * state-law-override" directives.  *Id*. at 865 (emphasis added).  (Indeed, defendants here would seem to agree, at least according to one of their earlier filings: "this Court would have such power ['to override any state laws of state court actions'] ***as a last resort***" (Dkt. 151 at 14 (bracketed text borrowed; emphasis added)).)

2.  Import of Those Principles on the District Court Judge's Overrides of State Law

In light of the foregoing, the Ninth Circuit had little difficulty concluding the district court erred each time it permitted the sheriff—who, again, was a named defendant in the litigation—to override state law in an effort to staunch the unconstitutional overcrowding.  First, "the court should have waited until the threat of sanctions failed to induce compliance before authorizing the state-law-override provisions."  968 F.2d at 864.  (Essentially what *Amici* Judges argued in November 2022 – *see* Dkt. 328 Tr. at 26-36.)  Second, regarding the "most recent expansion of the early-release provisions," they possessed "the same infirmities":

"The court expanded the Sheriff's powers when it held the City in contempt, but did not wait to see if the threat of sanctions would induce compliance. * * * As with the previous order, the district court should have made findings that [other asserted] alternatives were inadequate before authorizing any further override provisions.  Absent such findings, the state-law-override provisions cannot be considered the option least intrusive on the operation of state government. * * * [T]he district court went too far under these circumstances in allowing the Sheriff to override state laws and state court sentences[.] * * * At a minimum, the court should give the Sheriff override authority only as a last resort and only as essential to achieve compliance with the consent decree."

*Id*. at 864-865 (bracketed text added).

Page 7 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

## C.  *The Instant Matters*

Here, the injunction Judge Panner entered in 2002 contained one paragraph of substantive text to protect a critical but narrow constitutional right: timely admission to a state hospital for defendants declared unable to proceed to trial "in accordance with Oregon's existing applicable statutory provisions." (Dkt 51.)  Today, however, we have parties and a neutral expert with potentially divergent or much broader interests than simply returning the state to compliance.[2] Perhaps as a result, and certainly due to the collaborative motion practice in 2022 that compelled the *amici* into action, today we now have not only the federal overwriting of perfectly valid and

---

[2]    Counsel for plaintiff Disability Rights Oregon, for example, recently expressed concerns "about the potential for criminalizing mental health challenges" and "said Oregon needs to fully fund community restoration programs to help people outside the state hospital."  *See* https://oregoncapitalchronicle.com/2025/01/07/disability-watchdog-group-seeks-order-to-find-oregon-in-contempt-of-court/ (accessed Jan. 13, 2025.)  Regarding civil commitment, DRO sees that process as "broken, discriminatory, traumatic, and rarely successful" and is soliciting "Action to Stop the Expansion of Voluntary Commitment in Oregon."  *See* https://www.droregon.org/advocacy/civil-commitment-faq (accessed Jan. 19, 2025).  Plaintiff Metropolitan Defender Services, Inc., as its name suggests, correctly describes its mission "to provide quality representation and zealous advocacy for each client, and to promote improvement in the administration of justice." *See* https://mpdlaw.com/history/ (accessed Jan. 13, 2025).  The state defendants for their part, in August 2022, acknowledged that, "[g]iven the circumstances we find ourselves in now with the wait list, the forensic orders, and the discharges, we find ourselves no longer – the State is not in a position to oppose the relief that plaintiffs are requesting." (Dkt. 273 at 10:17-20.)  (Of course, plaintiffs were not seeking contempt at that time, the avoidance of which may have been (or may continue to be) defendants' primary litigation strategy.)  And, finally, Dr. Pinals—a leading academic, clinical, and forensic psychiatrist from her first report going forward (as one would expect) has emphasized medical and empirical considerations – for example, "preventing unnecessary admissions and diverting individuals from admission and from HLOC [hospital level of care] when those levels of care or placements are not *clinically* appropriate[.]" (Dkt. 262-1 (Neutral Expert First Report at 16 (emphasis added)).)  Finally, there is the State of Oregon itself, which, as evident from the laws it has enacted in Chapter 161 and whether or not enlightened in the eyes of the parties, appears to view the processes for and significance of competency restoration much differently.

Page 8 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

otherwise constitutional Oregon state laws without any prior contempt citation having been issued—contrary to both the *Stone* court's holding and its admonitions but consistent with plaintiffs' preference for not expanding hospital capacity for the civil commitment and justice-involved populations— but also an injunction with something approaching 20 pages of small font single-spaced recommendations at various stages of completion (*see*, *e.g.*, Oregon Neutral Expert Seventh Report, Oct. 18, 2023, at 7-26) ***that is not working***.

Plaintiffs now seek to overwrite state law even further, including statutory wording and systems (such as community restoration and the ready-to-place process itself) that did not exist in 2002. *See*, *e.g.*, ORS 161.370 (2001). On the front end, they want to make OSH off-limits for any person charged with a misdemeanor (and eviscerate the product of last year's mediation). On the back end, they ask the Court to empower agents of the named defendants—much like the sheriff in *Stone*—to decide at what point committed patients must leave the state hospital notwithstanding that the legislature expressly has committed that decision to the state's judiciary based, at least in part, on intentionally requiring judges to use different, broader decisional criteria than hospital employees when deciding what level of care is needed. *Compare* ORS 161.371(3)(b)(A) (hospital superintendent or facility director) *with* ORS 161.371(3)(c)(A) (courts) *and* Dkt. 540 at 25; 541-5 Ex. E at 1 (DRO's requested relief).

With OSH already doing a demonstrably poorer job of restoring defendants to competency than before state law was first overwritten (not as a matter of last resort) in September 2022—*see* Tables 2 and 3, *infra*—giving the keys of compliance to the entity that is

Page 9 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

most directly violating the U.S. Constitution, as DRO asks the Court to do, seems fraught with

potential peril.

## IV.    CONCLUSION

The judges' concerns today are essentially those they voiced in 2022, and they worry

that the intervening years' worth of effort and expense have been for naught or very little.  They

end here with the question they posed last November:

> "[T]he Court in many ways finds itself in the same position today that it was two
> years ago: the number of aid and assist admissions are increasing; OSH is unable
> to keep up; and the Court is faced with the difficult decision whether to further
> relieve defendants of their state law obligations consistently with plaintiffs' policy
> preferences in the hope that compliance can be restored and will be maintained or,
> when compared against considerations of federalism and further impacts to the
> public, victims, the justice system, and criminal defendants themselves, to seek
> some other enforcement mechanism that will bring the state—which, once again
> is sitting on the cusp of a full legislative session—into compliance with
> constitutional requirements."

(Dkt. 525 at 7.)

Respectfully submitted January 22, 2025.

_____/s/ Keith M. Garza_____
Keith M. Garza, OSB No. 940773

Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon 97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges

Page 10 – *AMICI* JUDGES' JANUARY 2025 STATUS CONFERENCE MEMO

## Aid & Assist Commitments to the Oregon State Hospital, By Month
### Oregon Judicial Department
### September 2021 – December 2024

### Overview

If a court determines that a defendant lacks fitness to proceed with a criminal case, one potential action is commitment to the Oregon State Hospital (OSH) for services to restore the defendant's ability to aid & assist in their own defense.

This document shows the number of aid & assist defendants Oregon's circuit courts committed to OSH each month in the twelve months before and the 28 months after Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case.

Since Judge Mosman's remedial order in September 2022, the number of commitments has fluctuated between a low of 69 defendants committed in July 2023 and February 2024 and a high of 125 defendants committed in July 2024.

### Method

The statistics in this document are based on information from the Oregon Judicial Department's Odyssey case management system.

The number of aid & assist commitments in a month is the number of defendants who, in that month:

- Had an order issued on one of their cases committing the defendant to OSH for restoration services

    and

- Were not already committed to OSH on another case at the time of the order

### Data Challenges and Assumptions

The chart on page 3 shows the number of aid & assist defendants committed to OSH each month by Oregon's circuit courts.

Each month's number excludes defendants who remained committed to OSH under orders issued in prior months, and therefore represents the number of new defendants committed to OSH that month.

Over time, the number of defendants *committed* to OSH should be similar to the number of aid & assist defendants *admitted* to OSH, but the number of circuit court commitments in a month may differ from the number of aid & assist admissions due to any of the following reasons.

- **Delays in Admission:** Because it takes time for defendants to be transported to Salem and admitted to OSH, some defendants who are committed to OSH in one month might not be admitted until a subsequent month.

- **Defendants Not Admitted to OSH:** While most defendants committed to OSH are eventually admitted, any defendants who are committed by a circuit court and not admitted to OSH – for example, defendants denied admission due to not being eligible under Judge Mosman's remedial order – would cause the number of defendants committed and the number admitted to differ.

- **Municipal Court Commitments:** Some municipal courts handle aid & assist cases and commit defendants to OSH.  While defendants committed to OSH by municipal courts may be included in OSH admission data, such commitments are not included in this report.

- **Duplicate Party Records:** Aid & assist defendants are sometimes committed to OSH on multiple cases, and this report counts defendants committed on multiple cases only once as long the cases have a single Odyssey party record.  OJD works to minimize the number of duplicate party records in its system, but defendants who do have duplicate records in Odyssey may be over-counted in this report.

Finally, it is important to note that this document includes only data entered into Odyssey through January 6, 2025.  The number of commitments for December 2024 may change if courts complete or update December data entry after January 6.

## The Data

The chart on the following page shows the number of defendants committed to OSH for aid & assist restoration services by Oregon's circuit courts each month between September 2021 and December 2024.

Oregon's circuit courts committed an average of 75 aid & assist defendants per month in the twelve months prior to Judge Mosman's remedial order in September 2022, and committed an average of 94 defendants per month in the 28 months after Judge Mosman's order.

Since Judge Mosman's remedial order in September 2022, the number of defendants committed each month has fluctuated between a low of 69 defendants in July 2023 and February 2024 and a high of 125 defendants in July 2024.



Aid & Assist Commitments to the Oregon State Hospital, by Month
For Defendants Committed by Oregon's Circuit Courts
September 1, 2021 through December 31, 2024
Commitments to OSH
0
25
50
75
100
125
58
59
87
71
75
61
83
81
82
81
77
89
84
88
91
70
104
78
98
105
95
85
69
106
91
102
96
90
88
69
88
93
123
92
125
96
84
110
90
112
September
October
November
December
January
February
March
April
May
June
July
August
September
October
November
December
January
February
March
April
May
June
July
August
September
October
November
December
January
February
March
April
May
June
July
August
September
October
November
December
2021
2022
2023
2024
Month

## Number of Defendants Found Unfit to Proceed
## and Percent Committed to the Oregon State Hospital
### Oregon Judicial Department
### January 2020 – December 2024

### Overview

After a court determines that a defendant lacks fitness to proceed with a criminal case, the court must determine an appropriate action for the defendant.

One potential action after a defendant is found unfit to proceed is commitment to the Oregon State Hospital (OSH) for restoration services.  This document contains data on the number of defendants found to lack fitness to proceed in Oregon's circuit courts each year since 2020, and the percent of those defendants for whom the court's initial action was commitment to OSH.

### Method

The numbers in this document are drawn entirely from the Oregon Judicial Department's Odyssey case management system.

The numbers of *Defendants Found Unfit to Proceed* in Table 1 (page 5) represent the number of defendants each year who were found to lack fitness to proceed on a circuit court case, excluding defendants who, at the time of the order finding the defendant unfit, already lacked fitness to proceed on another case.

The number of *Defendants Whose Initial Placement Was Commitment to the Oregon State Hospital* in Table 1 is the number of the defendants found unfit to proceed for whom the first placement ordered by the court – other than any orders for the defendant to remain in custody temporarily while the court determined an appropriate action – was commitment to OSH.

### Data Challenges and Assumptions

It is critical to note that the number and percentage of defendants whose ***initial*** placement was commitment to OSH do ***not*** include defendants who were ordered into community restoration when they were found unfit to proceed but were later committed to OSH because community restoration services were not successful.

It is also important to be aware that the numbers in this document include only Oregon's circuit courts, and so do not include defendants found unfit to proceed by municipal courts.

For these reasons, the number of defendants whose initial placement was commitment to OSH each year should be lower than the total number of aid & assist defendants admitted to OSH that year.

It is also important to note that this document includes only data entered into Odyssey through January 6, 2025, and that the data for 2024 may change as courts make initial placement decisions and enter initial placement orders for defendants who were found unfit at the end of 2024.

## The Data

Table 1, below, shows the number of defendants found unfit to proceed in Oregon's circuit courts by year, from January 2020 through December 2024. The table also shows the number and percent of defendants found unfit to proceed each year for whom the court's initial placement action was commitment to OSH.

| Table 1: Initial Placement Decisions for Defendants Found Unfit to Proceed *For Defendants Found Unfit to Proceed in Oregon Circuit Courts Between 1/1/2020 and 12/31/2024* | | | |
|---|---|---|---|
| Year | Defendants Found Unfit to Proceed | Defendants Whose Initial Placement Was Commitment to the Oregon State Hospital (OSH) | Percent of Defendants Whose Initial Placement Was Commitment to OSH |
| 2020 | 762 | 570 | 75% |
| 2021 | 977 | 750 | 77% |
| 2022 | 1,102 | 842 | 76% |
| 2023 | 1,362 | 957 | 70% |
| 2024* | 1,414 | 949* | 67%* |
| **\*Note:** Data for 2024 includes only data entered into Odyssey through January 6, 2025. It is possible that additional commitment orders will be entered for defendants who were found unfit at the end of 2024 but for whom the court set over its initial placement decision. | | | |

Although the number of defendants whose initial placement was commitment to OSH increased each year from 2020 to 2023, the increases were due to an increase in the total number of defendants found unfit to proceed rather than an increase in the percentage of defendants that the circuit courts committed to OSH.

The percent of defendants initially committed to OSH in Oregon's circuit courts ranged between 75% and 77% from 2020 to 2022 before falling to 70% in 2023.

Both the number and percent of defendants whose initial placement was commitment to OSH decreased in 2024. It is possible, however, that additional commitment orders will be entered for defendants who were found unfit at the end of 2024 but for whom the court set over its initial placement decision.

# Fitness Findings and New Charges for Defendants After Commitment to the Oregon State Hospital Is Terminated
### Oregon Judicial Department

## Overview

This document shows circuit court data on fitness to proceed findings when commitment to the Oregon State Hospital (OSH) is terminated, and on new criminal cases filed within six months of commitment being terminated.

Comparing data from the twelve months before Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case (September 2021 through August 2022) with data from the following 28 months (September 2022 through December 2024) shows that, in the latter period:

- The percent of defendants who were found fit to proceed at the end of their commitment to OSH decreased from 59% to 41%

- The monthly number of defendants with commitment terminated without regaining fitness doubled (from 27.8 per month to 55.7 per month)

- The monthly number of new felony cases filed within six months of a defendant's commitment being terminated increased 47% (from 5.3 per month to 7.9 per month)

- The monthly number of new misdemeanor cases filed within six months of a defendant's commitment being terminated increased 96% (from 10.3 per month to 20.3 per month)

In the 28 months following Judge Mosman's remedial order, the percent of defendants found fit to proceed at the end of their commitment to OSH was:

- 63% for defendants with Measure 11 felony charges

- 42% for defendants whose most serious charge was a non-Measure 11 felony

- 30% for defendants who did not have a felony charge

## The Data/Method

The numbers in this document are drawn entirely from the Oregon Judicial Department's (OJD's) Odyssey case management system.

Defendants who have been found to lack fitness to proceed and committed to OSH for restoration services are counted as having their commitment terminated when all cases on which they were committed have an event entered – such as an order finding the

defendant fit to proceed, an order for community restoration, or a dismissal judgment – that indicates that they are no longer committed to OSH.

## Data Challenges and Assumptions

OJD does not have access to admission or discharge data from OSH, and the numbers in this document are based solely on information on when the court terminated the commitment.  This may differ from the date that a defendant was discharged by OSH.

Similarly, OJD's data on fitness findings are based on court determinations as to whether defendants regained fitness to proceed, and may be different from an analysis of the opinions of OSH forensic evaluators prior to discharge.

The numbers in this document also depend on accurate data entry by court staff, particularly in ensuring that defendants with multiple aid & assist cases have a single Odyssey party record.  OJD attempts to minimize the number of duplicate records in its system, but defendants who were committed to OSH on multiple cases with duplicate party records may be counted multiple times in these numbers.

For these reasons, the numbers in this document may differ from numbers compiled with OSH data.

It is also important to note that this document includes only information entered into Odyssey through January 6, 2025.  Numbers for the 28 months after Judge Mosman's remedial order may change slightly as courts complete any remaining data entry from 2024.

## Commitments Terminated and Fitness Findings

Table 2 (page 8) shows information on monthly aid & assist commitments terminated in the twelve months before and the 28 months after Judge Mosman's remedial order in the federal *Mink/Bowman* case, including the number and percentage of those defendants who were found fit to proceed on at least one of their cases.

Defendants are counted as found fit to proceed if the court found the defendant fit on any their cases, either at the time the commitment was terminated or prior to any order to release the defendant from custody.

Defendants who were not found fit to proceed until after an order to release them from custody are *not* counted as found fit in Table 2, as they are presumed to have lacked fitness to proceed when commitment was terminated and to have regained fitness while on community restoration.

Comparing data for September 2021 through August 2022 with data for September 2022 through December 2024 shows that the percent of terminated defendants who were found fit dropped from 59% to 41%, and that the number of terminated defendants who were not found fit on any of their cases increased from 27.8 defendants per month to 55.7 defendants per month.

| Table 2: Aid & Assist State Hospital Commitments Terminated, Per Month *In Oregon Circuit Courts* *Between September 1, 2021 and December 31, 2024* | | | |
|---|---|---|---|
| | Commitment Termination Date | | Change |
| | September 2021 – August 2022 | September 2022 – December 2024 | |
| Total Commitments Terminated, Per Month | 68.1 | 94.0 | **+38%** |
| Commitments Terminated - Defendant Found Fit, Per Month | 40.3 | 38.3 | **-5%** |
| Commitments Terminated - Defendant Not Found Fit, Per Month | 27.8 | 55.7 | **+100%** |
| Commitments Terminated - Percent of Defendants Found Fit | 59% | 41% | **-18 percentage points** |

## Commitments Terminated and Fitness Findings, By Charge Type

A major change caused by Judge Mosman's remedial order was the implementation of new limits on how long defendants could remain at OSH for restoration services. The new limits in Judge Mosman's remedial order were:

- One year for defendants charged with a Measure 11 felony

- Six months for defendants whose most serious charge was a non-Measure 11 felony

- The lesser of 90 days or the maximum sentence for defendants who were not charged with a felony

Table 3 (page 9) shows that, for each of the three charge categories, OSH was less successful at restoring defendants to fitness in the 28 months after the Judge Mosman's remedial order than in the twelve months prior to the remedial order.

In the 28 months following Judge Mosman's remedial order, 63% of Measure 11 defendants were found fit when their commitment was terminated, compared with 42% of defendants whose most serious charge was a lesser felony and 30% of defendants who were not charged with a felony.

| Table 3: Percent of Defendants Found Fit to Proceed When Commitment to OSH Is Terminated, By Charge Type *In Oregon Circuit Courts* *Between September 1, 2021 and December 31, 2024* | | | |
|---|---|---|---|
| **Most Serious Charge** | **Percent of Defendants Found Fit at Termination** | | **Change** |
| | **September 2021 – August 2022** | **September 2022 – December 2024** | |
| Measure 11 Felony | 79% | 63% | **-16 percentage points** |
| Non-Measure 11 Felony | 64% | 42% | **-22 percentage points** |
| Misdemeanor or Contempt | 42% | 30% | **-12 percentage points** |
| Total – All Charge Types | 59% | 41% | **-18 percentage points** |

### New Cases Filed Within Six Months of Termination

Table 4 (page 10) shows the monthly number of new criminal cases filed for defendants who had an aid & assist commitment to OSH terminated in the six months before the new case was filed.

New criminal cases include cases filed between September 1, 2021 and December 31, 2024 where:

- the defendant in the new case had the same first name, last name, and at least one other matching identifier (date of birth, state identification number, social security number, or driver's license number) as a defendant who had an aid & assist commitment terminated in the prior six months

  and

- at least one of the alleged offenses on the case occurred after the commitment was terminated

| Table 4: New Criminal Cases Filed Per Month for Defendants Who Had an Aid & Assist Commitment to the Oregon State Hospital Terminated in the Previous Six Months *For New Cases Filed in Oregon Circuit Courts Between September 1, 2021 through December 31, 2024* | | | |
|---|---|---|---|
| | **New Case Filed Date** | | **Change** |
| | **September 2021 – August 2022** | **September 2022 – December 2024** | |
| New Felony Cases Filed, Per Month | 5.3 | 7.9 | **+46%** |
| New Misdemeanor Cases Filed, Per Month | 10.3 | 20.3 | **+96%** |

Comparing the number of new criminal cases filed per month between September 2021 and August 2022 for defendants with a commitment terminated in the previous six months with the number of such cases filed per month between September 2022 and December 2024 shows that, in the latter period, new felony cases filed within 6 months of termination increased 46% (from 5.3 per month to 7.9 per month), and new misdemeanor cases went up 96% (from 10.3 per month to 20.3 per month).

# Defendants with All Cases Dismissed After *Mink/Bowman* Discharge Notice, by Most Serious Charge Degree
*Oregon Judicial Department*
*September 1, 2022 – December 31, 2024*

## Overview

In September 2022, Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case limited the time that defendants can be at the Oregon State Hospital (OSH) for aid & assist restoration services to:

- One year for defendants charged with a Measure 11 felony

- Six months for defendants whose most serious charge is a non-Measure 11 felony

- The lesser of 90 days or the maximum sentence for defendants who are not charged with a felony

This document shows data on defendants who had all the cases on which they were committed to OSH dismissed after OSH filed a notice (hereafter referred to as a *Mink/Bowman* discharge notice) that the defendant would be discharged under the timelines in Judge Mosman's remedial order.

## Method

The statistics in this document are based on events entered in the Oregon Judicial Department's Odyssey case management system.

Defendants on whom *Mink/Bowman* discharge notices have been filed count as having all their cases dismissed if both of the following are true:

- The defendant was not found fit to proceed on any of the cases on which a *Mink/Bowman* discharge notice was filed

- All cases or probation violations on which a *Mink/Bowman* discharge notice was filed were dismissed

The most serious charge degree for each defendant is identified by looking at all the cases on which the *Mink/Bowman* discharge notice was filed, and identifying the degree of the most serious charge that was pending when the notice was filed.

Although *murder* is not a charge degree, murder charges are categorized separately from other unclassified felonies to provide clarity as to what type of unclassified felony was dismissed.

## Data Challenges and Assumptions

The statistics in this document are based entirely on information from Odyssey, and therefore include only defendants in Oregon's circuit courts.  Some of Oregon's municipal courts also handle aid & assist cases, but data from those courts are not included in this report.

The results count defendants who had *Mink/Bowman* discharge notices filed on multiple cases at the same time only once, even if multiple cases were dismissed.  This means that the number of individual cases dismissed is higher than the numbers of defendants in the table below.

It is also important to note that not all dismissals occurred immediately upon on discharge from OSH.  Some defendants whose cases were ultimately dismissed may have remained in custody for a time while the court waited to see whether appropriate services to became available, or may have been released to community restoration prior to having their cases dismissed.

Finally, the statistics include only data entered into Odyssey through January 6, 2025. Any cases that were dismissed at the end of the December 2024 but had not been closed in Odyssey by January 6 are not included in these statistics.

## The Data

The table below shows the number of defendants who were not found fit to proceed and had all the cases on which OSH filed a *Mink/Bowman* discharge notice dismissed, by the most serious charge that was pending when the discharge notice was filed.

Through December 31, 2024, a total of 579 defendants with a *Mink/Bowman* discharge notice filed had all their cases dismissed without being found fit to proceed.

| Table 5: Defendants with All Cases Dismissed After Mink/Bowman Discharge Notice, By Most Serious Charge Degree *September 1, 2022 through December 31, 2024* | |
|---|---|
| **Most Serious Charge Degree** | **Number of Defendants** |
| Murder | 4 |
| Felony Class A | 62 |
| Felony Class B | 28 |
| Felony Class C | 178 |
| Other Felony | 1 |
| Misdemeanor Class A | 242 |
| Misdemeanor Class B | 21 |
| Contempt | 30 |
| Probation Violation | 13 |
| **Total** | **579** |