Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
Dave Boyer, OSB # 235450
Dboyer@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Amicus Curiae Disability Rights Oregon*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LEGACY EMANUAL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY HEALTH SYSTEM; PEACEHEALTH; PROVIDENCE HEALTH & SERVICES—OREGON; and ST. CHARLES HEALTH SYSTEM, INC., | Case No. 6:22-cv-01460-MO Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) |
| Plaintiffs, | AMICUS BRIEF REGARDING MOTIONS TO INTERVENE AND THIRD-PARTY STANDING |
| v. | |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, and DOLORES MATTEUCCI, in her official capacity as Superintendent of the Oregon State Hospital, | |
| **Error! Reference source not found.**. | |

## AMICUS BRIEF REGARDING MOTIONS TO INTERVENE AND THIRD-PARTY STANDING

Several major Oregon hospital corporations filed a second amended complaint in the

above-captioned matter, *Legacy Emanuel Hospital et al. v. Allen*. Dkt. 117. The matter was

consolidated with two other ongoing lawsuits involving related issues. Amicus, while a party in

the case in chief, *Disability Rights Oregon v. Mink*, is not a party in *Legacy Emanuel Hospital et al. v. Allen*. The Hospital Corporations have sought to represent the interests of a group of patients subject to civil commitment proceedings. Both the Oregon chapter of the National Alliance on Mental Illness and the Mental Health Association of Portland have offered motions in intervention to represent this group of patients. Amicus proffers this memorandum brief on those pending motions and briefing.

I.      **The Mental Health Association of Portland Has Standing to Represent the Interests of Its Constituents, People with Mental Illness, Under *Hunt***

The Mental Health Association of Portland should be permitted to represent people subject to civil commitment, because its constituents would otherwise have standing to sue, the interests at stake are germane to the MHAP's purpose, and the claim does not require direct participation by the individuals. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Being a direct membership organization with at least one identified member with standing is *one way* to obtain representational standing. Being a constituent organization with constituent "indicia of membership" is another way. *Id.* at 345.

In the present case, the Mental Health Association of Portland is operated by a board of directors, "advisors, and select supporters of the organization" comprised of people who self-identify as people with mental illness, as well as practitioners in fields of "practical social work, law enforcement, and forensic psychiatry." Dkt. 139, at 4; Dkt. 139-1, at 7. MHAP was founded in 2003 by Roy Silberstein, a man with schizophrenia who would later die inside Oregon State Hospital. Dkt. 139-1, at 6. Of their nine current board members, seven board members identify as people with mental illness and two as people with family members with mental illness. Dkt. 139-1, at 7. Three members of the board are attorneys who represent people at civil commitment

hearings. *Id.* MHAP's function and goals, in advocating for people with mental illness, align strongly with the interests of the patients facing civil commitment.

The *Hunt* case itself was about a state-funded apple advocacy commission, with no voluntary members. *Id.* at 342 ("If the Commission were a voluntary membership organization . . ., its standing to bring this action . . . would be clear. . . ."). By describing the non-member apple growers for whose interests the Commission advocated as "constituents," *Hunt* put non-membership organizations that advocate for their constituents on similar footing as membership-based organizations. *Id.* at 345. Thus, MHAP does not have to prove specifically that a card-carrying member of MHAP is currently civilly committed in order to represent the patients in question.

As the Supreme Court held, "it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association representing the individual growers and dealers who collectively form its constituency." *Hunt*, 432 U.S. at 345. When considering the equities of the present litigation, allowing constituent representation of people with disabilities by MHAP makes even greater sense. In *Hunt*, the constituents were commercial entities, apple "growers and dealers" who were "under no disabilities which prevent them from coming forward to represent their own rights." *Id.* at 342. By contrast, people facing civil commitment have far fewer resources for self-representation than do commercial produce growers and dealers. *Cf. Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1104 (9th Cir. 2004) (allowing organizational tester standing under Fair Housing Act consistent with intent behind Fair Housing Act to benefit people with disabilities). As people with mental illnesses are a "specialized segment" of the population who are the "primary beneficiaries" of MHAP's work, MHAP can stand in their shoes. *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1097 (9th Cir.

Page 3 -   AMICUS BRIEF REGARDING MOTIONS TO INTERVENE AND THIRD-PARTY
STANDING

2021). ("We are aware of no federal appellate decision in which a non-member organization showed that it served a 'specialized segment' of the community that is the 'primary beneficiary' of its activities but failed to establish that those non-members exercised control over the operation of the organization."). MHAP's representation of the civil commitment patients falls precisely in line with decades of case law on representational standing.

## II. NAMI-Oregon Fails to Allege a Comparable Structure of Operation By, For, and on Behalf of People with Disabilities and Fail to Show the Inadequacy of Representation of Its Interests by a Party with Whom It Agrees on All Points

While MHAP alleges that seven of its nine board members are people with mental illness, NAMI-Oregon fails to show that it is controlled by people with mental illnesses. Its own records show it is controlled instead by health care providers, in particular by employees of the Hospital Corporations. NAMI-Oregon's nine-person board of directors includes the "program manager for Behavioral Health, Providence Health and Services" and the "Chief Executive, Behavioral Health Providence Medical Group."[1] Other members include the vice president of behavioral health for CareOregon, the retired CEO of Albertina Kerr, the executive director of Youth Villages, an official with Lines for Life, and a banking officer with Heritage Bank. *Id.* The managerial structure of NAMI-Oregon—with two of nine board positions held by Providence Behavioral Health executives and the majority of positions held by provider representatives— makes NAMI-Oregon an unsuitable representative for the interests of patients, particularly where those interests conflict with both those of the state and those of major providers.[2] NAMI-Oregon

---

[1] NAMI-Oregon, "Staff and Board," *at* https://namior.org/about-us/staff-and-board/.

[2] According to NAMI-Oregon, Providence Health & Services is a major donor to its annual fundraisers, along with Cascadia Health and CareOregon. NAMI-Oregon, 2024 Sponsorship Opportunities, at 5 (listing Providence Health & Services and CareOregon as "gold sponsors" from its 2023 fundraiser), *at* https://namior.org/wp-content/uploads/sites/27/2024/08/NAMI-Oregon-2024-Combined-Sponsorship-Package-1.pdf-1-1.pdf

fails to allege that its direction is guided by people with mental illnesses or that its leadership is selected by people with mental illnesses.

In addition to this fundamental conflict of interest, NAMI's proposed intervention is limited to a "me too" position regarding the Hospital Corporations. Dkt. 121, at 2 and n.2 (asking to "join the existing Plaintiffs in asserting the claims in the Second Amended Complaint" and stating that requiring a separate complaint would only force NAMI-Oregon to recite the "same claims based on the same allegations" as those raised by the Hospital Corporations).

NAMI-Oregon has no apparent complaint against the Hospital Corporations for their following admissions: that the plaintiffs hold patients in "highly restrictive, locked environments," from which patients are "able to leave . . . only for short periods of time, if at all." Dkt. 1, at 6; *see also* Dkt. 117, at 5. Those patients "do not receive needed care and, in some cases, decompensate back to unstable conditions." *Id.* That degree of restriction and isolation is, by the Hospital Corporations' admission "unnecessary for such patients and often can cause decompensation. *Id.* at 10. They may remain in this "overly restrictive" setting for "the entire length of their commitment, which may be 180 days" or more if renewed. Dkt. 1, at 11; Dkt. 117, at 9. The Hospital Corporations negatively compare their own facilities to those at OSH, where they allege patients can "go places on day passes, wear their own clothes, and go outside daily for fresh air." Dkt. 1 at 17; Dkt. 117, at 16. The Hospital Corporations do not explain why the nature of hospital-based practices prohibit patients from, for instance, wearing their own clothing or leaving the building. While the state defendants deserve much criticism and bear heavy responsibility for not providing community services and failing to afford appropriate care to civilly committed patients, the Hospital Corporations are more than capable of making life significantly less isolating and less miserable for their patients in the meantime. OHA's practice

of placing civil committees in private hospitals has been the norm for more than six years, but the Hospital Corporations have apparently done nothing to accommodate the many civilly-committed patients they have in their care. NAMI-Oregon's approach—contrasted with MHAP's claims leveled against both the state defendants and Hospital Corporations—leaves those patients they claim to represent who are currently placed in private settings without any protections from isolation and maltreatment in the private settings, siding entirely with the claims of the Hospital Corporations that employ 22% of NAMI's Board.

In order to make a case for intervention, NAMI-Oregon must show, among three other factors, the "inadequacy of representation of existing parties." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001). Where an existing party will "undoubtedly make all the intervenor's arguments," the existing party is "capable and willing to make such arguments," and the would be intervenor would not "offer any necessary elements to the proceedings that the other parties would neglect," intervention is not warranted. *Id.* NAMI-Oregon states that it would merely agree with the claims and facts articulated by the Hospital Corporations. If NAMI-Oregon is only going to say "me too" to the Hospital Corporations' factual and legal claims, pursuing the same relief, then NAMI-Oregon lacks the ability to intervene, as it fails to show that its interests are not adequately represented.

### III.    The Hospital Corporations Harbor an Obvious Conflict of Interest with the Patients They Seek to Represent

Hospital Corporations primarily concern themselves with the costs associated by treating the patients they seek to represent. The Hospital Corporations repeated address their financial interest: they "incur additional expenses for additional staff and workers' compensation costs, property damage, and room closures." Dkt. 1, at 23. These basic financial interests remain at the

heart of their second amended complaint. Dkt. 117, at 36 (actions of OHA constitute a "deprivation of Plaintiffs' property and a denial of Plaintiffs' fundamental right to use its hospital beds"); *id.* at 37 (complaining of lost "costs associated with medicating and housing these individuals for extended periods of time, but also damage to hospital property").

The Hospital Corporations' various complaints in this case have repeatedly lambasted the patients they say they wish to represent. Hospital Corporations depict the patients they seek to represent as violent and disruptive. The Hospital Corporations chose to recount a vignette about one patient whose "attending physician described the patient as "ONE OF THE MOST DANGEROUS patients [he had] treated on an acute unit in [his] 30 plus years as a psychiatrist." Dkt. 1, at 19 (emphasis in original). Hospital Corporations repeatedly emphasized his assaultive behaviors in their pleadings, discussing his "exceptionally aggressive behavior that was instantaneous and unpredictable." *Id.* Hospital Corporations also chose to emphasis another individual's "impulsive and unpredictable behavior motivated by psychosis," discussing her convictions for attempted kidnapping, fourth-degree assault, and strangulation, complaining about her "hypersexual" behavior, "homicidal ideation," and her "explosive and violent outbursts." Dkt. 1, at 20-21. For a third patient, Hospital Corporations chose to highlight the details of his arrest "for threatening pedestrians with a knife" and detailed the use of force by police to "subdue him," even though this gratuitous recitation of the violent nature of his arrest had little to do with whether he remained in the hospital for too long. Dkt. 1, at 20. Hospital Corporations complained generally about staff being "kicked, punched, shoved, or bitten" by these patients. Dkt. 1, at 4. Hospital Corporations did not hesitate to cultivate fear of its patients in the most naked and provocative way in order to advance its own interests—i.e., depicting the hardship those patients' presence caused to Hospital Corporations.  Hospital Corporations may

assert whatever interests allegedly aligning with patients in its second amended complaint, but their earlier filings demonstrate their overwhelming hostility towards these patients. Attorneys truly advancing the interest of a client would never seek to recount an all-caps declaration of their client's extraordinary danger nor gratuitously recount the violent details of their arrests.

Obvious conflicts of interest between patients and the plaintiff hospital corporations abound in their pleadings. Intrinsic to the required finding of a "close relationship" between a litigant and the third party is a lack of conflict of interest between the litigant and the third party. *Hong Kong Supermarket*, 830 F.2d at 1082 (where supermarket pursued relief that benefited it and not its customers, its actions demonstrated a "conflict, rather than a congruence of interests" that undermined its claim to third party standing).

The closest analogue to the present matter was a recent lawsuit in California. *Siskiyou Hosp., Inc. v. California Dep't of Health Care Servs*., No. 220CV00487TLNKJN, 2022 WL 118409, at *1 (E.D. Cal. Jan. 12, 2022). In that matter, a private hospital sought to challenge the county's practices in leaving civilly committed patients in the hospital's emergency department "for unduly long periods of time" without reimbursement, even though the hospital alleged it was "neither equipped nor staffed to provide" mental health care services. *Id.* Along with claims brought on the hospital's own account were claims on behalf of the patients whose rights, the hospital alleged, were jeopardized by placement in the hospital's inadequate services. *Id.* at 3. The Court dismissed the complaint because the hospital's obvious conflicts of interest precluded third party standing allowing the hospital to represent the patients' interests. *Id.* at *4-*5. Siskiyou Hospital, by "seeking to avoid providing *any* care to these patients" was "clearly putting its own stated interests . . . above those of the 5150 patients." *Id.* at *4 (emphasis in original). The court particularly noted that the relief sought would preclude civilly committed

patients from getting mental or physical health care at the plaintiff's hospital during their civil commitment. *Id.* at *4. Siskiyou Hospital could not rely on the "provider-patient relationship" as grounds for a "close relation" with the third parties where the hospital "is essentially seeking to foreclose that relationship." *Id.* at *5. As a result, the Court rejected the assertion that the civil commitment patients "would advance the same arguments or seek the same outcome as Plaintiff." *Id.* at *4. While that matter was only a district court case, the close similarities of fact and legal claim between the present matter and the *Siskiyou Hospital* case should be persuasive to this Court.

Hospital Corporations' second amended complaint now omits much of the prior gratuitous disparagement of the patients they seek to represent, but the "glaring conflict of interest" between the patients and the Hospital Corporations has not disappeared. *Siskiyou Hospital*, 2022 WL 118409, at *4. One cannot avoid a conflict of interest by amending one's complaint in a way that fails to mention it, de-emphasizes it, or promises not to let a true conflict of interest affect one's future actions. *Hong Kong Supermarket*, 830 F.2d at 1082 (rejecting plaintiffs' proposal that the "inappropriateness of its remedy can be corrected by amending its complaint"). "Mutual interdependence of interests cannot be established by post hoc editing." *Id.*

The very real conflict of interest between the Hospital Corporations and the patients in question is briefly stated. The interest of the Hospital Corporation is not to have the patients in their care *at all*, for the many reasons alleged around costs, drains on staff, assaultive behaviors, damage to properties, reduced ability to serve other patients, etc. The interest of the patients is to receive the best, most appropriate care in whatever setting, public or private, will serve them best. Whether this complaint is resolved through settlement or litigation, the mental health system in Oregon will likely continue to be one of scarcity for the foreseeable future. Any

remedy will clearly pose a choice between getting civil commitment patients out of the hospital *quickly* on one hand and releasing them to the most *appropriate* setting on the other. The Hospital Corporations' self-interest clearly favors getting the patients out *quickly*—even to an inappropriate setting like a homeless shelter or a residential care setting that doesn't offer appropriate services. The interests of the patients, on the other hand, favor getting to a *better* placement, even if that takes some time.

The events of the last year or so while this matter went up to the Ninth Circuit have not abated the obvious tension between the financial self-interest of private hospitals and the interests and well-being of patients. For instance, staff of one of the plaintiff Hospital Corporations demanded police officers evict a man experiencing a psychiatric and medical crisis from their emergency department, leading directly to the death of that man in the back of a police car from a drug overdose mere minutes later.[3] Investigation of that death led to extensive further evidence of continuing problems at that hospital, with the hospital staff choosing to remove two dozen other patients with serious mental illness without conducting an appropriate vulnerable patient discharge safety review or without other appropriate EMTALA reviews. *Id.* at 13, 16, & 21. In addition to the patient who died following eviction by medical staff who claimed he was malingering, another patient with "behavioral/psychiatric symptoms and worsening physical condition" appeared at the same emergency department five times in three days seeking treatment, but was discharged five times by hospital staff to a bus stop in that three day period. *Id.* at 22. After the patient's sixth admission to Providence Milwaukie in three days, the hospital

---

[3] Ex. 1, Center for Medicare & Medicaid Servs., U.S. Dep't of Health & Human Servs., Statement of Deficiencies and Plan of Correction, Providence Milwaukie Hospital, Feb. 15, 2024, at 22.

finally discovered that she was septic and that her condition required intubation and a ventilator. *Id.* The Hospital Corporations repeated actions raise substantial questions about their capacity to put the interests of patients with mental illnesses in receiving appropriate care ahead of their own financial interests.

Now the Hospital Corporations claim that they seek to have the patients in question removed from their care and delivered to a facility "best able to treat them or a suitable facility." Dkt. 117, at 38. Because of the Hospital Corporations continuing conflict of interest, someone with *no* conflict of interest, with *no* financial motive must provide an independent voice about the best way to determine which facility is "best able to treat" people with mental illness or what facilities are "suitable." Allowing a party with an obvious conflict of interest to determine and enforce those provisions would present an inevitable temptation to define down the threshold for which placements are "best" or even merely "suitable," in order to relieve the Hospital Corporations from the financial responsibility for patient care as quickly as possible. Since the Hospital Corporations have previously chosen a bus stop five times as a "suitable" discharge plan for a patient experiencing serious physical and mental illness, the Court can hardly trust their judgment to be unaffected by their financial interests.

## IV.  The MHAP Is Entitled, Encouraged, and Required to Raise "New" Issues, So Long as the Issues are Not "Unrelated"

The Hospital Corporations depict MHAP's intervention as unwarranted and inappropriate because MHAP would introduce "new" issues into the case. Federal courts, however, welcome "new" proposed relief from intervenors, as long as the matter is not also "unrelated." *Akina v. Hawaii*, 835 F.3d 1003, 1012 (9th Cir. 2016). For instance, in the litigation over the Fairview Training Center here in Oregon, Disability Rights Oregon (then known as the Oregon Advocacy

Center) was permitted to intervene in litigation originally brought by the U.S. Department of Justice. *United States v. State of Or.,* 839 F.2d 635, 637 (9th Cir. 1988). The U.S. Attorney General had sought to challenge only the "more outrageous conditions existing within the facility," while DRO sought broadly to obtain "better conditions in the facility, sufficient training in self-care skills and sufficient community-based programs to insure freedom from unnecessary institutionalization." *Id.* at 637-38. The Ninth Circuit held that the district court erred by denying intervention to DRO on the grounds that DRO should just "file a separate lawsuit to air the issues and arguments they wish to inject into this litigation." *Id.* at 638. DRO was, as any intervenor is, entitled to seek very different relief from existing litigants, as long as the new claims for relief are somehow related to the original litigation.

Related claims are those where "*some* relationship exist[s] between the legally protected interest and the claims at issue." *Arakaki v. Cayetano*, 324 F.3d 1078, 1085 (9th Cir. 2003), *as amended* (May 13, 2003) (emphasis added). Only where any outcome of the original lawsuit would not "affect the [intervenor's] claims at all" should intervention be denied as "unrelated." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006); *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998) (intervenor's claims are sufficiently related if "resolution of the plaintiff's claims will actually affect the applicant"). In *Arakaki*, the plaintiffs challenged a series of race-conscious programs that reserved certain benefits to Hawaii residents with at least some of their ancestry traceable to the pre-Western contact population. 324 F.3d at 1081. A group of intervenors sought to advance new and different claims to limit all race-conscious benefits to those native Hawaiians with at least 50% of their ancestry traceable to the pre-Western contact population. *Id.* at 1081 n.1 & n.2. In *Arakaki*, the intervention was "unrelated" because, whether the plaintiffs or defendants prevailed in the underlying action, the

intervenors' claims would not be affected. Similarly in *Akina v. Hawaii*, the movant took the position that Hawaii should be "more restrictive" in addressing Native Hawaiian self-governance efforts, while the plaintiffs urged that the state should be "less restrictive." *Akina v. Hawaii*, 835 F.3d 1003, 1012 (9th Cir. 2016). The intervenors' interest in *Akina* would be the same "[r]egardless of how the plaintiffs' lawsuit is resolved." *Id.* Intervention is only "unrelated" where the outcome of the litigation between the original litigants would not affect the intervenor at all.

Here, by contrast, the MHAP would be greatly affected by an outcome in favor of either party. MHAP seeks to bring claims closely related to (indeed, often relying directly on) the factual allegations in the Hospital Corporations' various complaints. Instead of staking out a totally new claim, the MHAP seeks to step into the role of representing the interests of people facing civil commitment. This role is hardly unrelated, as the Hospital Corporations have already proposed those patients should be represented: the Hospital Corporations do not think this element of MHAP's intervention is "unrelated," just that the Hospital Corporations should perform that role, or that NAMI-Oregon should do it. MHAP's cross-claims against the Hospital Corporations are not "unrelated" legally or factually to the disposition of the Hospital Corporations action. MHAP's interests would certainly be affected by a determination that civil committees are 100% the responsibility of OHA, or by a determination that patients can continue to linger in private hospitals indefinitely. Claims are not "unrelated" merely because the original litigant finds them undesirable.

An intervenor is, in fact, *required* to offer some "necessary elements to the proceedings that other parties would neglect" to show the inadequacy of the existing parties, part of any threshold showing for intervention. *Sw. Ctr. for Biological* Diversity, 268 F.3d at 822. MHAP's

proposal to assert simultaneously both the state's obligations to improve access to appropriate mental health care and the private hospital corporations' responsibilities to provide legally compliant services to their patients while lodged at the private hospitals is just this kind of issue that the "other parties would neglect." The parties are, in fact, currently neglecting just this area of relief.

Hospital Corporations have been compelled to treat the vast majority of civil committees in the last six years. That the Hospital Corporations have taken few steps to make civil commitment more humane at any point in the last six years raises serious questions of joint responsibility for violations of individual rights among both the Hospital Corporations and the State Defendants. Any road back to compliance with the law in Oregon will likely take a long time, meaning that people with mental illnesses will likely continue to spend long stretches of time in the custody of the Hospital Corporations, even if ultimate responsibility returns to OHA. A comprehensive solution to this problem may require looking at how to get more community-based mental health services to avoid patients decompensating to the point of needing civil commitment; increased access to OHA-funded civil commitment placements; and increased development of long-term mental care options by the Hospital Corporations.[4] The Hospital Corporations implicit proposal that civil committees should remain in inadequate settings, without access to the outside, without access to visitors, and without their own clothing

---

[4] Although Hospital Corporations reject any claim that they should take on long-term mental health treatment, Hospital Corporations already provide a large variety of long-term care services relating to physical health outside of acute hospital settings. *See, e.g.,* Providence Health Care, "Skilled Nursing Care," *at* https://www.providence.org/services/skilled-nursing-care (describing a large variety of long-term care facilities and services operated by Providence); Legacy Health Services, "Long Term and Extended Care," *at* https://lhshealth.com/long-term-and-extended-care/ (describing a large variety of long-term care facilities and services operated by Legacy). Hospital Corporations identify no basis for providing long-term medical but not long-term mental health care.

until such time as OHA finally has the wherewithal to supply those services entirely would involve neglect of significant rights by the private hospitals for years to come. Here, the relative posture of the two primary litigants defines two polar outcomes: the State Defendants reject any responsibility to remove civil committees from private hospitals, while the Hospital Corporations believe that OHA has all the responsibility to redress all harms associated with civil committees in their care. Far from staking out some new and unrelated issue, MHAP suggests that both parties share some degree of legal responsibility for providing legally adequate services to people with mental illness facing civil commitment—a position somewhere in the middle of the two litigants. To the extent that MHAP injects new issues into the litigation, those new issues are adequately related to the legal and factual subject matter of the case to permit intervention.

## CONCLUSION

Oregon's mental health system is in profound chaos. Every participant in the system—counties, OHA, state judges, OSH, district attorneys, private hospitals, CCOs, and individual providers—must take their own share of joint responsibility within the system for the ways in which they have impacted it for better and worse. MHAP seeks to intervene in these proceedings to ensure that the voice of people with mental illnesses, undistorted by conflicts of interest or the influence of moneyed parties, can be heard in these proceedings.

MHAP's board of directors and leadership structure—comprised primarily of self-identified people with mental illness—shows that it is oriented around the needs and interests of people with mental illnesses. MHAP brings new concepts to the table and proposes specific ways the rights of people with mental illnesses should be protected. It is not controlled by corporations with financial interests. It does not merely say "me too" to someone else's claims.

Hospital Corporations are not well-postured to provide appropriate support for or representation of these patients. Their financial interests in avoiding all responsibilities for the

care of people under civil commitment preclude their representation of these individuals. Having a contrary voice urging *both* that OHA increase resources to services for people with mental illnesses and that the private hospital corporations treat civil committees better during placement in their care will provide an essential counterweight to the polarized positions of the plaintiffs and defendants, each trying to stick the other with complete responsibility, regardless of the consequences in patient care.

NAMI-Oregon lacks the adequate distance from the Hospital Corporations not to reflect the same conflict of interests. Its "me too" proposal fails to create any distance from the Hospital Corporations in terms of their relative intents in the case. MHAP instead demonstrates that it will vigorously advocate for the interests of people with mental illnesses, no matter which parties' inaction threatens their interests.

DATED January 21, 2025.

DISABILITY RIGHTS OREGON

/s Thomas Stenson
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
Dave Boyer, OSB # 235450
Dboyer@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:    (503) 243 2081
FAX:   (503) 243 1738

*Counsel for Plaintiff Disability Rights Oregon*