DAN RAYFIELD
Attorney General
CARLA A. SCOTT #054725
SHEILA H. POTTER #993485
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
JILL CONBERE #193430
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.oregon.gov
          Sheila.Potter@doj.oregon.gov
          Craig.M.Johnson@doj.oregon.gov
          Jill.conbere@doj.oregon.gov

Attorneys for Defendants Patrick Allen, Sejal Hathi, Dolores Matteucci, and Sara Walker

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

#### PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No.  3:02-cv-00339-AN (Lead Case)<br>Case No.  3:21-cv-01637-AN (Member Case)<br>Case No.  6:22-CV-01460-AN (Member Case) |
| Plaintiffs, | DEFENDANTS' STATUS REPORT |
| v. | |
| SAJEL HATHI, in her official capacity as head of the Oregon Health Authority, and SARA WALKER in her official capacity as Interim Superintendent of the Oregon State Hospital, | |
| Defendants. | |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, | Case No.  3:21-cv-01637-AN (Member Case) |
| Plaintiffs, | |
| v. | |
| SARA WALKER, Interim Superintendent of the Oregon State Hospital, in her official capacity, DOLORES MATTEUCCI, in her | |

individual capacity, SAJEL HATHI, Director
of the Oregon Health Authority, in her official
capacity, and PATRICK ALLEN in his
individual capacity,

        Defendants.

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

        Plaintiffs,

   v.

SAJEL HATHI, in her official capacity as
Director of Oregon Health Authority,

        Defendant.

Case No.  6:22-CV-01460-AN (Member Case)

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND........................................................ 2

    A.    Overview of OSH and the Populations it Serves .................................................. 2

    B.    With Tremendous Funding, OHA has Delegated to the Counties the
        Responsibility to Arrange for Community Placements and Services for the
        A&A and GEI Populations ...................................................................................... 4

    C.    Discharging A&A and GEI Patients From OSH .................................................. 9

        1.    A&A Discharge Processes and the A&A Ready to Place List .................. 9

        2.    GEI Discharge Process and GEI Dashboards ......................................... 11

    D.    Forensic Evaluations Services (FES) at OSH ................................................... 14

    E.    Historical Compliance with the *Mink* Injunction ............................................. 16

    F.    *Bowman* ............................................................................................................. 16

    G.    The Parties' Interim Agreement in *Mink/Bowman* and Court-Appointment
        of Dr. Pinals as the Neutral Expert .................................................................... 17

    H.    Status of the State's Efforts to Implement the Recommendations in Dr.
        Pinals First Through Ninth Reports .................................................................... 17

III.  ANSWERS TO THIS COURT'S QUESTIONS AT THE NOVEMBER 18, 2024,
     STATUS HEARING ............................................................................................ 18

    A.    Update Regarding Capacity-Building and Throughput Efforts ........................... 18

    B.    Compliance Projections ...................................................................................... 20

    C.    Status of Proposed Legislation............................................................................ 20

    D.    Status of State-court Contempt Cases................................................................. 21

IV.   CONCLUSION ................................................................................................... 23

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4793

## I.    INTRODUCTION

The State Defendants—the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH)—are not currently in compliance with the seven-day admission requirement under the *Mink* Injunction. With the agreement of the parties, this Court appointed a Neutral Expert, Dr. Debra Pinals, to examine Oregon's behavioral health system and make short- and long-term recommendations designed to enable timely admission of those found unfit to stand trial because they cannot aid and assist in their own defense (A&A patients) and those found guilty except for insanity in criminal cases (GEI patients). From December 2021 onward, the parties have worked with Dr. Pinals to meet with stakeholders, analyze data, and craft a set of systemic improvements. Dr. Pinals provides regular reports to this Court with her recommendations.

As explained in more detail in Sections II.H and III.A, the State Defendants have been taking and continue to take the steps recommended by Dr. Pinals. The driving force resulting in noncompliance is *not* the State's lack of capacity or efforts but rather the unprecedented increase in A&A commitment orders, which is beyond their control.  The below chart provides data regarding historical numbers of .370 orders:



The State Defendants also answer, in Section III, to the best of their ability, this

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Court's queries from the last status conference, namely at sections:  (III.A) an update regarding the status of increasing capacity to serve the A&A and GEI populations; (III.B) a report regarding the likelihood that proposed legislation will pass; (III.C) a timeline for OSH coming into compliance; and (III.D) an account of the amount of contempt fines imposed by state court judges.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Overview of OSH and the Populations it Serves

OSH generally serves six populations:  (1) civilly committed patients, who have been found by the court to be an imminent danger to themselves or others, or unable to provide for their own basic health and safety needs due to their mental illness, and who meet criteria for expedited admission to OSH; (2) GEI patients; (3) A&A patients; (4) persons who have been determined to be Extremely Dangerous Persons; (5) committed voluntary-by-guardian patients who meet expedited admission criteria; and (6) administrative transfers of youth ages 18 or above from the Oregon Youth Authority who require hospital level of care for mental health treatment (a very small percentage of patients at OSH).

A&A patients are committed to OSH under ORS 161.370 (.370 orders) for a limited purpose:  stabilization and treatment services that enable them to understand the criminal charges against them and thus to "aid and assist" in their own defense. They are not admitted to OSH for purposes of "curing" their mental illnesses. A&A patients comprise the greatest number of patients at OSH. Historically, OSH had received 60-90 such orders per month; it is currently receiving approximately 100-127 orders per month.

GEI patients are the second-largest population at OSH; in 2024, on average less than five GEI patients were committed to OSH per month. GEI patients are committed to OSH when, because of a mental disorder, they lacked substantial capacity to appreciate the criminality of their conduct or conform their conduct to the law and would otherwise have been convicted of a felony offense and present a substantial danger to others such that they are not

Page 2 -   DEFENDANTS' STATUS REPORT
CAS/j3b/981643539

appropriate for conditional release and treatment in the community. Civilly committed patients, patients committed voluntarily by guardians, and Extremely Dangerous Person committed patients are currently the smallest populations at OSH, and some of those patients are housed by OHA at private hospitals around the state or in community placements.

The patient population at OSH breaks down as follows:



OSH has two campuses, one in Salem and one in Junction City. The Junction City campus opened in March 2015, with initially only 72 beds, of which 24 were Secure Residential Treatment Facilities (SRTFs) and 48 were hospital level of care beds (HLOC), serving a combination of civilly committed and GEI Patients. Over the course of 2016 and 2017, a third unit opened at the Junction City campus, adding an additional 24 HLOC beds. OHA opened two additional SRTF units at the Junction City campus (with 48 beds total) during the pandemic and filled them with Salem patients who were ready to step down from HLOC, to create additional HLOC capacity in Salem for .370 patients, for *Mink* compliance.

In 2019, OSH served more than 1,565 patients and employed more than 2,000 staff.  In 2024, OSH served 1,759 patients and now typically has about 2,400 staff between the two

Page 3 -    DEFENDANTS' STATUS REPORT

campuses.  There are now 561 beds at the Salem campus (474 HLOC beds and 87 SRTF beds).

There are now 144 beds at OSH's Junction City Campus (72 HLOC beds and 72 SRTF beds).

This represents an increase in the total number of beds at OSH across both campuses from 672

beds in 2013 to a total of 705 beds currently.

A&A patients are exclusively housed on the Salem campus, which is where OSH's

Forensic Evaluation Services (FES) are located.

> **B.     With Tremendous Funding, OHA has Generally Delegated to the Counties the Responsibility to Arrange for Community Placements and Services for the A&A and GEI Populations**

Both A&A and GEI patients receive services and are also placed and served in the

community through a variety of avenues.  Generally, they may be placed in secure residential

treatment facilities (SRTFs); residential treatment facilities (RTFs) and residential treatment

homes (RTHs); other facilities such as Northwest Regional Re-entry Center, under direct

contracts with either OHA or counties; adult foster homes; at home or with family with wrap-

around services; or in hotels or motels with wrap-around services.

Services are provided in a variety of ways.  For example, OHA contracts with the

county Community Mental Health Programs (CMHPs) to provide some community

restoration services through County Financial Assistance Agreements (CFAAs). One service

element in OHA's contracts with the CMHPs provides them with funding to pay third-party

providers for residential placement for mandatory patient populations, such as A&A patients,

when the residents do not have other financial resources (Medicaid, private insurance,

disability checks, or private resources) to pay for the placement.

CMHPs also have certain contractual responsibilities regarding identifying

placements with third-party providers for these patients. However, CMHPs generally are not

the direct-care providers and do not necessarily have a contract with the direct-care

providers.  CMHPs do not have authority to admit or evict a patient from a particular

placement.  CMHPs also generally do not pay the placement provider; the providers are

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

generally paid by other sources, including Medicaid. A&A patients typically have a tenancy agreement with the private direct-care provider, and the patient is responsible for payment. OHA provides limited state-only funds to CMHPs through the CFAAs to pay for community placements when public assistance or other third-party resources are not available.

The CFAAs also require CMHPs to provide some community restoration services. For example, one service element in those contracts deals with community restoration and covers care coordination, linkage with public assistance and other services, legal skills training, coordination of outpatient services, arranging transportation, arranging for monthly reports to the court, arranging forensic evaluations, and the like. But this contract provision does not require CMHPs to themselves provide residential placements.

The CFAAs for GEI patients work somewhat differently. There are three models the counties have followed in executing their responsibilities, which are outlined in Service Element 30 of the CFAA for GEI patients in the community: (1) Some counties, such as Multnomah County, delegate their monitoring and supervision obligations to non-profit mental health organizations such as Cascadia, New Narrative, or Coda, which also provide treatment and residential care to GEI patients; (2) some counties, such as Clackamas County, maintain their supervisory role but subcontract with a non-profit mental health care organization for residential and care services; and (3) other counties, such as Umatilla County, have awarded their contract to a non-profit mental health organization, Community Counseling Solutions, which provides one residential placement but which also allows another non-profit, Lifeways, to run an SRTF in the county (McNeary Place), and where a state-run facility (Pendleton Cottages) is also available for residential care.

The funding stream in Service Element 30 is divided into 3 parts: (1) stipends for monitoring and supervision, which includes the community evaluations that essentially start the process, the Psychiatric Security Review Board (PSRB) and court-ordered evaluations for conditional and court-ordered release, and the CMHPs' or delegees' monthly reports;

Page 5 -    DEFENDANTS' STATUS REPORT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(2) security payments that pay providers for the amounts that are not Medicaid-reimbursable, such as those for GEI patients who are considered higher risk and lower acuity; and

(3) "Type C Funding" or what is sometimes referred to as "funding of last resort," which refers to something the GEI patient is required to undergo to mitigate risk and that if they do not receive, their community placement will be revoked and they will returned to OSH, such as sex offender treatment.

In addition to funding the counties through the CFAAs, OHA contracts directly with providers and CMHPs to support a continuum of residential placements.  In 2024, OHA developed contracts directly with SRTF providers. These contracts provide service payments for individuals that are required by the court or PSRB to receive an SRTF level of care, despite that level of care not having been determined to be a medical necessity.  OHA has obligated more than $9 million for these contracts and to date, has paid more than $3 million.

Similarly, GEI patients discharging from OSH are placed and receive services in the community in various placements which include the following:  SRTFs; RTFs; Residential Treatment Homes (RTHs); adult foster homes; or independently at home, with families with wrap-around services, or in hotels or motels with wrap-around services. As with funding for A&A patients in the community, Service Element 30 of the CFAA primarily governs the funding stream for GEI patients in the community by providing for three main components: (1) monitoring and supervising of GEI patients, (2) coordinating, and in certain limited circumstances, paying for, treatment at outpatient clinics for GEI patients if the treatment is not deemed medically necessary, and (3) funding residential treatment for GEI patients if the level of care is not deemed medically necessary.

Over time, OHA has significantly increased funding for community placements and services for the A&A and GEI populations in the community.  This graph represents funding for A&A services for each CMHP, broken down by fiscal years and half-year periods, spanning from July 2019 to June 2025:

Page 6 -   DEFENDANTS' STATUS REPORT
CAS/j3b/981643539



The below charts detail the funds sent to the CMHPs for the A&A population in the community through the CFAA and direct contracts for community restoration services:

| 2023-24 Spend Plan for All Funds | Obligated | In Contract? | Spent? |
|---|---|---|---|
| Evaluation (PDES) Community Restoration Annual Report | $423,100 | Yes, via IGA | Yes |
| Community Restoration Services Northwest Regional Recovery Center (NWRRC), Coos, Lane, Multnomah, Washington | $14,119,946 | Yes, via direct contracts | Funds are paid on a monthly basis |
| HB5525 OSH Transition: Community Navigator Pilot Program (five county sites) | $6,000,000 | Yes, sent out via CFAA | Funds are paid on a monthly basis |
| HB5204 Aid and Assist: CMHPS funds to support community restoration services | $7,500,000 | Yes, sent out via CFAA | Funds are paid on a monthly basis |
| County Financial Assistance Agreements (CFAA) | $12,593,472 | Yes, sent out via CFAA | Funds are paid on a monthly basis |
| **Total** | **$40,636,518** | | |

| 2021-23 Spend Plan for All Funds | Obligated | In Contract? | Spent as of 9.12.22 |
|---|---|---|---|
| Evaluation (PDES) Paid via Interagency monetary agreement in 2021 | $500,000 | Yes, via IGA | $500,000 |
| Community Restoration Services (includes*E board contracts) Northwest Regional Recovery Center (NWRRC), Coos, Lane, Multnomah | $8,931,292 | Yes, contractors bill quarterly, working well | Paid through Q1 and Q2 state fiscal year |
| HB5042 Community Restoration sent out Dec 2021 | $2,250,000 | Yes, sent out via CFAA | $2,250,000 |
| MHS currently contracted via County CFAA Service Element | $6,901,735 | Yes, via CFAA | $6,901,735 |
| RFA for Aid and Assist RFA closed March 2022, award amounts and contracts are finished | $15,918,286 | Yes, all in contract waiting on CMHP signature | Invoicing started Oct.1 2022 (Q2) |
| **Total** | **$34,501,313** | | **$34,501,313** |

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The below chart depicts funding for the GEI population in the community from 2021 through 2025:

| 2023-25 PSRB Spend Plan | Obligated | In Contract? | Spent? |
|---|---|---|---|
| CFAA for Monitoring, Security and Supervision Services for PSRB and JPSRB | **$10,343,304** | Yes, via CFAA and direct contracts | Funds are paid on a monthly basis |

| 2021-23 PSRB Spend Plan | Obligated | In Contract? | Spent? |
|---|---|---|---|
| CFAA for Monitoring, Security and Supervision Services for PSRB and JPSRB | **$9,926,395** | Yes, via CFAA and direct contracts | Yes |

### C.    Discharging A&A and GEI Patients From OSH

#### 1.    A&A Discharge Processes and the A&A Ready to Place List

A&A Patients are discharged from OSH under various circumstances: (1) when they are either found by a certified evaluator to be "able" or "never able" to aid and assist in their defense; (2) when their statutory end of jurisdiction occurs; (3) when they no longer need a hospital level of care and the committing court authorizes discharge to community restoration—those patients are placed on OSH's A&A Ready to Place List (RTP List); or (4) when their period of inpatient restoration ends under this Court's temporary remedial orders.  With some exceptions, discharges for all but those on the RTP list are proceeding in a timely manner.

OSH's RTP List includes patients who have been charged with a crime and: (1) are unable to aid and assist in their own defense; (2) are committed to OSH for restoration treatment; and (3) do not currently require hospital level of care (HLOC), as determined by OSH. OSH regularly reevaluates A&A patients' HLOC status and, if they still qualify for the list, file RTP notices every 30 days with the court until they are discharged. OSH withdraws a pending RTP notice from the court if the patient is no longer eligible. Unless requested by a CMHP or court, OSH only evaluates A&A patients whose highest criminal charge is a

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

misdemeanor or non-person C-level felony for the RTP List. On rare occasions, CMHPs request the hospital to evaluate other patients for the RTP List, as allowable by statute.

When OSH determines that an A&A patient does not require HLOC, it must file an "RTP notice" with the court; that notice triggers the following process pursuant to ORS 161.371(3)-(4):

> The court should order the Community Mental Health Program (CMHP) to conduct a community restoration consultation and submit a report to the court within 5 judicial days.

> • Within 10 judicial days of the CMHP filing the report, the court must hold a hearing to determine an appropriate action under ORS 161.370(2)(c) (i.e. continue the OSH commitment, terminate commitment at OSH and order community restoration, initiate civil commitment or guardianship proceedings, or dismiss the charges).

> • If the court cannot make the required findings under the relevant felony or misdemeanor HLOC standard, the court must terminate OSH commitment. If the defendant is housed in a jail, the court must set a review hearing, within 7 days from the date of the termination of the OSH commitment, to determine what action should be taken under ORS 161.370(2)(c) other than OSH commitment.

As part of this process, the CMHP is required to consult with the defendant and with any local entity that would be an option for community restoration services, to determine whether appropriate community restoration services are present and available in the community. ORS 161.371(3)-(4). The CMHP is responsible for making referrals to appropriate community placements for the patient, and providing that information to the court. *Id*. In making referrals to appropriate community providers, the CMHP is required by rule and contract to be primarily guided by the recommendation of OSH's clinical team, which identifies the level of care and services that it believes is appropriate for the patient. OAR 309-088-0130(5)(a); Mental Health Service 04, 2024-2025 County Financial Assistance Agreement.

For nearly three years, the Oregon Department of Justice (DOJ) has been monitoring OSH's RTP List to assist state courts in complying with the above statutory requirements. Dr. Pinals' Tenth Report at pages 18-19 includes a report on DOJ's analysis of the barriers

Page 10 -  DEFENDANTS' STATUS REPORT

that are hindering discharges of those on the RTP List. Those barriers include but are not limited to: (1) the court not making the written statutory findings to justify continued commitment; (2) the court delaying the statutory process, which prevents resolution of the RTP notice; (3) the court's expressed preference for an SRTF when OSH is recommending a lower level of care, with some circuit courts ordering continued commitment at OSH unless an SRTF is available for all A&A patients on their dockets; (4) recurring lack of responses from CMHPs regarding discharge planning; and (5) a lack of available placements.

To address state court cases where the statutory process was not followed, Oregon DOJ has engaged in informal outreach to court staff, defense attorneys, and prosecutors. Where informal outreach is not successful, DOJ has filed motions to intervene and letters with each court in the underlying criminal case notifying it of the issue(s). Out of 36 letters filed so far, the state circuit court appears to have corrected the identified error in 15 cases but did not correct the error in 13 cases. In the remaining cases, the circuit court partially corrected the error(s) identified or the defendant was discharged for other reasons such as being found able to aid and assist or reaching their statutory or federal remedial order end of jurisdiction.

As of January 22, 2025, there were 94 A&A patients on the RTP List. In November and December 2024, OSH discharged 90 A&A patients who were on RTP List (30 were discharged to community restoration and 60 were discharged for other reasons such as being found able, never able, or because they reached the end of their statutory or federal remedial order restoration limits). The attached Exhibit 1 reflects additional data relevant to the RTP List.

### 2.  GEI Discharge Process and GEI Dashboards

GEI patients are also discharged from OSH under various circumstances: (1) the GEI patient no longer meets jurisdictional criteria under the PSRB (no longer has a qualifying

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

mental disorder); (2) the GEI patient's maximum statutory commitment time imposed by the court has run; or (3) the GEI patient is conditionally released.

Under the GEI statutory scheme, a GEI patient has a right to an initial hearing within 90 days of commitment and then at least once every two years. *See* ORS 161.341(6)(a) and 161.341(7)(b). Per statute, either the hospital or the GEI patient can also request a hearing at any time the hospital or patient believes the patient no longer meets jurisdictional criteria or no longer needs HLOC.  According to ORS 161.346(1)(a) and ORS 161.351(1), the PSRB must discharge an individual if, after a full hearing, it finds by a preponderance of the evidence that the individual is no longer affected by a qualifying mental disorder. Alternatively, if an individual continues to have a qualifying mental disorder but has shown they are no longer a substantial danger to others, they may still be eligible for a conditional release. ORS 161.346(1)(a).

When a GEI patient's interdisciplinary team (their treatment team) determines the patient is ready to start conditional release planning, they present the patient's case to OSH Risk Review, an independent body made up of a psychiatrist, psychologist, social worker, and program director from the particular program where the specific patient is being treated, who, together, assess whether the patient is conditional release ready. This designation does not mean the patient is ready to be released that day, but rather that they are ready to begin the planning process by being referred to the PSRB for an evaluation order.

If OSH Risk Review determines that the GEI patient is ready for conditional release, the next step in the process is that the patient's social worker asks the PSRB to order a community evaluation at a specific identified placement in the community. The Board then orders the evaluation immediately in most of the cases, unless the patient is a capital offender. In capital offender cases, the Board will review whether the evaluation is appropriate and render a decision within a week; typically, it orders an evaluation.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Currently, under Oregon administrative rule, the community provider has 15 days to schedule an interview with the GEI patient and then has an additional 30 days to complete the evaluation and submit it to the Board. *See* OAR 309-019-0160(2).  Assuming the GEI patient is accepted to the community program (the community provider has the right to decline), a summary of the conditional release plan is created and provided. The hospital submits an application to the Board for a hearing, and the hearing is scheduled within 60 days per OAR 859-050-0015(5), though current data shows the Board is scheduling hearings within 38 days. The Board has approved conditional release in 96% of the hearings that were requested in 2024.

If the community placement has availability, typically the GEI patient is conditionally released to the placement within 24 hours. However, if the placement is not available, and if the delay is 60 or more days, there is brief consultation before the Board, and the GEI patient is again approved unless they have destabilized. As of June 30, 2024, the Board supervised an average of 347 adult clients on conditional release each month, achieving a "maintenance rate" of 99.38% for the first half of 2024, meaning that this percentage of the GEI population who had released from OSH remained on conditional release (and were not revoked back to OSH).

OSH maintains an "OSH Forensic Admission and Discharge Dashboard" which includes two metrics related to the GEI patient wait times: (1) how long persons who have been found GEI are waiting in custody to be admitted to OSH, and (2) how long GEI patients who are ready for conditional release planning are waiting to be released from OSH. For simplicity, the dashboard currently uses the term "no longer needing HLOC" to refer to a GEI patient who is conditional release ready, but as described more fully above, there is a more detailed process that must occur before a GEI patient is actually ready to be released from OSH (after the IDT refers the patient to Risk Review as conditional release ready, Risk Review approves, and refers to the GEI patient to the Board for an evaluation, the Board

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

orders a community evaluation, the community evaluation is completed, and once the provider approves the plan, the Board holds a hearing, and once the Board approves the release, and a placement is available, then the person is released).

Thus, where the Dashboard indicates an average of 238.0 days' wait for GEI patients, as indicated on the December 2024 report, that wait is from the day OSH Risk Review approves the interdisciplinary team's recommendation to start conditional release planning to the date of release; it is not a count from the Board's approval to the date of release. The attached Exhibit 1 provides a copy of the December 2024 OSH Forensic Admission and Discharge Dashboard, which include the GEI metrics mentioned above.

### D.    Forensic Evaluations Services (FES) at OSH

Forensic evaluations are an important part of moving forensic patients through the system. OSH's Forensic Evaluation Services (FES)[1] receives orders from municipal and circuit courts to conduct forensic evaluations in the following circumstances: (1) initial competency evaluations to determine whether a person is able to aid and assist in their own defense pursuant to ORS 161.365 for both in-custody defendants and those who are in the community; (2); competency evaluations for in-custody defendants who a court has committed to OSH pursuant to ORS 161.370 and the subsequent evaluations required at regular intervals by that statute while the person remains committed to OSH (3); competency evaluations of individuals in the community who are under restoration orders under ORS 161.370; (4) GEI evaluations for individuals both in-custody and those in the community pursuant to ORS 161.315; (5) diminished capacity evaluations pursuant to ORS 161.309; (6) evaluations for extreme emotional disturbance under 163.135(3); and (7) competency evaluations for Extremely Dangerous Persons pursuant to ORS 161.701(10)(b).

---

[1]Evaluations can also be performed by licensed private evaluators when hired, for example, by defense attorneys.

Page 14 -  DEFENDANTS' STATUS REPORT
CAS/j3b/981643539

Leadership at FES is relatively new. Dr. Morgyn Beckman has been the Director of FES for two and a half years and Dr. Andy Bustos has been the Associate Director for one and a half years. In that time, FES has collaborated with Dr. Pinals to promote significant improvements, and FES continues to strive to improve and reduce inefficiencies to perform more evaluations. Over the past 18 months, FES has onboarded ten new evaluators and one new administrative staff. In addition, FES has entirely re-vamped its onboarding process to promote long-term success in the department. FES now has a department manual and a formal onboarding process that lasts 3-6 weeks depending on the needs of the new hire. In the past year, FES has facilitated virtual interviews to occur for patients who reside at OSH. This both takes strain off unit staff and promotes longevity among our staff who reside at various locations in the state and country.

On average FES is now performing 45 evaluations per week. As of December 2023, it was averaging 30 evaluations per week, the vast majority of which were seen on the unit. Significant strain has been taken off the unit following a move to using kiosks equipped with videoconferencing software in the FES Evaluation rooms, and this format has been replicated to facilitate virtual court hearings at OSH.

Completing evaluations is a crucial step in moving patients out of OSH and in getting new patients admitted. OSH is already taking the steps that will significantly improve timeliness of forensic evaluations, including the hiring of 3 new FTE evaluators. Dr. Pinals recommends those steps in her Tenth Report.

FES is currently completing evaluations ordered under ORS 161.370 for all A&A patients committed to OSH within the statutory timeframes and has processes in place for expedited evaluations for both those persons at OSH and in community restoration. FES is scheduling all in-custody initial evaluations under ORS 161.365 within three months of the order and all evaluations on in-custody GEI's (known as .315s) within three months of the

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

order. With the hiring of the new evaluators, OSH expects to have the waitlist for ordered community restoration evaluations to a manageable level by June 2025.

As will be discussed further in consultation with Dr. Pinals' recommendations going forward, OHA is exploring creation and funding of an OHA-based FES department that would be in addition to OSH FES and would work in tandem with OSH FES.

### E.    Historical Compliance with the *Mink* Injunction

From 2002 (when the *Mink* Injunction issued) through 2018, the State maintained consistent compliance with the *Mink* Injunction's seven-day admission requirement. In 2019, after OSH became unable to timely admit A&A patients due to a substantial and unexpected surge in commitment orders, the plaintiffs in *Mink*—Disability Rights Oregon (DRO) and Metropolitan Public Defender (MPD)—filed a motion to hold OSH in contempt. The State defended and prevailed, and OSH returned to compliance from approximately August 2019 to April 2020.

In the spring of 2020, due to the steps necessary to limit the potential for spread of COVID within the hospital, OSH again became unable to comply with the *Mink* Injunction. In April 2020, OSH moved to modify the *Mink* Injunction temporarily due to the pandemic, which the Court granted over Plaintiffs' opposition. OSH was able to comply for some periods of time between June 2020 and October 2020 and then was otherwise excused from compliance under Judge Mosman's temporary modification until December 2021. Plaintiffs made multiple attempts to end the modification, which the Court finally ended in December 2021. The *Mink* case then moved into settlement talks regarding how to achieve compliance.

### F.    *Bowman*

Meanwhile, in November 2021, MPD filed the *Bowman* case on behalf of two defendants in state-court criminal cases who had been found GEI and who had been waiting for admission to OSH (as OSH was prioritizing admissions under .370 orders, per Mink). The

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Bowman* Plaintiffs obtained a TRO requiring OSH to immediately admit them, which OSH did.

### G.     The Parties' Interim Agreement in *Mink/Bowman* and Court-Appointment of Dr. Pinals as the Neutral Expert

In December 2021, the *Mink/Bowman* parties engaged in settlement conferences with Judge Beckerman and reached an Interim Agreement under which they jointly moved to consolidate both cases and appoint Dr. Debra Pinals as a neutral expert.  Dr. Pinals is a scholar and practitioner in the field of public mental health services and the criminal justice system. The parties agreed to have her provide recommendations to address OSH's capacity issues and create a plan for both long- and short-term compliance for timely admission of A&A and GEI patients. From December 2021 onward, the parties have worked with Dr. Pinals to meet with stakeholders, collect and analyze data, and craft a broad array of systemic changes to achieve compliance.  Dr. Pinals provides regular reports to this Court with recommendations.

### H.     Status of the State's Efforts to Implement the Recommendations in Dr. Pinals First Through Ninth Reports

Dr. Pinals' recommendations resulted in a host of short- and long-term systemic recommendations to improve OSH's ability to timely admit A&A & GEI patients. The State tracks implementation of those recommendations in monthly progress reports provided to Dr. Pinals and posted on OHA's *Mink*/*Bowman* website. *See* https://www.oregon.gov/oha/osh/pages/mink-bowman.aspx (providing links to those monthly progress reports).  The State is undertaking extensive work to return to compliance by implementing Dr. Pinals' recommendations and is substantially adhering to them.  The State Defendants are currently working with Dr. Pinals to carefully review the status of all her recommendations to ensure they are appropriately being implemented and will report fully on the implementation status of all recommendations in the Defendants' response to DRO's motion for contempt, which will be filed by January 28, 2025, and through live testimony at

Page 17 -  DEFENDANTS' STATUS REPORT

the contempt hearing.

Dr. Pinals' recommendations also resulted in a series of temporary federal court remedial orders issued by Judge Mosman ("the federal court remedial orders") that, among other things, override state statutes by limiting who may be admitted to OSH (with some emergency exceptions) and shortens inpatient restoration time periods (with some exceptions to extend time for public safety and other reasons). As a result of those orders and numerous systemic steps OSH/OHA took on its own and in conjunction with Dr. Pinals' recommendations, the State returned to compliance for approximately nine months (from July 2023 until May 2024). By the end of May 2024, after OSH received yet another record number of .370 orders, it fell back out of compliance and is not currently able to project when it can return to compliance.

## III.    ANSWERS TO THIS COURT'S QUESTIONS AT THE NOVEMBER 18, 2024, STATUS HEARING

### A.    Update Regarding Capacity-Building and Throughput Efforts

In addition to the work the State Defendants have done to meet Dr. Pinals' past recommendations, OHA recently issued Requests for Information (RFIs) to the counties to better understand their immediate needs to expand capacity in their communities.  In October and November 2024, OHA worked swiftly to respond to the information received in response to those RFI's, as well as working with Dr. Pinals and Plaintiffs, to develop and implement several *new* efforts to increase throughput at OSH and build capacity in community placements. Those proposals include: (1) hiring 3 new FTE evaluators within FES to help, among other things, move patients out of OSH and community restoration when they are found able or never able; (2) capacity-building in SRTFs and RTFs with available funding of $9.4 million; (3) new OHA-provided training across all system partners to, among other things, remove barriers to placements where courts and prosecutors are erroneously concluding higher levels of care are required; and (4) implementing the Extended Care Management Unit (ECMU) to work OSH's A&A and GEI RTP Lists to better enable timely

Page 18 -  DEFENDANTS' STATUS REPORT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

transition out of OSH to the appropriate level of care in the community. *See* the attached

Exhibit 4 for more detail regarding the status of these and other new efforts.

In addition, OHA is submitting during the 2025 session: (1) proposed legislation to

enact limits on who may be admitted to OSH and for how long, consistent with the Court's

orders to date with some expanded nuances, as well as limits on community restoration time

periods per the repeated recommendations of Dr. Pinals; (2) policy option packages seeking

at least $55 million to fund additional capacity building and increases in various services,

including expansion of the Community Navigator Program and additional Substance Abuse

Disorder services; and (3) at least $3.5 million in flexible behavioral health housing funds.

Indeed, the Governor's Budget for the 2025 legislative session includes the OHA's

requested funds *and more*, to increase capacity for A&A patients and other populations

served by OSH and OHA. See the attached summary of what is in the budget that is designed

to address timely admission of forensic patients to OSH. Governor Tina Kotek fully supports

the State's efforts to meet Dr. Pinals' recommendations, as demonstrated in the attached

Exhibit 2.

Finally, in addition to actions included in Dr. Pinals' Tenth Report, the State

Defendants continue to look for other ways to improve community placements to facilitate

faster discharges from OSH.  For example, in collaboration with the ECMU team, OHA's

Licensing and Certification team submitted needed emergency administrative rules

prioritizing the forensic population (A&A and GEI Population) and individuals discharging

from OSH for community placement. The rules are effective as of January 17, 2025.

And OHA has identified $875,000 to distribute to counties by February 15, 2025, to

spend on flexible housing funds which will support individuals by providing immediate and

long-term stability. *See* Exhibit 4.  These supports include items such as rental assistance,

application fees, moving costs, storage fees, repair and maintenance fees, eviction avoidance,

and utilities.  34 counties will receive these funds allocated based on the number of A&A

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

commitment orders from 2022 through 2024. The receiving counties will be required to report on how they use the allocated funds through a reporting template that OHA will review on a quarterly basis.  The Governor's Budget also includes $80 million for the development of permanent supportive housing funding.  *See* Exhibit 2.

### B.    Compliance Projections

The State Defendants cannot currently project when they will return to compliance. That said, since the last status hearing in these matters, the number of A&A patients waiting for admission was reduced from 86 to 76, and there are no GEI patients waiting for admission.

### C.    Status of Proposed Legislation

The proposed legislation to impose statutory limits on inpatient and community restoration is moving forward.  In 2024, in anticipation of potential legislation on this topic, OHA prepared a placeholder bill, which has now been introduced into the 2025 legislative session as House Bill 3051 (HB 3051).  Attached as Exhibit 3 is OHA's draft of language to implement Dr. Pinals' recommendations.  Governor Kotek has authorized this language to proceed and fully supports its enactment.  *See* Exhibit 2.  Representative Jason Kropf has agreed to introduce this draft language as a proposed amendment to HB 3051.  The language has been sent to Legislative Counsel, which is the office that will convert OHA's draft language into an official amendment, and that amendment is expected to be ready by February 4, 2025.  Representative Kropf has also organized a large workgroup of stakeholders to discuss many issues around both A&A and Civil Commitment.  In addition, several other legislators have introduced bills on the same general topics.

And, as noted above, Governor Kotek included far more than OHA requested in her Governor's Budget to fund extensive services and capacity building that are designed to expand, among other things, placements and services for the A&A and GEI populations in the community.

Page 20 -  DEFENDANTS' STATUS REPORT
CAS/j3b/981643539

### D.    Status of State-court Contempt Cases

| Date of Contempt Judgment/Order | Status on Appeal | Type of Underlying Commitment Order | Amount of Sanctions (All Remedial) | Directed Recipient of Monetary Sanctions |
|---|---|---|---|---|
| 06/03/2019 (4 cases joined for purposes of contempt proceeding | Affirmed | .365 and .370 A&A | $100/day for each day past seven days from the date of the .365 or .370 order | Trust account with Oregon Public Defense Services to be used exclusively for competency evaluations of defendants within the county of the order |
| 11/12/2019 (3 cases joined for contempt hearing) | N/A | .365 and .370 A&A | $0 – contempt found, but plaintiffs did not prove that they suffered compensable harm | N/A |
| 09/22/2021 (2 cases combined for contempt hearing)

10/13/2021 (second contempt finding, but no additional sanctions ordered) | N/A | GEI | $100 per day each defendant remained in custody each day past date of evidentiary hearing on contempt motion | Trust fund with county sheriff's office to exclusively fund staff training for corrections staff on managing behavioral health issues of people in custody |
| 10/25/2021 | N/A | GEI | $100 per day defendant remained in custody past ten days after the opinion letter on contempt issued | Unspecified: no judgment creditor listed |
| (2 cases joined for contempt hearing) | N/A | GEI | $0—contempt found, but no sanctions ordered | N/A |
| 02/24/2022 (original) 04/2022 (amended) | N/A | GEI | $449.01 per day each day defendant remained in custody past sentencing date (3x lodging cost at county, totaling $6,735.15)], plus 9% interest | Defendant |
| 06/28/2024 | Appeal filed; briefing in progress | .370 A&A | $2,500 per day until defendant was admitted to OSH ($17,500 total) | Oregon Judicial Department |
| 07/11/2024 | Appeal filed; briefing in progress | 370 A&A | $100 per day for each day that defendant was in custody after court's order of commitment against OSH and OHA separately ($2,600 total) | Defendant |
| 07/19/2024 | Appeal filed; | .370 A&A | $1,500 | Defendant |

Page 21 -  DEFENDANTS' STATUS REPORT
CAS/j3b/981643539

| Date of Contempt Judgment/Order | Status on Appeal | Type of Underlying Commitment Order | Amount of Sanctions (All Remedial) | Directed Recipient of Monetary Sanctions |
|---|---|---|---|---|
| | briefing in progress | | | |
| 09/26/2024 | N/A | .370 A&A | $900 against OSH and OHA separately ($1,800 total) | Unspecified; no judgment creditor listed |
| 09/26/2024* | N/A | .370 A&A | $0—contempt found; no judgment imposing fine on record | N/A |
| 10/10/2024 10/31/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($3,000 total) | Defendant |
| 10/10/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($4,200 total) | Defendant |
| 10/29/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($2,200 total) | Defendant |
| 10/31/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($2,200 total) | Defendant |
| 11/07/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($2,400 total) | Defendant |
| 10/31/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($3,200 total) | Defendant |
| 11/04/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($3.600 total) | Defendant |
| 11/04/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($4,200 total) | Defendant |
| 11/13/2024 | Appeal filed; briefing in progress | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($4,000 total) | Defendant |
| 11/26/2024 | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately ($3,800 total) | Defendant |

Page 22 -  DEFENDANTS' STATUS REPORT

| Date of Contempt Judgment/Order | Status on Appeal | Type of Underlying Commitment Order | Amount of Sanctions (All Remedial) | Directed Recipient of Monetary Sanctions |
|---|---|---|---|---|
| 12/03/2024 | N/A | .370 A&A | $100 per day for each of twenty days defendant was in custody after court's commitment order against OSH and OHA separately ($4,000 total) | Defendant |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |
| 12/20/2024* | N/A | .370 A&A | $100 per day for each day defendant was in custody after court's commitment order against OSH and OHA separately | Unspecified |

## IV.     CONCLUSION

The State Defendants are substantially adhering to Dr. Pinals' recommendations and are currently working with her to respond to additional and recently identified areas needing improvement or refinements.  A comprehensive update will be provided with the State Defendants' briefing in response to DRO's motion for contempt and through testimony at the contempt hearing.  But in the last year it has remained difficult (impossible, on occasion) for the State Defendants to overcome surges in A&A commitment orders, over which they have no control.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

DATED January 23, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General

_s/ Carla A. Scott_
CARLA A. SCOTT #054725
CRAIG M. JOHNSON #080902
SHEILA H. POTTER #993485
Senior Assistant Attorneys General
JILL CONBERE #193430

Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.oregon.gov
Sheila.Potter@doj.oregon.gov
Craig.M.Johnson@doj.oregon.gov
Jill.Conbere@doj.oregon.gov
Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## OSH Forensic Admission and Discharge Dashboard
### December 2024

### Aid & Assist Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 82 | 15.1 |
| Admitted During the Month | 111 | 25.1 |



### PSRB / GEI Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 2 | 15.0 |
| Admitted During the Month | 5 | 28.4 |



### Aid & Assist No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 88 | 41.4 |
| Discharged for Community Restoration After Having Been Assessed to No Longer Need HLOC | 15 | 61.1 |
| Total Discharged During the Month | 99 | |



### PSRB / GEI No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 51 | 219.2 |
| Conditionally Released to the PSRB After Having Been Assessed to No Longer Need HLOC | 4 | 238.0 |
| Total Discharged During the Month | 5 | |



**Aid & Assist Orders & Readmission Rates**







| County | Aid & Assist Orders per Month | | | | | |
|--------|------|------|------|------|------|------|
|  | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Baker | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 |
| Benton | 0.3 | 0.8 | 1.1 | 1.9 | 1.8 | 2.8 |
| Clackamas | 2.4 | 1.8 | 4.1 | 4.6 | 6.5 | 3.9 |
| Clatsop | 0.8 | 1.3 | 1.3 | 1.7 | 1.4 | 1.8 |
| Columbia | 0.7 | 0.5 | 1.3 | 1.2 | 1.3 | 0.9 |
| Coos | 2.2 | 2.4 | 2.7 | 1.1 | 2.5 | 1.9 |
| Crook | 0.3 | 0.1 | 0.0 | 0.2 | 0.2 | 0.2 |
| Curry | 0.7 | 1.3 | 1.7 | 1.3 | 1.0 | 1.3 |
| Deschutes | 1.5 | 1.7 | 3.2 | 2.6 | 3.0 | 2.8 |
| Douglas | 1.9 | 1.8 | 3.8 | 3.3 | 3.7 | 4.1 |
| Gilliam | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Grant | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 |
| Harney | 0.0 | 0.1 | 0.0 | 0.1 | 0.0 | 0.2 |
| Hood River | 0.4 | 0.1 | 0.3 | 0.1 | 0.6 | 0.8 |
| Jackson | 4.4 | 3.0 | 4.8 | 4.3 | 5.9 | 6.5 |
| Jefferson | 0.4 | 0.1 | 0.0 | 0.3 | 0.1 | 0.4 |
| Josephine | 1.7 | 0.8 | 1.0 | 1.5 | 1.5 | 1.3 |
| Klamath | 0.4 | 0.6 | 1.4 | 1.3 | 2.1 | 2.3 |
| Lake | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.1 |
| Lane | 7.2 | 5.8 | 9.3 | 11.3 | 15.4 | 15.4 |
| Lincoln | 2.2 | 1.9 | 2.2 | 1.9 | 0.9 | 1.4 |
| Linn | 2.3 | 2.3 | 2.2 | 2.8 | 3.0 | 2.8 |
| Malheur | 0.6 | 0.5 | 0.3 | 0.6 | 0.8 | 0.8 |
| Marion | 5.8 | 7.1 | 8.2 | 9.3 | 8.9 | 8.8 |
| Morrow | 0.1 | 0.2 | 0.2 | 0.4 | 0.1 | 0.0 |
| Multnomah | 9.7 | 9.1 | 9.9 | 10.4 | 15.7 | 18.3 |
| Polk | 1.6 | 1.1 | 1.1 | 2.3 | 2.8 | 2.2 |
| Sherman | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Tillamook | 1.0 | 0.7 | 0.6 | 1.3 | 0.8 | 0.9 |
| Umatilla | 0.5 | 0.9 | 1.0 | 1.4 | 1.9 | 1.7 |
| Union | 0.1 | 0.1 | 0.2 | 0.3 | 0.1 | 0.0 |
| Wallowa | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Wasco | 0.3 | 0.3 | 0.3 | 0.3 | 0.5 | 0.5 |
| Washington | 5.8 | 7.5 | 8.9 | 10.8 | 10.8 | 11.9 |
| Wheeler | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Yamhill | 1.3 | 0.4 | 0.9 | 1.1 | 1.5 | 1.5 |
| **Total** | **56.8** | **54.4** | **72.0** | **79.3** | **94.9** | **97.4** |

**Aid & Assist**

| County | Admission List (as of last day of month) | | | | Patients Admitted During Month | | | | No Longer Needing HLOC (as of last day of month) | Recommended LOCUS | | | | | | | Patients Discharged for Community Restoration | Recommended LOCUS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Avg Days | Low | High | Count | Avg Days | Low | High | Count | 1 | 2 | 3 | 4 | 5 | 6 | Avg Days | Count | 1 | 2 | 3 | 4 | 5 | 6 | Avg Days |
| Baker | | | | | | | | | | | | | | | | | | | | | | | | |
| Benton | 5 | 18.8 | 6 | 27 | | | | | | | | | | | | | 1 | | | | 1 | | | 77.0 |
| Clackamas | 4 | 9.0 | 2 | 23 | 5 | 21.4 | 21 | 23 | 2 | | | | | 1 | 1 | 33.0 | 3 | | | 1 | 1 | 1 | | 67.0 |
| Clatsop | 4 | 15.3 | 8 | 23 | 3 | 25.0 | 23 | 27 | | | | | | | | | | | | | | | | |
| Columbia | 2 | 17.5 | 12 | 23 | 1 | 26.0 | 26 | 26 | | | | | | | | | | | | | | | | |
| Coos | 2 | 20.5 | 13 | 28 | 1 | 26.0 | 26 | 26 | | | | | | | | | | | | | | | | |
| Crook | 2 | 21.0 | 20 | 22 | | | | | | | | | | | | | | | | | | | | |
| Curry | | | | | 2 | 19.0 | 14 | 24 | 2 | | | | 2 | | | 41.5 | | | | | | | | |
| Deschutes | 3 | 7.7 | 2 | 16 | 5 | 27.0 | 24 | 29 | 2 | | | | 2 | | | 41.0 | | | | | | | | |
| Douglas | 3 | 21.3 | 20 | 23 | 4 | 27.3 | 22 | 33 | 6 | | | 2 | 3 | 1 | | 31.8 | | | | | | | | |
| Gilliam | | | | | | | | | | | | | | | | | | | | | | | | |
| Grant | | | | | | | | | | | | | | | | | | | | | | | | |
| Harney | 1 | 14.0 | 14 | 14 | | | | | | | | | | | | | | | | | | | | |
| Hood River | 1 | 12.0 | 12 | 12 | 1 | 25.0 | 25 | 25 | | | | | | | | | | | | | | | | |
| Jackson | 3 | 17.0 | 15 | 21 | 9 | 24.7 | 22 | 29 | 6 | | | 1 | 2 | 3 | | 35.7 | | | | | | | | |
| Jefferson | 1 | 29.0 | 29 | 29 | | | | | | | | | | | | | | | | | | | | |
| Josephine | 2 | 9.0 | 2 | 16 | 1 | 24.0 | 24 | 24 | 1 | | | | 1 | | | 9.0 | | | | | | | | |
| Klamath | 2 | 5.0 | 1 | 9 | 1 | 27.0 | 27 | 27 | 4 | | | | | 3 | 1 | 46.5 | 1 | | | 1 | | | | 74.0 |
| Lake | | | | | | | | | | | | | | | | | | | | | | | | |
| Lane | 15 | 12.9 | 2 | 23 | 12 | 24.7 | 22 | 30 | 18 | | | 1 | 3 | 13 | 1 | 49.3 | 5 | | | | 3 | 2 | | 70.2 |
| Lincoln | | | | | 2 | 25.0 | 24 | 26 | 2 | | | | 1 | 1 | | 5.0 | | | | | | | | |
| Linn | 3 | 13.0 | 13 | 13 | 3 | 28.0 | 24 | 34 | | | | | | | | | | | | | | | | |
| Malheur | 1 | 12.0 | 12 | 12 | | | | | | | | | | | | | | | | | | | | |
| Marion | 8 | 16.6 | 2 | 30 | 13 | 23.6 | 9 | 33 | 13 | | | 1 | 4 | 8 | | 58.4 | 1 | | | | | | 1 | 32.0 |
| Morrow | | | | | | | | | | | | | | | | | | | | | | | | |
| Multnomah | 10 | 15.0 | 1 | 22 | 27 | 25.3 | 22 | 34 | 17 | | | 1 | 8 | 8 | | 37.4 | 4 | | | | 2 | 2 | | 45.5 |
| Polk | 2 | 20.0 | 20 | 20 | 3 | 29.3 | 27 | 32 | 1 | | | | | 1 | | 50.0 | | | | | | | | |
| Sherman | | | | | | | | | | | | | | | | | | | | | | | | |
| Tillamook | | | | | 2 | 19.5 | 11 | 28 | 1 | | | | 1 | | | 9.0 | | | | | | | | |
| Umatilla | 1 | 27.0 | 27 | 27 | 2 | 30.5 | 28 | 33 | 3 | | | | 1 | 2 | | 35.7 | | | | | | | | |
| Union | | | | | | | | | | | | | | | | | | | | | | | | |
| Wallowa | | | | | | | | | | | | | | | | | | | | | | | | |
| Wasco | 1 | 6.0 | 6 | 6 | | | | | | | | | | | | | | | | | | | | |
| Washington | 4 | 17.0 | 9 | 22 | 13 | 25.8 | 23 | 32 | 9 | | | 1 | 2 | 6 | | 27.4 | | | | | | | | |
| Wheeler | | | | | | | | | | | | | | | | | | | | | | | | |
| Yamhill | 2 | 20.5 | 15 | 26 | 1 | 27.0 | 27 | 27 | 1 | | | | | 1 | | 107.0 | | | | | | | | |
| **Total** | **82** | **15.1** | **1** | **30** | **111** | **25.1** | **9** | **34** | **88** | **0** | **0** | **7** | **30** | **48** | **3** | **41.4** | **15** | **0** | **0** | **2** | **7** | **6** | **0** | **61.1** |

**PSRB / GEI**

| County | Admission List (as of last day of month) | | | | Patients Admitted During Month | | | | Patients Conditionally Released to PSRB / Level of Care Needed | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Avg Days | Low | High | Count | Avg Days | Low | High | Count | SRTF | RTF | AFH | DOC | Ind. | Other | Avg Days |
| Baker | | | | | | | | | | | | | | | | |
| Benton | | | | | | | | | | | | | | | | |
| Clackamas | | | | | | | | | | | | | | | | |
| Clatsop | | | | | 1 | 27.0 | 27 | 27 | | | | | | | | |
| Columbia | | | | | | | | | | | | | | | | |
| Coos | | | | | | | | | | | | | | | | |
| Crook | | | | | | | | | | | | | | | | |
| Curry | | | | | | | | | | | | | | | | |
| Deschutes | 1 | 15.0 | 15 | 15 | | | | | 1 | 1 | | | | | | 238.0 |
| Douglas | | | | | | | | | | | | | | | | |
| Gilliam | | | | | | | | | | | | | | | | |
| Grant | | | | | | | | | | | | | | | | |
| Harney | | | | | | | | | | | | | | | | |
| Hood River | | | | | | | | | | | | | | | | |
| Jackson | | | | | | | | | | | | | | | | |
| Jefferson | | | | | | | | | | | | | | | | |
| Josephine | | | | | | | | | | | | | | | | |
| Klamath | | | | | | | | | | | | | | | | |
| Lake | | | | | | | | | | | | | | | | |
| Lane | | | | | | | | | 1 | 1 | | | | | | 497.0 |
| Lincoln | | | | | | | | | | | | | | | | |
| Linn | | | | | 1 | 33.0 | 33 | 33 | | | | | | | | |
| Malheur | | | | | | | | | | | | | | | | |
| Marion | 1 | 15.0 | 15 | 15 | | | | | | | | | | | | |
| Morrow | | | | | | | | | | | | | | | | |
| Multnomah | | | | | 2 | 24.0 | 24 | 24 | 1 | | | | | | 1 | 7.0 |
| Polk | | | | | | | | | | | | | | | | |
| Sherman | | | | | | | | | | | | | | | | |
| Tillamook | | | | | | | | | | | | | | | | |
| Umatilla | | | | | 1 | 34.0 | 34 | 34 | 1 | 1 | | | | | | 210.0 |
| Union | | | | | | | | | | | | | | | | |
| Wallowa | | | | | | | | | | | | | | | | |
| Wasco | | | | | | | | | | | | | | | | |
| Washington | | | | | | | | | | | | | | | | |
| Wheeler | | | | | | | | | | | | | | | | |
| Yamhill | | | | | | | | | | | | | | | | |
| **Total** | **2** | **15.0** | **15** | **15** | **5** | **28.4** | **24** | **34** | **4** | **3** | **0** | **0** | **0** | **0** | **1** | **238.0** |

*\*Data related to PSRB / GEI patients who no longer need hospital level of care are not listed until they discharge since the county and level of care is not known until placement.*

## Definition Guide

**Aid & Assist** – Includes patients under an ORS 161.370 court order needing competency restoration.

**PSRB / GEI** – Includes patients under a GEI court order (ORS 161.327 and ORS 161.336) or a PSRB court order (ORS 419C.530, ORS 426.220, ORS 426.701, and ORS 426.702).

**Currently on the Admission List** – Includes patients awaiting admission to OSH for whom OSH has received the court order.
    **Avg Days** – The average days a patient currently on the admission list has been waiting for admission to OSH, measured from the date the court order was signed.

**Admitted During the Month** – Includes patients who were admitted to OSH during the month.
    **Avg Days** – The average days a patient admitted to OSH had been waiting for admission, measured from the date the court order was signed.

**No Longer Needs Hospital Level of Care** – Includes patients who have been assessed to no longer need Hospital Level of Care (HLOC) and are ready to be discharged from OSH. Aid & Assist patients are added to the Ready to Place (RTP) list and PSRB/GEI patients are added to the Conditional Release Ready (CRR) list.
    **Avg Days** – The average days a patient assessed to no longer need HLOC has been waiting for discharge, measured from the date the assessment was made.

**Discharged After Having Been Assessed to No Longer Need Hospital Level of Care** – Includes patients who had been assessed to no longer need HLOC and were discharged from OSH during the month.  For Aid & Assist patients, only those discharged to community restoration are included.
    **Avg Days** – The average days a patient discharged from OSH had been waiting for discharge, measured from the date the assessment was made.

**LOCUS Score** – The Level of Care Utilization System (LOCUS) is a dynamic instrument that is used to determine and recommend a continuum of service needs, e.g. the environment of care, hours of contact and types of services.
    **1** – Independent Living - Patients who are living either independently or with minimal support in the community and who have achieved significant recovery from past episodes of illness.
    **2** – Independent Living - Patients who need ongoing treatment, but who are living either independently or with minimal support in the community.
    **3** – Independent Living – Patients who need intensive support and treatment, but who are living either independently or with minimal support in the community.
    **4** – Supportive/Supported Housing and ACT Services - Patients can live in the community either in supportive or independent settings, but treatment needs require intensive management by a multi-disciplinary treatment team.
    **5** – RTF/RTH - This level of care has traditionally been provided in non-hospital; free standing residential facilities based in the community.
    **6** – Class 1 SRTF or Psychiatric Hospital - Traditionally provided in a hospital setting, but could, in some cases, can be provided in a free-standing non-hospital setting.

**Level of Care Needed** – All levels of supervision under the PSRB are assessed not just by clinical stability but also by dangerousness.  The PSRB mission is community and public safety therefore the driver for placement is safety to the community.
    **SRTF** – Patients who need placement in a locked Secure Residential Treatment Facility (SRTF) that provides support for daily living, medication monitoring, and crisis intervention.
    **RTF** – Patients who need placement in an unlocked Residential Treatment Facility (RTF) that provides support for daily living, medication monitoring, and crisis intervention.
    **AFH** – Patients with specific needs who require Adult Foster Home (AFH) placements that provide support for training or assistance with personal care and activities of daily living, supervision of medications and/or behavior, crisis prevention, and management of diet and health care.
    **DOC** – Patients that have been dually sentenced to both PSRB and DOC at the same time and are ready to be released to DOC care.
    **Ind.** – Patients who may still require treatment but who are appropriate for either an independent living (Ind.) arrangement or with minimal support in the community.
    **Other** – Patients who have a more uncommon level of need not identified in the other categories.



TINA KOTEK
GOVERNOR

January 21, 2025

Judge Adrienne Nelson
Mark O. Hatfield United States Courthouse, Room 1407 1000
Southwest Third Avenue
Portland, OR 97204-2942

Dear Judge Nelson,

I believe that every Oregonian should have access to healthcare, including behavioral health services and supports – no matter where they live or what they can afford. I am focused on building a behavioral health continuum of care that will meet people where they are and provide culturally responsive services to meet their mental health and addiction needs.

In that spirit, I am writing to express my strong commitment to ensuring our state is in compliance with the Mink Injunction. We must ensure timely admittance of defendants under aid and assist to the Oregon State Hospital (OSH) for competency restoration and to improve discharge options for individuals who are ready for discharge, including but not limited to those who have undergone competency restoration. Consistent with my expectations of the agency and with the support of my office, the Oregon Health Authority (OHA) is working diligently with Dr. Pinals, the Court-appointed neutral expert, to implement her recommendations.

My recommended budget and my endorsement of forthcoming legislation from OHA to impose statutory restoration limits will move us forward in addressing our system's current challenges in serving these populations. Moreover, I have directed my office to develop a new permanent supportive housing model to close gaps in our continuum of care to ensure we are tackling the issue from every possible angle. We do not have the luxury of pursuing one solution at a time – we must have multiple, complementary solutions in the pipeline.

My recommended budget includes multiple investments that will promote effective community restoration, in alignment with the recommendations from Dr. Pinals' most recent report. My budget also includes a $90 million investment in adult facility-based care to include secure residential treatment facilities that can serve individuals in competency restoration and reduce the Ready to Place lists at OSH for both aid and assist and people who are considered guilty except for insanity. To expand operations of programs that serve these two populations, we are actively pursuing strategies to address the workforce crisis that undermines our current programs from operating at their full potential. There is also a $50 million investment in my budget for workforce supports which will assist us in making sure we have the workforce to staff the projected increased community capacity. In addition, my budget for OSH includes

Exhibit 2, Page 1 of 2

Judge Adrienne Nelson
January 21, 2025
Page 2

funding for three additional forensic evaluators, a flexible housing fund, and a community navigator pilot expansion program that has demonstrated success. My budget includes funding for community deflection as a prevention strategy to deflect people with severe addiction challenges from entering the justice system more deeply. My budget also includes a rate increase for psychiatric inpatient care to ensure that we do not lose any additional capacity in that area.

Lastly, I have included $80 million dollars in my budget for the development of Permanent Supportive Housing and have tasked my team to work with the OHA, Oregon Housing and Community Services, and partner organizations to develop a stronger continuum of supportive housing. This will better support individuals with significant behavioral health challenges, particularly individuals who are in community restoration.

Finally, I support the statutory changes to restoration limits recommended by Dr. Pinals that are reflected in LC 420.

I take our current yet temporary lack of compliance as an opportunity to improve Oregon's behavioral health system and want to assure you that this is a high priority. If we can improve care, reduce barriers, and better align Oregon's systems to respond to individuals who need competency restoration, then all Oregonians will benefit.

Thank you for your work on this important set of issues.

Sincerely,

Governor Tina Kotek

**Bill Language to Implement the Report of the Mink/Bowman Neutral Expert**
12/12/24

This document contains bill language designed to implement the requirements of the order by Judge Mosman (Second Amended Order to Implement Neutral Expert's Recommendations), issued July 2, 2023, as directed in the report submitted by the Neutral Expert to the court on November 19, 2024.

This bill language is intended to become an amendment to Oregon Health Authority's requested LC 420, OSH Time Limits and Restoration Placeholder. Representative Kropf has agreed to introduce this language as an amendment (presumably pending his final review).

Note that legislators and stakeholders are discussing Aid & Assist and civil commitment on a much broader scale. Some have proposed to expand the capacity of Oregon State Hospital, change the civil commitment standards, create "deflection" programs to avoid commitment, and much more. In that context, legislators are likely to consider this bill language as part of a larger potential package of legislation.

This is in standard bill format:

- Plain text is existing language unchanged
- *Italics* text is existing language to be removed
- **Bold** text is new language to be added

The comments by Matthew Green (me) are annotations to explain what each change does, with language on the topic from the report.

## ORS 161.355 – Definitions
As used in ORS 161.355 (Definitions) to 161.371 (Procedures upon commitment of defendant):

(1 )"Certified evaluator" has the meaning given that term in ORS 161.309 (Notice of mental defense).

(2) "Community restoration services" means services and treatment necessary to safely allow a defendant to gain or regain fitness to proceed in the community, which may include supervision by pretrial services.

(3) "Hospital level of care" means that a defendant requires the type of care provided by an inpatient hospital in order to gain or regain fitness to proceed.

(4) "Public safety concerns" means that the defendant presents a risk to self or to the public if not hospitalized or in custody.

**(5) "Person misdemeanor" includes:**

> **(a) ORS 162.315 (Resisting arrest) Resisting Arrest; ORS 163.160 (Assault in the fourth degree) Assault IV; ORS 163.187 (Strangulation) Strangulation; ORS 163.190 (Menacing) Menacing; ORS 163.195 (Recklessly endangering another person) Recklessly Endanger Another; ORS 163.200 (Criminal mistreatment in the second degree) Criminal Mistreatment II; ORS 163.212**

**(Unlawful use of an electrical stun gun, tear gas or mace in the second degree) Use of Stun Gun, Tear Gas, Mace II; ORS 163.415 (Sexual abuse in the third degree) Sexual Abuse III; ORS 163.454 (Custodial sexual misconduct in the second degree) Custodial Sexual Misconduct in the Second Degree; ORS 163.465 (Public indecency) Public Indecency; ORS 163.467 (Private indecency) Private Indecency; ORS 163.472 (Unlawful dissemination of an intimate image) Unlawful Dissemination of Intimate Image; ORS 163.476 (Unlawfully being in a location where children regularly congregate) Unlawfully Being in a Location Where Children Regularly Congregate; ORS 163.545 (Child neglect in the second degree) Child Neglect II; ORS 163.575 (Endangering the welfare of a minor) Endanger Welfare of Minor; ORS 163.687 (Encouraging child sexual abuse in the third degree) Encouraging Child Sex Abuse III; ORS 163.700 (Invasion of personal privacy in the second degree) Invasion of Personal Privacy II; ORS 163.709 (Unlawful directing of light from a laser pointer) Unlawfully Directing a Laser Pointer; ORS 163.732 (Stalking)(1) Stalking; ORS 163.750 (Violating a court's stalking protective order)(1) Violating Court's Stalking Order; ORS 165.572 (Interference with making a report) Interfering with Making a Police Report; ORS 165.815 (Criminal impersonation) Criminal Impersonation; ORS 166.065 (Harassment)(4) Harassment/Offensive Sexual Contact; ORS 166.155 (Bias crime in the second degree) Bias Crime II; ORS 166.385 (Possession of hoax destructive device)(2) Misdemeanor Possession of a Hoax Destructive Device; ORS 167.054 Furnishing Sexually Explicit Material to a Child; ORS 475.910 (Application of controlled substance to the body of another person)(4) Unlawful Administration of a Controlled Substance; ORS 609.990 (Penalties for ORS 609.060, 609.095, 609.098, 609.100, 609.169 and 609.405)(3)(a) Maintaining Dangerous Dog; ORS 811.060 (Vehicular assault) Vehicular Assault; ORS 813.010 (Driving under the influence of intoxicants), Driving Under the Influence of Intoxicants (as provided in OAR 213-004-0009 (Prior ORS 813.010 (DUII) Convictions)); ORS 837.374 (Reckless interference with aircraft)(2) and (3) Unlawful Interference with Aircraft (if aircraft manned at time of offense); and attempts or solicitations to commit any Class C person felonies as defined in section (14) of this rule; or**

**(b) Violation of:**

**(A) An Extreme Risk Protective Order entered under ORS 166.525 et seq.**

**(B) A Family Abuse Prevention Act Restraining Order entered under ORS 107.700 et seq.**

**(C) An Elderly Persons and Persons with Disabilities Abuse Prevention Act Restraining Order under ORS 124.005 et seq.;**

**(D) A Sexual Abuse Restraining Order under ORS 163.760 et seq.; or**

**(E) An Emergency Protection Order under ORS 133.035.**

ORS 161.370 – Determination of fitness to proceed
(1)

(a) When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court.

(b) If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed under ORS 161.365 (Procedure for determining issue of fitness to proceed), the court may make the determination on the basis of the report. If the finding is contested, the court shall hold a hearing on the issue. If the report is received in evidence in the hearing, the party who contests the finding has the right to summon and to cross-examine any certified evaluator who submitted the report and to offer evidence upon the issue. Other evidence regarding the defendant's fitness to proceed may be introduced by either party.

(2)

(a) If the court determines that the defendant lacks fitness to proceed, the criminal proceeding against the defendant shall be suspended and the court shall proceed in accordance with this subsection.

(b) After making the determination under paragraph (a) of this subsection, the court shall receive a recommendation from a community mental health program director or the director's designee, and from any local entity that would be responsible for treating the defendant if the defendant were to be released in the community, concerning whether appropriate community restoration services are present and available in the community.

(c) If the parties agree as to the appropriate action under this section, the court may, after making all findings required by law, enter any order authorized by this section. If the parties do not agree as to the appropriate action, the court and the parties shall, at a hearing, consider an appropriate action in the case, and the court shall make a determination and enter an order necessary to implement the action. In determining the appropriate action, the court shall consider the primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), the least restrictive option appropriate for the defendant, the needs of the defendant and the interests of justice. Actions may include but are not limited to:

(A) Commitment for the defendant to gain or regain fitness to proceed under subsection (3) or (4) of this section;

(B) An order to engage in community restoration services, as recommended by the community mental health program director or designee, under subsection (6) of this section;

(C) Commencement of a civil commitment proceeding under ORS 426.070 (Initiation) to 426.170 (Delivery of certified copy of record), 426.701 (Commitment of "extremely dangerous" person with qualifying mental disorder) or 427.235 (Notice to court of need for commitment) to 427.290 (Determination by court of need for commitment);

(D) Commencement of protective proceedings under ORS chapter 125; or

(E) Dismissal of the charges pursuant to ORS 135.755 (Dismissal on motion of court or district attorney).

Exhibit 3, Page 3 of 12

(d) If the court, while considering or ordering an appropriate action under this subsection, does not order the defendant committed to a state mental hospital or other facility, but finds that appropriate community restoration services are not present and available in the community, for any defendant remaining in custody after such determination, the court shall set a review hearing seven days from the date of the determination under paragraph (a) of this subsection. At the review hearing, the court shall consider all relevant information and determine if commitment to the state mental hospital or other facility is appropriate under subsection (3) or (4) of this section, or if another action described in paragraph (c) of this subsection is appropriate. At the conclusion of the hearing the court shall enter an order in accordance with the defendant's constitutional rights to due process.

(e) If the court determines that the appropriate action in the case is an order for the defendant to engage in community restoration services, but the defendant has a pending criminal case, warrant or hold in one or more other jurisdictions, the other jurisdictions shall, within two judicial days of becoming aware of the proceeding under this section, communicate with the court and the other jurisdictions, if applicable, to develop a plan to address the interests of all jurisdictions in the defendant in a timely manner.

(3)

(a) If the most serious offense in the charging instrument is a felony, the court shall commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age, if the court makes the following findings:

(A) The defendant requires a hospital level of care due to public safety concerns if the defendant is not hospitalized or in custody or the acuity of symptoms of the defendant's qualifying mental disorder; and

(B) Based on the findings resulting from a consultation described in ORS 161.365 (Procedure for determining issue of fitness to proceed) (1), if applicable, from any information provided by community-based mental health providers or any other sources, and primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), the appropriate community restoration services are not present and available in the community.

(b) If the defendant is committed under this subsection, the community mental health program director, or director's designee, shall at regular intervals, during any period of commitment, review available community restoration services and maintain communication with the defendant and the superintendent of the state mental hospital or director of the facility in order to facilitate an efficient transition to treatment in the community when ordered.

(c) If the court does not order the commitment of the defendant under this subsection, the court shall proceed in accordance with subsection (2)(c) of this section to determine and order an appropriate action other than commitment.

(4)

(a) If the most serious offense in the charging instrument is a **person** misdemeanor, the court may not commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or **if the most serious offense in the charging instrument is a misdemeanor, the court may not commit the defendant** to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age, unless the court:

> (A)

>> (i) Receives a recommendation from a certified evaluator that the defendant requires a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder; and

>> (ii) Receives a recommendation from a community mental health program director, or director's designee, that the appropriate community restoration services are not present and available in the community; or

> (B) Determines that the defendant requires a hospital level of care after making all of the following written findings:

>> (i) The defendant needs a hospital level of care due to the acuity of the symptoms of the defendant's qualifying mental disorder;

>> (ii) There are public safety concerns; and

>> (iii) The appropriate community restoration services are not present and available in the community.

(b) If at the time of determining the appropriate action for the case, the court is considering commitment under paragraph (a)(A) of this subsection and:

> (A) Has not received a recommendation from a certified evaluator as to whether the defendant requires a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder, the court shall order a certified evaluator to make such a recommendation.

> (B) Has not received a recommendation from the community mental health program director or designee concerning whether appropriate community restoration services are present and available in the community, the court shall order the director or designee to make such a recommendation.

(c) If the court does not order the commitment of the defendant under this subsection, the court shall proceed in accordance with subsection (2)(c) of this section to determine and order an appropriate action other than commitment.

(d) If the defendant is committed under this subsection, the community mental health program director, or director's designee, shall at regular intervals, during any period of commitment, review available community restoration services and maintain communication with the

defendant and the superintendent of the state mental hospital or director of the facility in order to facilitate an efficient transition to treatment in the community when ordered.

(5) If the most serious offense in the charging instrument is a violation **or a misdemeanor other than a person misdemeanor**, the court may not commit the defendant to the custody of the superintendent of a state mental hospital or director of a facility designated by the Oregon Health Authority if the defendant is at least 18 years of age, or **if the most serious offense in the charging instrument is a violation, the court may not commit the defendant** to the custody of the director of a secure intensive community inpatient facility designated by the authority if the defendant is under 18 years of age.

(6)

(a) If the court does not order the commitment of the defendant under subsection (3) or (4) of this section, if commitment is precluded under subsection (5) of this section or if the court determines that care other than commitment would better serve the defendant and the community, the court shall release the defendant, pursuant to an order that the defendant engage in community restoration services, until the defendant has gained or regained fitness to proceed, or until the court finds there is no substantial probability that the defendant will, within the [*foreseeable future*] **time remaining for restoration within the maximum time period established in subsection (7) of this section**, gain or regain fitness to proceed. The court may not order the defendant to engage in community restoration services in another county without permission from the other county.

(b) **If the court has previously ordered the commitment of the defendant under subsection (3) or (4) of this section, the court may subsequently order that the defendant engage in community restoration services if and only if a forensic evaluation indicates there is a substantial probability that additional restoration efforts will restore the defendant.**

**(c)** The [*court may order a*] community mental health program director coordinating the defendant's treatment in the community [*to provide the court with status reports on the defendant's progress in gaining or regaining fitness to proceed. The director shall provide a status report if the defendant is not complying with court-ordered restoration services.*] **shall cause the defendant to be evaluated and shall notify the court regarding the defendant in the same manner and within the same timelines as required of the superintendent of a state mental hospital or director of a facility to which the defendant is committed are required to do so under ORS 161.371.**

[*(c)*] **(d)** A community mental health program director coordinating the defendant's treatment in the community shall notify the court if the defendant gains or regains fitness to proceed. The notice shall be filed with the court and may be filed electronically. The clerk of the court shall cause copies of the notice to be delivered to both the district attorney and the counsel for the defendant.

[*(d)*] **(e)** When a defendant is ordered to engage in community restoration services under this subsection, the court may place conditions that the court deems appropriate on the release, including the requirement that the defendant regularly report to a state mental hospital or a

certified evaluator for examination to determine if the defendant has gained or regained fitness to proceed.

(7) **If the defendant is at least 18 years of age, the maximum time period authorized for restoration described in this section is as follows:**

**(a) If the most serious offense in the charging instrument is a violation or a misdemeanor other than a person misdemeanor, the maximum time period is 90 days in community restoration services.**

**(b) If the most serious offense in the charging instrument is a person misdemeanor, the maximum time period is:**

**(A) A maximum of 90 days in commitment and a subsequent maximum of 90 days in community restoration services; or**

**(B) A maximum of 90 days in community restoration services.**

**(c) If the most serious offense in the charging instrument is a felony, the maximum time period is:**

**(A) A maximum of 180 days in commitment and a subsequent maximum of 90 days in community restoration services; or**

**(B) A maximum of 180 days in community restoration services.**

**(d) Notwithstanding paragraph (c) of this subsection, if the most serious offense in the charging instrument is a aggravated murder or a crime listed in ORS 137.700 (2), the maximum time period is:**

**(A) A maximum of 360 days in commitment and a subsequent maximum of 180 days in community restoration services; or**

**(B) A maximum of 360 days in community restoration services.**

**(e) Notwithstanding paragraphs (a) through (d) of this subsection, the maximum time period in commitment and community restoration services combined may be no longer than a period of time equal the maximum sentence the court could have imposed if the defendant had been convicted.**

**(f) For purposes of calculating the maximum period of commitment described in this subsection:**

**(A) The initial custody date is the date on which the defendant is first committed under this section on any charge alleged in the accusatory instrument; and**

**(B) The defendant shall be given credit against each charge alleged in the accusatory instrument:**

> **(i) For each day the defendant is committed under this section, whether the days are consecutive or are interrupted by a period of time during which the defendant has gained or regained fitness to proceed; and**
>
> **(ii) Unless the defendant is charged on any charging instrument with aggravated murder or a crime listed in ORS 137.700(2), for each day the defendant is held in jail before and after the date the defendant is first committed, whether the days are consecutive or are interrupted by a period of time during which the defendant lacks fitness to proceed.**

**(8)** The Oregon Health Authority shall establish by rule standards for the recommendation provided to the court described in subsection (2) of this section. [1971 c.743 §52; 1975 c.380 §5; 1993 c.238 §3; 1999 c.931 §§1,2; 2005 c.685 §6; 2009 c.595 §107; 2011 c.508 §1; 2011 c.724 §8; 2015 c.130 §2; 2017 c.49 §1; 2017 c.233 §3; 2017 c.628 §1; 2017 c.634 §16; 2019 c.311 §5; 2019 c.318 §2; 2019 c.538 §2a; 2021 c.395 §7]

## ORS 161.371 – Procedures upon commitment of defendant

(1) The superintendent of a state mental hospital or director of a facility to which the defendant is committed under ORS 161.370 shall cause the defendant to be evaluated within 60 days from the defendant's delivery into the superintendent's or director's custody, for the purpose of determining whether there is a substantial probability that, in the [*foreseeable future*] **time remaining for restoration within the maximum time period established in ORS 160.370(7)**, the defendant will have fitness to proceed. In addition, the superintendent or director shall:

> (a) Immediately notify the committing court if the defendant, at any time, gains or regains fitness to proceed or if there is no substantial probability that, within the [*foreseeable future*] **time remaining for restoration within the maximum time period established in subsection (7) of this section**, the defendant will gain or regain fitness to proceed.
>
> (b) Within 90 days of the defendant's delivery into the superintendent's or director's custody, notify the committing court that:
>
>> (A) The defendant has present fitness to proceed;
>>
>> (B) There is no substantial probability that, in the [*foreseeable future*] **time remaining for restoration within the maximum time period established in ORS 160.370(7)**, the defendant will gain or regain fitness to proceed; or
>>
>> (C) There is a substantial probability that, in the [*foreseeable future*] **time remaining for restoration within the maximum time period established in ORS 160.370(7)**, the defendant will gain or regain fitness to proceed. If the probability exists, the superintendent or director shall give the court an estimate of the time in which the defendant, with appropriate treatment, is expected to gain or regain fitness to proceed.

(c) Notify the court if court-ordered involuntary medication is necessary for the defendant to gain or regain fitness to proceed and, if appropriate, submit a report to the court under ORS 161.372 (Involuntary administration of medication for fitness to proceed).

(2)

(a) If the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that there is a substantial probability that, in the [*foreseeable future*] **time remaining for restoration within the maximum time period established in ORS 160.370(7)**, the defendant will gain or regain fitness to proceed, unless the court otherwise orders, the defendant shall remain in the superintendent's or director's custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain fitness to proceed. In keeping with the notice requirement under subsection (1)(b) of this section, the superintendent or director shall, for the duration of the defendant's period of commitment, submit a progress report to the committing court, concerning the defendant's fitness to proceed, at least once every 180 days as measured from the date of the defendant's delivery into the superintendent's or director's custody.

(b) A progress report described in paragraph (a) of this subsection may consist of an update to:

(A) The original examination report conducted under ORS 161.365; or

(B) An evaluation conducted under subsection (1) of this section, if the defendant did not receive an examination under ORS 161.365.

(3)

(a) Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a felony, and the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that a hospital level of care is no longer necessary due to present public safety concerns and the acuity of symptoms of the defendant's qualifying mental disorder, the superintendent or director may file notice of the determination with the court. Upon receipt of the notice, the court shall order that a community mental health program director or the director's designee, within five judicial days:

(A) Consult with the defendant and with any local entity that would be responsible for providing community restoration services, if the defendant were to be released in the community, to determine whether community restoration services are present and available in the community; and

(B) Provide the court and the parties with recommendations from the consultation.

(b) Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a felony, and the community mental health program director determines that community restoration services that would mitigate any risk posed by the defendant are present and available in the community, the community mental health program director may file notice of the determination with the court. Upon receipt of the notice, the court shall order that the superintendent of the state mental hospital or director of the facility to which the defendant is committed, within five judicial days:

(A) Evaluate the defendant to determine whether a hospital level of care is no longer necessary due to present public safety concerns, or no longer necessary due to the acuity of symptoms of the defendant's qualifying mental disorder; and

(B) Provide the court and the parties with recommendations from the evaluation.

(c) Within 10 judicial days of receiving the recommendations described in paragraph (a) or (b) of this subsection, the court shall hold a hearing to determine an appropriate action in accordance with ORS 161.370(2)(c) as follows:

(A) If, after consideration of the factors and possible actions described in ORS 161.370(2)(c) and any recommendations received under paragraph (a) or (b) of this subsection, the court determines that a hospital level of care is necessary due to public safety concerns or the acuity of symptoms of the defendant's qualifying mental disorder, and that based on the consultation or evaluation described in paragraph (a) or (b) of this subsection, any information provided by community-based mental health providers or any other sources, primary and secondary release criteria as defined in ORS 135.230 (Definitions for ORS 135.230 to 135.290), and any other information the court finds to be trustworthy and reliable, the appropriate community restoration services are not present and available in the community, the court may continue the commitment of the defendant.

(B) If the court does not make the determination described in subparagraph (A) of this paragraph, the court shall terminate the commitment and shall set a review hearing seven days from the date of the commitment termination for any defendant remaining in custody. At the review hearing, the court shall consider all relevant information, determine an appropriate action in the case as described in ORS 161.370(2)(c) and enter an order in accordance with the defendant's constitutional rights to due process.

(4)

(a) Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a **person** misdemeanor, and the superintendent of the state mental hospital or director of the facility to which the defendant is committed determines that the defendant no longer needs a hospital level of care due to the acuity of symptoms of the defendant's qualifying mental disorder or there are not present public safety concerns, the superintendent or director shall file notice of the determination with the court, along with recommendations regarding the necessary community restoration services that would mitigate any risk presented by the defendant. Upon receipt of the notice, the court shall order that a community mental health program director or the director's designee, within five judicial days:

(A) Consult with the defendant and with any local entity that would be responsible for providing community restoration services, if the defendant were to be released in the community, to determine whether appropriate community restoration services are present and available in the community; and

(B) Provide the court and the parties with recommendations from the consultation.

(b) Notwithstanding subsection (2) of this section, if the most serious offense in the charging instrument is a **person** misdemeanor, and the community mental health program director determines that the community restoration services that would mitigate any risk posed by the defendant are present and available in the community, the community mental health program director may file notice of the determination with the court. Upon receipt of the notice, the court shall order that the superintendent of the state mental hospital or director of the facility to which the defendant is committed, within five judicial days:

> (A )Evaluate the defendant to determine whether a hospital level of care is no longer necessary due to present public safety concerns, or no longer necessary due to the acuity of symptoms of the defendant's qualifying mental disorder; and

> (B) Provide the court and the parties with recommendations from the evaluation.

(c) Within 10 judicial days of receiving the recommendations described in paragraph (a) or (b) of this subsection, the court shall hold a hearing to determine an appropriate action in accordance with ORS 161.370(2)(c) as follows:

> (A) After consideration of the factors and possible actions described in ORS 161.370 (Determination of fitness to proceed) (2)(c), the consultation or evaluation and any recommendations described in paragraph (a) or (b) of this subsection, and any other information the court finds to be trustworthy and reliable, the court may continue the commitment of the defendant if the court makes written findings that a hospital level of care is necessary due to public safety concerns and the acuity of symptoms of the defendant's qualifying mental disorder, and that appropriate community restoration services are not present and available in the community.

> (B) If the court does not make the findings described in subparagraph (A) of this paragraph, the court shall terminate the commitment and shall set a review hearing seven days from the date of the commitment termination for any defendant remaining in custody. At the review hearing, the court shall consider all relevant information, determine an appropriate action in the case as described in ORS 161.370 (Determination of fitness to proceed) (2)(c) and enter an order in accordance with the defendant's constitutional rights to due process.

(5)

> (a) If a defendant remains committed under this section, the court shall determine within a reasonable period of time whether there is a substantial probability that, in the [*foreseeable future*] **time remaining for restoration within the maximum time period established in ORS 161.370(7),**, the defendant will gain or regain fitness to proceed. [*However, regardless of the number of charges with which the defendant is accused, in no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:*

> > *(A) Three years; or*

*(B) A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted.*

*(b) For purposes of calculating the maximum period of commitment described in paragraph (a) of this subsection:*

*(A) The initial custody date is the date on which the defendant is first committed under this section on any charge alleged in the accusatory instrument; and*

*(B) The defendant shall be given credit against each charge alleged in the accusatory instrument:*

*(i) For each day the defendant is committed under this section, whether the days are consecutive or are interrupted by a period of time during which the defendant has gained or regained fitness to proceed; and*

*(ii) Unless the defendant is charged on any charging instrument with aggravated murder or a crime listed in ORS 137.700(2), for each day the defendant is held in jail before and after the date the defendant is first committed, whether the days are consecutive or are interrupted by a period of time during which the defendant lacks fitness to proceed.*

*(c)*] **(b)** The superintendent of the state mental hospital or director of the facility to which the defendant is committed shall notify the committing court of the defendant's impending discharge 30 days before the date on which the superintendent or director is required to discharge the defendant under this subsection.

(6)

(a) All notices required under this section shall be filed with the court and may be filed electronically. The clerk of the court shall cause copies of the notices to be delivered to both the district attorney and the counsel for the defendant.

(b) When the committing court receives a notice from the superintendent or director under subsection (1) of this section concerning the defendant's progress or lack thereof, or under subsection (5) of this section concerning the defendant's impending discharge, the committing court shall determine, after a hearing if a hearing is requested, whether the defendant presently has fitness to proceed.

(7) If at any time the court determines that the defendant lacks fitness to proceed, the court shall further determine whether the defendant is entitled to discharge under subsection (5) of this section. If the court determines that the defendant is entitled to discharge under subsection (5) of this section, the court shall dismiss, without prejudice, all charges against the defendant and:

(a) Order that the defendant be discharged; or

(b) Initiate commitment proceedings under ORS 426.070, 426.701 or 427.235 to 427.290.



# Aid & Assist and GEI/PSRB Recommendations Progress Updates – 1.24.24

As stated by Dr. Pinals 10th report dated 11/12/24, the state has worked closely with Dr. Pinals and the plaintiffs to develop a series of recommendations that should be implemented within agreed upon timelines to maximize the potential to return to compliance as soon as possible. Below outlines an overview of the progress made with the recommendations and the next steps the state will be taking.

1. **Expand Oregon State Hospital (OSH) Forensic Evaluation Service by Hiring Three (3) Full-Time Equivalent Forensic Evaluators.**

    OSH agreed to hire three (3) additional full-time evaluators to begin work in March 2025. This will increase FES's capacity to complete evaluations for individuals in CR by another 25-30 evaluations per month.

    **Completed:**
    - Positions were posted on Workday for recruitment and three applicants applied.
    - Dr. Beckman and Dr. Bustos started reviewing received applications.
    - Dr. Beckman and Dr. Bustos conducted multiple interviews for the three positions starting on 12/20/2024.
    - Dr. Beckman and Dr. Bustos have conducted two additional interviews in the month of January 2025.
    - Dr. Beckman and Dr. Bustos have extended offers to three candidates and are waiting to hear back on one of the offers.
    - One applicant for the evaluator position has accepted the offer and will begin on 3/03/2025.
    - Another applicant for the evaluator position has accepted the offer and will begin on 5/12/2025.
    - One current part time evaluator is moving to a full time position starting 2/10/2025.

    **Next Steps:**
    - Dr. Beckman and Dr. Bustos will complete the recruitment for the final position; if the candidate to whom it was offered declines, there is an alternative candidate to whom the position will be offered.

2. **Establish an Aid & Assist Flexible BH Housing Funds Resource**

    The State agreed to provide flexible housing funds which will support individuals by providing immediate and long-term stability. These supports include items such as rental assistance, application fees, moving costs, storage fees, repair and maintenance fees, eviction avoidance, and utilities. **(Please note: funding is listed in the 2025-2027 Governors Budget, starting July 1st 2025)**

Exhibit 4, Page 1 of 5



# Aid & Assist and GEI/PSRB Recommendations Progress Updates – 1.24.24

**Completed:**

- Behavioral Health Division has identified an additional $875,000 to distribute to counties by 02/15/2025. The team has developed a distribution breakdown for the additional funding and is drafting a memo to accompany the funding.
- The team established a draft funding distribution breakdown to coordinate with OHCS. The developed funding formula modified the previously estimated funding distribution. The formula outlines that 34 counties will receive allocated funds based on the number of A&A cases from January 01st 2022 – December 20th, 2024.
- The team has established a reporting method and process. Counties are expected to report on how they will use the allocated funds through an established reporting template that will be reviewed on a quarterly basis by OHA.
- The team has established a communications plan to communicate funding allocations and reporting expectations. The communications will include a memo to Community Mental Health Providers (CMHP) directors and meetings with Association of Oregon Community Mental Health Programs (AOCMHP) and Counties.
- The team has met with Oregon Housing and Community Services (OHCS) to understand lessons learned and implement those lessons in the funding distribution for the flexible funds.

**Next Steps:**

- The team will distribute an initial $875,000 to counties by mid-February through a grant amendment.
- The team is working to coordinate with OHCS on a distribution method that targets the forensic population. Please note the funding distribution and reporting process may change based on the Governor's recommended budget outlining that the funding is allocated to OHCS.
- Behavioral Health leadership will coordinate with the Governor's Office on the funding intent and distribution plan.
- The team will also be setting up a meeting with AOCMHP to give an overview of the funding details, funding impact, and reporting guidance.

3. **Aid & Assist SRTF Expansion**

OHA's 2023-2025 budget includes a onetime only appropriation of $9.4 million from HB 5024. The Intensive Service Unit within OHA BH will use these funds for Secured Residential Treatment Facility (SRTF) and Residential Treatment Facility/Housing (RTF/H) expansion projects to increase bed capacity throughout the state of Oregon and improve access to services.

**Completed:**
- Kick off meetings with the following facility expansions have been conducted: Northwest Regional Reentry Center (NWRRC) Expansion, Jackson House gap funding, Lifeworks



## Aid & Assist and GEI/PSRB Recommendations Progress Updates – 1.24.24

Northwest conversion and SRTF new build, Cascadia ADA Residential Expansion, Independence Place (a total of 43-47 beds).
- The NWRRC legal sufficiency review has been completed, and the draft Grant Agreement and Declaration of Restrictive Covenants has been sent to NWRRC for review.
- Lifeworks NW and Jackson House are coordinating with Behavioral Health Investments (BHI) unit to clarify needed documentation and then BHI will develop the initial contracts with both facilities.
- Cascadia ADA Residential Expansion and Independence Place are working on completing required documents for BHI Unit.

**Next Steps:**
- Intensive Services Unit (ISU) is working to conduct facility kick off meeting for Harlow Shangri-La and the Tigard Project (10 bed increase).
- Intensive Services Unit (ISU) will continue to coordinate on a consistent basis with BHI and the facilities to execute contracts and provide technical assistance.
- OHA Behavioral Health adopted an emergency rule, effective January 17, 2025, that prioritizes residential beds for the forensic population and patients discharging from OSH.

4. **Provide Specific Training and Education to Oregon Judicial Department (OJD), District Attorneys, and Community Mental Health Providers (CMHPs)**

To improve shared understanding of contractual roles, level of care determinations, and competency restoration and evaluation, the state will provide training topics to various audiences including CMHPs, Substance Use Disorder (SUD) providers, and courts. There are three main trainings that will initially occur during the first and second quarters in 2025.

**Completed:**
- The team has established a training curriculum on community placement services and supports, levels of care, and OSH's Ready to Place determination on December 15th 2024.
- The team has established a training curriculum on legal process of A&A and GEI/PSRB, best practices, and service delivery models for SUD providers on December 15th 2024.
- The team has developed the curriculum on competency restoration and forensic evaluation on January 13th, 2025.

**Next Steps:**
- The team will continue to finalize and consolidate trainings by mid-February for the training focused on community placement services and supports, levels of care, and OSH's Ready to Place determination established.
- The team will start to coordinate and establish training dates and timing logistics by February 15th 2025. The team aims to conduct the training for the first topic (community placement services and supports, levels of care, and OSH's Ready to Place determination) by mid-March 2025.



## Aid & Assist and GEI/PSRB Recommendations Progress Updates – 1.24.24

5. **Oregon Health Authority Behavioral Health (OHA BH) Coordination Integration: Phased Approach to Reinstitute Extended Care Management Unit (ECMU)**

While the courts ultimately approve the discharge and transition plan, the ECMU program would work with Multnomah, Washington and Lane counties that make up 35% of all individuals on the Ready to Place (RTP) list and facilitate placement for individuals ready to discharge from OSH by increasing and improving communication and resource identification.

**Completed:**
- ECMU team is continuing build out the ECMU team outlining roles and responsibilities:
    - ECMU team has established a team of 5 individuals who will be consistently working with the CHOICE team to facilitate placement and discharge for individuals on the "Ready to Place" list
    - ECMU team has started drafting the unit's charter that will outline all the unit's responsibilities and the intended impact.
    - OHA has established a meeting to improve the connection with OSH and GEI processes – in addressing the GEI population.
    - ECMU team has drafted Oregon State Hospital Aid and Assist/GEI Escalation Pathway for Discharge.
    - ECMU team and Behavioral Health Leadership have sent out communication including a memo to outline the intent and coordination goals of ECMU.
    - ECMU team has developed a consistent notification process with OSH in order to review individuals on the RTP list with the three pilot counties on a weekly basis.

- Case Management of discharges from OSH:
    - In collaboration with the ECMU team, Licensing and Certification team submitted needed emergency rules related to community placement waitlists to address an identified barrier in RTP placement. The rules are effective as of January 1, 2025.
    - In collaboration with the ECMU team, Licensing and Certification team submitted needed emergency rules prioritizing the forensic population (A&A and GEI Population) and individuals discharging from OSH for community placement. The rules are effective as of January 17, 2025.
    - ECMU team has met with Lane, Multnomah and Washington County and conducted the in-depth review of individuals on the RTP list.
    - As of December 31st 2024, 12 individuals from the three focused counties were discharged into the community, representing 92.3% of the eligible RTP list.
    - As of January 22nd 2025, an additional 8 individuals from the three focused counties were discharged into the community.
    - ECMU team established the unit's goal (metric) for the three pilot counties: ECMU will seek to increase the percentage of individuals on the RTP list who are discharged to the community by 15%. Currently the base metric is on average 75% of the RTP list are discharged into the community for the three pilot counties.

Exhibit 4, Page 4 of 5



# Aid & Assist and GEI/PSRB Recommendations Progress Updates – 1.24.24

      o  ECMU and Choice Team developed a Call-to-Action crisis mitigation beginning with Choice contractors and A&A Coordinators to form a collaborative Utilization Management (UM) strategy. The UM strategy focuses on individuals currently in residential treatment with a Length of Stay (LOS) between 18-24 months and their readiness for transition to stepdown care. This will create vacancies to allow for OSH discharges. The call-to-action will also solicit solutions from partners who see the barriers at a closer local level.

**Next Steps:**
- The team is working to develop a process flow outlining how different units are going to work together to improve flow and make sure the work is not duplicative. The team is aiming to finalize the process flow by early February 2025.
- The team is continuing to work with Lane, Multnomah and Washington County to move individuals off the Ready to Place List.

6. **Community Navigator Pilot Expansion:**

The state agreed to expand the current Community Navigator through a regional approach chosen based on the number of individuals at OSH. The expansion would occur six months after receipt of funding. **(Please note the funding has been incorporated in the Governor's 2025-2027 Budget, starting July 1st, 2025)**

**Completed:**

- The team has reviewed OSH census data to determine potential pilot sites.
- The team has identified selected regional sites: Southern Coast and Southern Region.
- The Community Navigator team reviewed regional site options with Dr. Pinals.
- The team has coordinated with Cheryl Ramirez (AOCMHP) to establish next steps in coordinating with counties in the regional sites and drafted a communications plan.

**Next Steps:**
- The team will continue to develop a thorough communications, expansion, and funding distribution plan for the two regional site options.