**D e b r a  A.  P i n a l s, M. D.**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Court Monitor**

**First Report**

**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** September 5, 2025

**Court Monitor:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

The *Mink/Bowman* consolidated case pertains to individuals in Oregon found unable to Aid and Assist in their own defense and individuals found Guilty Except for Insanity (GEI). Based on a longstanding permanent federal injunction against the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH), OSH is ordered to admit detained Oregon criminal defendants within seven days of a state court order to restore that defendant's abilities to Aid and Assist. There is no seven-day mandate for the GEI admissions, but because each of the two cases (*Mink*, pertaining to defendants unable to Aid and Assist and *Bowman*, pertaining to individuals found GEI) involved issues pertaining to timely admission of individuals who were waiting in Oregon jails for admission, the Federal Court agreed with my recommendations to merge the admission waitlists for both groups.

The original *Mink* litigation has spanned decades with several different judges. I was initially retained in December 2021 as a Neutral Expert in this case after the state was largely out of compliance in the wake of COVID-19 impacts on services. The state was moving toward

compliance in 2024 and was compliant with the order for several months and then fell out of compliance, leading plaintiffs DRO to file a motion for contempt, with MPD plaintiff also filing a motion for potential court ordered remedies. A hearing on the contempt motion was held in March 2025 before The Honorable Adrienne Nelson, who oversees this matter at present. Subsequently Judge Nelson did find the defendants in contempt and ordered remedies, including shifting my role from Neutral Expert to that of Court Monitor.  Judge Nelson also ordered that the defendants follow several recommendations from my 11th Neutral Expert report and pay fines of $500 for every day an defendant found unable to Aid and Assist waits in jail for admission beyond the 7-day mandate.  The defendants have filed appeals on aspects of Judge Nelson's rulings. The plaintiffs and defendants have also filed motions outlining disagreements with how fines are calculated, and Judge Nelson reduced the fines to a judgment as of 9/4/25.

This report represents my first as the *Mink/Bowman* Court Monitor, and the Twelfth (12th) overall report that I have produced in this case.   Per the instructions of Judge Nelson, this report is to inform the upcoming status hearing on 9/8/25 and will provide a basic overview of current data, a summary of my work since my last report dated 5/5/25, and conclusions.

**Qualifications to Perform this Work:**

I have worked for over twenty-five years as a clinical and academic and forensic psychiatrist and have functioned for over twenty years in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my Neutral Expert First Report.

**Sources:**

In the interim since my 5/5/25 report, I have reviewed new relevant legal documents and numerous outside sources to inform my conclusions. A broad list of source documents is available as needed but will not be listed here for this status report.

In the time since my prior report, meetings and discussions have included the following:

1. Periodic communications with The Honorable Adrienne Nelson;

2. Meetings with various OHA and OSH staff, including leadership from the hospital and FES;

3. Regular meetings and several ad hoc meetings and discussions with representatives of Governor Kotek, as well as OHA, OSH, DRO and MPD representatives and leaders both separately and together as well as email communications.  In addition, I met with staff from these agencies at various points in this interval period.

   a. From the Governor's Office:

      i. Amy Baker, Behavioral Health Initiative Director

      ii. Constantin Severe, Deputy General Counsel

      iii. KC Ledell, Behavioral Health Senior Advisor

   b. From OHA, OSH, the weekly/bi-weekly leadership meetings have included primarily:

      i. Current administrative leaders including Kristine Kautz, OHA Deputy Director, Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA, along with Samantha Byers, Lisa Nichols and Bonnie Cappa from OHA HSD/ISU and OSH Interim Superintendent, Mr. Dave Baden and now Mr. Jim Diegal, as well as Dr. Morgyn Beckman and Dr. Andy Bustos of the OSH Forensic Evaluation Services. I have also met with Medicaid leadership multiple times, including Shawna McDermott and Holly Heiberg most commonly.

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 3 of 40

    c.  From Oregon Department of Justice (DOJ):

        i.  Carla Scott, DOJ Special Litigation Unit Counsel

        ii.  Jill Conbere, Assistant Attorney General, DOJ

        iii.  Kailana Piimauna, Sr. Assistant Attorney General, General Counsel Division

        iv.  Melissa Chureau, General Counsel Division

    d.  From Disability Rights Oregon (DRO):

        i.  Emily Cooper, Legal Director

        ii.  Thomas Stenson, Deputy Legal Director

    e.  From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC

4.  Meetings with Ms. Cherryl Ramirez, Director AOCMHP, and representatives of CMHPs across Oregon.

I continue to periodically consult with Kirsten Beronio, JD, a Medicaid expert, to help provide insights into potential strategies within Medicaid.

I have watched several legislative sessions relevant to this matter by video recording.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
APD: Aging and People with Disabilities
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
CRR: Conditional Release Ready meaning approved by the hospital risk review and ready for review by the PSRB
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
ECMU: Extended Care Management Unit
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 4 of 40

IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
NWRRC: Northwest Regional Reentry Center
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
ODDS: Oregon Developmental Disability Services
ODHS: Oregon Department of Human Services
OHA: Oregon Health Authority
OPDS: Oregon Public Defenders Services
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities and Updates During this Reporting Period:**

My last report was presented to Judge Nelson on 5/5/25 and was released to the public by the defendants shortly thereafter. Since that time, I have continued to meet regularly with the parties to review progress, and I have had the opportunity to speak to Judge Nelson on several occasions.

Areas of focus with the state have been to review aspects of the tracking document that puts forward work plans and milestones to meet the terms of recommendations made to date in this matter. For this reporting period this has included:

Work to redefine the GEI processes for greater clarity on phases that individuals go through prior to discharge and to better identify where there are delays. The goal of this work is also to help reduce the delays as noted in my earlier recommendations. Between meetings with me, the state defendants have also worked with PSRB leadership to ensure that the flow and

concomitant responsibilities are clear. The product of that work is presented in the data section above.

Another area of focus has been with the Medicaid leadership. Kirsten Beronio, J.D., a consultant I retained who is a Medicaid expert, has been part of those meetings. Those meetings have included a back and forth dialogue about how Medicaid can take a more active role in examining data and outcomes for the AA and GEI populations, how care coordination can be better coordinated with the community navigators, and how the needs of the populations can be better met to reduce the revolving door they face between care providers, psychiatric facilities, and jails.  There have also been discussions about CCO contracting and some of the challenges in working within rate structures that are being re-examined by the state. CCO re-procurement is on a new schedule, though yearly contractual changes within the current CCO arrangement are still possible.  I look forward to continuing the Medicaid discussions and pursuing better data to help inform improvements that can be made for continuity of services.

In addition, I have spent time focusing on the activities of the Extended Care Management Unit (ECMU) as well as the contract management at Northwest Regional Reentry Center (NWRRC).

A major activity this reporting period has also been tracking progress and speaking with various stakeholders about House Bill 2005 (HB 2005), which went through many legislative hearings before its final passage. I raised serious concerns about the final language in the bill and continue to have those concerns. I had very good communication with staff from the Governor's office including Amy Baker, KC Ledell, and Constantin Sever, who have provided information as needed and have worked closely with the Mink/Bowman OHA and OSH leadership to help support efforts toward compliance. The legislation itself is discussed further below.

I spent time reviewing the community restoration manual and worked with the state to get it into its near final form. With the passage of HB 2005, I recommended and agreed with the plan to delay making the manual available as it needs some changes based on the new legislation. The defendants and I have discussed new deadlines for work on that through late winter. During weekly meetings with defendants, I am apprised of updates including a data review and discussions and reports from OSH and OHA about progress and efforts to date. The defendants appear to be fully cooperative with the efforts in which they are engaged. There have been some shifts in project leaders to help address any concerns that have been noted. Periodic meetings with the plaintiffs also include a review of any concerns and discussion of any updated information. Because of the litigation posture, meetings with all parties have not occurred, except for one meeting where there was discussion about potential fines utilization.

**Data**

*Background Data*: The data that is designed to track compliance with the 7-day admissions order is a key metric for this case. Although the defendants have not yet returned to compliance, the overall direction toward compliance is positive (see **Figure 1** and **Table 1**). Wait times are significantly shorter than those documented in my last report in May 2025. At the end of August 2025, 34 people found unable to Aid and Assist were on the waitlist, compared to 46 at the end of April. The average wait times for those who were on the list at the end of August was 7.8 days, compared to 9.6 days in April. In addition, the average days that people waited for admission for those admitted in August 2025 was 10.2 days, compared to 20.7 in April 2025. This is slightly increased from July (which was at 9.7 days), but overall, the current data marks an approximately 50% reduction in overall wait times for admitted individuals and is significantly closer to the compliance requirement of 7 days. It should be noted that the patients found GEI waited 8.8 days for admission in August 2025, again this is significantly reduced. There were only seven GEI admissions in August compared to 107 Aid and Assist patient admissions. In August 2025, OSH admitted 107 A&A patients with an average wait time of 10.2 days. Of note, eight (8) of the 107 admissions in August were within the 7-day *Mink* requirement.

There continue to be high numbers of people determined to no longer need hospital level of care waiting for discharge. At the end of August there were 72, and at the end of April there were 97. This also reflects improvements in discharge-ready metric (see **Figure 1**).

**Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of Aug 31, 2025**

**OSH Forensic Admission and Discharge Dashboard**
August 2025

### Aid & Assist Admission List



### PSRB / GEI Admission List



### Aid & Assist No Longer Needing HLOC



### PSRB / GEI No Longer Needing HLOC



OSH Quality Management – Data and Analysis
'Informing the Pursuit of Excellence'

Page 1 of 5
9/3/2025

**Table 1. Individuals Awaiting Admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* | *As of 11/1/23* | *As of 4/1/24* | *As of 11/1/24* | *As of 4/1/25* | *As of 8/1/25* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 | 24 | 11 | 76 | 79 | 33 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days | 3.5 days | 5.4 days | 12.6 Days | 14.3 Days | 4.7 Days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days | 1-9 days | 3-10 days | 1-28 days | 1-28 days | 1-23 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | | | | | | | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* | *As of 11/1/23* | *As of 4/1/24* | *As of 11/1/24* | *As of 4/1/25* | *As of 8/1/25* |
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 | 1 | 0 | 2 | 2 | 0 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days | 1.0 days | N/A | 13.0 days | 12.0 days | N/A |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days | 1 day | N/A | 9-17 days | 12 days | N/A |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric to determine the number of beds that can be used at any given time. The hospital was operating at a census of that was more commonly in the 670 or 680 range until recently. I discussed this at length with the prior Chief Medical Officer Dr. Sara Walker, as it was not clear that the hospital was operating to his functional capacity. There were several reasons why this was the case, largely related to strict ordering of admissions and the lack of flexibility in some counties pertaining to transportation. With some adjustment in how admissions are managed based on my prior recommendations, the hospital has been managing closer to the 705 active capacity. As of 8/1/25 there were 696 patients at OSH, and I was told

that there were 697 on 9/3/25. OSH leadership reports out capacity to me on a weekly basis to continue to review how close beds are being managed to the active capacity.

**Table 2: OSH Bed Capacities as of 8/1/25**

| Site | Licensed Capacity | Active Capacity |
|------|-------------------|-----------------|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 75 | 72 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | **150** | **144** |
| **OSH Total** | **742** | **705** |

**Table 3**. OSH Census as of 8/1/25

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|------|--------------|------|------------------|-------|-------|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |
| 11/1/2023 | 366 | 291 | 17 | 1 | 675 |
| 4/1/2024 | 360 | 288 | 30 | 0 | 678 |
| 11/1/2024 | 375 | 270 | 27 | 8 | 680 |
| 4/1/2025 | 383 | 269 | 28 | 3 | 683 |
| 8/1/2025 | 394 | 262 | 37 | 3 | 696 |

Since my last report in May 2025, Aid and Assist restoration orders have continued to rise, and there have been several months of where the hospital received over 100 orders, but not as many as the two months in 2024 that contributed to the backlog of admissions. (See **Table 4** and **Figure 2**).

There were 111 orders received in August 2025 not reflected in **Table 4.** The months of June, July and August each had over 100 orders, seen in **Table 4.** This was the highest monthly run of restoration orders recorded since April 2022.

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 10 of 40

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| April 2022 | 79 | 7 (4 standard / 3 revocation) |
| May 2022 | 76 | 7 (4 standard / 3 revocation) |
| June 2022 | 73 | 6 (4 standard / 2 revocation) |
| July 2022 | 72 | 5 (3 standard / 2 revocation) |
| August 2022 | 81 | 7 (4 standard / 3 revocation) |
| September 2022 | 84 | 6 (5 standard / 1 revocation) |
| October 2022 | 95 | 3 (3 standard / 0 revocation) |
| November 2022 | 89 | 6 (2 standard / 4 revocation) |
| December 2022 | 74 | 4 (4 standard / 0 revocation) |
| January 2023 | 107 | 3 (3 standard / 0 revocation) |
| February 2023 | 78 | 5 (3 standard / 2 revocation) |
| March 2023 | 109 | 7 (2 standard / 5 revocation) |
| April 2023 | 103 | 5 (2 standard / 3 revocation) |
| May 2023 | 94 | 7 (3 standard / 4 revocation) |
| June 2023 | 86 | 1 (1 standard / 0 revocation) |
| July 2023 | 73 | 3 (0 standard / 3 revocation) |
| August 2023 | 109 | 5 (3 standard / 2 revocation) |
| September 2023 | 93 | 7 (6 standard / 1 revocation) |
| October 2023 | 97 | 3 (2 standard / 1 revocation) |
| November 2023 | 98 | 3 (2 standard / 1 revocation) |
| December 2023 | 92 | 3 (2 standard / 1 revocation) |
| January 2024 | 83 | 4 (4 standard / 0 revocation) |
| February 2024 | 73 | 9 (3 standard / 6 revocation) |
| March 2024 | 87 | 2 (2 standard / 0 revocation) |
| April 2024 | 99 | 1 (1 standard / 0 revocation) |
| May 2024 | 127 | 7 (3 standard / 4 revocation) |
| June 2024 | 90 | 2 (0 standard / 2 revocation) |
| July 2024 | 128 | 3 (0 standard / 3 revocation) |
| August 2024 | 99 | 4 (3 standard / 1 revocation) |
| September 2024 | 92 | 6 (6 standard / 0 revocation) |
| October 2024 | 102 | 6 (3 standard / 3 revocation) |
| November 2024 | 89 | 5 (3 standard / 2 revocation) |
| December 2024 | 105 | 3 (3 standard / 0 revocation) |
| January 2025 | 89 | 2 (2 standard / 0 revocation) |
| February 2025 | 79 | 4 (3 standard / 1 revocation) |
| March 2025 | 96 | 8 (4 standard / 4 revocation) |
| April 2025 | 101 | 9 (8 standard / 1 revocation) |
| May 2025 | 82 | 7 (5 standard / 2 revocation) |
| June 2025 | 105 | 5 (4 standard / 1 revocation) |
| July 2025 | 111 | 6 (3 standard / 3 revocation) |

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 11 of 40

**Figure 2. Aid & Assist Admissions/Orders Trends through August 2025**



**Figure 3** shows data through 8/31/25 regarding progress toward compliance with the overarching 7-day admission requirement. The figure depicts that the state is below what were set as benchmarks back in 2022 (these benchmarks are no longer part of the planning but can serve as a point of historical reference). There is marked movement toward compliance compared to my last report.

**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 8/31/25**



Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 12 of 40

In working with OHA and OSH, additional data has been developed to continue to help drive recommendations and solutions toward compliance. The table that previously described discharge data based on "cohorts" that were established between individuals at the hospital prior to the 9/1/22 restoration time limit Federal Court Order has been sunset at my recommendation. Instead, I have worked with the defendants to more closely examine readmission rates as well as percentage of defendants discharged due to either reaching their restoration time limit or discharged after receiving a dischargeable finding.  **Figure 4** shows that the percentage of discharges that occur simply because they "timed out" on the Federal Court Order restoration time limits, has decreased from 27% to 15%. Thus, although many stakeholders report that the new time limits are creating more discharges just due to the clock running out, this does not appear to be the case. What it does mean, however, is that a higher percentage are being discharged into community restoration (See **Figure 5**).  As I have noted in multiple prior reports, it is likely that many of these individuals would ultimately be found unrestorable, whether they stayed in the hospital or not, thus sending increasing numbers to community restoration without a clear clinical and forensic indication could utilize important resources unnecessarily.

**Figure 4. Percentage of Aid and Assist Discharged due to Reaching their Restoration Time Limit through July 2025**



Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 13 of 40

*Mink/Bowman*
Court Monitor 1st Report
9/5/25

**Figure 5. Percentage of Aid and Assist Discharged into Community Restoration**



Another question that has come up among various groups especially in the legislative debates is whether the shortened restoration times at OSH has created a problem with fewer people being able to have a dischargeable finding of Able, Never Able, or Med Never. The data before and after the 2022 Federal Court Order are somewhat difficult to compare, but **Figure 6** attempts to do this, and **Figure 7** examines data that looks at type of dischargeable finding among those discharged from OSH after receiving a dischargeable finding, and as recommended by evaluators. The data shows that overall, proportions of discharges of individuals found Able remains in the mid 80% range, Never Able has hovered around 9%, and Med Never has decreased from about 5.5% to about 3.5%. It should be noted that the absolute numbers of defendants in each of these categories would be lower, since the percentage discharged with a dischargeable finding has decreased.   Many of these findings could be explained by the increased utilization of community restoration, though further study of both the inpatient and community system for restoration should be examined.

**Figure 6**. **Percentage of Aid and Assist Discharged after Receiving a Dischargeable Finding**



14

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 14 of 40

**Figure 7. Percentage of Dischargeable Finding by Type**



**Table 5** shows the type of findings in the month of July with most defendants found Able, and about half as many discharged to community restoration.

**Table 5. Legal Status of AA Discharges in July 2025 based on Hospital Data**

| July 2025 A&A Discharges | | |
|---|---|---|
| Reason | Count | Percent |
| Restoration Limit | 17 | 17% |
| Community Restoration | 27 | 27% |
| Dischargable Finding | 48 | 48% |
| *Able* | *41* | *41%* |
| *Never Able* | *3* | *3%* |
| *Med Never* | *4* | *4%* |
| Other | 8 | 8% |
| **Total** | **100** | **100%** |

Another useful metric to examine the system function overall is the readmission rate of people found unable to Aid and Assist. I raised this in my early reports and several times since. The Aid and Assist population has had higher re-admission rates than other populations, and this trend has continued for over a decade (see **Figure 8**). That said, the fact that this trend continues requires OHA to continue to develop programs that can maximize

community tenure for these individuals, whether that includes working to minimize re-arrest, prevent decompensation of symptoms or taking other actions to counter the factors that are contributing to returns to the hospital for restoration.  It will be useful to examine how many of these individuals were also in community restoration.

**Figure 8. Hospital Readmission Rates for Individuals Ordered to OSH for Restoration**



There have been a relatively unpredictable number of orders that have come to the hospital each month, even though the trends overall have been showing increases. **Table 8** below shows that projections made prior to the 2022 Federal Court Order have been different from what has actually occurred. Specifically, there have been more orders, and more admissions and discharges. The increasing flow of court orders have had a large role in the backlog for admissions, even with OSH staff working diligently to keep apace.

16

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 16 of 40

**Table 6. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Original Projections (Pre-Federal Order Implementation) | | | | Actuals *(with Current Projections)* | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 89 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 74 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 107 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 78 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 109 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 103 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 94 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 86 | 42 |
| Jul-23 | 87 | 87 | 79 | 10 | 103 | 104 | 73 | 14 |
| Aug-23 | 87 | 87 | 79 | 10 | 112 | 100 | 109 | 17 |
| Sep-23 | 90 | 90 | 84 | 10 | 102 | 95 | 93 | 19 |
| Oct-23 | 91 | 91 | 84 | 10 | 97 | 93 | 97 | 24 |
| Nov-23 | 91 | 91 | 84 | 10 | 103 | 108 | 98 | 14 |
| Dec-23 | 92 | 92 | 84 | 10 | 64 | 83 | 92 | 23 |
| Jan-24 | 92 | 92 | 84 | 10 | 96 | 82 | 83 | 22 |
| Feb-24 | 92 | 92 | 84 | 10 | 97 | 81 | 73 | 14 |
| Mar-24 | 92 | 92 | 89 | 10 | 79 | 85 | 87 | 11 |
| Apr-24 | 92 | 92 | 89 | 10 | 84 | 96 | 99 | 22 |
| May-24 | 92 | 92 | 89 | 10 | 93 | 108 | 127 | 34 |
| Jun-24 | 92 | 92 | 89 | 10 | 79 | 74 | 90 | 58 |
| Jul-24 | 92 | 92 | 89 | 10 | 102 | 103 | 128 | 79 |
| Aug-24 | 92 | 92 | 89 | 10 | 95 | 95 | 99 | 79 |
| Sep-24 | 92 | 92 | 94 | 10 | 86 | 84 | 92 | 85 |
| Oct-24 | 92 | 92 | 94 | 10 | 109 | 107 | 102 | 76 |
| Nov-24 | 92 | 92 | 94 | 10 | 80 | 77 | 89 | 91 |
| Dec-24 | 92 | 92 | 94 | 10 | 99 | 111 | 105 | 82 |
| Jan-25 | 92 | 92 | 97 | 10 | 93 | 93 | 89 | 84 |
| Feb-25 | 92 | 92 | 97 | 10 | 90 | 97 | 79 | 68 |
| Mar-25 | 92 | 92 | 97 | 10 | 88 | 85 | 96 | 79 |
| Apr-25 | 92 | 92 | 97 | 10 | 104 | 128 | 101 | 46 |
| May-25 | 92 | 92 | 97 | 10 | 99 | 99 | 82 | 32 |
| Jun-25 | 92 | 92 | 97 | 10 | 118 | 109 | 105 | 26 |
| Jul-25 | 92 | 92 | 97 | 10 | 99 | 102 | 111 | 33 |
| Aug-25 | 92 | 92 | 97 | 10 | 97 | 99 | 96 | 30 |
| Sep-25 | 92 | 92 | 97 | 10 | 97 | 99 | 96 | 27 |
| Oct-25 | 92 | 92 | 97 | 10 | 97 | 99 | 96 | 24 |
| Nov-25 | 92 | 92 | 97 | 10 | 97 | 99 | 96 | 21 |
| Dec-25 | 92 | 92 | 97 | 10 | 97 | 99 | 96 | 18 |

Community restoration data continues to be refined, and the goal is to work with OJD and OHA to get accurate data on duration of community restoration and outcomes. For this report, the data that is shown is in the same format as in my prior reports and is based on quarterly reports by the CMHPs. The most recent available data goes through 3/31/25. The data is depicted in **Table 7** and **Table 8**.

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 17 of 40

The community restoration data shows that community restoration episodes continue to increase (2019:337; 2020:383; 2021:458; 2022:648; 2023:1035 (different from the total presented in my last report due to more updated numbers); 2024:1261; 2025Q1: 746 (which if the same each quarter for all of 2025 would be approximately 2984 episodes). In 2024, 296 people had community restoration episodes for over one year (1249-953), a number slightly different from the number in my last report due to data differences, but representing about 23% of the community restoration episodes. To date in Quarter 1 of 2025, it appears that 162 people have been in community restoration for over one year (734-572), and 177 community restoration episodes lasted between six months and one year.

Since community restoration began, about 497 community restoration episodes lasted over one year (3081-2584). The mean number of days for community restoration was slightly lower at 208, but the maximum days a person was in community restoration this reporting period was 1726 days or 4.73 years. Given that these are pretrial individuals who are generally facing less serious charges and are not posing public safety risks to be eligible for community restoration, this is a long period of time under pretrial supervision. Again, this data still requires refinement to draw further conclusions.

*[Intentionally left blank]*

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 18 of 40

*Mink/Bowman*
Court Monitor 1st Report
9/5/25

## Table 7. CMHP Reported Completed Community Restoration Data 1/1/2019-3/31/2025

**CMHP Reported Community Restoration Data 1/1/2019-3/31/2025**

| | # of Community Restoration Episodes | % of Total Community Restoration Episodes |
|---|---|---|
| # of Community Restoration Episodes | 3099 | |
| # of Days Minimum | 1 | |
| # of Days Maximum | 1726 | |
| # of Days Mean | 208 | |
| # of Days Median | 147 | |
| Days in Community Restoration | # of Community Restoration Episodes | % of Total Community Restoration Episodes |
| 0-90 | 1026 | 33.1% |
| 0-180 | 1792 | 57.8% |
| 0-365 | 2584 | 83.4% |
| 0-730 | 3026 | 97.6% |
| 0-1095 | 3081 | 99.4% |

- This table includes all community restoration cases, completed and ongoing.
- The reported numbers may change in the near future as counties are being asked to review and clean their data as necessary.

## Table 8. CMHP Reported Year by Year Data 1/1/2019 -3/31/2025

**CMHP Reported Community Restoration Data 1/1/2019-3/31/2025**

| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 Q1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of Community Restoration Episodes | 337 | | 383 | | 458 | | 648 | | 1035 | | 1261 | | 746 | |
| # of Days Minimum | 2 | | 1 | | 1 | | 1 | | 1 | | 1 | | 1 | |
| # of Days Maximum | 1661 | | 1726 | | 1726 | | 1726 | | 1726 | | 1726 | | 1726 | |
| # of Days Mean | 278 | | 310 | | 296 | | 300 | | 294 | | 259 | | 251 | |
| # of Days Median | 200 | | 223 | | 197 | | 197 | | 219 | | 197 | | 162 | |
| Days in Community Restoration | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes | # of Community Restoration Episodes | % of Total Community Restoration Episodes |
| 0-90 | 74 | 22.0% | 64 | 16.7% | 101 | 22.1% | 132 | 20.4% | 216 | 20.9% | 280 | 22.2% | 246 | 33.0% |
| 0-180 | 156 | 46.3% | 156 | 40.7% | 203 | 44.3% | 289 | 44.6% | 441 | 42.6% | 580 | 46.0% | 395 | 52.9% |
| 0-365 | 248 | 73.6% | 268 | 70.0% | 334 | 72.9% | 478 | 73.8% | 717 | 69.3% | 953 | 75.6% | 572 | 76.7% |
| 0-730 | 319 | 94.7% | 356 | 93.0% | 427 | 93.2% | 592 | 91.4% | 981 | 94.8% | 1216 | 96.4% | 708 | 94.9% |
| 0-1095 | 332 | 98.5% | 375 | 97.9% | 445 | 97.2% | 630 | 97.2% | 1021 | 98.6% | 1249 | 99.0% | 734 | 98.4% |

- This table includes all community restoration cases, completed and ongoing.
- The reported numbers may change in the near future as counties are being asked to review and clean the reported data as necessary.

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 19 of 40

Forensic Evaluation Services (FES) data continues to show high numbers of evaluations conducted by FES staff, including requests for evaluations of individuals outside of OSH (see **Table 9). Table 10** shows the number and types of evaluations being conducted by FES each month. **Figure 9** is a graphic depiction of **Table 10**. **Figure 10** shows the number of FES evaluations of people in community restoration. A dip in the number of interviews conducted in August for community restoration defendants was accounted for by staff absences for vacation and some staff turnover.

**Table 9. Number of Active FES Cases as of 8/20/25**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 397 |
| .370 Evaluations not at OSH | 394 |
| .365 Evaluations not at OSH | 79 |
| .315 Evaluations not at OSH | 25 |
| **Total Cases** | **895** |

**Table 10. Number of FES Evaluation Interviews from Jan 2024 to those Scheduled in September 2025**

| Month | Number of interviews | Inpatient 370s | 365s | 315/135 | Outpatient 370s |
|---|---|---|---|---|---|
| January '24 | 150 | 144 | 4 | 2 | 0 |
| February | 138 | 121 | 12 | 3 | 2 |
| March | 122 | 108 | 7 | 5 | 2 |
| April | 149 | 129 | 8 | 1 | 11 |
| May | 153 | 125 | 11 | 2 | 15 |
| June | 142 | 121 | 14 | 0 | 7 |
| July | 165 | 148 | 8 | 1 | 8 |
| August | 159 | 127 | 8 | 3 | 21 |
| September | 134 | 117 | 9 | 3 | 5 |
| October | 172 | 124 | 17 | 3 | 28 |
| November | 150 | 121 | 15 | 2 | 12 |
| December | 159 | 125 | 11 | 2 | 21 |
| January '25 | 201 | 141 | 12 | 2 | 46 |
| February | 168 | 125 | 14 | 3 | 26 |
| March | 180 | 134 | 14 | 1 | 31 |
| April | 215 | 127 | 20 | 2 | 66 |
| May | 198 | 130 | 11 | 2 | 55 |
| June | 199 | 137 | 12 | 5 | 45 |
| July | 207 | 141 | 17 | 3 | 46 |
| August | 185 | 146 | 18 | 6 | 15 |
| September (est) | 181 | 121 | 24 | 3 | 33 |

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 20 of 40

**Figure 9: Graphic Depiction of Number of FES Evaluation Interviews from Jan 2024 to those Scheduled in September 2025**



**Figure 10. Outpatient 370s January 2024 to September 2025**



The data in **Table 11** shows that approximately one third of people with lower-level offenses who are admitted to OSH do not need a Hospital Level of Care within 10 days of discharge. I have spoken with the defendants about studying this population to understand what could

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 21 of 40

have been done to divert them from the hospital or more promptly discharge them. There is ongoing discussion about following up on recommendations to study this group of defendants.

**Table 11. 10-Day RTP Assessment Outcomes (August 2022 through July 2025)**

| Year | 10-Day RTP Assessments | Patients Found RTP | Percent Found RTP |
|---|---|---|---|
| 2022 (Aug-Dec) | 205 | 87 | 42.4% |
| 2023 | 648 | 250 | 38.6% |
| 2024 | 596 | 170 | 28.5% |
| 2025 (Jan-Jul) | 440 | 139 | 31.6% |
| **Total** | **1,889** | **646** | **34.2%** |

The mediation that resulted in the Second Amended order from 7/3/23 offered exceptions to the original restoration duration limits. The information in **Table 12** shows how many of these extension requests were received and granted.

**Table 12**. **Number of 30-day and 180-day Requests to Extend Restoration Duration through July 2025**

| Period | 30-Day Extension Requests | | | | 180-Day Extension Requests | | | |
|---|---|---|---|---|---|---|---|---|
| | Initial | 2nd | 3rd | **Total** | Initial | 2nd | 3rd | **Total** |
| Jul 2023 – Dec 2023 | 17 | | | **17** | 17 | 5 | | **22** |
| 2024 | 74 | 5 | 1 | **80** | 42 | 11 | 4 | **57** |
| 2025 YTD (Jan-Jul) | 53 | 1 | | **54** | 18 | 4 | 4 | **26** |
| **Total** | **144** | **6** | **1** | **151** | **77** | **20** | **8** | **105** |

*Currently all competency restoration extension requests are being granted, whether they meet criteria or not.*

In addition, civil expedited admission requests and admissions were also tracked (See **Table 13**). This data shows that about 59% of these requests have been accepted overall and this percentage has been fairly consistent since refining the civil expedited admissions criteria.

**Table 13. Civil Expedited Admission Requests through July 2025**

| Period | Requests | Accepted | Denied | Under Review |
|--------|----------|----------|--------|--------------|
| Sep 2022 – Dec 2023 | 22 | 14 | 8 | |
| 2024 | 58 | 34 | 24 | |
| 2025 YTD (Jan-Jul) | 62 | 37 | 25 | 2 |
| **Total** | **142** | **85** | **57** | **2** |

**Figure 11** shows a Conditional Release Process Map that was developed to help improve communication about where people were in the discharge process and be able to focus resources at the decision points in the process flow where the resources could reduce wait times.

**Figure 11. Conditional Release Process Map**



**Figure 12** depicts information that has been put together to track the efficiencies in GEI processes. During this interim reporting period I have worked with the state to help refine its definitions of the various stages of GEI discharge processes so that efforts could be focused on areas that can be improved in terms of timeframes. Some of this is reflected in the process map

above in **Figure 11**. From the time a treatment team identifies a GEI patient as potentially ready for conditional release to the time the person is discharged should ideally be 121 days per the current rules and policies. However, this has been occurring in approximately 30.3% of the cases. The state has continued to make efforts to reduce wait times for persons found GEI but more work is still needed.

**Figure 12. Conditional Release and OSH/PSRB Dashboard through August 2025**

**OSH/PSRB Conditional Release Dashboard**
*August 2025*

<u>Current Patients at OSH in the Conditional Release Process and Evaluation/Hearing Decisions (as of September 1, 2025)</u>

| Conditional Release Process Stage | Count |
|---|---|
| Meets criteria to start the conditional release process, pending order for community evaluation | 0 |
| Evaluation ordered, pending written evaluation result & plan from community | 10 |
| Evaluation result & plan received, pending hearing request | 0 |
| Hearing requested, pending hearing & result | 5 |
| **Total patients currently in the conditional release process** | **15** |

| Conditional Release Granted / Pending Release Reason | Count |
|---|---|
| Waiting for bed (SRTF) | 6 |
| Waiting for bed (RTF/RTH) | 9 |
| Waiting for bed (AFH, DOC, Independent, Other) | 0 |
| Other | 0 |
| **Total patients granted conditional release, pending conditional release** | **15** |



| Percent of completed community evaluations where the patient is deemed appropriate for placement and accepted | |
|---|---|
| August 2025 | 100% (4/4) |
| Since January 2023 | 95.5% (168/176) |

| Percent of PSRB hearings where the patient is granted conditional release from OSH | |
|---|---|
| August 2025 | 100% (2/2) |
| Since January 2023 | 95.5% (150/157) |

<u>Percent of Patients Who Complete Each Stage Within the Expected Timeframe</u>



OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 3
9/3/2025

**Select Updates from OHA:**

Director Sejal Hathi has returned from leave and based on reports I have been given, has been meeting and staying abreast of the Mink/Bowman activities. The funding requested by OHA of

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 24 of 40

the legislature outlining the requests from my 10th Neutral Expert report were approved, and OHA is currently working on executing the deliverables for those requests. For example, construction is beginning to expand NWRRC by 20 beds, and there are programs that are going to be coming online for increased community capacity.  One issue that arose is that there has been some debate about the strict CMS rules about what constitutes and Institution of Mental Disease for adults, and whether campus type construction would run into issues with this designation. The OHA leadership and the CMHPs are discussing this and developing approaches that will help ensure cost effective community expansion.

OHA has also been working on developing training, increasing work around data for community restoration in line with OJD data, and participating actively in planning for the implementation of HB 2005.

Contract management for NWRRC has greatly improved with a census reported weekly of approximately 35 over the last several months, except for the last two weeks when there were unexpected discharges. In addition, OHA leadership has worked closely with NWRRC such that as of this week there are no individuals who have been there for more than a year, and the state is now looking at the eight individuals who have been there for more than 90 days to help identify more appropriate placements. This marks very good progress.

The ECMU is focused on 44 individuals on the Ready to Place list, and has expanded its county reach, now working with Multnomah, Lane, Washington, Coos, Douglas, and Curry counties. The ECMU cases have included use of leadership to help remove barriers to expedite AA and GEI discharges.

OHA has been working also with the CMHPs to move the CFAA contracting process forward. There was a delay as elements of the new requirements were debated. Some of the

requirements involve more oversight by the state and a request for work prioritizing the mandated populations. Proposed budgets are now being submitted to the state for review.

In conversations with OHA leadership, they have been working to address the barriers to the work with ODDS and APD to assist with expediting discharges and potentially diverting individuals from arrest in the first place. The state has indicated that the situation has improved. There will need to be more conversations about this.

OHA has also been working on plans for developing a capacity to provide forensic evaluations in the community and coordinate community restoration. They are continuing to process budget analyses for costs to then request funding from the legislature.

Overall, the OHA leadership appears to continue to be working through the recommendations that have been ordered by the court and even those that are not ordered by the court.

**OSH Updates:**

OSH has stabilized somewhat since my last report. Mr. James Diegel has stepped in as Interim Superintendent. Although he was initially on a six-month contract, it has been extended to one year, and is due to expire in June 2026. He has identified new leadership to help him, as Dr. Bell left OSH shortly after being named interim Chief Medical Officer (CMO). As of 8/1/25 Dr. Amit Bhavan was named the Interim CMO through June 2026. I have spoken to Mr. Diegel about setting up a meeting with Dr. Bhavan and the other professional staff. Mr. Diegel indicated that recruitment for permanent leaders will begin in earnest in January. Also, Mr. Diegel and Mr. Baden informed me that the person that they had been recruiting to be the permanent Superintendent chose not to come for family reasons, and it was not because of salary issues.

OSH is also focusing efforts on dealing with CMS findings, with an expected site visit soon given a decertification date of 10/3/25 by which the hospital will have to have remedied areas where corrective actions were indicated.

OSH has also managed several COVID-19 cases, causing some units to close admissions, but this has not affected overall admission flow.

OSH has put the admissions coordination closer to the CMO's office to ensure that there is a high-level oversight of how it is working. To remedy delays in jail transports, OSH leaders have reissued their formal communication to the jails per my recommendation, making it clear when defendants have to be transported, they have worked with individual jails for picking up and dropping off defendants timely. The Governor's office is also looking at any barriers to timely transportation in the meantime.

As noted in the data depiction above, the actual census of the facility has been closer to active capacity since my last report. I review this information with them approximately weekly.

Administrative delays with GEI discharges appear to have improved per the conditional release dashboard, though it is not clear if there are systemic improvements overall. This is an area that will require further tracking.

**Forensic Evaluation Services:**

Dr. Beckman reported on 9/3/25 that there were 113 people waiting for community restoration evaluations. The number of people awaiting a scheduled evaluation as of 1/22/25, according to Dr. Beckman, was 267. As of 4/23/25, the number of people waiting for a scheduled evaluation was 150.  Thus, there is still progress with a lower number of people waiting.  The FES has had some resignations, and they recently finished interviews for the position, when a second

27

evaluator resigned. Dr. Beckman believes that the second position can be filled with a candidate from this current round of interviews. The resignations were apparently due to outside factors.

FES leadership is also working to finalize a contractor to help with overflow. They are working to keep apace with the community restoration evaluation orders and are completing them within the HB 2005 statutory timelines and sooner, with waiting times of four to five months.

**Summary of AOCMHP Discussions and Activities:**

I continue to meet with CMHP representatives approximately once per month. They have most recently been discussing HB 2005 and the CFAA contracts. The conversations have been helpful to keep them informed on this case and to also help me understand their perspectives on issues raised by state demands for their services. They have provided positive feedback on the ECMU activities and at the most recent meeting described working on their budget proposals for the CFAAs.

**Summary of Legislative Efforts Regarding the Mink Restoration Time Limits and Behavioral Health Funding:**

OHA, OSH, and the Governor's office advocated strongly to pass legislation that would implement competency restoration timeframes in line with my Second Report recommendations. There was strong opposition to the proposals by prosecutors, one of the defense lobbying groups and some judges, and a compromise bill was reached. I have significant concerns about the bill that was passed and how it will impact the *Mink/Bowman* compliance. I have provided my concerns to OHA. The Governor, in signing the legislation into law, wrote a signing letter expressing her concerns as well. Specifically, there appear to be numerous ways to extend community restoration, there will be requirements for tracking complex timelines that have fits and starts, areas of compliance are not clearly defined and

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 28 of 40

raise clinical concerns and several aspects of the law raise concerns about where people will be required to stay and whether those requirements will lead to Olmstead issues.

**Federal Court Order for an External Study led by the Court Monitor:**

In Judge Nelson's contempt order dated 6/6/25 she articulated the following remedial measure:

> *Defendants are ordered to hire an independent auditor, to be chosen and overseen by Dr. Pinals, to review how the State has spent funding dedicated to increasing the supply of behavioral health services in the community; identify what levels of care are still lacking and where; and provide this information in a public report to the Court, to be completed within ninety days of the date of this Opinion and Order. Defendants shall be responsible for the costs associated with implementing this remedial measure.*

As an update to the court, the defendants have worked under my direction to solicit bids from specific firms who can competently do this type of consultation. Those bids are under review. I have previously communicated to the court a request for additional time beyond the 90 days ordered to conduct this study. The selection of the entity is forthcoming within the next two weeks, and the period for contracting will be abbreviated, but in all likelihood the work will not start in earnest until October given current timing. There are some advantages to this timing given that the CFAA contracting is still underway and can be incorporated into the findings. In addition, the CMHPs are conducting their own study through legislative appropriation and these will need to be coordinated. I would anticipate receiving results of a completed study within four to six months of the work being initiated.

**Fines to date:**

In accordance with the 6/6/25 contempt finding by Judge Nelson, fines have been calculated monthly. The state has made efforts to remedy delays related to transport and delayed court

orders (though this was generally not an issue except for outlier examples). Some delays related to transport remain challenging and may not be fixable for the state, but efforts are underway.  Fines have been calculated to date as follows:

| Dates | Amount |
|-------|--------|
| 6/16/25-7/14/25 | $120,500 |
| 7/15/25-8/14/25 | $127,000 |

In accordance with the federal court order, the parties did meet with me to confer about the use of the funds and have generally agreed on using the funds flexibly to support unique, not otherwise fundable needs of defendants who need placement secured for discharge or stabilization. Now that fines have been reduced to judgment a further conversation will be needed between plaintiffs and defendants and me.

**Conclusions and Comments:**

The updates during this reporting period is favorable, in that many areas of concern I raised in my 11th report have been or are being remedied. The direction toward compliance is positive, with defendants waiting 10.2 days during this reporting period. My estimation is that improvements will ebb and flow for a period as residential settings and other interventions play out, and depending on the number of orders received. For example, the average wait times went up slightly between July and August from 9.7 to 10.2, largely because of three months in a row of more than 100 orders for admission to the state hospital.

In my testimony on 3/12/25 at the contempt hearing, I opined that compliance could be achieved within six to 12 months if the legislators adopted the proposed legislation. The funding allocation did get approved, and work is underway to enhance the community base capacity. The legislation for community restoration did not get approved in a manner that I see

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 30 of 40

as helpful to this case or to defendants in Oregon found in the Aid and Assist process. Yet it remains to be seen how it will ultimately work, and how much energy and resources it will take to implement. Nevertheless, at this time, my original estimation of time to achieve compliance feels on track if the efforts of OHA and OSH continue.

The Honorable Judge Adrienne Nelson in her contempt order of 6/6/25 clarified that she adopted recommendations 1; 2(a), (c), and (d) (as modified); 6(a) and (b); 7(a)-(c); 8(a) and (c); 9(a)-(c); 10(a) and (b); 11; 13; and 14. I will provide commentary on these below.

Additionally, I have had several discussions with OHA leadership and on 7/14/25 came to the opinion that recommendation 18.2 on the tracker should be marked discussed and concluded at this time. Specifically, that recommendation stated: "OHA will monitor the OSH waitlist weekly. If the waitlist exceeds 10 days, OHA will initiate jail diversion meetings with CMHP to review current symptoms and explore appropriate alternative community restoration services, if available." In exploring this recommendation, it appears that the feasibility to take action within the 10-day time frame is unrealistic, in part because there is no status of OHA to move a criminal case that is currently in motion. In lieu of the recommendation as worded, I have recommended to DOJ that CFAA contracts require that CMHP staff work with the jail medical staff to ensure continuity of care for people known to the CMHP system, including ensuring transmission of medication information and other treatment needs so that the jail staff can maintain the individual in a plan of service that includes medications during their jail stay. One reason for destabilization is discontinuity of treatment across systems, and if this can be mitigated, there may be more likelihood that defendants will remain/appear able to aid and assist when they are in court or more quickly upon order for restoration. The state defendants will additionally continue to work toward their general jail diversion efforts. I will continue to monitor whether a more precise and workable recommendation would be helpful for compliance. Should waitlist time frames increase, this issue may be revisited.

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 31 of 40

I turn now to commentary on my recommendations from my 11th report adopted by Judge Nelson. I have included below only those sections that she adopted, but have maintained numbering sequence for consistency.

1. ***Continuation of the original Mosman Order with limitations on admissions to OSH and time limits for restoration services****. This is currently set to expire, 6/29/25 extended by Judge Nelson on 3/26/25. Until there is a legislative remedy, any withdrawal of this order will immediately result in a regression away from compliance.  I recommend that it continues to be in effect for another year, during which time the fluctuations in the system will be able to be monitored.*

    Comment: This Federal Court order has now been extended until 6/30/26 under the authority of Judge Adrienne Nelson.

2. ***Modification of OSH Admissions and Discharge Processes.*** *As articulated to Dr. Sara Walker on 4/8/25 it is imperative that the hospital use hospital bed space to the full extent of its managed capacity and potentially expand use of other available beds in the facility when it appears safe to do so. As such, I now recommend the following:*

    a. *OSH should continue to admit people based on the order of their placement on the waitlist, except in those circumstances where for logistical reasons they cannot be admitted (e.g., sheriffs unwilling to transport the day a bed is available, female bed vs male bed, medical beds that are best filled with individuals with more medical needs, etc.), in which case some variations to that sequencing would be reasonable to get your census up to managed capacity, with those variations still considering the date of the original order for placement (e.g., two competing similar female bed needs would warrant having the first one on the list to come in first).  In addition, the other exception to the admission order would be if there are expedited admissions that need more immediate admission for clinical reasons per*

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 32 of 40

*the protocols that have been established- these would be able to be admitted before all others if the criteria are met.*

*The hospital has already implemented this recommendation, but I delineate it here for the Court's attention.*

> Comment: This recommendation has assisted with full bed management, helping OSH operate closer to active capacity.

b.  *Admissions could be further restricted such that misdemeanor defendants not be eligible for OSH admission for restoration purposes (consistent with remedies suggested by both plaintiffs). The concern with this recommendation at this time is that there could be an increased rate of more serious charges being levied, and as such, with the numbers already turning in the right direction, this may not be a necessary step.*

> Comment: This recommendation was not adopted by Judge Nelson.

c.  *Plaintiffs from DRO asked for discharges to be mandated within timeframes. I do not agree with that remedy as that may create unsafe clinical situations for patients. Instead, I continue to recommend MPD's remedy that discharges be fully under the authority of OSH in collaboration with CMHPs pursuant to recent rule changes.*

> Comment: The state defendants continue to take steps to improve discharge processes, and although this recommendation was adopted by the Federal Court, it is difficult to implement given the complexity of the role of state court judges in statutorily approving certain discharges continue to have to permit defendants to be discharged.

d. *Admissions that are determined to not need hospital level of care within 10 days should be examined and expedited discharge processes should be developed.*

> Comment: This is an area of ongoing discussion and an analysis of this population is pending.

6. **GEI Process Improvements.** *As noted in my 10th report, and consistent with MPD's motion for relief, there are too many delays in GEI discharges. Although OSH did modify and shorten their expected time frames for some of the steps for approval that were within their administrative control, none of the steps meet the expected timeframe, and the closest one that does is related to PSRB processes. OHA and OSH processes are still delayed. There is also confusion at times among state leaders about how the processes work. Thus, I recommend the following:*

a. *OHA and OSH should work together, along with the PSRB leadership, to create a clear language for the steps needed to discharge individuals found GEI from OSH. All documentation should use similar labels, including labels seen on the new conditional release data tracker.*

> Comment: This activity has been successfully developed and is presented in this report.

b. *OHA and OSH should demonstrate at least a 20% improvement in the time it takes for discharge of GEI patients once identified by the treatment team as discharge ready, and this improvement should be achieved within three months.*

> Comment: Some improvements have occurred but the work in this reporting period has been focused on refining definitions. My goal is to now turn to the effort to develop 20% improvements.

7. **Establishment of a community-based formalized forensic evaluation and restoration service and increased access to evaluators to reduce backlog in the short term and**

***eliminate backlog in the long term.*** *Consistent with remedies suggested by both plaintiffs, more evaluators are needed to complete evaluations in the short term and improvements are needed related to community-based evaluation services.*

    ***a.*** *Forensic Evaluation Services should expedite the completion of the 150 pending evaluations within three months and staff should be contracted if additional evaluators are needed beyond the current staffing complement.*

        Comment: Current wait times exceed three months. There has been staff turnover, but FES is currently hiring and finalizing contracting. I recommend continuing to move toward more expedited evaluations within the community, though HB 2005 may make the timing more complex with the statutory timing being different.

    ***b.*** *OHA should establish an office for community forensic services whether that becomes part of OSH FES or is managed through OHA. This will be critical to help maximize expertise in building out evaluation systems and operations for community restoration that includes regular competency updated evaluations as supported in statutory proposals. These should begin regardless of the existence statute and the state should be compelled to ensure that they are completed, so that individuals do not languish in community restoration services for unlimited periods of time.*

        Comment: OHA is working on a plan for this type of service and has begun to discuss this planning with me.

    ***c.*** *Given the prolonged delays in receipt of OJD's GAINS center report recommending options for forensic evaluation services, I withdraw my earlier recommendation to rely upon it.*

        Comment: Judge Nelson also adopted this recommendation such that no further work on this is needed.

8. ***Community restoration improvements.***

    a. *Pursuant to my prior recommendations, the community restoration manual should be completed and timelines for its completion delineated in discussion with the neutral expert. It will require updates to ensure it meets the specificity outlined in my Second Report.*

        <u>Comment</u>: Final revisions to the community restoration were reviewed with me at about the same time as HB 2005 was signed into law. I recommended and the state agreed that to make the manual most successful to provide best practices and decrease confusion, it would be important to incorporate the HB 2005 provisions. This is currently underway with a plan to have a new version by March 2026.

    b. *OHA should revisit options and develop a mechanism for paying only for the portion of restoration services that occur within the community restoration timelines outlined in HB 3051. This is consistent with the MPD proposed remedy to the Court. Any other time needed should not fall to OHA or its contracted entities. Individuals in the Aid and Assist process, however, should continue to receive medically necessary services as per their usual entitlements when they are Medicaid eligible or medical services according to Medicare or private payers. This will require a delinking of what community restoration services are that are not Medicaid-reimbursable and those that are, and a concomitant revisiting of rules in the CFAA and Medicaid discussions,*

        <u>Comment</u>: Judge Nelson did not adopt this recommendation in her order, and given the provisions of HB 2005 it will be more feasible to see if the legislation itself will help ensure community restoration is utilized within time limits.

c. *Training efforts should continue to be pursued by OHA and OSH to help educate willing community partners on the activities and opportunities for services for individuals eligible to receive public services.*

> Comment: I have reviewed training materials. At least two sessions were presented. Training is being updated to incorporate HB 2005.

9. ***Bed Capacity tracking and commissioning a study to examine community capacity and needed improvements overtime specific to the forensic population.***

a. *I support the recommendations of both MPD and DRO for an audit and study of bed capacity and recommend it occur under the Neutral Expert's guidance.*

b. *OHA should examine its bed tracking website and ensure its accuracy and consistency. The staff responsible for uploading data and OHA leadership should confer and, in consultation with the Neutral Expert and perhaps others, review why there are discrepancies in bed capacity data across time and how to rectify data reporting.*

c. *OHA should report on regular progress regarding capacity expansion planning as recommended in my 10th report.*

> Comment for a-c recommendations: The study of bed capacity is in process of being contracted. I have discussed bed tracking and presentations with OHA. Bed tracking numbers are being reported in meetings with me, though this work will require further attention as we continue to refine what the reporting looks like for clarity.

10. ***Improvements in contract management of NWRRC.*** *It has become clear during this interim period that contract management of NWRRC has not yielded utilization of the site to the full agreed upon capacity of 35 beds and OHA leadership has not always been clear*

37

on what capacity they were supposed to achieve. Several recommendations in this area are in order.

   a.   *Contract management of NWRRC should be rigorously monitored at high levels of OHA with regular data reports to the Neutral Expert.*

        Comment: Contract management has shifted to Dr. Christa Jones who reports on the activities to me on a regular basis. The census has remained closer to the 35 bed capacity and long-stay residents are being identified for alternative placements. This matter is improved significantly and I plan to continue to track it.

   b.   *Utilization management needs to include re-evaluations so that individuals whose AA status changes are not left to languish at NWRRC.*

        Comment: Process improvements have occurred to ensure more timely re-evaluations though community evaluations continue to need to be examined to ensure appropriate resource allocation for timely evaluation.

   c.   *Close oversight of expansion plans with construction design that is clinically oriented is imperative. The Neutral Expert should be provided with regular architectural updates and planning information. This should include an examination of the potential need (and funding for) a clinical director who has credentials that can work with people with complex behavioral health needs, conducting assessments when needed and developing policy and practices that are infused with clinical approaches.*

        Comment: This recommendation was not adopted by Judge Nelson. That said, the state has informed me of updates regarding the expansion plans that are underway.

**11. *Focus on discharges through expansion of ECMU activities for AA and GEI populations.***
*Although the ECMU is just beginning to develop its mechanisms of action, this type of oversight appears to be positive, and its efforts should expand to additional counties. The*

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 38 of 40

*RTP list and the Conditional Release Ready list must be reduced. Over 130 people are identified at OSH as not needing OSH services. Oregonians and the legislature should take note of that simple data point. Notwithstanding the concerns about over-reliance on institutions in violation of the ADA, at approximately $650,000 per year, the OSH service should be limited to those who need it.*

> Comment: The ECMU expanded from working with three to now six counties since my last report. The CMHPs give the ECMU support positive reviews. Overall, the RTP list has fewer people on it. OHA will continue to report to me regularly regarding ECMU activities and effectiveness.

13. ***Community Navigator continuation and expansion.*** *The community navigator program must be expanded. Continuity of care and support during transitions are critical if individuals in AA and GEI processes are to maximize their stability and move toward recovery and decreased engagement in problematic activities, including criminal activities and substance use.*

> Comment: I received preliminary information about Community Navigator impacts that was positive. OHA presented plans for expansion on a regional basis, and funding was approved for further services. Staff working on Medicaid coordinated care is increasingly collaborating with the Behavioral Health Community Navigator activities. I anticipate receiving a more formal report on community navigator activities and effectiveness.

14. ***Ongoing review of implementation status of prior and current recommendations.*** *Work should continue in earnest to review and complete recommendations as delineated in the project tracker. A metric should be added to determine whether the activity is complete, partially complete, or incomplete by the deadline to help track activity and provide a better metric for the court in determining compliance and contempt issues.*

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 39 of 40

<u>Comment</u>: I appreciate the work of the OHA and OSH staff and especially of DOJ Attorney Jill Conbere who has taken a leading role in helping organize the tracker and updating it, as well as coordinating needed meetings (with additional staff support from Deloitte staff) to assist in improving the tracker. We continue to discuss deadlines for prior recommendations and a shared understanding of when a milestone has been met.

In conclusion, in my opinion, there has been significant progress toward compliance during this reporting period with an average wait time of 10.2 days most recently, and the defendants have been working hard to accomplish this. That said, OSH is still not admitting defendants within the required seven-day time frame and fines are accruing. Efforts need to continue in earnest to continue to drive wait times down to protect the Constitutional rights of the *Mink/Bowman* defendants that are the focus of this case. Oregon has many different initiatives that are occurring at the same time, and it will be important to remain vigilant, with course corrections implemented as needed if at any point compliance is negatively impacted. I appreciate the efforts of the defendants, their counsel,  the plaintiffs and other interested partners in helping improve the wait times at issue in this matter.

**Respectfully Submitted,**

Debra A. Pinals, M.D.

Court Monitor, *Mink/Bowman*

Exhibit A, Decl. of Thomas Stenson
First Court Monitor Report, Page 40 of 40