IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>        Plaintiffs,<br>    v.<br><br>SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority, and JAMES DIEGEL, in his official capacity as Interim Superintendent of the Oregon State Hospital,<br><br>        Defendants. | Case Nos.: 3:02-cv-00339-AN (lead)<br>       3:21-cv-01637-AN<br>       (consolidated)<br>       6:22-cv-01460-AN<br>       (consolidated)<br><br>OPINION AND ORDER |

Plaintiffs Legacy Health System, Legacy Emanuel Hospital & Health Center (together with Legacy Health System, "Legacy"), PeaceHealth, Providence Health & Services – Oregon ("Providence"), and St. Charles Health System, Inc. ("St. Charles") bring this action against defendant Dr. Sejal Hathi ("Dr. Hathi"), in her official capacity as Director of the Oregon Health Authority ("OHA").[1]  On October 21, 2024, proposed-intervenor National Alliance on Mental Illness-Oregon ("NAMI-Oregon") filed a motion to intervene.  On November 12, 2024, defendant filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.  On December 6, 2024, proposed-intervenor Mental Health Association of Portland ("MHAP") filed a motion to intervene.  The Court heard oral argument from the parties and proposed-intervenors on August 27, 2025.  For the reasons set forth below, defendant's motion to dismiss is GRANTED in part and DENIED in part, and both NAMI-Oregon and MHAP's motions to intervene are DENIED as moot.

---

[1] The Court uses the lead case caption in this Opinion and Order, however, all references to "plaintiffs" and "defendant" used herein refer to the named plaintiffs and defendant in consolidated case *Legacy Health System v. Allen*, No. 6:22-cv-01460-AN ("*Legacy Health System*"), the case that is the subject of the instant motions to dismiss and intervene. Similarly, all references to "this action" or "this case" refer to *Legacy Health System*.

# LEGAL STANDARD

## A.    Motion to Dismiss

### 1.    *Lack of Subject Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a motion to dismiss for lack of jurisdiction may be a facial or factual attack. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A factual attack involves a dispute as to the completeness or the truth of the facts underlying the complaint that would, by themselves, otherwise invoke federal jurisdiction. *See id.* When a jurisdictional motion "involv[es] factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment [because] resolution of th[ose] jurisdictional facts is akin to a decision on the merits." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). In other words, a court interpreting a factual attack may rely on evidence outside the complaint and resolve factual disputes. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)); *Safe Air for Everyone*, 373 F.3d at 1039.

Summary judgment, and thus a factual attack under Rule 12(b)(1), may be granted when "[v]iewing the evidence in the light most favorable to the nonmoving party," the Court determines that "there are no genuine issues of material fact." *Safe Air for Everyone*, 373 F.3d at 1040 n. 4. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted). Substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a "defendant raises a factual attack, the plaintiff must support [their] jurisdictional allegations with 'competent proof'" under the same evidentiary standard that governs in the summary judgment context." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (internal citation omitted)

(quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010)). The plaintiff therefore carries "the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.*

      2.    *Failure to State a Claim*

      A motion to dismiss for failure to state a claim may be granted only when "'there is no cognizable legal theory'" or when the complaint lacks sufficient factual allegations to "'support a cognizable legal theory'" or "state a facially plausible claim for relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Iqbal*, 556 U.S. at 678.

      A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

**B.**    **Motion to Intervene**

1.    *Intervention as of Right*

Rule 24(a)(2) requires a court to permit intervention when four requirements are met:

"(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action."

*Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (en banc).  The applicant seeking to intervene bears the burden of showing that all four requirements are met.  *Chamness v. Bowen*, 722 F.3d 1110, 1121 (9th Cir. 2013).  In making its determination, a court is "guided primarily by practical and equitable considerations, and the requirements of intervention are broadly interpreted in favor of intervention."  *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004).

2.    *Permissive Intervention*

Rule 24(b)(1)(B) grants courts discretion to permit intervention when an applicant makes a timely motion to intervene and "has a claim or defense that shares with the main action a common question of law or fact."  The movant bears the burden of establishing three requirements: (1) the applicant "shares a common question of law or fact with the main action;" (2) the applicant's "motion is timely;" and (3) "the court has an independent basis for jurisdiction over the applicant's claims."  *Cooper v. Newsom*, 13 F.4th 857, 868 (9th Cir. 2021).  Even if all three requirements are met, "the district court must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties."  *Id.*

## BACKGROUND

**A.**    *Mink-Bowman*

The present action is one of three consolidated cases.  The other two cases are *Oregon Advocacy Center v. Mink*, No. 3:02-cv-00339-AN ("*Mink*"), which is the lead case; and *Bowman v. Matteucci*, No. 3:21-cv-01637-AN ("*Bowman*") (together with *Mink*, "*Mink-Bowman*").

The plaintiffs in *Mink*, who include two non-profits and an individual, brought suit in 2002, seeking a federal court order compelling OHA and the Oregon State Hospital ("OSH") to expeditiously

provide hospital admission and medical treatment to criminal defendants who were determined by Oregon courts to be unfit to proceed to trial due to an inability to aid and assist in their own defense. *Mink*, No. 3:02-cv-00339-AN, Findings of Fact & Concls. of L., ECF [47], at 1. Despite orders to transfer aid-and-assist individuals for admission and treatment, these individuals were instead being held in jail for lengthy periods of time. *Mink*, No. 3:02-cv-00339-AN, Op. & Order of January 9, 2023, ECF [338], at 2. Then-District Judge Owen M. Panner held a court trial on April 8, 2002, and then issued findings of fact and conclusions of law on May 10, 2002, in which he ordered that OHA and OSH "ensure that persons who are declared unable to proceed to trial [due to an inability to aid and assist in their own defense] be committed to the custody of the superintendent of a state hospital designated by the Department of Human Services as soon as practicable[,]" and that such admissions "be done in a reasonably timely manner, and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial[.]" *Mink*, No. 3:02-cv-00339-AN, Mins. of Proceedings of April 8, 2002, ECF [37]; *Mink*, No. 3:02-cv-00339-AN, Findings of Fact & Concls. of L. 1-2, 14. Judge Panner's May 10, 2002, ruling is hereinafter referred to as the *Mink* permanent injunction. The *Mink* defendants appealed the *Mink* permanent injunction, and the Ninth Circuit affirmed. *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003). Since that time, the *Mink* defendants' efforts toward compliance with the permanent injunction have been court-monitored.

As litigation in *Mink* went on, in 2021, two individuals found unfit to proceed to trial based on court orders finding them to be "guilty except for insanity" ("GEI") filed *Bowman*, also against OHA and OSH. *See Bowman*, No. 3:21-cv-01637-AN, Compl., ECF [1]. These individuals were later joined as plaintiffs by one of the non-profit plaintiffs in *Mink*, and, similar to the plaintiffs in *Mink*, the plaintiffs in *Bowman* alleged that the State of Oregon held individuals found GEI in jail for months despite orders from state court judges directing these individuals' commitment to OSH. *Mink*, No. 3:02-cv-00339-AN, Op. & Order of January 9, 2023, at 3. In 2022, several health systems operating community hospitals within the state—specifically, the five named plaintiffs in this case—joined *Mink-Bowman* as *amici*. *See Mink*, No. 3:02-cv-00339-AN, Op. & Order of May 25, 2023, ECF [395].

**B.**    **This Action**

In addition to joining *Mink-Bowman* as *amici*, plaintiffs simultaneously filed the present action, alleging various constitutional violations committed by defendant against both plaintiffs and their civilly committed patients.  *See* Compl., ECF [1].[2]  After conducting a hearing, then-presiding Senior District Judge Michael W. Mosman consolidated the case with *Mink-Bowman*.  *See* Op. & Order of January 9, 2023, ECF [41], at 4; *Mink*, No. 3:02-cv-00339-AN, Mins. of Proceedings of October 25, 2022, ECF [306].  As a result of the consolidation, this case was reassigned to Judge Mosman from now-Chief District Judge Michael J. McShane.  Notice of Case Reassignment, ECF [9].  The three consolidated cases have since been reassigned from Judge Mosman to District Judge Adrienne Nelson.  Notice of Case Reassignment, ECF [108]; *Mink*, No. 3:02-cv-00339-AN, ECF [476].

1.    *First Amended Complaint*

Plaintiffs amended their complaint in this case for the first time on December 2, 2022.  1st Am. Compl. ("FAC"), ECF [28].  The FAC sets forth seven claims for relief, for violations of (1) civilly committed individuals' Fourteenth Amendment due process rights; (2) plaintiffs' Fourteenth Amendment due process rights; (3) plaintiffs' rights under the Takings Clause of the Fifth Amendment; (4) plaintiffs' rights under the Takings Clause of Article I, Section 18 of the Oregon Constitution; (5) civilly committed patients' rights under ORS § 426.060; (6) civilly committed patients' rights under ORS § 426.150(1); and (7) civilly committed patients' rights under ORS §§ 759A.142(5)(a) and (6)(a).  *Id.* at 26-38.  Ultimately, plaintiffs sought in the FAC declaratory and injunctive relief, nominal damages, and attorneys' fees.  *Id.* at 5, 38-40.

On December 22, 2022, defendant filed a motion to dismiss the FAC.  Def. 1st Mot. to Dismiss, ECF [30].  In that motion, defendant argued that (1) plaintiffs lacked Article III standing (a) to bring their own claims, (b) to bring third-party claims on behalf of civilly committed patients, and (c) because plaintiffs' claims were not ripe; (2) the FAC failed to state a claim for (a) substantive or

---

[2] All citations without reference to another case number are to the docket in this case, *Legacy Health System*.

procedural due process, (b) takings, or (c) violations of Oregon state law; and (3) the Eleventh Amendment bars nominal damages. *Id.* Plaintiffs responded in opposition on January 26, 2023, ECF [43], and defendant replied on February 16, 2023, ECF [55]. In addition, DRO filed an amicus brief regarding the third-party standing issues on January 13, 2023, ECF [42], which plaintiffs responded to on January 26, 2023, ECF [44].

Judge Mosman held oral argument and then took defendant's first motion to dismiss under advisement. Mins. of Proceedings of April 25, 2023, ECF [74]. On May 25, 2023, Judge Mosman issued an opinion and order granting defendant's motion and dismissing the FAC with prejudice (the "May 2023 opinion and order"), in which he found, in relevant part, that plaintiffs lacked third-party standing to bring claims on behalf of their civilly committed patients. Op. & Order of May 25, 2023, ECF [88].

Plaintiffs first sought clarification of the May 2023 opinion and order, Pls. Unopposed Mot. for Clarification, ECF [93], and then moved for its reconsideration, Pls. Mot. for Recons., ECF [96]. Upon denial of the motion for reconsideration, *see* ECF [101], plaintiffs appealed the May 2023 opinion and order, *see* ECF [103]. On appeal, the Ninth Circuit reversed in part, vacated in part, and remanded to the district court "in light of the third-party standing principles discussed" in its decision, wherein it held that the record was "insufficient to determine whether [plaintiffs have] third-party standing to assert claims on behalf of civilly committed patients." *Legacy Health Sys. v. Hathi*, No. 23-35511, 2024 WL 2843034, at *3 (9th Cir. June 5, 2024). Regarding the issue of third-party standing, the Ninth Circuit wrote:

> "How the principles discussed in these cases and others should apply here is not obvious. Doctors often have been found to have standing to assert the rights of their patients. But [plaintiffs] do[] not seek to provide appropriate long-term treatment to civilly committed patients [themselves]; rather, [plaintiffs] seek[] an injunction requiring OHA to provide appropriate long-term care to these patients. Accepting as true the [FAC]'s allegations, 'the outcome' that [plaintiffs] 'seek[] on the face of [their] complaint' would benefit civilly committed patients by ensuring they receive appropriate long-term treatment from OHA. But as [the FAC] acknowledges, bed space at OSH is limited, and OSH is under competing pressure from the injunction upheld by our circuit in [*Mink*], which requires OSH to admit criminal defendants who are found 'mentally incapacitated . . . within seven days of the judicial finding of their incapacity to proceed to trial.' Whether [plaintiffs'] interests are sufficiently aligned with the interests of [their] civilly committed patients may depend on what outcome [plaintiffs] in fact [are] likely to achieve in this litigation and whether that outcome would benefit the patients whom [plaintiffs] seek[] to represent.

. . .

"The district court also found that [plaintiffs] lacked third-party standing because [they] 'complain about how much civilly committed patients are costing them and about the harms the patients inflict on their staff members.'  These allegations can be relevant to third-party standing, especially to the extent they may reflect a prioritization of the hospitals' financial concerns or indicate a potential disjunction of interests if the remedy sought by [plaintiffs]—the creation or allocation of additional bed space at OSH for civilly committed patients—proves unavailable.  But some tension in [plaintiffs' FAC] between the needs of civilly committed patients and [plaintiffs] is not necessarily enough to show that [plaintiffs] lack[] a 'close relation' to the patients in light of our precedent instructing that parties with some degree of adversity may nonetheless be 'sufficiently aligned' for third-party standing purposes."

*Id.* at \*2 (internal citations omitted).

2.    *Second Amended Complaint*

On October 4, 2024, defendant filed a second amended complaint (the "SAC").  2d Am. Compl. ("SAC"), ECF [117].  The SAC sets forth the following allegations.  Plaintiffs are some "of Oregon's largest not-for-profit health systems" who all "provide hospital and healthcare services . . . [and] receive patients who are detained or civilly committed pursuant to Oregon law."  *Id.* ¶ 5.  Plaintiffs "are not designed, equipped, staffed, or intended to provide long-term mental health treatment for civilly committed individuals."  *Id.* ¶ 6.  Indeed, "[o]nly some of [the] hospitals have behavioral health units," and units occupied by civilly committed individuals "are highly restrictive, locked environments," wherein patients may only leave "for short periods of time, if at all, because of environmental, regulatory, and staffing limitations."  *Id.*  Additionally, plaintiffs "operate emergency departments and medical-surgical units within their community hospitals," wherein "patients experiencing mental health crises often are left . . . pursuant to Oregon civil commitment laws because of [defendant's] practices and conduct . . . , which has led to a shortage of acute psychiatric beds."  *Id.* ¶ 7.  Plaintiffs assert that civilly committed patients are entitled to "receive treatment calculated to lead to the end of their involuntary detention," *id.* ¶ 15 (citing *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)), *i.e.*, they must be given "'a realistic opportunity to be cured or to improve [the] mental condition' for which they were confined," *id.* ¶ 16 (quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).  Plaintiffs allege that although they are equipped only to provide acute, short-term care, which necessarily requires a more restrictive patient environment, defendant's practices

and conduct routinely leave civilly committed patients in plaintiffs' care for long periods of time. *Id.* ¶¶ 17-19, 30-32. Plaintiffs assert "[t]here is no realistic way for [them] to realistically provide long-term treatment in [acute care] environments." *Id.* ¶ 31.

Expounding on defendant's role, plaintiffs assert that defendant is responsible for providing "civilly committed individuals with necessary treatment during their commitment in the most appropriate and least restrictive setting possible to fulfill patients' constitutional rights." *Id.* ¶ 21. "By statute, [defendant] must direct civilly committed persons 'to the facility best able to treat' them, or delegate to a community mental health program director the responsibility for assignment of civilly committed persons to a 'suitable' facility." *Id.* ¶¶ 22, 35 (emphases omitted) (quoting Or. Rev. Stat. § 426.060(2)(a), (d)). Additionally, "[t]he director of OHA may assign or transfer the civilly committed person to any facility 'which, in the opinion of the director, will appropriately meet the mental health needs of the person under civil commitment.'" *Id.* ¶ 23 (citing Or. Admin. R. 309-033-0290(1)(a)). Plaintiffs emphasize that although "[t]he director of OHA *may* place the person in a community hospital . . . in doing so, the director of OHA must 'consult' with the community hospital's admitting physician, and both must, together, 'determine whether the best interests of a person under civil commitment are served by an admission to a community hospital.'" *Id.* ¶ 23 (quoting Or. Admin. R. 309-033-0270(3)(a)).

In contrast to plaintiffs' facilities, plaintiffs allege that OSH, which is operated and managed by OHA, contains

> "multiple secure long-term residential treatment units which provide the long-term treatment that many civilly committed patients need: fewer restrictions, more independence, a calmer and more stable environment, more stable peer communities, less patient turnover, more socialization and peer support, more group counseling, and more training and education programs for patients to learn to care for their basic needs, maintain employment, and sustain healthy relationships."

*Id.* ¶ 25. However, plaintiffs allege that "OHA has increasingly prioritized the admission of aid-and-assist and [GEI] patients at OSH over civilly committed patients"—in part as a result of the permanent injunction entered in *Mink*—and "has done virtually nothing to create additional capacity for civilly committed patients to receive needed treatment in appropriate settings" or "to ensure that other entities authorized for

civilly committed patients . . . can fill the gap left by the state." *Id.* ¶¶ 25-27. Plaintiffs assert that "[t]he law prohibits OHA from prioritizing aid-and-assist and GEI patients over civilly committed patients if it means giving civilly committed patients inadequate care," and in the Ninth Circuit, "when it comes to providing constitutionally adequate treatment for involuntarily detained patients, '[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation.'" *Id.* ¶ 28 (alterations in original) (quoting *Ohlinger*, 652 F.2d at 779).

Plaintiffs allege that defendant "has effectively outsourced its responsibilities to civilly committed patients by leaving patients indefinitely in hospitals' emergency rooms, acute behavioral care units, and medical-surgical units." *Id.* ¶ 29. Because "[h]ospitals are required by law, and as a condition of licensure, to have an emergency department, or provide emergency services . . . [they] must accept all patients who enter through their emergency rooms, regardless of whether they might later be civilly committed or whether the hospital is approved to treat detained or civilly committed patients." *Id.* ¶ 33. "Of the patients who are detained, some remain in emergency departments while others may be admitted to the scarce number of inpatient psychiatric beds that exist in [p]laintiffs' hospitals, and still others may be admitted to inpatient medical unit beds." *Id.* ¶ 34. Plaintiffs are prohibited "from discharging these patients while they are psychiatrically unstable, lack a safe discharge plan, and are being detained under Oregon civil commitment law," as well as from "discharg[ing] unstable patients in their emergency rooms[.]" *Id.* Thus, despite their hospitals not being "equipped, staffed, or designed to house civilly committed individuals for months at a time, let alone six months or more," plaintiffs nonetheless remain forced to do so. *Id.* ¶¶ 36-38. And "[d]ue to the complex interplay between federal and state laws and regulations, [p]laintiffs have no choice but to become certified for at least some" programs that entail the possibility of treating civilly committed patients, in order "to avoid violating the law and jeopardizing [p]laintiffs' licensure and funding." *Id.* ¶ 46.

Ultimately, plaintiffs assert that "OHA harms civilly committed patients by failing to meet its duty to ensure patients in need of long-term treatment receive it, and deliberately leaving patients indefinitely in community hospitals that are not equipped or staffed to provide such treatment." *Id.* ¶ 47.

OHA's actions are also alleged to harm community hospitals because "[w]hen OHA abandons civilly committed patients in community hospitals after the point at which they can no longer medically benefit from receiving emergency and acute care," those hospitals are prevented "from being able to care for other psychiatric patients in the community who are in need of emergency and acute care resources." *Id.* ¶ 50. Plaintiffs further assert that OHA's conduct "deprives [them] of their property without due process of law and effectuates a taking of [p]laintiffs' property[,]" thereby causing financial harms. *Id.* ¶ 52.

Based on these and some additional factual allegations, the SAC sets forth twelve claims for relief, for violations of (1) civilly committed individuals' substantive due process rights; (2) civilly committed individuals' procedural due process rights; (3) community hospitals' substantive due process rights; (4) community hospitals' procedural due process rights; (5) community hospitals' rights under the Takings Clause; (6) Title II of the Americans with Disabilities Act ("ADA"); (7) Section 504 of the Rehabilitation Act; (8) Section 1557 of the Patient Protection and Affordable Care Act ("ACA"); (9) community hospitals' rights under Article I, Section 18 of the Oregon Constitution; (10) civilly committed individuals' rights under Oregon Revised Statutes ("ORS") § 426.060; (11) civilly committed individuals' rights under ORS § 426.150(1); and (12) civilly committed individuals' rights under ORS §§ 659A.142(5)(a) and (6)(a). *Id.* ¶¶ 63-164. Plaintiffs seek in the SAC declaratory and injunctive relief, and attorneys' fees and costs. *Id.* ¶¶ A-K.

On November 12, 2024, defendant filed a motion to dismiss the SAC. Def. 2d Mot. to Dismiss ("Def. Mot."), ECF [128]. Plaintiffs responded in opposition on December 11, 2024. Pls. Resp. Opp'n to Def. Mot. ("Pls. Resp."), ECF [140]. Defendant filed a reply in support of its motion on January 9, 2025. Def. Reply Supp. Mot. to Dismiss ("Def. Reply"), ECF [158].

  3. *Motions to Intervene*

NAMI-Oregon and MHAP have both moved to intervene as proposed intervenor-plaintiffs. *See* NAMI-Oregon Mot. to Intervene, ECF [121]; MHAP Mot. to Intervene, ECF [139].

  4. *Hearing*

On August 27, 2025, the Court heard oral argument regarding defendant's motion to

dismiss and NAMI-Oregon and MHAP's motions to intervene. Mins. of Proceedings of August 27, 2025, ECF [268]. Following oral argument, the parties submitted supplemental briefing regarding updated authority. *See* Pls. Notice of Suppl. Auth., ECF [269]; Def. Suppl. Br. Supp. Mot., ECF [270].

## DISCUSSION

### A.    Defendant's Motion to Dismiss

Defendant argues that plaintiffs (1) lack third-party standing and (2) fail to state a claim as to any of the twelve claims set forth in the SAC. Def. Mot. 1.

### 1.    *Third-Party Standing*

To begin, the Court finds that plaintiffs lack third-party standing. As such, plaintiffs' first, second, sixth, seventh, eighth, tenth, eleventh, and twelfth claims, all of which are asserted on behalf of plaintiffs' civilly committed patients, are appropriately dismissed.

"Federal courts have traditionally been reluctant to grant third-party standing." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987); *see Fleck & Assocs. v. Phoenix, City of, an Arizona Mun. Corp.*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006) (noting that third-party standing is "disfavored"). Accordingly, "[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). This is because (1) "courts should not adjudicate such rights unnecessarily"; and (2) "third parties themselves usually will be the best proponents of their own rights," and "courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them." *Id.* These principles have resulted in a presumption against third-party standing. *See Miller v. Albright*, 523 U.S. 420, 445 (1998) (O'Connor, J., concurring). To overcome the presumption, a plaintiff must establish three criteria: (1) "'injury in fact'"; (2) "a close relation to the third party"; and (3) "some hindrance to the third party's ability to protect [their] own interests." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (quoting *Singleton*, 428 U.S. at 112-16). Defendant asserts that plaintiffs cannot establish either the second or third elements. Def. Mot. 8.

Here, plaintiffs have not established the close relationship element. "A litigant is granted

third-party standing because the tribunal recognizes that her interests are aligned with those of the party whose rights are at issue and that the litigant has a sufficiently close connection to that party to assert claims on that party's behalf." *Pony v. County of Los Angeles*, 433 F.3d 1138, 1147-48 (9th Cir. 2006) (collecting cases); *see Harris v. Evans*, 20 F.3d 1118, 1124-25 (11th Cir. 1994) ("Courts have repeatedly emphasized that the key to third-party standing analysis is whether the interests of the litigant and the third party are properly aligned, such that the litigant will adequately and vigorously assert those interests.").  Close relationships have been found, in certain situations, between healthcare providers and their patients.  *See San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1213 (N.D. Cal. 2025) (finding third-party standing for healthcare providers to assert equal protection claim on behalf of transgender patients when "many" of the providers "specifically [] serve transgender people"); *see also Singleton*, 428 U.S. at 115 (discussing doctor-patient relationship).  However, a healthcare provider and their patients do not *per se* have a close relationship; rather, the party seeking to establish third-party standing "must be able to convince the court that it would be as effective a proponent of [the third parties'] rights as they would be." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987) (collecting cases).  "Put simply, [a] [p]laintiff must establish a '[m]utual interdependence of interests' between itself and the absent third parties." *Siskiyou Hosp., Inc. v. Cal. Dep't of Health Care Servs.*, No. 2:20-cv-00487-TLN-KJN, 2022 WL 118409, at *4 (E.D. Cal. Jan. 12, 2022) (quoting *Hong Kong Supermarket*, 830 F.2d at 1082).

Plaintiffs allege that their "interests as healthcare providers are closely aligned with the interests of their patients[,]" with whom they "have inherently close, fiduciary, and confidential relationships[.]"  SAC ¶ 60.  Plaintiffs emphasize that the relief they seek—"(1) for civilly committed patients to have access to the most appropriate and least restrictive long-term treatment options once they are ready for such care, and (2) for [p]laintiffs to be able to treat more civilly committed patients who enter through their emergency rooms"—"will only benefit, and not harm," their patients. *Id.* ¶ 61.  Put differently: "[i]f [p]laintiffs are successful in this lawsuit, it will result in civilly committed patients having access to the most appropriate and least restrictive long-term treatment options, while opening more beds for detained and civilly committed patients in need of emergency and acute care." *Id.*  Plaintiffs make clear that they

"are not seeking any relief that will result in fewer placement options for civilly committed patients, the creation of less-suitable placement options for [p]laintiffs' patients, or that will allow for the premature discharge of [p]laintiffs' patients to inappropriate settings." *Id.* ¶ 62.

The Court finds that plaintiffs' allegations, even accepted as true, are not sufficient to establish third-party standing. The Court is cognizant that this case is not clear-cut. Indeed, the Ninth Circuit indicated that the third-party standing question in this case may be a "close[]" one, and that the application of existing case law to the facts of this case—at least as alleged in the FAC—"is not obvious." *Legacy Health System*, 2024 WL 2843034, at *1-2. Nonetheless, the Ninth Circuit's guidance leads the Court to conclude that plaintiffs have not established third-party standing.

In its previous decision in this case, the Ninth Circuit counseled "that the 'close relation' inquiry is nuanced and fact-dependent." *Id.* at *2. More specifically, the Ninth Circuit indicated that courts must carefully consider the remedy sought by the party seeking to establish third-party standing and must ask whether that remedy would benefit the group on whose behalf standing is sought. *Id.* (citing *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996)). Expounding on this principle, the Ninth Circuit cited *Hong Kong Supermarket* to explain that although "[v]endors generally have standing to assert claims on behalf of their customers," third-party standing may not lie between a vendor and their customers if the vendor seeks a remedy that would harm the customers. *Id.* This is because, on such facts, the vendor's and customers' interests would not be "'inextricably' intertwined." *Id.* (quoting *Hong Kong Supermarket*, 830 F.2d at 1082).

Applying these principles to the case at hand, the Ninth Circuit recognized that although "[d]octors often have been found to have standing to assert the rights of their patients," plaintiffs here "do[] not seek to provide appropriate long-term treatment to civilly committed patients" themselves, but rather, seek "an injunction requiring OHA to provide appropriate long-term care to these patients." *Id.* The Ninth Circuit noted that "'the outcome' that [plaintiffs] 'seek[] on the face of [the FAC]' would benefit civilly committed patients by ensuring they receive appropriate long-term treatment from OHA." *Id.* (citing *Hong Kong Supermarket*, 830 F.2d at 1082). Nonetheless, "as [the FAC] acknowledges, bed space at OSH is

limited, and OSH is under competing pressure from the injunction upheld by [the Ninth Circuit] in [*Mink*]." *Id.* Thus, the Ninth Circuit reasoned that "[w]hether [plaintiffs'] interests are sufficiently aligned with the interests of [their] civilly committed patients may depend on what outcome [plaintiffs] in fact [are] likely to achieve in this litigation and whether the outcome would benefit the patients whom [plaintiffs] seek[] to represent." *Id.* Because "[t]hese questions [were] not clearly answered in the [FAC] or the" briefing, the Ninth Circuit remanded for reconsideration "in light of the third-party standing principles discussed[.]" *Id.*

      Finally, the Ninth Circuit noted that plaintiffs' allegations regarding "how much civilly committed patients are costing them and about the harms [the patients] inflict on their staff members" may "be relevant to third-party standing, especially to the extent they may reflect a prioritization of the hospitals' financial concerns or indicate a potential disjunction of interests if the remedy sought by [plaintiffs] . . . proves unavailable," but that these allegations are not, alone, sufficient to defeat third-party standing. *Id.* at *3. To the contrary, "parties with some degree of adversity may nonetheless be 'sufficiently aligned for third-party standing purposes.'" *Id.*

      Though the FAC and SAC are not identical, much of the two complaints are substantively aligned. As was the case when the parties were before the Ninth Circuit, plaintiffs still "do[] not seek to provide appropriate long-term treatment to civilly committed patients [themselves, but] rather, . . . an injunction requiring OHA to provide appropriate long-term care to these patients," *id.* at *2, whether that be by providing such care itself or by building out community placements for such care. Similarly, it remains true that "'the outcome' that [plaintiffs] 'seek[] on the face of [their] complaint' would benefit civilly committed patients by ensuring they receive appropriate long-term treatment from OHA." *Id.* The Court must, however, focus on "what outcome [plaintiffs] in fact [are] likely to achieve in this litigation and whether the outcome would benefit the patients whom [plaintiffs] seek[] to represent." *Id.* Just as these questions were "not clearly answered" by the FAC, *id.*, so too are they not by the SAC.

      It is true that some of plaintiffs' allegations in the SAC regarding third-party standing are new, however, none of those allegations address in sufficient detail the remedy that is likely to be achieved by this litigation or whether it will benefit, and not harm, plaintiffs' patients. Plaintiffs allege that they have

"inherently close, fiduciary, and confidential relationships" with their civilly committed patients, who plaintiffs seek to ensure have access "to the most appropriate and least restrictive long-term treatment options" so that plaintiffs may then "be able to treat more civilly committed patients who enter through their emergency rooms." SAC ¶¶ 60-61. Plaintiffs state in a conclusory fashion that this requested relief "will only benefit, not harm, [p]laintiffs' patients." *Id.* Finally, plaintiffs contend that they place greater focus in the SAC on "OHA's failure to create, fund, and otherwise make available adequate bed space in Oregon as a whole, at OSH, *and in the community*." Pls. Resp. 13 (emphasis in original) (citing SAC ¶¶ 26-27, 29, 55, 61-62). These allegations are insufficient. Indeed, these allegations remain focused on shifting long-term care of civilly committed patients *out* of plaintiffs' hands. In other words, this case does not clearly mirror the cases in which a close relationship was found between healthcare providers and their patients, whom those healthcare providers sought to continue to serve—in contrast to those cases, plaintiffs here seek to have their patients be treated elsewhere, *i.e.*, in simplest terms, for their patients to no longer be their patients. Furthermore, without greater detail, plaintiffs' requested relief remains vague enough such that it could still plausibly lead to a result that benefits plaintiffs only, *e.g.*, by shifting the care for these patients without establishing an adequate alternative. Finally, plaintiffs' "new" allegations were, at the least, also alluded to in the FAC. *See* FAC ¶¶ 16, 21, 42, 66. Because the SAC does not address the outstanding questions raised by the Ninth Circuit on appeal, the Court concludes that plaintiffs have not established a close relationship with civilly committed patients, and thus, have not established third-party standing.

Plaintiffs' remaining arguments do not persuade the Court to the contrary. For example, plaintiffs assert that third-party standing is not a matter of Article III standing analyzed under Rule 12(b)(1), but rather, prudential standing analyzed under Rule 12(b)(6). Pls. Resp. 4 (citing *Elizabeth Retail Props. LLC v. KeyBank Nat'l Ass'n*, 83 F. Supp. 3d 972, 985-86 (D. Or. 2015)). Plaintiffs argue that this means the Court must construe their allegations as true, draw all reasonable inferences in their favor, and freely give leave to amend when justice so requires. *Id.* This argument is a red herring. As defendant points out, the court in *Elizabeth Retail Properties*—the sole case cited by plaintiffs on the subject—analyzed the shareholder standing rule, not third-party standing, and in any event, because OHA does not here seek to

introduce evidence beyond the SAC, *see* Def. Reply 2 n.2, "it makes no difference whether [the Court] consider[s] the prudential standing argument under Rule 12(b)(1) or Rule 12(b)(6)," *Nordisk Sys., Inc. v. Sirius Comput. Sols., Inc.*, 156 F. Supp. 3d 1212, 1215 (D. Or. 2015).  The Court's analysis is thus unchanged.  Likewise, plaintiffs argue that the third-party standing standard is a "liberal" one in the Ninth Circuit, and that their allegations are thus sufficient.  However, the Court cannot say that the third-party standard is a "liberal" one where there is a presumption against third-party standing and where third-party standing is "disfavored."  *See Miller*, 523 U.S. at 445; *Fleck & Assocs.*, 471 F.3d at 1105 n.3; *Hong Kong Supermarket*, 830 F.2d at 1081.

Finally, plaintiffs argue that they need not "articulate specific relief" that "is 'likely' to solve Oregon's longstanding behavioral health crisis," in part because the relief likely to be achieved in a given case is "an issue that generally does not crystallize until late in litigation."  *Id.* at 14-15 (quoting Def. Mot. 17).  As such, plaintiffs assert they should, "[i]nsofar as a more specific request for equitable relief is needed, [be] entitled to . . . develop their claims through discovery to support, based on facts learned in that process, more specific requests for relief," and "[t]o the extent OHA speculates that [plaintiffs] may later seek relief that might not benefit patients, this Court has broad discretion to craft relief to ensure patients are protected."  *Id.* at 16 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946); Fed. R. Civ. P. 54).  However, the issue of standing is generally a "threshold question" that "determin[es] the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Here, the Ninth Circuit's guidance indicates that the issue of plaintiffs' third-party standing may only be determined upon a sufficient articulation of the remedy plaintiffs seek and how that remedy will benefit, and not harm, plaintiffs' civilly committed patients.  *See Legacy Health System*, 2024 WL 2843034, at *2.  For this reason, plaintiffs' final argument fails.

Having found that plaintiffs have not established the close relationship element, the Court need not, and therefore does not, reach the final element of the third-party standing analysis.  Likewise, having found that plaintiffs have not established third-party standing to sue on behalf of their civilly committed patients, the Court need not, and therefore does not, reach the merits of defendant's arguments

that all of plaintiffs' claims brought on behalf of civilly committed patients should be dismissed for failure to state a claim. Thus, plaintiffs' claims brought on behalf of their civilly committed patients, which include plaintiffs' first, second, sixth, seventh, eighth, tenth, eleventh, and twelfth claims for relief, are dismissed.

      2.     *Due Process*

Defendant next argues that plaintiffs' third and fourth claims fail because plaintiffs do not plausibly allege substantive or procedural due process violations on behalf of themselves or other community hospitals. Def. Mot. 21. The Court addresses plaintiffs' substantive and procedural due process claims in turn.

      a.     Substantive Due Process

Plaintiffs have adequately alleged a substantive due process claim. The substantive due process clause "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)); *see Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks and citations omitted) ("[T]he Due Process Clause specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed"). "To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property." *Nunez*, 147 F.3d at 871. The plaintiff must then show that "the alleged deprivation . . . 'shock[s] the conscience and offend[s] the community's sense of fair play and decency.'" *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013) (quoting *Marsh v. County of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012)). When analyzing a substantive due process claim, courts must "focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake[.]" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

As an initial matter, plaintiffs have adequately alleged the deprivation of a protected property interest. Plaintiffs' substantive due process claim asserts that "[t]he right to exclude others from

an owner's property and to use the property as the owner sees fit is [a] fundamental right." SAC ¶ 80 (citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005)). Though defendant argues that a property right cannot serve as the basis for a substantive due process claim, the sole citation defendant provides in support of this assertion is to the syllabus in *Glucksberg*, which is not "part of the opinion of the Court but . . . prepared by the Reporter of Decisions for the convenience of the reader," and which supports the proposition that substantive due process protects fundamental liberty interests but does not appear to address the issue of whether a property interest could satisfy the substantive due process test. 521 U.S. at 702 (citing *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337 (1906)); *see* Def. Mot. 18; *and see* Def. Reply 15. Defendant does not address the case law cited by plaintiffs to the contrary. Based on the controlling law cited herein, which makes clear that a property interest may serve as the basis of a substantive due process claim, *see Nunez*, 147 F.3d at 871; *see also Glucksberg*, 521 U.S. at 721, the Court concludes that plaintiffs have adequately alleged the deprivation of a protected property interest.

Plaintiffs have also satisfied the second step of the substantive due process analysis. Plaintiffs allege in the SAC that defendant "deliberately leav[es] patients indefinitely in community hospitals that are not equipped or staffed to provide such treatment," which "leads to an unconscionable situation where individuals are denied the care that justifies their commitment in the first place and that they are constitutionally entitled to receive." SAC ¶ 47. Plaintiffs allege that defendant "knows that it is harming civilly committed patients but continues to do it anyways." *Id.* ¶ 48. Plaintiffs further allege that "[d]espite knowing of its unlawful practices for years, [defendant] continues to engage in these practices," and in fact "benefits by passing the costs of Oregon's civil commitment system to private entities, enabling [defendant] to avoid having to provide additional funding and resources to this most vulnerable population." *Id.* ¶ 53. Despite this, defendant allegedly "has failed to provide a solution for the patients for whom it is responsible." *Id.* ¶ 55. Plaintiffs allege that defendant "has indifferently indicated no serious intent or interest in changing its ways," and that "OHA officials apathetically shrug their shoulders and say that they lack funding to address the problem, that [p]laintiffs will simply have to keep forfeiting their property, and . . . that civilly committed patients will simply have to continue foregoing needed long-term treatment,

despite being entitled to it." *Id.* ¶ 58. Taken as true, these allegations are sufficient to allow a reasonable factfinder to determine that the alleged deprivation "shock[s] the conscience and offend[s] the community's sense of fair play and decency." *Sylvia Landfield Trust*, 729 F.3d at 1195. As such, plaintiffs have adequately alleged a substantive due process claim.

Defendant's remaining arguments do not alter the Court's analysis. Defendant argues that plaintiffs' substantive due process claim fails because it "is subsumed by [plaintiffs'] takings claim," and because plaintiffs have not alleged facts that show defendant "infringed on [p]laintiffs' fundamental liberty interests, let alone in a manner that shocks the conscience." Def. Mot. 21. Generally, "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate as to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). However, a substantive due process claim may still lie where a taking results from conduct "that is 'so arbitrary or irrational that it runs afoul of the Due Process Clause,'" *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) (quoting *Lingle*, 544 U.S. at 542; and citing *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007)), such as where the alleged conduct was deliberately indifferent or where the alleged deprivation "'shocks the conscience,'" *Graham v. Connor*, 490 U.S. 386, 393 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1032-33 (1973)). Because the Court has already found that plaintiffs have adequately alleged the deprivation of a fundamental property interest that a factfinder could plausibly conclude shocks the conscience, defendant's arguments fail.

The Court is also not persuaded by defendant's argument that "[p]laintiffs cannot establish a constitutionally protected liberty interest when they are voluntarily seeking to provide services to civilly committed patients" and "have voluntarily sought certification to treat" those patients. Def. Mot. 22. As plaintiffs point out, much of plaintiffs' argument is that their treatment of civilly committed patients is *not* voluntary. For example, plaintiffs allege that "[d]ue to the complex interplay between federal and state laws and regulations, [they] have no choice but to become certified for at least some of the program times [defendant identifies] to avoid violating the law and jeopardizing [p]laintiffs' licensure and funding." SAC ¶ 46. Because defendant "requires hospitals to be approved and certified in order to provide 'care and

treatment services for persons under civil commitment or for persons in custody,'" plaintiffs assert that their "certifications are mandated by [defendant's] regulations, not sought voluntarily." *Id.* Indeed, plaintiffs allege that if they "failed to become certified, [they] inevitably would be forced to, among other things, provide treatment to civilly committed patients without certification to do so." *Id.* Similarly, plaintiffs argue that even if their pursuit of certain certifications could be construed as voluntary, defendant far exceeds the scope of any such voluntariness by leaving civilly committed patients in plaintiffs' care "long past any understanding or agreement regarding th[at] care." Pls. Resp. 27; *see* SAC ¶¶ 55-56, 58, 90. Plaintiffs' allegations are sufficient to refute defendant's arguments regarding voluntariness.

b.    Procedural Due Process

Plaintiffs have also adequately stated a procedural due process claim. To state a procedural due process claim, a plaintiff must allege "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)). "The essence of procedural due process is that 'individuals whose property interests are at stake are entitled to notice and an opportunity to be heard.'" *Franceschi v. Yee*, 887 F.3d 927, 935 (9th Cir. 2018) (quoting *Dusenbery v. United States*, 534 U.S. 161, 167 (2002)). Importantly, "because due process is a flexible concept, '[p]recisely what procedures the Due Process Clause requires in any given case is a function of context.'" *Id.* (alteration in original) (quoting *Brewster*, 149 F.3d at 983; and citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

As stated above, plaintiffs have adequately alleged a protected property interest. The issue remaining is whether plaintiffs have adequately alleged a denial of adequate procedural protections. To determine whether a certain procedure satisfies due process requirements in a particular context, courts use "the three-part balancing test described in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)":

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Hufford*, 249 F.3d at 1150-51 (quoting *Mathews*, 424 U.S. at 334).

   Plaintiffs have adequately alleged a denial of adequate procedural protections.  With regard to their procedural due process claim, plaintiffs allege that "[t]here is no adequate state law procedure for community hospitals to contest being forced to house civilly committed individuals indefinitely during their 180-day commitment" because "[a]lthough Oregon civil commitment procedure involves a process by which OHA or its delegee consults with the admitting physician of a hospital to 'determine whether the best interests of a committed person are served by an admission to [that] community hospital,' that procedure is not being followed."  SAC ¶ 90 (citing OAR 309-033-0270(3)(a)).  Rather than affording plaintiffs "a meaningful opportunity to be heard regarding whether a civilly committed patient should be committed to [p]laintiffs' community hospitals for long-term treatment lasting up to 180 days," defendant "is simply leaving patients at [p]laintiffs' hospitals without any meaningful process."  *Id.*  "Nor is there a remedy available for community hospitals to seek compensation from OHA or their contracted Coordinated Care Organizations for most of [the] costs associated with" housing and caring for civilly committed patients.  *Id.*  "As a result, an already difficult workforce shortage has become a crisis," and "[t]he strains on [p]laintiffs' care providers and resources are not sustainable, [which] present[s] a risk of loss of critical mental health services to members of the community who are in crisis."  *Id.*  Because "[p]laintiffs lack an adequate remedy at law," they assert that declaratory and injunctive relief are appropriate and necessary to stop the violation of community hospitals' procedural due process rights.  *Id.* ¶ 86.

   Plaintiffs' allegations are sufficient to allow the Court to conclude that plaintiffs are being denied adequate procedural protections.  With regard to the first *Mathews* factor, again, a property "owner's right to exclude others from entering and using [their] property [is] perhaps the most fundamental of all property interests."  *Lingle*, 544 U.S. at 539.  This factor favors plaintiffs.  The second *Mathews* factor also favors plaintiffs.  Accepting plaintiffs' allegations as true, there is a risk of erroneous deprivation: by not adhering to the requirements of OAR 309-033-0270(3)(a), civilly committed patients remain in plaintiffs' care without regard to whether any determination has been made as to whether continued admission is in

"the best interests of [the] committed person[s]." Similarly, these allegations indicate that the value of additional or substitute procedural safeguards is probable. Finally, the third factor, the governmental interest in the function involved and the potential fiscal and administrative burdens that additional or substitute procedural safeguards would entail, weighs in favor of defendant. There can be no doubt that the function involved here, the provision of care for civilly committed patients, is an important one, and that additional or substitute procedural safeguards may entail substantial efforts by defendant. On balance, however, the gravity of the private interest that is affected and the general lack of procedural safeguards providing either notice or an opportunity to be heard—either pre- or post-deprivation—together lead the Court to conclude that plaintiffs have adequately alleged a procedural due process claim. *See Brewster*, 149 F.3d at 985 (emphasizing notice and opportunity to be heard in discussing adequacy of both pre- and post-deprivation procedures).

Defendant nonetheless argues that plaintiffs have failed to allege any "denial of adequate procedural protections" because "[p]laintiffs admit there is an administrative procedure that would apply to address [their] alleged harms," and plaintiffs have not alleged that they have "tried to engage in this process."[3] Def. Mot. 22-23 (citing SAC ¶ 90). However, this argument is not persuasive where that process (1) is not being followed, and thus, practically speaking, can provide no recourse to plaintiffs; and (2) is not one that *plaintiffs* are required to engage in. To the latter point, it is noteworthy that the plain language of OAR 309-033-0270(3)(a) does not put the onus on community hospitals to determine appropriate placements for civilly committed patients. In this context, plaintiffs have sufficiently alleged the denial of adequate procedural protections.

For all these reasons, taking plaintiffs' allegations as true, as the Court must, plaintiffs have adequately alleged a procedural due process claim.

---

[3] Defendant also again argues that plaintiffs have not alleged "any deprivation of a constitutionally protected liberty or property interest." Def. Mot. 22 (citing *Franceschi*, 887 F.3d at 935). However, because the Court has already concluded that plaintiffs have adequately alleged the deprivation of a protected property interest, the Court does not address this argument here.

3.      *Takings*

Defendant next argues that plaintiffs' fifth and ninth claims fail because (1) plaintiffs cannot establish a taking where the SAC shows that plaintiffs have voluntarily chosen to obtain the certifications that result in their admission and treatment of civilly committed patients; (2) plaintiffs fail to state a takings claim because although they allege a physical taking, they have not "allege[d] any direct invasion or appropriation of physical property"; and (3) "the only remedy [p]laintiffs seek," *i.e.*, declaratory and injunctive relief, "is not available in a takings claim." Def. Mot. 23-24. The Court addresses defendant's third argument first.

"Equitable relief is not available to enjoin an alleged taking . . . when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (footnote omitted); *see Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948, 956 (9th Cir. 2008) ("From a remedial perspective . . . 'just compensation' is on all fours with traditional monetary damages, which are the quintessential form of retrospective relief."). "As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin government action effecting a taking." *Knick v. Township of Scott, Pa.*, 588 U.S. 180, 201 (2019). And indeed, "the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking," and thus, "equitable relief is generally unavailable." *Id.* Persuasive authority indicates the same. *See, e.g.*, *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 942 (D. Or. 2023) ("[E]ven if [the plaintiffs] had viable takings claims, injunctive relief is not generally a proper remedy for a takings claim, which can be remedied with damages."); *Atwood v. Strickler*, No. 3:19-cv-01699-IM, 2020 WL 3549662, at *5 (D. Or. June 29, 2020) (quoting *Knick*, 588 U.S. at 205) ("'As long as just compensation remedies are available . . . injunctive relief will be foreclosed.'"); *Los Molinos Mut. Water Co. v. Ekdahl*, 695 F. Supp. 3d 1174, 1189 (E.D. Cal. 2023) ("[T]he injunctive relief sought by [the plaintiffs]—even if alleged to be 'prospective'—is not consistent with the remedies available in connection with their claim . . . . [The plaintiffs] have not alleged that they are prevented from seeking just compensation for an alleged future taking of their [property] rights in state court," and "[b]ecause there are no allegations indicating that [the] plaintiffs will be prevented from

bringing suit to recover just compensation remedies for any alleged future takings, [they] cannot seek injunctive or declaratory relief for the alleged violations of the takings clause."); *Pakdel v. City & County of San Francisco*, 636 F. Supp. 3d 1065, 1077-78 (noting that "federal courts have consistently denied equitable relief for takings claims" and dismissing the plaintiffs' claims for declaratory and injunctive relief where the "[p]laintiffs d[id] not aver monetary damages would be inadequate to make them whole").

        This plethora of authority cautions that plaintiffs' takings claims must be dismissed. Plaintiffs offer no concrete reason why they cannot seek just compensation for the alleged takings they suffer.  Like the plaintiffs in *Los Molinos Mutual Water Company*, plaintiffs here have not alleged that they are prevented from seeking just compensation.  *See* 695 F. Supp. 3d at 1189-90.  And like the plaintiffs in *Pakdel*, plaintiffs here have not "aver[red that] monetary damages would be inadequate to make them whole."  636 F. Supp. 3d at 1077-78.  As such, the default rule that equitable and injunctive relief are not available with respect to a takings claim remains applicable, and plaintiffs' fifth and ninth claims fail as a matter of law.

        Plaintiffs largely do not address the abundance of case law addressed herein.  Instead, plaintiffs assert that the procedures for acquiring compensation for the takings at issue in this case are inadequate because "[s]eeking just compensation for [defendant's] repeated deprivations of [p]laintiffs' property would require [p]laintiffs to repeatedly litigate a multiplicity of suits involving the same and similar repeated deprivations of property as long as OHA's practices continue indefinitely."  SAC ¶ 101.  In support of this assertion, plaintiffs argue that two other cases, an Eighth Circuit case and a case from this district, indicate that "declaratory and injunctive relief may be appropriate where the available state procedures for acquiring compensation for each taking is inadequate."  Pls. Resp. 29 (citing *Pharm. Rsch. & Mfrs. of Am. v. Stolfi* ("*Stolfi*"), 724 F. Supp. 3d 1174, 1188-91 (D. Or. 2024), *rev'd & remanded on other grounds*, 153 F.4th 795 (9th Cir. 2025) ("*Stolfi II*"); *Pharm. Rsch. & Mfrs. of Am. v. Williams* ("*Williams*"), 64 F.4th 932, 945 (8th Cir. 2023)).

        In *Stolfi*, the court considered whether a plaintiff could seek equitable relief for a regulatory takings claim.  724 F. Supp. 3d at 1188-91.  Specifically, the plaintiff alleged that Oregon's Prescription

Drug Price Transparency Act violated the First Amendment by requiring that pharmaceutical manufacturers publicly disclose pricing and product information online, which the plaintiff alleged amounted to a mandated disclosure of its trade secret. *Id.* at 1183-84. The court concluded that the plaintiff was entitled to seek equitable relief because the available procedure for receiving just compensation was not adequate. *Id.* at 1190-91. More specifically, the court concluded that following the available procedures would require the plaintiff to file "a multiplicity of suits involving the same underlying takings," which would be "'incapable of compensating the manufacturers for the repetitive, future takings that w[ould] occur.'" *Id.* at 1190-91 (quoting *Williams*, 64 F.4th at 945). The court thus granted summary judgment in favor of the plaintiff. *Id.* at 1190-91, 1202. On appeal, the Ninth Circuit reversed and remanded. *Stolfi II*, 153 F.4th at 805. The Ninth Circuit did not specifically address the district court's statements regarding the availability of equitable relief with respect to a takings claim, or whether this question may differ between a physical and regulatory takings claim. However, the Ninth Circuit's analysis centered entirely on the three-part regulatory taking test set forth in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), which is not applicable to physical takings claims. *See Stolfi II*, 153 F.4th at 834-40. In this context, *Stolfi* is simply of little aid here, where plaintiffs assert a physical, not regulatory, takings claim.

For all these reasons, the Court is not persuaded that it should ignore the great weight of authority precluding the takings claim where monetary damages are available, as they appear to be here. Because plaintiffs' takings claims fail for this reason, the Court need not reach the parties' remaining arguments, including whether plaintiffs' voluntary certifications render meritless their takings claims and whether plaintiffs have adequately "allege[d] a[] direct invasion or appropriation of physical property." Def. Mot. 23-24.

**B.     NAMI-Oregon and MHAP's Motions to Intervene**

Both NAMI-Oregon and MHAP move as intervenor-plaintiffs to assert third-party claims on behalf of civilly committed patients. Because the third-party claims are dismissed, the motions to intervene are denied as moot.

## CONCLUSION

For the reasons discussed herein, defendant's Motion to Dismiss, ECF [128], is GRANTED in part and DENIED in part.  Plaintiffs' claims brought on behalf of civilly committed patients (claims one, two, six, seven, eight, ten, eleven, and twelve), and plaintiffs' takings claims (claims five and nine), are DISMISSED without prejudice and with leave to amend.  Plaintiffs' remaining claims three and four, the substantive and procedural due process claims, survive.  Though the Court is skeptical that plaintiffs may be able to set forth additional allegations sufficient to establish third-party standing or their takings claims, in an abundance of caution, the Court grants plaintiffs thirty (30) days from the date of this Opinion and Order to file a third amended complaint curing the deficiencies outlined herein.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.").  Based on the dismissal of plaintiffs' third-party claims, proposed-intervenors NAMI-Oregon and MHAP's motions to intervene, ECF [121] and [139], are DENIED as moot.  NAMI-Oregon and MHAP are both granted leave to renew their motions to intervene in the event that any third amended complaint adequately alleges third-party standing.


IT IS SO ORDERED.


DATED this 9th day of December, 2025.

Adrienne Nelson
United States District Judge