PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: (503) 947-3764
Preston@CitizensForMentalHealthReform.com

Non-Party Amicus Curiae, appearing pro se

FILED29 DEC '25 11:22USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDER SERVICES, INC; A.J. MADISON, <br><br> Plaintiffs, <br><br> v. <br><br> SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority; JAMES DIEGEL, in his official capacity as Interim Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No:  3:02-cv-00339-AN (lead) <br> 3:21-cv-01637-AN <br> (consolidated) <br><br> AMICUS BRIEF OF NON-PARTY PRESTON BERMAN |

## I. STATEMENT OF INTEREST OF AMICUS CURIAE

Non-Party *amicus curiae*, appearing pro se Preston Berman ("Amicus") is a long-term patient under the jurisdiction of the Oregon Psychiatric Security Review Board (PSRB) and is currently hospitalized at the Oregon State Hospital (OSH). Amicus has lived experience with the OSH environment and with PSRB processes that influence length of stay, step-down readiness, and the pace of transition to community settings.

Amicus submits this amicus brief to assist the Court on remedial and operational questions in these consolidated matters. Although the named Plaintiffs appropriately focus on system compliance for Aid and Assist admissions and timely restoration, the practical ability to meet those obligations is directly affected by bed utilization and throughput across OSH populations, including patients held under PSRB jurisdiction. In Amicus's experience, certain system design choices can either reduce avoidable friction and delays or unintentionally create them.

Amicus's brief is narrowly tailored to remedial considerations. Amicus does not seek to add claims, expand the pleadings, or litigate collateral disputes. Instead, Amicus offers concrete, administratively feasible options for improving capacity, reducing unnecessary long-stay occupancy unrelated to clinical need, and supporting durable compliance with the Court's orders. These options are summarized in Exhibit 1 (campus restructuring proposal) and Exhibit 2 (SB 1114 as introduced).

## II. SUMMARY OF ARGUMENT

Capacity and compliance are system problems, not silo problems. Remedies aimed at reducing Aid and Assist wait times will be more durable if they account for bed flow across OSH, including long-stay PSRB patients whose length of stay is often driven by non-clinical factors such as placement bottlenecks, jurisdictional practices, and step-down availability.

Exhibit 1 presents a targeted operational remedy. A reconfiguration that consolidates Junction City as an all-HLOC (.370) campus, while prioritizing Salem for long-stay PSRB treatment, better aligns each population with the physical plant and operational realities of each campus. This alignment reduces preventable stressors for long-stay patients, supports consistent HLOC standards, and can reduce transport burden from southern Oregon and day-to-day operational inconsistency.

Throughput improves when the system builds a real "pipeline." Several administratively feasible tools can accelerate transition without compromising safety, including: conditional release status while still physically residing in OSH (so the legal transition is completed before a community bed opens), reopening Salem step-down cottage capacity for appropriate PSRB patients, and making fuller use of existing authority for out-of-state conditional release when clinically appropriate and supported by natural supports. Oregon Administrative Rule 859-070-0035 – Out-of-State Conditional Release Order: "The Board may consider and approve a conditional release plan to have the patient reside out of state."

PSRB discharge and jurisdiction practices affect OSH bed availability, even though the primary focus of these consolidated cases is timely admission and restoration for .370 patients.

Oregon appellate decisions show a recurring pattern in which PSRB resists discharge even when the record no longer supports current dangerousness or a qualifying mental disorder, and those choices keep GEI patients in scarce hospital-level beds long after clinical need has shifted to step-down or community settings.

In *Haidar v. Psychiatric Sec. Review Bd.*, 324 Or. App. 129 (2023), the Court of Appeals reversed a PSRB order that refused to discharge a woman found GEI in 1994 and instead continued her conditional release despite advanced dementia, severe cognitive decline, profound physical limitations, and consistent testimony from both treating professionals that she did not present a substantial danger to others.

In *Walters v. PSRB*, 341 Or. App. 41, 574 P.3d 49 (2025), the court reversed a PSRB order that found a current qualifying mental disorder at a five-year jurisdictional review even though every treating clinician, including PSRB's own psychiatrist, testified that no qualifying disorder remained and that a past adjustment disorder had fully resolved.

In *Norgren v. PSRB*, 344 Or. App. 617 (2025), the court reversed PSRB's refusal to discharge an individual who had been symptom-free for years while living safely in the community, where the board relied on a speculative chain of "what if" events instead of concrete evidence that his current condition made him a substantial danger to others. And in *Drew v. PSRB*, 322 Or. 491, 909 P.2d 1211 (1996), the Oregon Supreme Court vacated a PSRB order continuing jurisdiction because the board failed to logically connect the facts in the record to its conclusion about current dangerousness.

Taken together, these decisions reflect the same problem: PSRB continuing jurisdiction based on stale records and hypothetical future scenarios, even when current clinical evidence and real-world functioning point toward discharge.

Recent rule changes move in the same direction. On March 10, 2025, PSRB filed Temporary Administrative Order PSRB 1-2025 and recodified a loosened nexus standard as OAR 859-030-0010, stating that "[a] qualifying mental disorder may combine with another condition to render the person a substantial danger to others and need not be sufficient on its own to render the person a substantial danger to others." That language carries forward the same defect in prior versions of OAR 859-010-0005 by allowing continued PSRB jurisdiction even when non-qualifying factors are the primary drivers of any residual risk, so long as a qualifying diagnosis is present in some reinforcing way. Under the earlier rule, OAR 859-010-0005(8) (PSRB 1-2023), "dangerousness" required behavior that placed others at risk of physical injury "because of the person's qualifying mental disorder." What began as a requirement that current dangerousness be grounded in an active qualifying disorder has drifted toward a framework where a historical or latent diagnosis can anchor jurisdiction if any other risk factor is described as "combining" with it.

From Amicus's perspective as someone under PSRB jurisdiction, this combination of case law and rulemaking matters for *Mink-Bowman* even if PSRB is not the headline issue. When PSRB interprets "substantial danger" broadly and clings to jurisdiction on speculative theories that appellate courts repeatedly reject, PSRB patients remain in hospital-level beds that could otherwise be used to admit and treat .370 patients in a timely manner. A remedial framework that measures and reduces "administrative bed days" should therefore include metrics that capture when GEI patients are held primarily because of speculative dangerousness theories,

PAGE 5 AMICUS BRIEF OF NON-PARTY PRESTON BERMAN

placement inertia, or rule-driven overreach, rather than current clinical need and individualized, evidence-based risk.

Exhibit 2 (SB 1114) reflects an active legislative path that could reduce non-clinical long stays. Whether or not the bill is enacted, its approach illustrates that Oregon policymakers recognize the mismatch between GEI jurisdiction duration and guideline-based sentencing frameworks. The Court can incorporate that reality into monitoring and remedial planning by requiring transparent accounting for why beds remain occupied after patients are clinically ready to step down. In the 2026 Legislative Session, the Legislature could enact language based on SB 1114 with an emergency clause, which would further reduce non-clinical long stays and better align GEI jurisdiction with guideline-based sentencing. Critically, SB 1114 does not require releasing truly dangerous individuals simply because a GEI term ends. Oregon law provides a public-safety backstop through civil commitment authority, including ORS 426.701, which functions as a safeguard for "extremely dangerous" persons who continue to meet statutory criteria for involuntary custody and treatment even after a criminal-jurisdiction term expires.

For these reasons, the Court should consider remedial measures that (1) better align populations with campuses, (2) strengthen step-down and conditional release pipelines, and (3) require monitoring metrics that distinguish clinical need from administrative or systemic delay.

## III. ARGUMENT

**A. Durable compliance requires remedies that improve bed flow across OSH populations.**

The Court's compliance objectives necessarily depend on OSH's ability to admit and treat people in a timely manner. In practice, OSH capacity is constrained not only by admissions volume, but also by length of stay and the availability of step-down and community placements. When a meaningful portion of hospital-level beds are occupied by patients who are clinically stable but delayed by systemic barriers, the result is predictable: bottlenecks at the hospital door, increased jail wait times, and growing pressure on staff and operations inside the hospital.

For PSRB patients, extended hospitalization can be driven by factors that are not reducible to day-to-day clinical care, including scarcity of appropriate community placements, delays in conditional release logistics, and jurisdictional practices that treat speculative future risk as a reason to continue control even when current functioning and treatment adherence are stable. These realities matter to the remedial question before the Court because they directly affect OSH's capacity to meet Aid and Assist timelines.

Exhibit 1 and Exhibit 2 provide two complementary lenses for the same systems problem: (1) operational design choices about where patients are housed and how campuses are structured, and (2) structural drivers of long stays that are not always tied to present clinical necessity.

**B. Exhibit 1: A targeted campus-alignment remedy that improves bed flow, safety consistency, and dignity.**

Exhibit 1 proposes a practical swap in how OSH uses the Salem and Junction City campuses. The core concept is simple: align each population with the setting that best fits its operational needs and lived-environment realities, without changing the legal standards that govern admission, custody, or discharge.

Consolidate Junction City as an all-HLOC campus for .370 patients. Exhibit 1 recommends operating Junction City as entirely HLOC, except 1 SRTF unit (.370 only .) A single operating model across that campus would reduce unit-to-unit variation, simplify staffing patterns and training, and make acuity expectations more consistent.

Prioritize Salem for long-stay PSRB patients where stability and privacy are clinically relevant. PSRB patients are often hospitalized for longer periods, and over long stays the physical environment becomes a clinical variable. Exhibit 1 points to concrete features that directly affect day-to-day dignity, conflict risk, and stabilization, especially single-room availability and bathroom privacy. For example, Junction City's layout can be less workable for long-stay patients: Forest has only one single room per unit and both toilets and showers are in the hallway, while on Mountain rooms have toilets but showers are still shared in the hallway. Over months or years, those configurations predictably create avoidable stressors for patients with trauma histories, vulnerability concerns, or privacy-related clinical needs, and those stressors can accumulate into higher friction, more conflicts, and more incidents.

Salem, by contrast, is better positioned to support long-stay PSRB treatment routines with more usable common space and quieter areas that support de-escalation and recovery-oriented

structure, plus therapeutic outdoor options that matter in real-life treatment delivery, including the West and East plazas and, when permitted, access to the softball field. This is not about comfort as a luxury. It is about placing long-stay PSRB patients in a baseline environment that supports stabilization rather than adds friction. At the same time, .370 restoration involves frequent transitions, court timelines, and transport demands. .370 patients deserve humane, therapeutic care, but as pretrial detainees they should not be prioritized over long-stay PSRB patients when the choice is which population must absorb a less private, more correctional-feeling environment. A rebalanced approach aligns resources with population needs and reduces the correctional overlay for PSRB patients who are in treatment, not serving a sentence.

Stratify .370 placement rather than treating all .370 patients as identical. Exhibit 1 does not argue that .370 patients should receive inferior care. It argues that the system should match intensity and safety infrastructure to need. Under this approach, lower-risk .370 patients can be served at Junction City within a consistent HLOC model, while more acute or higher-risk .370 patients can remain in Salem where proximity to maximum-security resources and clinical backup can be critical. Stratification reduces "placement drift" by tying where a person is housed to a clear acuity rationale rather than bed pressure alone.

This is an administratively feasible remedy the Court can evaluate with objective metrics. Exhibit 1 is not a request for a new standard or an expansion of the case. It is an operational design choice that can be evaluated through measurable outcomes such as: jail wait time trends, average length of stay by legal status, transfer cycle time, incident rates, staff overtime and vacancy pressure, transport burden, and patient-reported dignity and safety indicators. If the

Court directs the parties and the Monitor to evaluate this option, Exhibit 1 can be tested as a targeted remedy with defined implementation steps, a phased timeline, and transparent reporting.

Why this matters to *Mink-Bowman* compliance. The system's immediate compliance problems present as Aid and Assist delays, but the underlying constraint is capacity and throughput. Exhibit 1 addresses that constraint by reducing avoidable friction for long-stay PSRB patients and by simplifying HLOC operations for .370 patients. In combination, these changes can reduce churn, reduce preventable setbacks, and free hospital-level capacity for those who actually need it, which supports durable compliance rather than short-term triage.

### C. Practical pipeline tools that speed step-down without compromising safety.

Exhibit 1 is a campus-alignment remedy. In parallel, the Court can promote durable compliance by encouraging pipeline tools that reduce "administrative bed days," meaning days spent in hospital-level beds primarily because the system is waiting on paperwork, placement, or process rather than clinical need. The tools below are concrete and can be implemented in a way that preserves individualized risk assessment and public safety.

Conditional release status while the person remains physically at OSH ("paperwork first, bed later"). A recurring bottleneck is that conditional release hearings and finalization of plans occur only after a community placement is secured, even when the patient is clinically stable and otherwise ready. A process that allows appropriate PSRB patients to be placed on conditional release status while still residing at OSH would convert "dead time" into productive time. Once a community bed opens, the move can occur quickly because the legal status, supervision designation, and treatment conditions have already been completed. This reduces last-minute scrambling, lowers transport and coordination failures, and improves predictability for counties and providers.

Step-down settings that function as true placeholders, not additional bottlenecks. Where OSH uses SRTF-level environments (such as Bridges/Forest) as part of a transition pathway, those units should operate as intentional step-down nodes with clear eligibility criteria, expected length-of-stay targets, and a defined queue logic for community placements. Without that structure, the system risks "placement drift," where individuals remain in step-down environments without a firm pathway forward, recreating the same throughput problem in a different building.

Reopen or expand cottage-style capacity for clinically appropriate PSRB patients. For individuals who do not require hospital-level security but remain delayed by housing scarcity, Salem cottage-style settings can reduce unnecessary use of high-intensity beds and create a more stable environment while the final community placement is arranged. Cottage settings can be paired with the "conditional release while in hospital" approach to accelerate transitions the moment a community slot opens. The operational goal is not to create a new endpoint, but to build a flexible buffer that prevents clinically stable individuals from occupying beds needed for admissions and restoration.

Use existing authority for out-of-state conditional release when clinically appropriate and supported by natural supports. When an individual has strong, reliable natural supports outside Oregon and an appropriate, structured plan can be arranged, out-of-state conditional release authority can reduce unnecessary prolonged hospitalization and should be encouraged. Used carefully and selectively, this tool can improve outcomes by placing people nearer to family support systems and can also reduce congestion in hospital-level beds. The key is a standardized process with clear documentation, supervision arrangements, and continuity of treatment.

Preserve safety through stratification and individualized criteria. None of these pipeline tools require a one-size-fits-all approach. Each tool can be limited to clinically appropriate individuals, with stratified pathways for higher-risk patients, step-up triggers, and clear revocation processes. The design principle is to move avoidable delay out of hospital-level beds while maintaining individualized risk management.

Together, these pipeline tools complement Exhibit 1's campus-alignment remedy. Campus alignment improves fit and day-to-day stability; pipeline tools improve throughput. Both support the same remedial objective: durable reductions in wait times and more reliable compliance driven by system design rather than crisis triage.

## CONCLUSION

For the reasons stated above, Amicus respectfully submits that the remedial issues before the Court will be best addressed through operational solutions that improve capacity, throughput, and system coherence across OSH populations. The Court can strengthen durable compliance by evaluating the Exhibit 1 campus-alignment remedy, adopting practical pipeline tools that reduce administrative bed days, and requiring transparent metrics that distinguish clinical necessity from placement and process delay. Amicus respectfully requests that the Court consider these targeted recommendations as part of its remedial framework and ongoing monitoring in this consolidated matter.

## PRAYER FOR RELIEF

WHEREFORE, Non-Party Amicus Curiae Preston Berman respectfully prays that the Court:

1. Direct the parties and the Court Monitor to evaluate the remedial options described in Exhibit 1 and to report to the Court, on an expedited schedule set by the Court, regarding feasibility, implementation steps, and measurable impacts on capacity, transport burden, operational consistency, safety outcomes, and patient dignity indicators;

2. Direct the parties and the Court Monitor to implement or propose a standardized "pipeline" process that reduces administrative bed days by completing conditional release planning and step-down logistics for clinically appropriate PSRB patients before community placements become available;

3. Direct the parties and the Court Monitor to evaluate, and as appropriate to implement, reopening or expanding cottage-style capacity on the OSH Salem campus for clinically appropriate PSRB patients as a step-down resource that reduces unnecessary use of hospital-level beds while maintaining safety and individualized treatment planning; and

4. Grant such other and further relief as the Court deems just and proper.


DATED: December __, 2025.           Respectfully submitted,

s/ *Preston Berman*
PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Preston@CitizensForMentalHealthReform.com

Non-Party Amicus Curiae, appearing pro se

## CERTIFICATE OF SERVICE

I certify that on December ___, 2025, I served the foregoing AMICUS BRIEF OF

NON-PARTY PRESTON BERMAN upon the parties hereto by the method indicated below, and

addressed to the following:

|  |  |
|---|---|
| DAN RAYFIELD | ___ HAND DELIVERY |
| Attorney General | ___ MAIL DELIVERY |
| CARLA A. SCOTT #054725 | ___ OVERNIGHT MAIL |
| SHEILA H. POTTER #993485 | ___ TELECOPY (FAX) |
| CRAIG M. JOHNSON #080902 | _X_ E-MAIL |
| Senior Assistant Attorneys General | ___ E-SERVE |
| JILL CONBERE #193430 | |
| Assistant Attorney General | |
| Department of Justice | |
| 100 SW Market Street | |
| Portland, OR 97201 | |
| Telephone: (971) 673-1880 | |
| Fax: (971) 673-5000 | |
| Email: Carla.A.Scott@doj.oregon.gov | |
| Sheila.Potter@doj.oregon.gov | |
| Craig.M.Johnson@doj.oregon.gov | |
| Jill.Conbere@doj.oregon.gov | |

*Attorneys for Defendants Patrick Allen, Sejal Hathi,*
*Dolores Matteucci, and James Diegel*

DATED: December ___, 2025.          Respectfully submitted,

s/ *Preston Berman*
PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Preston@CitizensForMentalHealthReform.com

Non-Party Amicus Curiae, appearing pro se

## CERTIFICATE OF SERVICE

I certify that on December __, 2025, I served the foregoing AMICUS BRIEF OF

NON-PARTY PRESTON BERMAN upon the parties hereto by the method indicated below, and

addressed to the following:

Emily Cooper OSB #182254                    ____ HAND DELIVERY
ecooper@droregon.org                        ____ MAIL DELIVERY
Thomas Stenson OSB #152894                  ____ OVERNIGHT MAIL
tstenson@droregon.org                       ____ TELECOPY (FAX)
David Boyer OSB # 235450                     X  E-MAIL
dboyer@droregon.org                         ____ E-SERVE
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

DATED: December __, 2025.            Respectfully submitted,

                                     s/ *Preston Berman*
                                     PRESTON BERMAN
                                     2600 Center St. NE
                                     Salem, OR 97301-2669
                                     Preston@CitizensForMentalHealthReform.com

                                     Non-Party Amicus Curiae, appearing pro se

## CERTIFICATE OF SERVICE

I certify that on December ___, 2025, I served the foregoing AMICUS BRIEF OF

NON-PARTY PRESTON BERMAN upon the parties hereto by the method indicated below, and

addressed to the following:

Jesse Merrithew OSB #074564
Email: jesse@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

___ HAND DELIVERY
___ MAIL DELIVERY
___ OVERNIGHT MAIL
___ TELECOPY (FAX)
_X_ E-MAIL
___ E-SERVE

Counsel for Plaintiffs Metropolitan Public Defender;
A.J. Madison

DATED: December ___, 2025.

Respectfully submitted,

s/ *Preston Berman*
PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Preston@CitizensForMentalHealthReform.com

Non-Party Amicus Curiae, appearing pro se

# EXHIBIT 1

# EXHIBIT 1 OSH Salem/JC Restructuring of the Populations

To: Dr. Pinals, Judge Nelson
From: Preston Berman

Date: 12/13/2025

**Background** *The hospital needs a campus configuration that matches each population to the setting best equipped to serve it. PSRB patients are diverted from the criminal justice system and often remain hospitalized longer, so stability, privacy, and a consistently therapeutic environment are central to care quality and safety. .370*
*restoration involves frequent transitions, court timelines, and transport demands, so placement should also reduce time in correctional vehicles and STRs while supporting timely restoration in a facility closer to Southern Oregon. Junction City has large secure capacity (175 beds) including a 24-bed on-grounds cottage program split across three buildings, creating an opportunity to simplify operations by consolidating acuity expectations.*



## Current Condition

*PSRB and .370 needs are not consistently aligned with the lived environment and operational realities of each campus. Junction City is less suitable as a primary long-stay setting for PSRB patients due to privacy-limiting single rooms, bathroom/shower configurations: on Mountain, rooms have toilets but showers are shared in the hallway; on Forest, both toilets and showers are in the hallway with nothing in-room. For long-stay PSRB patients—many with trauma histories, vulnerability concerns, or clinical needs related to privacy—these conditions can create avoidable stressors and conflicts and undermine dignity over time. Meanwhile, .370 patients face frequent transport and system movement, and placement decisions can inadvertently increase time in correctional vehicles and STRs.*

### Proposal

- *Convert Bridge 1 to gender-diverse PSRB-only.*
- *Convert Bridge 2 to a gender-specific male .370 unit.*
- *Convert Bridge 3 to gender-specific male PSRB-only.*
- *Make 3.5 Salem HLOC units PSRB-only.*
  *(this would equal the same current JC PSRB Population.)*

- *Convert Junction City to entirely HLOC .370, with the exception of Forest 1 which should remain and SRTF.*

- *Stratify .370 placement: send lower-risk .370 to Junction City; keep more acute/higher-risk .370 in Salem due to Harbors proximity.*

- *Result: PSRB stays in Salem's long-stay therapeutic environment (West/East plazas, softball field when permitted) while Junction City supports restoration and consistent HLOC operations.*

### Financial Implications

*One-time costs include patient transfers, policy/procedure updates, and staff training. Ongoing costs may include staffing and scheduling adjustments to support an all-HLOC Junction City model and PSRB-only capacity in Salem. Potential savings include fewer retrofits.*

### Known Risks

*Risks include maintaining safe capacity during moves, staffing/union impacts, ensuring safety and access for gender-diverse PSRB placement, and avoiding placement drift without clear .370 criteria. An all-HLOC Junction City model also requires consistent standards across units. If unchanged, PSRB patients may face long-term placement in a less private, more correctional-feeling setting, increasing friction and destabilization risk while transport burden and operational inconsistency continue.*

# EXHIBIT 2

83rd OREGON LEGISLATIVE ASSEMBLY--2025 Regular Session

# Senate Bill 1114

Sponsored by Senator GELSER BLOUIN

### SUMMARY

The following summary is not prepared by the sponsors of the measure and is not a part of the body thereof subject to consideration by the Legislative Assembly. It is an editor's brief statement of the essential features of the measure **as introduced.** The statement includes a measure digest written in compliance with applicable readability standards.

Digest: The Act limits how long a person found GEI can be committed or under supervision. (Flesch Readability Score: 61.8).

Limits the total term of commitment and conditional release for certain persons found guilty except for insanity to the sentence the person would have received under the sentencing guidelines or as required by a mandatory minimum sentence.

Establishes a process by which certain persons found guilty except for insanity and subject to a total period of commitment or conditional release equal to the statutory maximum sentence for the offense may petition for post-conviction relief.

### A BILL FOR AN ACT

2  Relating to guilty except for insanity; creating new provisions; and amending ORS 161.327.

3  **Be It Enacted by the People of the State of Oregon:**

4  **SECTION 1.** ORS 161.327 is amended to read:

5  161.327. (1) After the defendant is found guilty except for insanity pursuant to ORS 161.319, if

6  the court finds by a preponderance of the evidence that a person found guilty except for insanity

7  of a felony is affected by a qualifying mental disorder and presents a substantial danger to others,

8  the court shall order as follows:

9  (a) If the court finds that the person is not a proper subject for conditional release, the court

10  shall order the person committed to a state hospital or, if the person is under 18 years of age, to a

11  secure intensive community inpatient facility for custody, care and treatment. When the court orders

12  a person committed under this paragraph, the court shall place the person under the jurisdiction

13  of the Psychiatric Security Review Board.

14  (b) If the court finds that the person **can** be adequately controlled with supervision and treat-

15  ment if conditionally released and that necessary supervision and treatment are available, the court

16  shall order the person conditionally released.

17  (2)(a) If a party intends to request conditional release under this section, the party shall, as soon

18  as practicable, notify the opposing party, the court and the board of the request. The party re-

19  questing conditional release shall make every effort to provide the notification in a manner that

20  allows sufficient time to carry out the provisions described in this subsection before the court de-

21  termination on conditional release.

22  (b) Upon receipt of a request for conditional release under this section:

23  (A) If the most serious offense in the charging instrument is a Class C felony, the court shall

24  order that a local mental health program designated by the board consult with the person to de-

25  termine whether the necessary supervision and treatment for the person are available in the com-

26  munity and appropriate for the person and shall order the release of any records to the program

27  director that are necessary to complete the consultation.

NOTE: Matter in **boldfaced** type in an amended section is new; matter [*italic and bracketed*] is existing law to be omitted. New sections are in **boldfaced** type.

LC 3244

SB 1114

(B) If the most serious offense in the charging instrument is a Class A or Class B felony, the court may order that a local mental health program designated by the board consult with the person to determine whether the necessary supervision and treatment for the person are available in the community and appropriate for the person. If the court orders the consultation, the court shall further order the release of any records to the program director that are necessary to complete the consultation.

(3)(a) If the outcome of a consultation described in subsection (2)(b) of this section indicates that the necessary supervision and treatment are available in the community and appropriate for the person, the local mental health program shall evaluate the person to determine whether the person can be adequately controlled with supervision and treatment if conditionally released, and the program director shall provide to the court and to the board a report of the findings resulting from the consultation, a report of the findings resulting from the evaluation and recommendations for treatment.

(b) If the outcome of a consultation described in subsection (2)(b) of this section indicates that the necessary supervision and treatment for the person are not available in the community or not appropriate for the person, the program director shall submit to the court and to the board a report of the findings resulting from the consultation and may include any recommendations for treatment.

(4) In determining whether a person should be conditionally released, the court:

(a) May order evaluations and examinations as provided in ORS 161.336 (3) and 161.346 (2) or as otherwise needed by the court;

(b) Shall act in conformance with subsection (2)(b) of this section concerning an order for a local mental health program designated by the board to consult with the person;

(c) Shall have as its primary concern the protection of society; and

(d) May not order conditional release without a report from the consultation described in subsection (2)(b) of this section and the evaluation described in subsection [(3)/(b)] **(3)(a)** of this section.

(5) When a person is conditionally released under this section, the person is subject to those supervisory orders of the court as are in the best interests of justice, the protection of society and the welfare of the person. The court shall designate a person or state, county or local agency to supervise the person upon release, subject to those conditions as the court directs in the order for conditional release. Prior to the designation, the court shall notify the person or agency to whom conditional release is contemplated and provide the person or agency an opportunity to be heard before the court. After receiving an order entered under subsection (1)(b) of this section, the person or agency designated shall assume supervision of the person pursuant to the direction of the board. The person or agency designated as supervisor shall be required to report in writing no less than once per month to the board concerning the supervised person's compliance with the conditions of release.

(6) Upon placing a person on conditional release, the court shall within one judicial day provide to the board an electronic copy of the conditional release order. The court shall additionally notify the board in writing of the supervisor appointed and all other conditions of release, and the person shall be on conditional release pending hearing before the board. Upon compliance with this section, the court's jurisdiction over the person is terminated.

(7)**(a)** The total period of commitment or conditional release under ORS 161.315 to 161.351 may not exceed [*the maximum sentence provided by statute for the crime for which the person was found guilty except for insanity.*]:

**(A) The presumptive sentence the person would have received if convicted of the crime**

[2]

SB 1114

1  under the sentencing guidelines of the Oregon Criminal Justice Commission, except as pro-
2  vided in subparagraphs (B) and (C) of this paragraph;

3  (B) The mandatory minimum sentence the person would have received for the crime
4  under ORS 137.700 or any other statute, if the crime is subject to a mandatory minimum
5  sentence; or

6  (C) The maximum sentence provided by statute for the crime, if the crime is a sex crime
7  as defined in ORS 163A.005 or the crime involved causing the death of another person.

8  (b) Any amount of time a person has spent in custody prior to being found guilty except
9  for insanity shall be included when determining whether the maximum total period of com-
10  mitment or conditional release for the person has been exceeded.

11  (8) An order of the court under this section is a final order appealable by the person found
12  guilty except for insanity in accordance with ORS 19.205 (5). Notwithstanding ORS 19.255, notice
13  of an appeal under this section shall be served and filed within 90 days after the order appealed from
14  is entered in the register.  The person shall be entitled on appeal to suitable counsel possessing
15  skills and experience commensurate with the nature and complexity of the case. If the person is fi-
16  nancially eligible, suitable counsel shall be appointed in the manner provided in ORS 138.500 (1), and
17  the compensation for counsel and costs and expenses of the person necessary to the appeal shall be
18  determined and paid as provided in ORS 138.500.

19  (9) Following the order described in subsection (1) of this section, the court shall notify the
20  person of the right to appeal and the right to a hearing before the board in accordance with ORS
21  161.336 (5) and 161.341 (3).

22  (10) The board shall hold a review hearing within 90 days for a person conditionally released
23  under this section.

24  (11) The board shall establish by rule standards for the consultations described in subsection
25  (2)(b) of this section and the evaluations described in subsection (3)(a) of this section.

26  **SECTION 2. (1) Notwithstanding ORS 138.510 (3), at any time within one year after the**
27  **effective date of this 2025 Act, a person who was found guilty except for insanity before the**
28  **effective date of this 2025 Act may file a petition for post-conviction relief under ORS 138.510**
29  **to 138.680 claiming, as grounds for relief, that the person was subject to a total period of**
30  **commitment and conditional release equal to the statutory maximum sentence for the of-**
31  **fense in violation of ORS 161.327 (7), as amended by section 1 of this 2025 Act.**

32  **(2) ORS 138.550 does not apply to petitions for post-conviction relief described in this**
33  **section.**

34  **(3) Notwithstanding ORS 138.530, in a post-conviction relief proceeding under this section,**
35  **the petitioner has the burden of proving, by a preponderance of the evidence, that:**

36  **(a) The person was found guilty except for insanity and subject to a total period of com-**
37  **mitment and conditional release equal to the statutory maximum sentence for the offense;**
38  **and**

39  **(b) The use of the statutory maximum sentence to determine the total period of com-**
40  **mitment and conditional release is not in conformance with ORS 161.327 (7), as amended by**
41  **section 1 of this 2025 Act.**

42  **(4) Notwithstanding ORS 138.520, if post-conviction relief is granted under this section,**
43  **the court shall vacate the original judgment of guilty except for insanity and enter a new**
44  **judgment of guilty except for insanity with a total period of commitment and conditional**
45  **release in accordance with ORS 161.327 (7), as amended by section 1 of this 2025 Act.**

[3]

1    (5) Except as otherwise provided in this section, all provisions of ORS 138.510 to 138.680

2    apply to petitions for post-conviction relief described in this section.

3    SECTION 3. (1) Section 2 of this 2025 Act is repealed on January 2, 2028.

4    (2) The repeal of section 2 of this 2025 Act does not affect a petition for post-conviction

5    relief described in section 2 of this 2025 Act filed within the time limitations described in

6    section 2 of this 2025 Act.

7    ————————————

[4]

934963

Preston Berman
2600 Center St NE
Salem, OR 97301-2669

1***********************SNGLP 480

Clerk US District Court
United States Courthouse
1000 SW 3rd Ave Ste 1407
Portland, OR 97204-2944