DAN RAYFIELD
Attorney General
CARLA A. SCOTT #054725
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
JILL CONBERE #193430
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Carla.A.Scott@doj.oregon.gov
Craig.M.Johnson@doj.oregon.gov
Jill.Conbere@doj.oregon.gov

Attorneys for Defendants Patrick Allen, Fariborz Pakseresht, Dolores Matteucci, and Sean Murphy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>Plaintiffs,<br><br>v.<br><br>FARIBORZ PAKSERESHT, in his official capacity as interim head of the Oregon Health Authority, and JAMES DIEGEL in his official capacity as Interim Superintendent of the Oregon State Hospital,<br><br>Defendants. | Case No. 3:02-cv-00339-AN (Lead Case)<br>Case No. 3:21-cv-01637-AN (Member Case)<br><br>DEFENDANTS' FORENSIC SYSTEM IMPROVEMENT REPORT |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES DIEGEL, Interim Superintendent of the Oregon State Hospital, in his official capacity, DOLORES MATTEUCCI, in her | Case No. 3:21-cv-01637-AN (Member Case) |

individual capacity, FARIBORZ PAKSERESHT, Interim Director of the Oregon Health Authority, in his official capacity, and PATRICK ALLEN in his individual capacity,

Defendants.

Pursuant to this Court's request at the September 15, 2026, Status Conference, Defendants prepared the attached report regarding their comprehensive systemic improvements designed to achieve sustained compliance with the permanent injunction in this case.

On or before December 7, 2026, Defendants will file a status report describing their current compliance status with that injunction as well as their projections regarding ongoing compliance with and without this Court's current remedial orders.

DATED November 16, 2026.

Respectfully submitted,

DAN RAYFIELD
Attorney General

*s/ Carla A. Scott*

CARLA A. SCOTT #054725
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
JILL CONBERE # 193430
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.oregon.gov
Craig.M.Johnson@doj.oregon.gov
Jill.Conbere@doj.oregon.gov
Of Attorneys for Defendants

OREGON HEALTH AUTHORITY
**Behavioral Health Division**
Mink Program Management

## November 16, 2026

# Oregon's Forensic System Improvement Report

## A progress report on OHA's efforts related to the Mink Injunction

## Other formats and languages

You can get this document in other languages, large print, braille or a format you prefer free of charge. Contact the Oregon Health Authority's Mink team at oha-division-minkbowman@odhsoha.oregon.gov or 503-931-7121 (voice/text). We accept all relay calls.

# Table of Contents


Executive Summary ........ 5

Strategy for Achieving and Sustaining Compliance ........ 7

1. Improving the Timeliness of Forensic Evaluations ........ 7

a. Ensuring Timely Evaluations at Oregon State Hospital ........ 8

b. Improving Access to Community-Based Forensic Evaluations ........ 8

2. Building More Community Options and Support ........ 9

a. Expanding Specialized Capacity for Restoration and Step-Down Care ........ 9

b. Building Provider Readiness for Community-Based Residential Care ........ 10

c. Investing in Community Behavioral Health Infrastructure ........ 12

d. Expanding Intensive Permanent Supportive Housing Capacity ........ 13

e. Strengthening Community Diversion Pathways ........ 14

3. Helping People Move More Smoothly Through the System ........ 15

a. Supporting Complex Transitions through the Extended Care Management Unit 15

b. Improving Release Processes for Guilty Except for Insanity Patients ........ 16

c. Supporting Transitions and Ongoing Engagement through the Community Navigator Program ........ 18

d. Improving Admissions and Treatment Tracking at Oregon State Hospital ........ 19

4. Strengthening Coordination Across Partners and Agencies ........ 19

a. Strengthening Collaboration with the Psychiatric Security Review Board ........ 20

b. Coordinating with Human Services on Long-Term Care Needs ........ 20

c. Updating County Agreements to Strengthen Coordination ........ 21

d. Enhancing Data Coordination with the Courts ........ 22

e. Improving Oversight through the External Forensic Investment Study ........ 23

5. Modernizing Legal and Policy Frameworks that Guide the System ........ 23

a. Implementing HB 2005 (2025) and Strengthening the Aid & Assist Framework .. 24

b. Modernizing Oregon's Residential Behavioral Health Framework (HB 2015) ....... 25

c. Updating Prioritization Rule for Residential Admissions (OAR 309-035) ........ 26

d. Developing a Legislative Concept to Support Medication Continuity ........ 27

6. Strengthening Upstream Interventions ........ 27

a. Enhancing Early Supports for Children, Youth and Families ........ 28

b. Strengthening Identification and Support for Emerging Psychosis ........................ 28
c. Improving Substance Use Treatment and Recovery Pathways ............................... 29
d. Enhancing Crisis Response and Stabilization Across the System ........................... 29
e. Expanding Culturally Specific Behavioral Health Supports..................................... 30
f. Strengthening Peer-Delivered Supports for People at Risk..................................... 30
**Conclusion**......................................................................................................... **31**
**Appendix A: Organizational Roles Supporting Program Implementation**.................. **32**

# Executive Summary

The Mink Injunction requires Oregon to admit individuals who have been ordered to receive competency restoration services at Oregon State Hospital (OSH) within seven days of the court order. The Oregon Health Authority (OHA) is working to achieve sustained compliance with this requirement. This work begins with the day-to-day management of admissions, including communicating with courts and judges, maintaining a consolidated admissions list, and using real-time hospital census information to coordinate admissions. But meeting the seven-day requirement consistently also depends on broader system efforts to ensure beds are available at OSH and in the community when needed. This includes helping patients leave OSH when they are ready, expanding community treatment and housing options, and providing services that can prevent hospitalization.

Dr. Pinals's recommendations have been instrumental in guiding these broader efforts. The six areas below provide a strategic framework for understanding how OHA is advancing Dr. Pinals's recommendations alongside complementary initiatives that support the same goals.

1. **Improving the timeliness of forensic evaluations**
2. **Building more community options and support**
3. **Helping people move more smoothly through the system**
4. **Strengthening coordination across partners and agencies**
5. **Modernizing legal and policy frameworks that guide the system**
6. **Strengthening upstream interventions**

Together, these efforts help improve the flow of people through the forensic behavioral health system and support sustained compliance with the Mink Injunction.

**1. Improving the timeliness of forensic evaluations.** OHA and OSH have increased capacity for court-ordered evaluations by hiring more evaluators, improving scheduling, and strengthening communication with partners. To meet new legal requirements, OHA is also creating a new unit called the Community Restoration Evaluation Unit (CREU) that will coordinate community-based evaluations statewide and help ensure reports are completed on time.

**2. Building more community options and support.** OHA has continued to expand community capacity through growth at the Northwest Regional Re-entry Center (NWRRC), investments in residential treatment and supportive housing, and efforts to strengthen diversion pathways. Statewide onboarding

and support for new residential providers is also helping more programs become operational and accept referrals more quickly.

**3. Helping people move more smoothly through the system**. Timely transitions from OSH to community-based care are essential to maintaining capacity for new admissions. Since launching in 2024, the Extended Care Management Unit (ECMU) and Community Navigator Program have expanded to serve more counties and provide hands-on support to individuals, providers, and communities before and after discharge. These efforts advance several of Dr. Pinals's recommendations by improving care coordination, addressing barriers to community placement, and supporting efficient movement through the system. Both programs continue to grow and strengthen statewide capacity.

**4. Strengthening coordination across partners and agencies.** OHA has strengthened coordination with counties, courts, the Psychiatric Security Review Board (PSRB), and other partners through improved data sharing, reporting, and joint problem-solving. The PCG report, an external, Court-ordered study of Oregon's forensic investments, is also helping identify opportunities to strengthen statewide planning, oversight, and accountability.

**5. Modernizing the legal and policy frameworks that guide the system.** OHA helped shape House Bill 2005 (2025), which substantially revised Oregon's aid and assist laws and set new requirements for evaluations, reporting and restoration services in hospital and community settings. Implementation is now underway, alongside broader policy reforms designed to strengthen community capacity, support earlier intervention, and improve how people move through the behavioral health and forensic systems.

**6. Strengthening upstream interventions.** OHA continues to invest in behavioral health services that help people access care earlier and reduce the likelihood of crisis, hospitalization, or involvement in the criminal legal system. These efforts include strengthening early intervention, crisis response, substance use treatment, culturally specific services, and peer supports to help prevent needs from escalating and reduce future demand on the forensic system.

**Looking ahead.** Oregon has made meaningful progress in strengthening its general and forensic behavioral health system to help meet the requirements of the Mink Injunction consistently over time. At the same time, important work remains. Community and residential capacity continue to grow, but more options are still needed, particularly for people ordered for care in secure settings. OHA and its partners continue to modernize technology systems, strengthen local infrastructure, and improve coordination for individuals with complex care needs. By building on the progress described in this report, Oregon can continue advancing toward a more responsive, coordinated, and sustainable system of care.

## Strategy for Achieving and Sustaining Compliance

OHA's strategy for achieving sustained compliance with the Mink Injunction begins with the seven-day admission requirement. Alongside the day-to-day work of coordinating admissions to OSH, OHA is working to address the broader system challenges that affect its ability to admit people on time. This includes helping patients leave OSH when they are ready, expanding community treatment and housing options, and strengthening services that can prevent the need for hospitalization. Together, these efforts are intended to make hospital beds available when people need them and help Oregon consistently meet the seven-day requirement.

Dr. Pinals's recommendations have been instrumental in shaping OHA's approach to these challenges, providing valuable guidance on how to improve the movement of people through the forensic behavioral health system. Implementing her recommendations remains a central priority for OHA and its partners. The six areas below provide a strategic framework for understanding how OHA is advancing Dr. Pinals's recommendations alongside complementary initiatives that support the same goals.

1. **Improving the timeliness of forensic evaluations**
2. **Building more community options and support**
3. **Helping people move more smoothly through the system**
4. **Strengthening coordination across partners and agencies**
5. **Modernizing legal and policy frameworks that guide the system**
6. **Strengthening upstream interventions**

By focusing on these six areas, OHA's strategy aims to create a system that remains stable and effective over time. Aligning daily operations, policies, and partnerships around shared goals helps to build a foundation that supports timely care, reduces bottlenecks, and maintains strong performance long-term.

## 1. Improving the Timeliness of Forensic Evaluations

Timely forensic evaluations are essential for determining what services a person needs and how their case should move forward. When evaluations happen on time, people reach the right setting sooner, courts can make informed decisions more quickly, and movement through the restoration system is more efficient. Timely evaluations also help reduce avoidable delays, improve coordination among partners, and support the effective use of hospital and community resources. The initiatives that follow highlight recent

efforts to strengthen evaluation capacity and support a more consistent and coordinated evaluation process across Oregon.

## a. Ensuring Timely Evaluations at Oregon State Hospital

OSH's Forensic Evaluation Service (FES) conducts court-ordered evaluations to determine whether a person can participate in legal proceedings or meet criteria for a Guilty Except for Insanity (GEI) finding. FES was originally designed to evaluate people admitted to the hospital or held in custody. Over time, courts began ordering more evaluations for people in community restoration placements, requiring additional coordination with local providers and legal partners. Growing demand for community-based evaluations, combined with new evaluation timelines and reporting requirements established by House Bill 2005, has placed additional pressure on FES.

To meet these growing demands, FES has taken several steps to increase evaluation capacity. In 2025, OSH increased FES evaluator staffing from 21 to 24 in response to Dr. Pinals's recommendation. That same year, FES added temporary administrative support to help manage growing paperwork and scheduling needs. These changes have reduced response times, supported faster report filing, and improved day-to-day operations.

These efforts have produced strong results. Over the last year, FES has completed and submitted 100 percent of evaluations within statutory timeframes. When challenges have arisen, FES has worked closely with partners to quickly resolve issues and prevent delays.

Despite these improvements, several system-wide challenges continue to affect how quickly evaluations can be completed. Discovery materials do not always arrive on time, scheduling can be difficult when multiple partners must coordinate availability, and transportation needs can delay in-person evaluations. Evaluators may also be subpoenaed with little notice, requiring planned work to be rescheduled. FES continues to work with courts and other partners to identify these issues early and coordinate next steps. Growing demand for community-based evaluations also adds to FES's workload. As the State builds additional community evaluation capacity (see Section 2b), OHA expects that expansion to ease some of the pressure on FES.

## b. Improving Access to Community-Based Forensic Evaluations

OHA’s Behavioral Health Division (BHD) is establishing a Community Restoration Evaluation Unit (CREU) in response to HB 2005’s expanded reevaluation requirements and Dr. Pinals’s recommendation to build stronger statewide evaluation capacity. CREU will coordinate the timely completion and filing of restoration evaluations for people who are found unable to aid and assist (A&A clients) and ordered to community-based services. Until the unit is fully stood up, FES is providing interim support to ensure evaluations continue

moving forward, taking on a substantial volume of additional work during this transition and helping maintain continuity in the evaluation process.

Once fully implemented in March 2027, CREU is expected to manage more than 1,000 evaluations annually. Centralizing this work in one unit will allow OSH's forensic evaluators to focus on hospital patients, people in custody, and other priority populations. CREU will also standardize how records are collected, evaluations are scheduled, reports are prepared, and results are shared with the courts. These steps are intended to reduce delays, meet statutory deadlines, and create clearer expectations for partners across the state.

Key foundational work is already underway. OHA is standing up the internal team that will operate CREU, with three of the eight planned positions filled. OHA is also working to finalize contracts with evaluators who will conduct community-based evaluations. The unit is also developing the tools and workflows it will use once evaluations begin, including standardized processes for documentation and court filing.

As OHA continues to develop CREU, ongoing coordination with courts, defense counsel, and local mental health providers will be essential to ensure evaluations are scheduled and completed without delay. This early work lays the foundation for a more consistent and predictable system of community-based evaluations and will help reduce the pressure currently placed on the State Hospital's forensic evaluation team.

## 2. Building More Community Options and Support

Stronger community options help people receive the right level of care in the community while reducing demand on OSH. When people can move out of higher levels of care more quickly, hospital beds open for those who need them most. OHA's BHD has been working with providers, counties, and other partners to expand capacity, improve quality, and build clearer pathways into and through community-based services. The initiatives that follow highlight recent progress and ongoing work to strengthen Oregon's community system and support more timely movement across the forensic continuum.

### a. Expanding Specialized Capacity for Restoration and Step-Down Care

NWRRC is a specialized, non-licensed residential program that plays a unique role in Oregon's forensic system. It provides residential support to people who receive restoration services in the community and do not need hospital-level care. It also provides step-down support for individuals transitioning from OSH, jail, or higher-acuity residential settings, including those under PSRB jurisdiction. By serving people at multiple points across the forensic continuum, NWRRC helps reduce pressure on OSH and supports more timely movement through the system.

NWRRC operates under a direct contract with BHD, which allows the program to serve individuals with complex legal and clinical needs. The program's functional operating capacity is 35 beds, which is the number used for planning and daily operations. In response to Dr. Pinals's recommendation, BHD initiated a contract in March 2025 to expand NWRRC's capacity by at least 22 beds, and construction is scheduled for completion in May 2027. This expansion will increase beds for female residents and create dedicated space for A&A clients, strengthening placement options across the forensic continuum.

NWRRC is also broadening its referral pathways beyond OSH and local jails, including expanded referrals from acute care settings, Residential Treatment Facilities/Homes (RTFs/RTHs), Secure Residential Treatment Facilities (SRTFs), and PSRB-related placements. These additional referral sources are intended to support diversion from OSH, facilitate transitions between levels of care, and improve use of available capacity across the system. NWRRC has supported more than 100 admissions and discharges this calendar year—an important indicator of strong outcomes and safe transitions back to the community.

As placement needs grow, BHD and NWRRC are working together to strengthen referral and admission processes. Some individuals referred to NWRRC are not immediately ready for the setting and may need additional stabilization. Staff also sometimes receive referrals with incomplete information, requiring follow-up before an admission decision can be made. Variations in county practices, such as differences in court orders or transportation arrangements, can also influence the timing of admissions. Occasionally, individuals become ineligible shortly before intake if they are found able to proceed or their case is dismissed.

BHD is partnering with NWRRC and counties to improve referral completeness, increase daily intakes, and make effective use of available beds as the program expands. With its flexibility, strong outcomes, and growing capacity, NWRRC is a key partner in helping people transition out of higher-level settings and into appropriate community care.

## b. Building Provider Readiness for Community-Based Residential Care

As part of a statewide effort to expand community capacity, Oregon is licensing and supporting new residential treatment programs—including SRTFs, RTFs and RTHs. These programs are essential to easing pressure on the system by creating more options for people who no longer need hospital-level care, including A&A clients discharging from OSH. To support this growth, BHD developed a structured onboarding and support process for newly licensed providers. This work fills a long-standing gap by ensuring new programs understand statewide requirements, referral pathways, funding expectations, and coordination responsibilities from the outset.

Figure 2.1 New Licenses for SRTFs, RTFs, and RTHs, 2022-2026




Since November 2025, BHD has provided onboarding and technical assistance to nearly 100 newly licensed facilities through this process. Through early engagement meetings, BHD gives each new provider a targeted overview of key operational areas, including discharge workflows, legal frameworks, admission prioritization, Medicaid enrollment, authorization processes, and county pass-through funding. Staff also help providers establish secure communication channels and connect them with local mental health program leadership, hospital social work teams, and statewide teams that coordinate referrals and resolve placement challenges.

To deepen understanding of what residents need to transition successfully, BHD and OSH also offer regular hospital tours for residential providers and county partners. Since late summer 2026, about 65 individuals have participated in small weekly groups. These tours help new programs build familiarity with hospital processes and better prepare for admissions of people discharging from higher-acuity settings.

New providers enter with varying levels of experience and familiarity with behavioral health expectations. Many benefit from continued support as they build clinical skills, stabilize operations, and form strong partnerships with local mental health programs. BHD continues to refine this onboarding approach as more programs enter the system, helping ensure that providers can become reliable partners quickly. By giving new residential programs the tools, relationships, and guidance they need from the outset, BHD is strengthening the community system and supporting smoother transitions out of higher levels of care.

## c. Investing in Community Behavioral Health Infrastructure

BHD is making significant capital investments to expand the residential and housing capacity needed to support timely transitions from Oregon State Hospital and other acute settings into the community. Through multiple legislative appropriations across recent biennia, BHD administers state-funded grants that help develop, acquire, renovate, and expand behavioral health facilities and housing. Although these investments are not directed exclusively at people under A&A or GEI jurisdiction, they create systemwide capacity that benefits forensic populations by increasing the availability of safe, appropriate community placements. This expanded infrastructure helps alleviate discharge bottlenecks, reduce pressure on OSH, and strengthen the broader continuum of care that supports timely movement through the forensic system.

**Figure 2.2 BHD-Funded Adult Residential Capacity, Q4 2022-Q3 2026**




***Note:*** 2026 data reflect grantee-reported information and are subject to BHD review, including validation of facility openings and licensing status.

Since 2021, BHD has overseen significant capital investment funding allocations authorized through House Bills 5024, 5202, 2316, 5030, and 2059 and Senate Bills 5525 and 1530. These investments represent hundreds of millions of dollars directed toward behavioral health housing projects in urban, rural, and Tribal communities. As of Quarter 2 of 2026, these investments have supported the development of 345 new licensed beds and 488 new non-licensed beds and units, ranging from secure and nonsecure residential treatment facilities to supportive housing, transitional housing, recovery housing, and re-entry programs.

While these gains are substantial, capital development projects typically take two to six years to complete and often encounter challenges such as property

acquisition delays, zoning and permitting processes, cost escalation, and licensure requirements. BHD continues to work closely with grantees to monitor progress, address barriers, and coordinate with its Licensing and Certification and Workforce Incentives teams to support operational readiness. As more projects come online, these investments will meaningfully expand community options, improve system flow, and play a critical role in sustaining compliance with the Mink Injunction.

As these investments continue to come online, BHD is also evaluating how community-based behavioral health investments support individuals involved in the forensic system. As recommended by Dr. Pinals and ordered by the Court, BHD contracted with Public Consulting Group (PCG) to examine state investments in community-based forensic behavioral health services for individuals under A&A and GEI orders. An initial report was submitted to the Court in late October, with a second phase of the assessment planned for the coming months. The PCG assessment is discussed in greater detail in Section 4e.

## d. Expanding Intensive Permanent Supportive Housing Capacity

In 2026, Governor Kotek issued Executive Order 26-01, extending Executive Order 25-01, issued in January 2015, and directing OHA and Oregon Housing and Community Services (OHCS) to develop a tiered model of Permanent Supportive Housing (PSH), including a third tier for individuals with intensive behavioral health support needs exiting higher levels of care. These housing options create stable, long-term living environments for individuals who no longer need hospital or residential treatment but continue to need ongoing behavioral health support. Expanding these step-down settings can ease pressure on higher-acuity facilities and improve pathways for people ready to transition from Oregon State Hospital or other treatment programs.

To implement this mandate, OHA's Behavioral Health and Medicaid Divisions are collaborating with OHCS to develop a pilot of the Tier 3 PSH model. This effort also involves a local housing development organization, a Community Mental Health Provider (CMHP), and other mental health providers. The pilot will prioritize individuals transitioning from residential treatment settings, psychiatric hospitals, and acute care facilities, with an anticipated launch in January 2028.

To build a sustainable and scalable model, BHD is also working with OHA's Medicaid Division to explore opportunities to finance PSH-related services through Medicaid. Technical assistance from the Center for Medicare & Medicaid Services is scheduled to resume in November 2026 to support development of the pilot and broader statewide PSH programs.

In parallel, BHD is using $5.2 million provided by the Governor through House Bill 5025 in early 2026 to support the ongoing viability of intensive PSH in the Portland metropolitan area. BHD has contracted with Cascadia Health and New Narrative, with a third contract in development, to ensure the ongoing viability of intensive PSH in the Portland metro area. Together, these efforts are intended to expand community-based housing options, ease pressure on higher levels of care, and strengthen transitions across Oregon's behavioral health and forensic systems.

## e. Strengthening Community Diversion Pathways

BHD is working with CMHPs the local behavioral health authorities designated by Oregon counties, to understand their current diversion efforts and identify innovative practices that can be shared statewide. This work supports the broader goal of building more community options that reduce unnecessary involvement in the criminal legal system and connect people to treatment earlier.

Nearly all CMHPs provide post-booking diversion services. For example, Center for Human Development, Inc. in Union County maintains a close working relationship with the county jail, and through regular jail in-reach, CMHP staff and correctional officers identify individuals who can be diverted into community-based treatment. In Marion County, the District Attorney refers one to two "No Action" cases per month to the CMHP when charges are dismissed because mental health treatment is the more appropriate response.

**Figure 2.3 Availability of Pre- and Post-Booking Diversion Services**




Several counties also offer pre-booking diversion options. Community Counseling Solutions, which serves Grant, Gilliam, Morrow, Umatilla, and Wheeler Counties, partners with local law enforcement agencies so officers can

identify individuals with behavioral health needs before arrest and refer them to the CMHP for forensic diversion or behavioral health deflection services.

To support consistent learning and spread effective models, BHD is convening a forensic team learning collaborative in November 2026. This will begin the development of a statewide community of practice focused on strengthening diversion pathways and expanding community-based options across Oregon.

## 3. Helping People Move More Smoothly Through the System

Smooth transitions between levels of care are essential to reducing delays, supporting stability, and preserving hospital capacity for people who need admission most. When partners coordinate closely and have clear information about what is needed to move a person forward, individuals can transition more quickly to the appropriate setting. The initiatives that follow highlight examples of how OHA and its partners are improving these transitions across the forensic system.

### a. Supporting Complex Transitions through the Extended Care Management Unit

The ECMU supports transitions from OSH to community-based care for A&A clients and individuals found GEI. Its role is to help partners navigate complex discharge cases by improving visibility, clarifying responsibilities, and addressing barriers that can delay placement. ECMU does not make placement decisions or provide direct services. Instead, it works alongside system partners to support coordinated planning and problem-solving as individuals prepare to transition to the community.

Launched in November 2024 in a small number of counties, ECMU expanded to 18 counties through phased growth in 2025 and 2026, with a 19th county coming online soon.* The unit works closely with CMHPs, OSH, residential providers, and other partners to identify available placements, understand what actions remain, and ensure that follow-up tasks have clear ownership. CMHPs remain responsible for community placement planning for most individuals, and the PSRB approves plans for those under its jurisdiction. ECMU supports partners in staying aligned and consults on difficult-to-place cases when needed.

*Lane, Multnomah, Washington, Douglas, Coos, Curry, Clackamas, Jackson, Polk, Marion, Clatsop, Columbia, Grant, Gilliam, Morrow, Umatilla, Tillamook, Wheeler, and Deschutes (coming online soon).

As part of this work, ECMU uses the monthly A&A data that counties now submit under updated county agreements (see Section 5c). These data help ECMU identify who is on each CMHP's Ready-to-Place list and highlight where cases may be encountering barriers that delay discharge or placement. ECMU pairs these data with routine touchpoints with counties to confirm status updates, identify barriers early, and support coordinated problem-solving.

ECMU operates in a system where residential capacity, provider acceptance, and fragmented information can slow progress. Within this environment, ECMU helps reduce delays by improving visibility, using shared data to enhance coordination, and elevating barriers when needed. These efforts contribute to more consistent transitions from the hospital to community settings and support timely movement across the forensic system.

## b. Improving Release Processes for Guilty Except for Insanity Patients

People under PSRB's jurisdiction can move from OSH to the community only after the local CMHP completes a residential placement evaluation and conditional-release plan and PSRB approves it. Within OHA, OSH supports this process by initiating the request for evaluation, providing clinical information, preparing required documents, and facilitating discharge once PSRB authorizes release. BHD oversees expectations for timeliness and consistency for the CMHPs during the process. When evaluations, plan development, or placements are delayed—or when appropriate community beds are unavailable—individuals remain in the hospital longer than necessary, limiting capacity for A&A admissions.

Over the past two years, OHA, OSH, and PSRB have jointly reviewed each step of the conditional-release process to better understand where delays occur and how timelines can be reduced. In February 2025, OSH established a 121-day target for the process based on a detailed review of the activities required to complete a conditional release. On May 5, 2025, Dr. Pinals recommended reducing the overall timeline by an additional 20 percent. While OHA does not control every factor that affects how quickly an individual can be released, it has focused on the portions of the process where it has the greatest influence, including hospital workflows, coordination activities, and CMHP performance expectations. The improvements described below reflect progress in those areas and support the broader goal of reducing release timelines.

Several of the process stages where OHA has direct responsibility have shown measurable improvement. OSH plays a critical role in this work and has focused on improving how quickly individuals move through required stages. For example, OSH is responsible for obtaining signatures on the Conditional Release Agreement and submitting the final documents to PSRB and CMHPs. Although the expected timeframe for this step is seven days, the average

completion time over the most recent 12-month period (Oct 2025–Sep 2026) was 2.5 days, an improvement from the previously reported 2.8-day average.

**Figure 3.1 Time Reduction Across Selected GEI Release Process Stages (Days)**




During this same period, BHD worked to make the evaluation and planning process more consistent statewide. CMHPs are now expected to complete conditional-release evaluations within 30 days. While CMHPs are not yet meeting that timeline, performance has improved substantially: the average completion time decreased from 83.0 days (Oct 2024–Sep 2025) to 60.2 days (Oct 2025–Sep 2026)—a reduction of 22.8 days, or 27% percent. Because conditional release evaluations are one of the longest stages in the overall process, improvements in this area can significantly reduce the time individuals spend waiting for release. BHD also tracks whether CMHPs complete evaluations, monthly reports, and annual reviews on schedule and follows up when information is missing or delayed.

Despite progress, limited availability of community beds—especially in secure residential treatment facilities—remains the most significant barrier to timely conditional release. Many individuals under PSRB require these settings before stepping down to less restrictive care, and movement slows when openings are scarce or when residents have few transition options. BHD and OSH continue working closely with CMHPs, PSRB, and residential providers to support timely documentation, clear communication, and coordinated planning. Strengthening this work across agencies helps promote safe, timely transitions and preserves hospital capacity for those who need admission most.

## c. Supporting Transitions and Ongoing Engagement through the Community Navigator Program

Transitions upon discharge from OSH can be challenging, especially for people who may lose contact with services or face barriers securing housing, benefits, or treatment. Launched in June 2024 in response to a recommendation from Dr. Pinals in collaboration with the parties, the Community Navigator program provides intensive, person-centered support to help individuals navigate the A&A process, transition into the community, and remain engaged with services. Navigator teams are based in local CMHPs and include supervisors and staff with lived or professional experience in behavioral health or forensic settings. These teams begin working with participants before discharge and continue supporting them as they return to the community.

**Figure 3.2 Community Navigator Program: Original and Expansion Sites**




The program initially launched in Deschutes, Lane, Marion, Multnomah, and Washington counties. Navigators provide up to three months of in-reach at OSH and up to six months of individualized support after discharge. Services include discharge planning, help with benefits and identification, connection to outpatient treatment, and assistance with housing and other practical needs. Early results were encouraging: in 2024, 84 percent of participants engaged with navigators before discharge, and 79 percent attended scheduled treatment afterward—key indicators of stability and reduced likelihood of readmission.

Based on these results, BHD expanded the program in 2026 to Coos, Douglas, Klamath, and Curry counties and updated statewide agreements so navigators can support individuals in jail and at community entry. Expansion has also surfaced practical challenges: counties must volunteer to host navigator teams,

and hiring can take time. OHA continues working with interested counties to support implementation and strengthen referral pathways.

By maintaining contact through the transition period and reducing gaps in care, the Community Navigator Program helps people move more smoothly from hospital to community settings and reduces avoidable returns to the State Hospital.

### d. Improving Admissions and Treatment Tracking at Oregon State Hospital

Timely admissions and clear treatment planning are essential to helping people move through OSH without unnecessary delays. Much of the information needed to admit someone—court documents, medical records, and prior admission history— is typically not well organized upon patient admission to OSH. This can slow the admissions process and make it harder for staff to see the full picture of a person's needs. In addition, it has been a challenge to ensure coordination across multiple systems to keep assure the treatment plan is organized to avoid discharge delay.

To address these challenges, OSH is developing new tools to bring this information together. A new admissions system—scheduled to be operational in Q1 2027—will centralize court documents, medical records, and past hospital stays so staff can quickly access everything needed to admit a person and plan next steps. In addition, a new treatment-tracking tool will help clinicians monitor progress on discharge-related needs and identify what supports are still required for a safe transition. Together, these improvements will make it easier to understand where someone is in their treatment and how close they are to returning to the community.

This work is still underway and requires careful coordination with courts, jails, and counties as information systems evolve. But these efforts represent meaningful progress toward a clearer, more consistent process that reduces delays and supports smoother movement through the hospital.

## 4. Strengthening Coordination Across Partners and Agencies

Oregon's forensic and behavioral health system depends on many partners—counties, courts, jails, providers, and state agencies—working in sync. When information is shared clearly, roles are understood, and decision-making is aligned, people move through the system more smoothly and delays are less likely to occur. OHA has been working with these partners over many years to strengthen coordination by improving communication, clarifying expectations, and building shared processes that make the system more predictable and responsive. The initiatives in this section highlight examples of how these

collaborative efforts are helping reduce bottlenecks and support timely movement across the system.

## a. Strengthening Collaboration with the Psychiatric Security Review Board

Timely and safe transitions for individuals under the jurisdiction of PSRB rely on coordinated work among BHD, OSH, CMHPs, residential providers, and other partners. At Dr. Pinals's recommendation, a workgroup with BHD, OSH and PSRB convened over six months in early 2024 to identify opportunities to improve coordination and address barriers for conditional release. Building on this work, over the past two years, the agencies have strengthened their collaboration to improve communication, clarify responsibilities, and address barriers that can slow conditional-release decisions.

Leadership from BHD, OSH, and PSRB meet regularly to review complex cases, discuss placement options, and resolve issues that may delay discharge. Additional bi-weekly meetings focus on shared improvement priorities, such as residential provider onboarding and community monitoring practices. Monthly statewide meetings with CMHPs provide updates, discuss process changes, offer training opportunities, and respond to partner questions.

Shared tools have also improved coordination. BHD and PSRB now use a joint dashboard that tracks each step in the conditional-release workflow and highlights where delays occur. Case reviews show that PSRB approves community placements consistent with local recommendations in the vast majority of cases, underscoring the value of strong coordination earlier in the process.

BHD continues to support the community services needed for successful conditional release, including monitoring, case management, treatment recommendations, and collaboration with residential providers. Strengthened coordination among system partners has improved the conditional-release process and helped individuals move to the least restrictive appropriate setting more efficiently. However, community placement capacity remains a significant barrier to discharge. As of mid-November 2026, approximately 45 GEI clients were ready for discharge but awaiting appropriate community placement. Expanding community capacity and reducing discharge delays therefore remain key priorities for system partners.

## b. Coordinating with Human Services on Long-Term Care Needs

Some people in Oregon's forensic and behavioral health system need both mental health treatment and long-term care supports, such as help with daily activities or placement in settings that can meet complex medical or disability-related needs. These services span two agencies: OHA, which oversees the BHD

and OSH, and the Oregon Department of Human Services (ODHS), which oversees long-term care programs for older adults, people with physical disabilities, and people with developmental disabilities. Strong coordination between these agencies is essential for timely discharge and for preserving hospital capacity for individuals who must be admitted under A&A requirements.

A major area of joint work focuses on the Medicaid eligibility process that determines whether people with serious mental illness qualify for long-term care services. Delays in this process can keep individuals in the hospital even after they are clinically ready for discharge. To address this, OHA and ODHS are reviewing the eligibility process together and developing clearer timelines, decision pathways, and guidance for counties and providers. These efforts also advance Dr. Pinals's recommendation to strengthen coordination among OHA, OSH, and Developmental Disabilities Services to support timely discharge and community-based alternatives for individuals with intellectual and developmental disabilities involved in Aid & Assist and GEI processes.

OHA also facilitates regular meetings at the request of local partners to help resolve complex cases involving both behavioral health and long-term care needs. These meetings include staff from OHA, ODHS long-term care programs such as Aging and People with Disabilities and Developmental Disabilities Services, and the Oregon Public Guardian, which supports adults who do not have someone available to act on their behalf. OHA also participates in complex case discussions when invited, helping identify the mental health supports individuals may need in long-term care settings.

To strengthen on-site support, OHA continues to refine processes for onboarding mental health providers who deliver Enhanced Care Services and Enhanced Care Outreach Services in long-term care environments. These efforts help ensure that individuals who need both behavioral health treatment and long-term care supports can transition from OSH more smoothly and safely.

### c. Updating County Agreements to Strengthen Coordination

Counties play a central role in Oregon’s behavioral health and forensic system. Each county operates a CMHP, which supports individuals on A&A orders and plans for safe transitions from OSH. Much of this work is funded through County Financial Assistance Agreements (CFAAs), which outline counties’ responsibilities and reporting expectations.

OHA updated the CFAAs in 2026 to reflect current laws and system needs. As part of these revisions, the agreements now explicitly prioritize services and supports for individuals under Aid & Assist orders and PSRB jurisdiction, clarifying counties’ responsibilities to these populations. The updated CFAAs

also introduce a requirement for counties to submit A&A data monthly. Under prior agreements, reporting expectations varied widely across counties, resulting in inconsistent information flow and uneven coordination. The new monthly reporting schedule establishes a clearer and more reliable picture of statewide service needs and helps ensure that essential information—such as which individuals are Ready to Place—is available in a timely and consistent manner.

The updated agreements also streamline several administrative and reporting tasks so counties can spend more time on direct client support rather than duplicative paperwork. They provide clearer expectations for planning transitions back to the community and improve alignment across the forensic system.

Implementation of the revised CFAAs is ongoing, and counties vary in their staffing, data capabilities, and familiarity with the new requirements. To support this transition, OHA reviews monthly submissions, follows up when information is missing or late, and develops improvement plans with counties when needed. These efforts are helping build a more consistent flow of information between counties and the State, while allowing OHA to monitor statewide trends, identify service gaps, and strengthen coordination to reduce avoidable delays in the forensic system.

### d. Enhancing Data Coordination with the Courts

For people on A&A orders, Oregon's courts and OHA each maintain different parts of the information needed to understand a case. Courts record findings of unfitness, hearing dates, and case outcomes, while OHA documents treatment provided at OSH and in the community. When these records lived in separate systems, neither agency had a full view of a person's movement through the process, making it difficult to confirm timely care or ensure treatment ended within required timelines.

In response to recommendations from Dr. Pinals that were shared with the Court, OHA and the Oregon Judicial Department established a formal data-sharing partnership to improve visibility across the A&A process. Over the past two years, the agreement has expanded several times, and the agencies now exchange regular, structured data covering key stages of the A&A process. OHA's data and analytics teams work closely with court staff to refine these files and load them into OHA's systems, creating a unified dataset that is accurate, updated regularly, and aligned with the operational questions the state must be able to answer.

Work continues to migrate these files into a new statewide data platform, improve record-matching across systems, and develop routine combined reports. As these improvements take effect, OHA will have a clearer and more

reliable picture of timelines and outcomes—reducing manual cross-checks and supporting smoother coordination across the forensic system.

### e. Improving Oversight through the External Forensic Investment Study

Following Dr. Pinals's recommendation, OHA contracted with Public Consulting Group (PCG), for an external study examining state investments in community-based forensic behavioral health services for individuals under A&A and GEI orders. The study was submitted to Dr. Pinals and the Court at the end of October 2026. The report underscores how strongly effective community-based services depend on coordination across agencies, programs, and information systems. It provides a statewide view of how funding and service capacity have evolved and highlights the system structures needed to support a more reliable forensic behavioral health continuum.

PCG found that important information about forensic populations, funding, service use, outcomes, and available capacity remains distributed across multiple agencies and data systems, making it difficult to see how the system is performing as a whole. At the same time, the study identified practical opportunities to improve alignment. For example, PCG recommends designating a single entity or governance structure to provide statewide leadership for forensic behavioral health planning and oversight, and establishing a recurring statewide reporting process that consolidates essential information to support transparency and coordinated decision-making. While some of these recommendations fall outside OHA's direct authority, they illustrate potential pathways toward a more unified, data-informed system. OHA is reviewing the recommendations and working with Dr. Pinals regarding potential implementation where feasible and appropriate.

PCG also documented meaningful progress: state investments in community-based forensic services increased during the review period, and the number of individuals receiving community restoration services more than doubled. The report notes, however, that the full impact of these investments—both for forensic populations and for Oregon's broader behavioral health system—has not yet been realized. OHA has also been directed to support a second phase of study examining the adequacy of Oregon's community-based behavioral health continuum for forensic populations. Together, these findings offer a foundation that may support more aligned planning and system improvements in future years.

## 5. Modernizing Legal and Policy Frameworks that Guide the System

Clear and up-to-date laws and policies are essential for a system that depends on timely decisions, shared responsibilities, and smooth transitions between settings. Over time, gaps in statutes, outdated rules, and unclear requirements have contributed to delays in admissions, treatment, and discharge planning.

To support a more coordinated and predictable system, OHA and its partners have been working to modernize the legal and policy frameworks that guide the A&A process, community transitions, and residential services. The initiatives in this section highlight key examples of where Oregon is updating statutes, refining rules, and developing legislative concepts to better align the system with current needs and improve how people move through it.

## a. Implementing HB 2005 (2025) and Strengthening the Aid & Assist Framework

HB 2005 (2025) made significant updates to Oregon's A&A statutes, and OHA has led implementation of these changes across the forensic system. The legislation created clearer timelines, strengthened shared accountability, modernized expectations for restoration in both hospital and community settings, and expanded OHA's operational responsibilities. While the final bill reflected compromises among stakeholders and did not include every proposed reform, it addressed longstanding challenges in the A&A system and established a foundation for continued improvement. As implementation continues, OHA is monitoring outcomes and reviewing emerging data to assess the impact of the new requirements and identify areas where additional statutory or policy changes may be warranted.

The law established time limits for community restoration based on charge severity, requires 45-day status reviews, created court-notification requirements when timelines are not met, and set new intervals for forensic evaluations—every 90 or 180 days depending on charge category. To meet these expectations, OHA expanded evaluation capacity at the State Hospital and is developing CREU to coordinate community-based evaluations and support timely report filing.

For individuals ordered to OSH, OHA operationalized new statutory consultation and placement procedures, including required 30-day consultation updates and the use of Stop Orders, Most Restrictive Placement Determinations, and placement-objection processes. OHA also clarified how CMHP recommendations for nonsecure placements should be incorporated into setting decisions to strengthen alignment across partners.

HB 2005 also expanded reporting requirements related to placements, waitlists, and service capacity. To implement these provisions, OHA updated required A&A forms, revised reporting expectations, clarified workflows between CMHPs and OSH, and completed multiple rounds of emergency and permanent rulemaking under OAR 309-088. OHA also established a compliance process to monitor adherence to statutory deadlines and use of required forms as additional data become available.

To carry out this expanded work, BHD proposed Policy Option Package 425 in September 2026, requesting additional positions to support evaluation processes, statewide monitoring, revised procedures, rulemaking, data sharing, and technical assistance. If funded during the 2027 legislative session, these staffing resources will help ensure OHA can fully implement HB 2005's requirements and provide consistent support to counties, courts, and providers across the state.

Together, these efforts strengthen the legal and policy framework governing restoration, clarify roles and responsibilities across agencies, and support more timely and predictable movement through the A&A process.

## b. Modernizing Oregon's Residential Behavioral Health Framework (HB 2015)

HB 2015 directs OHA to identify and resolve longstanding administrative and financial barriers in Oregon's residential behavioral health system. This work has the potential to fundamentally reshape how residential settings are structured, licensed, financed, and integrated across the continuum of care. Because residential capacity is central to timely transitions from OSH and other higher levels of care, the reforms emerging from HB 2015 are critical both to addressing current system bottlenecks and to building a more sustainable framework for long-term compliance with the Mink Injunction.

As part of this directive, BHD conducted a statewide assessment of residential treatment facilities, residential treatment homes, and secure residential programs, comparing Oregon's current approach with federal guidance and practices in peer states. Providers, advocates, and staff consistently identified systemwide issues that limit capacity and create uneven experiences for residents. A core challenge is the lack of clarity between "setting" and "services," which affects licensure, reimbursement, and program design. This ambiguity contributes to inconsistent standards and makes it harder for residential programs to reliably accept and treat individuals stepping down from OSH, including those under A&A orders or PSRB jurisdiction.

The HB 2015 study, published on September 15, 2026, resulted in 31 findings and 34 recommendations aimed at updating residential definitions, expectations, and processes. Phase 1 focuses on clarifying statutory and regulatory terminology; distinguishing treatment from habilitative services; exploring new licensure types; strengthening Medicaid alignment; and improving case management for people with serious mental illness. Together, these changes lay the groundwork for a residential system that is clearer, more flexible, and better aligned with the treatment needs of individuals with complex behavioral health and legal involvement.

Many of these reforms have direct implications for Mink-Bowman compliance. Reframing residential programs as short-term, treatment-focused settings supports more timely OSH discharges, while clearer Medicaid pathways reduce administrative burden and increase provider readiness to support higher-acuity or forensic-involved populations. The recommendations also call for streamlined coordination among BHD, PSRB, counties, and providers to reduce avoidable delays and create more predictable transitions across settings.

BHD is now sequencing Phase 1 implementation and aligning this work with broader Residential Transformation and initiatives under HB 2005. While full implementation will take several years, HB 2015 establishes a roadmap for addressing root-cause issues that have constrained Oregon's behavioral health and forensic systems for decades. These reforms position the State to build a more coherent residential continuum that maintains flow, reduces bottlenecks, and supports lasting compliance with the Mink-Bowman orders.

### c. Updating Prioritization Rule for Residential Admissions (OAR 309-035)

Beginning in 2025, OHA implemented significant updates to OAR 309-035, the rule governing referrals, waitlists, and admissions for residential treatment programs. In developing these changes, OHA worked to balance the need for timely patient flow from OSH with the broader needs of Oregon's behavioral health system.

As a temporary measure, OHA implemented a rule change that prioritized OSH discharges for placement in residential treatment programs. This approach helped create capacity at the State Hospital and supported more timely admission of in-custody A&A defendants. However, it also contributed to delays in the admission of other behavioral health populations that required residential placement, increasing the risk that some of these individuals could ultimately enter the criminal legal system.

With the hospital now in compliance with the Mink Injunction, OHA is moving forward with regulatory changes, expected to be codified in late November 2026, that prioritize individuals discharging from both OSH and community hospitals. These refinements are intended to address a longstanding system tension: when individuals cannot move out of community hospitals or into residential treatment early enough, they may decompensate and—in some cases—enter the criminal legal system. At the same time, maintaining timely OSH discharges remains critical to maintaining hospital capacity and patient flow.

These policy changes occur alongside significant expansion of residential capacity. Since early investments began, more than 740 new residential treatment beds have been licensed statewide through a combination of BHD capacity investments and standard licensing processes (see Section 2c).

Together, these additions have strengthened the continuum needed to prevent unnecessary hospitalizations and reduce progression into the forensic system.

### d. Developing a Legislative Concept to Support Medication Continuity

Maintaining medication when a person on an A&A order leaves OSH and returns to jail is a persistent challenge. Even though the hospital provides a discharge plan, medication information, and a two-week supply, treatment is not always continued once the individual enters the jail setting. Current law does not allow involuntary medication orders issued at the hospital to follow the person into jail, which can lead to interruptions in treatment and rapid clinical decline.

The impact of these gaps is reflected in recent data: since 2023, OSH has discharged 1,609 individuals found able to proceed back to jail; within a year, 247 were readmitted—some multiple times. More than half of these readmissions involved a request for involuntary medication within 30 days of return, highlighting how quickly symptoms can worsen when treatment stops.

To address this recurring issue, OHA and OSH have developed a legislative concept for consideration in the 2027 long session. The proposal would create a clear legal framework to support medication continuity when someone moves from the hospital to jail. It would define what clinical information must be shared, ensure needed medications continue without interruption, and allow certain medication orders to remain in effect for a limited time after transfer. The concept also clarifies the responsibilities of hospitals, jails, and courts and includes protections for individual rights and confidentiality.

Although legislative action is still ahead, this proposal represents a meaningful step toward reducing avoidable crises, supporting more stable transitions, and improving timely progress through the A&A process.

## 6. Strengthening Upstream Interventions

While the Mink Injunction is focused on individuals already involved in the Aid & Assist process, long-term sustainability depends on a broader behavioral health system that helps people access care before they reach that point. The initiatives in this section describe statewide Behavioral Health Division investments that are not limited to Aid & Assist populations but help reduce behavioral health crises, justice-system involvement, and future demand on Oregon's forensic system. By increasing access to earlier, more culturally responsive, and community-based supports, these efforts complement the forensic-specific strategies described elsewhere in this report.

## a. Enhancing Early Supports for Children, Youth and Families

Behavioral health needs often begin in childhood, and when families cannot access early support, challenges can grow into crises affecting school stability, family well-being, and, over time, involvement with child welfare, juvenile justice, or adult forensic systems. Strengthening early supports ensures children receive care before problems intensify, improving long-term outcomes and reducing the need for higher-acuity services later. BHD leads system development to provide coordinated, developmentally appropriate services that help youth get timely treatment and remain safe, stable, and connected to their communities.

BHD is collaborating with system partners to build a more complete and equitable continuum of early supports. Efforts include strengthening the workforce, increasing system responsiveness, and expanding access to suicide prevention, behavioral health treatment for pregnant people, children, youth, and young adults. Mobile Response and Stabilization Services—linked to 988—deliver rapid in-home crisis support and follow-up stabilization as part of a broader array of community-based services, from school- and office-based therapy to Intensive In-Home Behavioral Health Treatment. For older youth, Young Adult Hubs and transition-age supports connect behavioral health care with housing, education, and employment pathways. Across all efforts, BHD prioritizes equity, culturally responsive practices, and strong partnerships with education and child-serving agencies to prevent unmet needs from growing into future crises.

## b. Strengthening Identification and Support for Emerging Psychosis

Early identification of psychosis helps young people stay connected to school, work, and community life, and reduces the need for higher-level services later on. BHD supports this work through Oregon's Early Assessment and Support Alliance (EASA), which provides rapid help for youth and young adults who are beginning to experience symptoms of psychosis. Since 2001, EASA has supported more than 6,000 young people and another 4,600 families seeking consultation and connection to care. The program responds quickly to referrals from schools, primary care, crisis teams, and cultural and community partners, helping ensure that individuals experiencing early symptoms enter treatment without delay.

EASA's coordinated approach produces strong results. Participants are far more likely to stay in school or work—72 percent compared to 29 percent nationally—and they are hospitalized much less often over time, dropping from 32 percent in the three months before enrollment to 9 percent after one year. Arrests during treatment are rare, and suicides have been extremely rare as well, at just 0.3 percent since 2008. These outcomes show how early, specialized

intervention can stabilize young people sooner, reduce reliance on hospital care, and prevent later involvement in the forensic system.

### c. Improving Substance Use Treatment and Recovery Pathways

Substance use disorders remain a major driver of behavioral health crises, instability, and preventable justice involvement. Many individuals who enter the forensic system have untreated or undertreated substance use needs, and gaps in care during transitions increase the risk of relapse, hospitalization, or contact with law enforcement. Strengthening earlier treatment and recovery pathways is therefore essential to reducing avoidable justice involvement and supporting more stable movement across the behavioral health system.

As part of its statewide responsibilities, BHD is improving Oregon's substance use treatment system by reducing barriers to care and expanding services that help people stabilize sooner, reducing risks that can lead to forensic system involvement. New rules let providers bill for crisis services before completing a full assessment, allowing immediate support when someone is at risk. Treatment access is growing through the SUD 1115 Demonstration Waiver, new opioid treatment programs, mobile and telehealth medication units, and expanded access to medication for opioid use disorder. BHD is also preparing for updated ASAM Criteria and working with statewide partners to strengthen treatment, peer services, housing supports, and culturally responsive care. Harm reduction efforts—including naloxone distribution, overdose response training, and syringe service programs—add further stability. Together, these actions help people get care earlier and reduce the crises and unmet needs that often lead to law enforcement contact or entry into the forensic system.

### d. Enhancing Crisis Response and Stabilization Across the System

Oregon’s Behavioral Health Crisis System (BHCS) is designed to provide immediate, community-based support to people across the lifespan experiencing behavioral health crises, reducing the need for emergency room visits, police involvement, or hospital admissions. Built around three pillars—someone to call, someone to respond, and a safe place to go—the system offers 24/7 access to the 988 Suicide and Crisis Lifeline, mobile crisis teams that meet people where they are, and crisis stabilization centers that provide short-term support. These services help people stay connected to their communities, interrupt the escalation of behavioral health symptoms, and reduce the likelihood that a crisis leads to arrest, incarceration, or other forensic involvement.

BHD has seen meaningful progress since launching this model. In 2025, 98 percent of contacts with 988 were resolved without emergency intervention, and crisis responders served more than 92,000 people. Mobile crisis teams were dispatched over 28,000 times, with only 4 percent of visits requiring a

director's custody hold, 18 percent resulting in hospitalization, and just 1 percent leading to arrest. Crisis teams also provided support in jails more than 1,300 times, helping connect individuals to care after a crisis event. While challenges remain—including workforce shortages, limited funding for crisis stabilization centers, and the need for more culturally specific crisis services—ongoing expansion of BHCS strengthens Oregon's ability to stabilize crises early and prevent unnecessary entry into the forensic system.

### e. Expanding Culturally Specific Behavioral Health Supports

Many people from culturally and linguistically diverse communities face barriers when seeking behavioral health services. When care does not fit with a person's cultural strengths, language and lived experience, they are less likely to engage early and more likely to disengage if those culturally specific needs are not met. These gaps can allow behavioral health concerns to escalate into crises that increase the risk of police contact or involvement in the forensic system. Expanding culturally specific supports is therefore an important strategy for helping individuals access care earlier, stay engaged, and receive services that feel relevant and trustworthy.

BHD is working to strengthen these pathways through the Culturally and Linguistically Specific (CLS) Services Enhanced Payment Program and sustained partnerships with culturally specific community organizations. Since 2023, more than 370 CLS providers have been approved, offering services in more than 31 languages and reaching over 260,000 people. BHD also supports conferences, trainings, and workforce development efforts that help organizations recruit, retain, and prepare providers who reflect the communities they serve. These investments expand access to culturally grounded care, improve continuity and engagement, and create safer entry points into the behavioral health system. While administrative barriers and data gaps remain, ongoing efforts continue to build a stronger foundation for culturally responsive care that can help prevent crises and reduce the likelihood of involvement with the forensic system.

### f. Strengthening Peer-Delivered Supports for People at Risk

Peer-delivered services offer important support to people whose behavioral health needs put them at risk of entering the criminal or forensic system. Forensic peers draw on lived experience with incarceration or court processes to help people stay engaged in services, build stability, and avoid crises that can lead to law enforcement contact. Along with supporting people in A&A or PSRB processes, forensic peers also work with individuals whose mental health, housing, or substance-use challenges could turn into crises or legal trouble if they don't get help early. By offering practical guidance and trusted

relationships, peers help people navigate complex systems, follow through on treatment, and address problems before they escalate.

BHD and its partners are strengthening this role by improving training, consistency, and fidelity across the peer workforce. So far, 637 people have completed forensic peer training and 189 have earned the endorsement, increasing the number of peers able to support people at risk of legal system involvement. Historically, separating mental-health and substance-use peer roles limited support for people with co-occurring needs. BHD is now working with peer leaders and certification bodies to clarify expectations, update best practices, and establish more consistent training standards with national technical assistance partners. These efforts expand access to trusted, culturally responsive support earlier in a person’s journey and help reduce the likelihood that behavioral health needs escalate into crises or later forensic involvement.

## Conclusion

OHA has made meaningful progress toward achieving sustained compliance with the Mink injunction's requirement to admit A&A clients to OSH within seven days. This progress reflects years of work by OHA, OSH, counties, providers, courts, and other partners to improve admissions processes, strengthen coordination, and address the barriers that affect the availability of hospital beds.

Dr. Pinals's recommendations have been instrumental in guiding this work, helping identify opportunities to improve how individuals move through the forensic behavioral health system. Implementing these recommendations remains a priority for OHA and its partners. As described throughout this report, this work is advancing alongside other efforts to improve forensic evaluations, expand community treatment and housing options, strengthen transitions out of OSH, and reduce the need for hospitalization.

Important challenges remain, including limited residential capacity, workforce shortages, ongoing technology modernization needs, and differences in local capacity. Addressing these challenges will require continued collaboration, investment, and focused attention to implementing Dr. Pinals's recommendations and monitoring progress.

Together, these efforts are intended to ensure that Oregon can consistently meet the seven-day admission requirement while helping individuals receive appropriate care and move through the forensic behavioral health system without unnecessary delays.

# Appendix

## Appendix A: Organizational Roles Supporting Program Implementation

This annex identifies the organizational roles in OHA that contribute to the work described in this report. It provides a sense of the breadth of staffing and coordination supporting Mink implementation across OHA—though it is not an exhaustive list of everyone involved.

| Program Area | Organizational Roles |
|---|---|
| **1. Improving the Timeliness of Forensic Evaluations** | |
| a. Ensuring Timely Evaluations at Oregon State Hospital | • FES Director, OSH<br>• FES Deputy Director, OSH (Dr. Andy Bustos)<br>• 24 Forensic Evaluators, OSH<br>• 4 Administrative Support Specialists, OSH |
| b. Improving Access to Community-Based Forensic Evaluations | • A&A/CREU Manager, BHD (Lisa Nichols)<br>• Senior Fiscal Analyst, BHD<br>• CREU Fiscal Analyst, BHD<br>• CREU Policy Analyst, BHD<br>• CREU Administrative Support<br>• 3 CREU Administrative Specialists, BHD<br>• Clinical Consultant (contracted Psychologist)<br>• CREU Evaluators (contracted) |
| **2. Building More Community Options and Support** | |
| a. Improving Specialized Capacity for Restoration and Step-Down Care | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• Residential Care Lead Strategist, BHD |

| | |
|---|---|
| | • ECMU Coordination Lead, BHD<br>• Adult Mental Health Coordinator, BHD<br>• Enhanced Care Clinical Coordinator, BHD<br>• Outreach Community Specialist, BHD |
| b. Building Provider Readiness for Community-Based Residential Care | • Forensic Technical Assistance and Contract Coordinator, BHD<br>• New Residential Facilities Liaison, BHD<br>• Outreach Community Specialist, BHD<br>• Residential Care Lead Strategist, BHD<br>• Residential Services Policy Analyst, Medicaid Division<br>• Enhanced Care Clinical Coordinator, BHD |
| c. Investing in Community Behavioral Health Infrastructure | • Behavioral Health Investments (BHI) Manager, BHD<br>• BHI Project Development Analyst, BHD<br>• BHI Project Development Analyst, BHD<br>• BHI Program Implementation Lead, BHD<br>• BHI Project Support Specialist, BHD<br>• BHI Housing Development Coordinator, BHD<br>• BHI Project Development Analyst, BHD<br>• BHI Strategic Initiatives Policy Analyst, BHD |

| | |
|---|---|
| | • BHI Program Coordinator, BHD<br>• Senior Strategic Advisor for Behavioral Health Capital Investments, BHD<br>• Program Service Coordinator, BHD<br>• BHI Team Lead, BHD<br>• BHI Project Development Analyst, BHD |
| d. Expanding Intensive Permanent Supportive Housing | • Adult Behavioral Health Policy Manager, BHD<br>• Women's Services and SUD Residential Coordinator, BHD<br>• Medicaid Policy Director, Medicaid Division |
| e. Strengthening Community Diversion Pathways | • Senior Forensic Diversion Policy Analyst, BHD |
| **3. Helping People Move More Smoothly Through the System** | |
| a. Supporting Complex Transitions through the Extended Care Management Unit | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• Residential Care Lead Strategist, BHD<br>• ECMU Coordination Lead, BHD<br>• Adult Mental Health Coordinator, BHD<br>• Enhanced Care Clinical Coordinator, BHD<br>• Outreach Community Specialist. BHD<br>• Forensic Behavioral Health Policy Analyst, BHD<br>• Senior A&A Forensic Policy Analyst, BHD<br>• Forensic Analyst, BHD |

| | |
|---|---|
| | • Forensic Program Coordinator, BHD |
| b. Improving Release Processes for Guilty Except for Insanity Patients | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• PSRB Senior Analyst, BHD<br>• PSRB Compliance Specialist, BHD<br>• PSRB Operations and Policy Analyst, BHD<br>• OSH Social Work Director (Della Hoffman)<br>• OSH Associate Director of Social Work<br>• Chief Analyst, OSH (Scott Hillier) |
| c. Guiding Transitions with the Community Navigator Program | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• Forensic BH Policy Analyst, BHD<br>• Senior A&A Forensic Policy Analyst, BHD<br>• Forensic Analyst, BHD |
| d. Improving Admissions and Treatment Tracking at State Hospital | • OSH Interim Deputy Superintendent (Megan Auclair)<br>• OSH Interim Admissions Director<br>• OSH Data and Information Services Director<br>• Office of Information Services Data Engineers<br>• OSH Operational Design Lead Analyst |
| **4. Strengthening Coordination Across Partners and Agencies** | |
| a. Strengthening Collaboration with the Psychiatric Security Review Board | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• OSH Social Work Director (Della Hoffman) |

| | |
|---|---|
| b. Coordinating with Human Services on Long-Term Care Needs | • Adult Behavioral Health Director, BHD (Samantha Byers)<br>• Enhanced Care Clinical Coordinator, BHD<br>• Adult Mental Health Coordinator, BHD |
| c. Updating County Agreements to Strengthen Coordination | • BHD Director (Ebony Clarke)<br>• BHD Deputy Director, Service Delivery (Dr. Christa Jones)<br>• CFAA Administrator, BHD |
| d. Enhancing Data Coordination with the Courts | • Manager of Behavioral Health Analytics, Health Policy and Analytics Division (HPA)<br>• Behavioral Health Data Analyst, HPA |
| e. Improving Oversight through the External Forensic Investment Study | • Operations & Strategy Deputy Director, BHD (Dr. Jon Collins)<br>• CMHP Cost Study Coordinator |
| **5. Modernizing Legal and Policy Frameworks that Guide the System** | |
| a. Implementing HB 2005 (2025) and Strengthening the A&A Framework | Core HB 2005 implementation team positions as listed in: 1b, 2b, 3a, 3c<br><br>Policy Option Package 425 requests the following positions:<br><br>CREU:<br>• A&A/CREU Manager<br>• Senior Fiscal Analyst<br>• CREU Fiscal Analyst<br>• CREU Policy Analyst<br>• CREU Administrative Support<br>• CREU Administrative Specialist (3 FTE) |

| | |
|---|---|
| | • Clinical Consultant (contracted Psychologist)<br>• CREU Evaluators (contracted)<br>A&A:<br>• Community Consultation and Report Specialist – OPA2<br>• Community Navigator Coordinator- OPA 3<br>Civil Commitment:<br>• Civil Commitment Manager<br>• Civil Commitment Support Specialist - AS2<br>ECMU and Residential Transformation:<br>• Forensic Residential Policy Analyst - 2 FTE<br>• ECMU Forensic Systems Analyst - OPA 1 |
| b. Modernizing Oregon's Residential Behavioral Health Framework (HB 2015) | • Deputy Director, Service Delivery, BHD<br>• Deputy Director, Operations and Strategy, BHD<br>• Adult Behavioral Health Director, BHD<br>• Mental Health Licensing and Certification Manager, BHD<br>• Behavioral Health Residential Transformation Strategist, BHD<br>• Medicaid Residential Services Policy Analyst, Medicaid Division |
| c. Updating Prioritization Rules for Residential Admissions (OAR 309-035) | • Deputy Director, Operations and Strategy, BHD<br>• Mental Health Licensing & Certification Manager, BHD |

| | |
|---|---|
| d. Developing a Legislative Concept to Support Medication Continuity | • OSH Interim Deputy Superintendent (Megan Auclair)<br>• OSH Government Relations Lead<br>• OSH Chief Medical Officer (Dr. Amit Bhavan) |
| **6. Strengthening Upstream Interventions** | |
| a. Enhancing Early Supports for Children, Youth and Families | • Child and Family and Lifespan Behavioral Health Director, BHD<br>• Child, Family and Lifespan Behavioral Health Manager, BHD<br>• Youth Suicide Prevention Coordinator, BHD (x3)<br>• Early Childhood Mental Health Specialist, BHD<br>• Family Peer Services and Engagement Analyst, BHD<br>• Children's Intensive Services Specialist, BHD<br>• Children's Intensive Treatment Services Specialist, BHD<br>• Intensive Community Based Services Coordinator, BHD<br>• School Based Mental Health Program and Policy Coordinator, BHD<br>• Children's 988/ Mobile Response and Stabilization Services Coordinator, BHD<br>• Wraparound Program Coordinator, BHD<br>• Complex Care Innovation Specialist, BHD<br>• Juvenile Fitness to Proceed Coordinator, BHD |

| | |
|---|---|
| | • Youth Integrated Behavioral Health Care Program and Policy Coordinator, BHD0 |
| b. Strengthening Identification and Support for Emerging Psychosis | • Child, Family and Lifespan Behavioral Health Manager, BHD<br>• Young Adult Services Coordinator, BHD |
| c. Improving Substance Use Treatment and Recovery Pathways | • Substance Use Disorder (BHD) Manager, BHD<br>• Substance Use Disorder Special Projects Advisor, BHD<br>• State Opioid Treatment Authority, BHD<br>• Opioid Response Grant Coordinator, BHD<br>• Harm Reduction Strategist, BHD<br>• SUD System Coordinator, BHD<br>• Opioid Settlement Data Liaison, BHD<br>• DUII Services Coordinator, BHD<br>• Harm Reduction Coordinator, BHD<br>• Principal Advisor, Substance Use Disorders Policy and Strategy, BHD<br>• Women's Services and SUD Residential Coordinator, BHD<br>• Integrated Co-Occurring Services Coordinator, BHD |
| d. Enhancing Crisis Response and Stabilization Across the System | • 988 & Behavioral Health (BH) Crisis System Manager, BHD<br>• 988 & BH Crisis System Operations, Policy Strategy Lead, BHD<br>• 988 Compliance Specialist, BHD |

| | |
|---|---|
| | • 988 & BH Crisis System Coordinator, BHD<br>• 988 & BH Crisis System Continuous Improvement Analyst, BHD<br>• Children's 988/Mobile Response & Stabilization Program Coordinator, BHD<br>• 988 & BH Crisis System Strategist, BHD<br>• 988 & BH Crisis System Strategist, BHD<br>• 988 & BH Crisis System Implementation Coordinator, BHD<br>• 988 Crisis System Support, BHD |
| e. Expanding Culturally Specific Behavioral Health Supports | • Behavioral Health Equity and Community Partnership Director<br>• Behavioral Health Equity Strategist<br>• Culturally and Linguistically Specific Services Specialist<br>• Strategic Initiatives Policy Analyst |
| f. Strengthening Peer-Delivered Supports for People at Risk | • Office of Recovery and Resilience Director, BHD<br>• Forensic Peer Services Program Analyst, BHD |

**Behavioral Health Division**
Mink Bowman
500 Summer Street, NE, E-20
Salem, OR 97301-1097
503-931-7121
Oregon State Hospital MinkInjunction Compliance

OREGON HEALTH AUTHORITY