IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON,<br><br>Plaintiffs,<br>v.<br><br>FARIBORZ PAKSERESHT, in his official capacity as Interim Director of the Oregon Health Authority, and JAMES DIEGEL in his official capacity as Interim Superintendent of the Oregon State Hospital,<br><br>Defendants. | Case No.: 3:02-cv-00339-AN (lead)<br>3:21-cv-01637-AN (consolidated)<br><br>ORDER |

On October 14, 2026, the Ninth Circuit issued a limited remand order directing this Court to inform the Ninth Circuit "whether it would have granted the same contempt order even without considering Dr. Pinals' Eleventh Report or any ex parte communication with Dr. Pinals." Ninth Circuit Limited Remand Order, ECF 806. For the reasons stated below, the Court confirms it would have granted the same contempt order without considering Dr. Pinals' Eleventh Report or any related communication with Dr. Pinals. *See* Opinion & Order of June 6, 2025 (hereinafter referred to as the "Contempt Order"), ECF 604; Debra A. Pinals, M.D., *Neutral Expert Eleventh (11th) Report Regarding the Consolidated* Mink *and* Bowman *Cases* (May 5, 2025) (hereinafter referred to as Dr. Pinals' "Eleventh Report") (publicly accessible at the following link: https://www.oregon.gov/oha/OSH/reports/Oregon_Mink-Bowman_11th_Neutral_Expert_Pinals_Report.pdf), ECF 620-1.

## BACKGROUND

In 2002, plaintiffs Disability Rights Oregon ("DRO"), Metropolitan Public Defender Services, Inc. ("MPD"), and individual A.J. Madison sought a federal court order compelling defendants to provide hospital admission and medical treatment to criminal defendants who were deemed unfit to proceed to trial due to an inability to aid and assist in their own defense. Findings of Fact & Concls. of L., ECF 47, at 1.

After a court trial, then-District Judge Owen M. Panner imposed a court order (the "Permanent Injunction") requiring that defendants be transported to medical facilities within seven days of a court finding they are unfit to proceed to trial. *Id.* at 4.

Defendants achieved compliance with the Permanent Injunction, but they subsequently fell out of compliance in 2018 and have persistently been out of compliance since. *See* Opinion & Order of January 9, 2023, ECF 338, at 2. On December 21, 2021, District Judge Michael W. Mosman appointed Dr. Debra Pinals as a Neutral Expert to provide recommendations "to address capacity issues at the Oregon State Hospital." Order Consolidating Cases and Appointing a Neutral Expert, ECF 240, at 2. Dr. Pinals has regularly provided the Court and parties with status reports detailing any progress updates and relevant data.

After years of non-compliance, on January 7, 2025, plaintiff DRO moved for an order to show cause why defendants should not be held in contempt, and for a remedial order. Motion for Order to Show Cause, ECF 540. On January 23, 2025, plaintiff MPD filed a Partial Joinder to DRO's Motion for Order to Show Cause, ECF 557. On January 24, 2025, the Court held a status conference and heard testimony from then-Interim Superintendent of the Oregon State Hospital ("OSH"), Dr. Sara Walker; Deputy Director of Administration of the Oregon Health Authority ("OHA"), Kristine Kautz; then-Director of Adult Behavioral Health of the OHA, Samantha Byers; and Dr. Pinals. *See* Status Conf. Tr., January 24, 2025, ECF 568. On March 12 and 13, 2025, the Court held a two-day hearing on the motions and heard testimony from Dr. Pinals; Dr. Walker; Behavioral Health Director of the OHA, Ebony Clarke; and then-Director of the OHA, Dr. Sejal Hathi. *See* Hearing Tr., March 12, 2025, ECF 592; Hearing Tr., March 13, 2025, ECF 593.

On June 6, 2025, the Court granted plaintiff DRO's Motion for a Rule to Show Cause and for a Remedial Order, ECF 540, and plaintiff Metropolitan Public Defender Services, Inc.'s Partial Joinder to DRO's Motion, ECF 557. *See* Contempt Order. "[B]ased on the testimony provided at the status hearing on January 24, 2025, and during the contempt hearing on March 12 and 13, 2025," the Court found defendants in contempt for not having "taken *all* reasonable steps to comply." *Id.* at 14. The Court imposed

monetary sanctions in the amount of $500.00 per class member per day. *Id.* at 17. The Court also changed Dr. Pinals' role from Neutral Expert to Court Monitor. *Id.* at 19. On June 17, 2025, defendants appealed this Court's order to the Ninth Circuit. Notice of Appeal, ECF 607. On October 14, 2026, the Ninth Circuit issued a limited remand order. Ninth Circuit Limited Remand Order.

## DISCUSSION

In response to the Ninth Circuit's question, the Court confirms it would have granted the same contempt order notwithstanding the Eleventh Report and any related communication with Dr. Pinals. The record demonstrates that the Court's Contempt Order was independently supported by evidence apart from Dr. Pinals' Eleventh Report and any related communications. Specifically, evidence provided during the January 24, 2025 status hearing, the March 12 and 13, 2025 hearings, and in Dr. Pinals' Tenth Report support the Contempt Order's findings of fact and finding of contempt. *See* Status Conf. Tr., January 24, 2025; Hearing Tr., March 12, 2025; Hearing Tr., March 13, 2025; Debra A. Pinals, M.D., *Neutral Expert Tenth (10th) Report Regarding the Consolidated* Mink *and* Bowman *Cases* (November 12, 2024), ECF 587-3 (hereinafter referred to as Dr. Pinals' "Tenth Report").

### A. Findings of Fact

Though the data in the Tenth and Eleventh Reports were not identical, any differences did not materially affect the outcome of the Contempt Order. As detailed below, the data from the Eleventh Report was largely consistent with the trends reflected in earlier reports and supported the same conclusions. And in most of the data points relied upon in the Contempt Order's findings of fact, the data reported in the Eleventh Report was more favorable to defendants than corresponding data presented in earlier reports or at various hearings.

1. *Contempt Order, Findings of Fact ¶ 1*

The first finding of fact does not reference the Eleventh Report or any related communication.

2. *Contempt Order, Findings of Fact ¶ 2*

The second finding of fact states:

> 2. Defendants stipulate that they are not in compliance with the Court's Permanent

> Injunction. Defendants do not contest that as of January 2025, data from OSH showed that the average length of detention before admission to OSH for all individuals found unable to aid and assist in their own defense was twenty-nine days. However, defendants argue that they have taken all reasonable steps to comply with the Permanent Injunction and that compliance has been hindered by factors beyond their control, primarily a lack of resources (*e.g.*, funding, bed capacity).

Contempt Order, Findings of Fact ¶ 2. This finding of fact also does not directly cite the Eleventh Report. The January 2025 data from OSH was presented by plaintiff DRO at the March 2025 hearings. *See* Hearing Tr., March 13, 2025, 219:25-220:3.

3. *Contempt Order, Findings of Fact ¶ 3*

The third finding of fact states:

> 3. For individuals admitted to OSH between April 7 and April 20, 2025, the average waiting period until admission was 21.8 days. Eleventh Report 11. By April 20, 2025, sixty-eight people were waiting for admission, with an average active waiting period of 12.1 days. *Id.* As of the end of April, forty-six people were waiting for admission, with an average active waiting period of 9.6 days. *Id.* The average active waiting period for all individuals admitted in April 2025 was 20.7 days, down from March 2025's average active waiting period of 25.4 days. *Id.* This downward trend toward compliance, while not insignificant, does not change the fact that the average active waiting period is well beyond the seven-day requirement. *Id.*

Contempt Order, Findings of Fact ¶ 3. The third finding of fact repeatedly cites the Eleventh Report. This finding of fact can similarly be supported by data consistently less favorable to defendants found in the Tenth Report. The Tenth Report states that for individuals admitted to OSH during October 2024, the average waiting period until admission was 26.9 days. Tenth Report 8, 9. As of November 1, 2024, seventy-six people were waiting for admission, with an average wait time of 12.6 days. Tenth Report 9. As of March 12, 2025, there were sixty-eight people waiting for admission on the aid and assist list with an average waiting period of 13.6 days. Hearing Tr., March 12, 2025, 13:11-13. These data points support the Court's finding that the "downward trend toward compliance, while not insignificant, does not change the fact that the average active waiting period is well beyond the seven-day requirement." Contempt Order, Findings of Fact ¶ 3.

4. *Contempt Order, Findings of Fact ¶ 4*

The fourth finding of fact states:

> 4. At the end of March 2025, the number of individuals admitted to OSH for restoration services who had since been determined to be "Ready to Place" and no longer needing hospital level of care, yet who remained at OSH, was seventy-eight. *Id.* At the end of April 2025, this number was ninety-seven. *Id.*

Contempt Order, Finding of Fact ¶ 4. The Tenth Report stated “[t]he number of people ready to place into the community increased, with [seventy-six] individuals on the identified list as no longer needing hospital level of care (HLOC) by 10/31/24 among those in the AA system.” Tenth Report 8. And as of March 12, 2025, eighty people on the aid and assist list no longer required HLOC. Hearing Tr., March 12, 2025, 14:2-3. These figures are within a similar range to those provided in the Eleventh Report.

5. *Contempt Order, Findings of Fact ¶ 5*

The fifth finding of fact states: “The GEI admissions waitlist has remained fairly constant, most recently with four people waiting for admission and about thirty-seven people who OSH has determined no longer need hospital level of care yet who remain at OSH.” Contempt Order, Finding of Fact ¶ 5. At the end of October 2024, two people found GEI were waiting for admission and fifty-two people found GEI who OSH had determined no longer required HLOC remained at OSH. Tenth Report 8-10. The GEI admissions waitlist thus did not change significantly and “remained fairly constant” between late 2024 and early 2025. Contempt Order, Finding of Fact ¶ 5. Moreover, the number of people who OSH had determined no longer required HLOC who remained at OSH was not significantly less in the Eleventh Report than in the Tenth Report.

6. *Contempt Order, Findings of Fact ¶ 6*

The sixth finding of fact states:

> 6. In April 2025, OSH admitted 128 Aid and Assist individuals. *Id.* at 16. This number is tied for the highest number of Aid and Assist admissions in a month. *Id.* In April 2025, the average wait time for admission of Aid and Assist individuals was 20.7 days, down from March 2025's average wait time of 25.4 days. *Id.*

Contempt Order, Finding of Fact ¶ 6. In October 2024, OSH admitted 107 Aid and Assist individuals, with the average wait time being 26.9 days. Tenth Report 9. The difference in the data between the Tenth and Eleventh Reports reflects that OSH increased its admission numbers while decreasing the wait time for admission.

7. *Contempt Order, Findings of Fact ¶ 7*

The seventh finding of fact states: "Data related to the effect of the implementation of Judge Mosman's initial remedial order shows that there were predictions of admissions increases, though the actual increases have at times exceeded predictions. *Id.* at 17-19." Contempt Order, Findings of Fact ¶ 7. The referenced pages of the Eleventh Report present a graph comparing admission wait time projections to benchmarks set in Dr. Pinals' Second Report and a table displaying discharge data related to Judge Mosman's initial remedial order as of May 1, 2025. *See* Eleventh Report 17-19. The Tenth Report contains a substantially similar table and graph, with data as of November 1, 2024. Tenth Report 12-13. Moreover, the Eleventh Report reflects improved performance by defendants through a decrease in admission wait time projections in early 2025. *See* Eleventh Report 17, Figure 3.

8. *Contempt Order, Findings of Fact ¶ 8*

The eighth finding of fact states:

> 8. Regarding civil expedited admission requests, defendants have undertaken efforts to track efficiencies in GEI processes, and the total time expected from referral for evaluation to discharge has lowered from 171 to 121 days. *Id.* at 24-25. However, defendants have yet to reach 100 percent compliance with any of the relevant metrics. *Id.* at 25.

Contempt Order, Findings of Fact ¶ 8. The Tenth Report states: "From initiation of a discharge request up until the time an individual is discharged from OSH far surpasses the 171-day total requirement. This is not acceptable, and flies in the face of *Olmstead* requirements and must be remedied." Tenth Report 35. At the March 12, 2025 hearing, plaintiff DRO stated that "the average time that someone spends on the Ready-to-Place list for GEIs . . . is 219 days. And . . . that time period is only increasing, it's not going down. So even though there have been efforts made, it's not yielding any results." Status Conf. Tr., January 24, 2025, 59:16-21; *see* Defs. Status Report, ECF 556, Ex. 1, at 1.

9. *Contempt Order, Findings of Fact ¶ 9*

The ninth finding of fact states:

> "9. Data reported by defendants indicates that the seven-day limit imposed by the Permanent Injunction has created increased patient flow and increased admissions of *Mink-*

*Bowman* class members to OSH by about thirty to thirty-five percent. *Id.* at 26."[1]

Contempt Order, Finding of Fact ¶ 9. At the January 24, 2025 status conference, Dr. Walker testified to the same impacts of Judge Mosman's order:

> "[T]he impacts that we've seen with the Court's remedial order, we saw an almost immediate increase in admissions by about 30 percent to the State Hospital, and that has persisted . . . We have seen overall an increase in the number of orders that we receive. There was an almost immediate increase following the remedial order from an average of 72 a month to an average of 92 a month, and that has continued to rise over the course of the last several months."

Status Conf. Tr., January 24, 2025, 33:19-34:4.

10. *Contempt Order, Findings of Fact ¶ 10*

The tenth finding of fact states:

> 10. Legislation related to community restoration timelines was introduced as part of the 2025 legislative cycle in an effort to aid defendants in securing funding and moving toward compliance. However, data presented by OHA during legislative hearings that examined the two leading proposed statutes indicated that one of those proposals would create a significant backwards trend away from compliance, and that the other proposal, assuming everything else remain [sic] status quo, would also not achieve compliance on its own. *Id.* at 27, 38.

Contempt Order, Findings of Fact ¶ 10. Dr. Walker recounted that she had testified in early March 2025 about "House Bill 3051-3, which is the amendment that the Oregon Health Authority put forward that carries the recommendations in Dr. Pinals' tenth report." Hearing Tr., March 12, 2025, 125:25-126:4. However, the final sentence of this finding is based on an opinion expressed by Dr. Pinals only in the Eleventh Report.

11. *Contempt Order, Findings of Fact ¶ 11*

The eleventh finding of fact states:

> 11. Defendants have undertaken efforts to meet the recommendations delineated in the project tracker. However, they remain delayed on several recommendations and have not performed well on others, such as the development of the community restoration manual and data report on community restoration; coordination between OHA and Oregon Developmental Disability Services and the Office of Aging and People with Disabilities; and undertaking a full contract monitoring of the Northwest Regional Re-entry Center

[1] The Court's previous description was inaccurate. While the Contempt Order refers to the Permanent Injunction's seven-day limit, the Eleventh Report referenced Judge Mosman's Second Amended Order to Implement Neutral Expert's Recommendations, ECF 416.

("NWRRC") to achieve a census of thirty-five beds. *Id.* at 30-33.

Contempt Order, Findings of Fact ¶ 11. Dr. Pinals had previously discussed the status of implementation of many of these suggestions. For example, at the January 24, 2025 status conference, Dr. Pinals testified that the community restoration manual had been "requested to be done sooner" and was "not produced." Status Conf. Tr., January 24, 2025, 78:19-20. At the March 12, 2025 hearing, Dr. Pinals testified that in her Tenth Report, she recommended the state expand NWRRC's functional capacity "by 20 additional spaces." Hearing Tr., March 12, 2025, 79:10-12. Dr. Pinals also testified that her Tenth Report recommended that a "point person" should be identified from the Oregon Developmental Disability Services to work with hospitals to "bring the planning forward in a more robust manner." Hearing Tr., March 12, 2025, 32:4-6. However, the finding's references to coordination between OHA and the Office of Aging and People with Disabilities and monitoring of NWRRC's thirty-five beds derive from discussion contained only in the Eleventh Report.

12. *Contempt Order, Findings of Fact ¶ 12*

The twelfth finding of fact states: "12. The census at NWRRC has not consistently been managed to full capacity. *Id.* at 28, 33." Contempt Order, Findings of Fact ¶ 12. Dr. Pinals' Tenth Report reflected a similar sentiment. After visiting the NWRRC, "it became clear that there needed to be more active utilization management to ensure that people are not remaining there unnecessarily." Tenth Report 18.

13. *Contempt Order, Findings of Fact ¶ 13*

The thirteenth finding of fact states: "13. Personnel changes, especially in OHA and OSH leadership positions, have also affected defendants' compliance. *See id.* at 29, 34-35." Contempt Order, Findings of Fact ¶ 13. Dr. Pinals had previously acknowledged personnel changes impacted compliance. At the January 24, 2025 status conference, Dr. Pinals testified that recommendations she had provided in her second report were "updated in the seventh report when there were leadership changes in the administration, and timelines were re-examined to be realistic given what was happening across the state." Status Conf. Tr., January 24, 2025, 72:9-12. She additionally noted that "a transition in the governor . . . created certain delays" and "transition in who the OHA leadership was . . . also created some

delays in keeping a focus on the remedies necessary for compliance to be achieved. *Id.* at 81:8-12.

14. *Contempt Order, Findings of Fact ¶ 14*

The fourteenth finding of fact states: "14. Delays in Medicaid policy reform continue to prevent the implementation of rule changes and contractual requirements to enhance care coordination. *Id.* at 32." Contempt Order, Findings of Fact ¶ 14. Dr. Pinals previously testified to challenges with Medicaid funding affecting care coordination at the March 2025 hearings. She had reviewed an evaluation conducted by OHA that "involve[d] a complex analysis of some of the roles within Medicaid and the [Coordinated Care Organizations ("CCO")] contracts to try to see what other ways there could be smoother transitions in care at certain points, for example, from discharge to the hospital, or ongoing care for people who have been in jails who move to community restoration, and really looking at the role of the CCOs and the fee for service, the managed care organizations and the fee-for-service care coordination." Hearing Tr., March 12, 2025, 82:4-13. She acknowledged "[t]his is not something that's totally under the control of OHA, this is a Medicaid federal law about how this works." *Id.* at 83:7-9. Still, her analysis "was trying to look at are there any other things that can be done to ensure care coordination across systems, and then look at if Medicaid can't fund it, what would the State need to fund for that continuity." *Id.* at 83:14-17.

15. *Contempt Order, Findings of Fact ¶ 15*

The fifteenth finding of fact states:

> 15. OSH has hired additional staff to conduct forensic evaluation services in an effort to reduce the backlog of individuals awaiting a scheduled evaluation. *Id.* at 37. As of January 22, 2025, the number of individuals awaiting a scheduled evaluation was 267. *Id.* As of April 23, 2025, the number was down to 150. *Id.*

Contempt Order, Findings of Fact ¶ 15. Dr. Pinals' Tenth Report reflected similar data. "Several new staff were hired and began working for OSH Forensic Evaluation Services. As a result of new staff, there has been greater ability to catch up on the demand for evaluations." Tenth Report 22. Earlier data also reflects that the number of individuals awaiting a scheduled evaluation decreased over time. As of October 1, 2024, the Tenth Report reflected 377 active cases for which FES was assigned to evaluate. Tenth Report 15, Table 9. This number decreased by the March 12, 2025 hearing, when the "backlog . . . [was] down to 175

orders." Hearing Tr., March 12, 2025, 124:6.

Thus, data from earlier testimony and Dr. Pinals' Tenth Report largely supports the same findings of fact. Moreover, data in the Eleventh Report reflected improvement on the defendants' part from earlier extrapolations, only further reflecting that defendants' "downward trend toward compliance, while not insignificant, does not change the fact that the average active waiting period is well beyond the seven-day requirement" and supporting the Court's ultimate finding of contempt. Contempt Order 12.

**B. Ex Parte Communication**

Defendants also allege that the Court relied on ex parte communication with Dr. Pinals to find them in contempt. *See* Contempt Order 11 (noting Dr. Pinals' Eleventh Report was "provided to the Court *in camera*"). To provide additional context, the Court typically reviews each progress report when ready for release and follows up with Dr. Pinals regarding any additional questions or concerns the parties may have raised with her directly, as it did with the Eleventh Report. Dr. Pinals shared no additional information with the Court that influenced the Contempt Order, outside of providing the Eleventh Report itself.

## CONCLUSION

For the reasons stated above, the Court thus confirms it would have granted the same contempt order without considering Dr. Pinals' Eleventh Report or any related communication with Dr. Pinals.

IT IS SO ORDERED.

DATED this 25th day of November, 2026.

Adrienne Nelson
Adrienne Nelson
United States District Judge