IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DISABILITY RIGHTS OREGON,[1] METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, <br><br> Plaintiffs, <br> v. <br><br> SEJAL[2] HATHI, in her official capacity as Director of the Oregon Health Authority, and SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No.: 3:02-cv-00339-AN (lead) <br> 3:21-cv-01637-AN <br> (consolidated) <br><br> OPINION AND ORDER |

On January 7, 2025, plaintiff Disability Rights Oregon ("DRO") filed a motion for an order to show cause why defendants Dr. Sejal Hathi ("Dr. Hathi"), in her official capacity as Director of the Oregon Health Authority ("OHA"),[3] and Dr. Sara Walker ("Dr. Walker"), in her official capacity as Interim Superintendent of the Oregon State Hospital ("OSH"),[4] should not be held in contempt, and for a remedial order pursuant to the Court's inherent authority; Federal Rule of Civil Procedure ("FRCP") 65; and the All Writs Act, 28 U.S.C. § 1651. Plaintiff Metropolitan Public Defender Services, Inc. ("MPD") takes no position on whether defendants should be held in contempt but joins in DRO's request for a remedial order. Defendants oppose both a finding of contempt and the entry of any remedial order. Various *amici* in this

---

[1] Plaintiff Disability Rights Oregon ("DRO") is named on the docket as "Oregon Advocacy Center" and has been referred to as both DRO and Oregon Advocacy Center since approximately January of 2023. The Court uses "DRO" in this Opinion and Order.

[2] Defendant Dr. Sejal Hathi's first name is misspelled on the docket as "Sajel." The Court uses the correct spelling in this Opinion and Order.

[3] The Court notes that Dr. Hathi is out on leave as of the date of this Opinion and Order, and that Kristine Kautz is currently serving as Interim Director of the Oregon Health Authority.

[4] The Court notes that Dr. Walker has resigned from her position as interim superintendent, and that Dave Baden is currently serving as Interim Superintendent of the Oregon State Hospital.

case have also provided the Court with their positions on plaintiffs' requests. The Court heard oral argument and received evidence from the parties on March 12 and 13, 2025. For the following reasons, DRO's motion, ECF [540],[5] and MPD's partial joinder to the same, ECF [557], are GRANTED. The Court finds that defendants are in contempt and grants plaintiffs' request for a remedial order, as outlined in this Opinion and Order.

## LEGAL STANDARD

### A.    Contempt

Federal "'courts have inherent power to enforce compliance with their lawful orders through civil contempt.'" *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). They are given "'wide latitude in determining whether there has been a contemptuous defense of [an] order.'" *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (1992) (quoting *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984)), *as am. on denial of reh'g* (Aug. 25, 1992). This "deference to the district court's exercise of discretion is heightened where the court has been overseeing a large, public institution for a long period of time." *Id.* (citing *Rufo v. Inmates of Suffolk Cnty Jail*, 502 U.S. 367, 393-94 (1992) (O'Connor, J., concurring); *Hutto v. Finney*, 437 U.S. 678, 688 (1978), *abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024)). Ultimately, when less intrusive measures fail to rectify constitutional violations, "more intrusive measures are justifiable." *Id.* at 861 (collecting cases).

The party moving for a finding of contempt "has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Id.* at 856 n.9 (citing *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989)). The contemnors then have the burden "to demonstrate why they were unable to comply" with the court's order. *Id.* (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983)). Ultimately, whether a finding of contempt is appropriate depends on "whether the defendants have performed 'all reasonable steps within their power to [e]nsure

---

[5] Unless otherwise noted, all ECF references in this Opinion and Order are to the lead case, *Oregon Advocacy Center v. Mink*, No. 3:02-cv-00339-AN.

compliance' with the court's orders." *Id.* at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976); and citing *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986)).

        The requirement that the defendants take "all reasonable steps" to ensure compliance does not mandate that they "consider every option that the court could conceive." *Id.* at 857. Furthermore, "'technical or inadvertent violations [] will not support a finding of civil contempt.'" *Id.* (quoting *Gen. Signal Corp.*, 787 F.2d at 1379). However, contempt is appropriate where there is "'little conscientious effort . . . to comply with th[e] [court's] orders[.]'" *Id.* (quoting *Sekaquaptewa*, 544 F.2d at 396). Even where conscientious effort has been made to comply, "good faith is not a defense" because "[i]ntent is irrelevant to a finding of civil contempt[.]" *Id.* at 856-57 (collecting cases). In such circumstances, partial compliance, taking some but not all reasonable steps, and asserting arguments based on insufficient funding, staff, and facilities do not satisfy the "all reasonable steps" standard. *See Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 3632486, at \*3, \*8 (W.D. Wash. July 7, 2016) (holding that "many steps towards compliance" does not mean all reasonable steps have been taken, and noting that a lack of facilities or staffing that contributes to a defendant's failure to comply can, under some circumstances, be caused by a defendant's failure to reform); *Stone*, 968 F.2d at 858 (collecting cases) ("[F]ederal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights.").

## B.    Remedial Order

        Federal courts' inherent authority includes the inherent authority to enforce a court's own orders and to impose civil contempt sanctions. *See Shillitani*, 384 U.S. at 370; *Stone*, 968 F.2d at 856. Additionally, FRCP 65 provides federal courts the authority to issue injunctions that bind the parties to an action; "the parties' officers, agents, servants, employees, and attorneys"; and any "other persons who are in active concert or participation with" the parties or their officers, agents, servants, employees, or attorneys. Fed. R. Civ. P. 65(d)(2)(A)-(C); *see Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) (citations omitted) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."). Finally, under the All Writs Act, a court

may issue "all writs necessary or appropriate to aid of their respective jurisdictions." 28 U.S.C. § 1651(a).

"There must be some connection between the underlying claims and the newly challenged conduct for that

conduct sufficiently to interfere with the Court's jurisdiction to support an extraordinary writ under the All

Writs Act." *Doe #1 v. Trump*, 458 F. Supp. 3d 1220, 1223 (D. Or. 2020).

## BACKGROUND

**A.     2002 to 2019**

On March 19, 2002, DRO, MPD, and individual A.J. Madison (collectively, "plaintiffs")

brought this action seeking a federal court order compelling defendants[6] to expeditiously provide hospital

admission and medical treatment to criminal defendants who were determined by Oregon courts to be unfit

to proceed to trial due to an inability to aid and assist in their own defense (hereinafter referred to as

"individuals found unable to aid and assist," "Aid and Assist individuals," or some variation thereof as is

contextually appropriate). Findings of Fact & Concls. of L., ECF [47], at 1. DRO, a non-profit law office

representing the rights of persons with disabilities, and MPD, a non-profit corporation representing indigent

criminal defendants in certain areas of Oregon, both hold interests implicated by defendants' delays in

accepting custody of persons found unfit to proceed due to an inability to aid and assist. *Id.* at 2. DRO and

MPD's constituents who are deemed unfit to proceed are harmed by defendants' failure to expeditiously

provide hospital admission and medical treatment. *Id.* at 2-4. Indeed, despite orders to transfer such

individuals for admission and treatment, these persons were being held in jail for lengthy periods of time.

Op. & Order of January 9, 2023, ECF [338], at 2.

On April 8, 2002, then-District Judge Owen M. Panner held a court trial, and later, after

consideration of the evidence and arguments, issued findings of fact and conclusions of law. Findings of

Fact & Concls. of L. 1-2. Judge Panner noted that under Oregon law, "'if the court determines that the

defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended . . . and the

---

[6] At the time the suit was filed, defendants were Bobby Mink, the then-Director of the Department of Human Services, and Stanley Mazur-Hart, the then-Superintendent of OSH, both in their official capacities. Defendants continue to be substituted, as appropriate, as personnel changes occur over time.

4

court shall commit the defendant to the custody of the superintendent of a state mental hospital designated by the Department of Human Services.'" *Id.* at 4 (quoting Or. Rev. Stat. § 161.370(2) (since amended)). Judge Panner noted that while the statute was, at the time, silent as to how quickly transport of such a defendant must occur, the prior version of the statute had provided that "the defendant shall be transported to the hospital or treatment facility as soon as practicable" and that "'[t]ransport shall be completed within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others.'" *Id.* (quoting Or. Rev. Stat. § 161.370(3)). Based on this legal backdrop, as well as the Court's factual findings "that persons found unfit to proceed in 2001 and 2002 spent an average of 31.98 days awaiting transport to OSH" and, out of 105 persons' records reviewed, "[o]nly 19 persons were transported within seven days or less[,]" the Court held that defendants "violated, and are violating, the due process rights of criminal defendants who are determined [] to be unfit to proceed to trial[.]" *Id.* at 7, 13. As a matter of law, such defendants "have a right to a reasonably timely transport to a treatment facility[.]" *Id.* at 14. For all of these and additional reasons, on May 10, 2002, Judge Panner ordered that defendants "ensure that persons who are declared unable to proceed to trial pursuant to ORS § 161.370(2) be committed to the custody of the superintendent of a state hospital designated by the Department of Human Services as soon as practicable[,]" and that such admissions "be done in a reasonably timely manner, and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial[.]" *Id.* Judge Panner's May 10, 2002, order is hereinafter referred to as the Court's "Permanent Injunction."

Defendants appealed the Permanent Injunction. *See* Notice of Appeal to U.S.C.A., ECF [48]. The Ninth Circuit affirmed, finding that defendants were out of compliance with constitutional requirements and ordering defendants to admit individuals found unable to aid and assist to OSH for restoration within seven days of receipt of the court's order directing the individuals' commitment for restoration. *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121-22 (9th Cir. 2003) (also located at Mandate from U.S. Ct. of Appeals, ECF [76], at 1).

Defendants achieved compliance with the Permanent Injunction and maintained

compliance for some time. However, in 2018, defendants fell out of compliance, and on May 10, 2019, MPD moved for a finding of contempt. Op. & Order of January 9, 2023, at 2; *see* MPD Mot. for Order to Show Cause for Finding of Contempt, & for Disc., ECF [85]. On May 21, 2019, the case was reassigned from Judge Panner to now-Senior District Judge Michael J. Mosman. Notice of Case Reassignment, ECF [99]. Judge Mosman ultimately declined to make a finding of contempt. Order of June 12, 2019, ECF [127].

**B.      2019 to 2024**

As litigation in *Oregon Advocacy Center v. Mink* (hereinafter, "*Mink*") progressed, two individuals found unfit to proceed to trial based on court orders finding them to be "guilty except for insanity" ("GEI") filed a parallel action against defendants: *Bowman v. Matteucci* (hereinafter, "*Bowman*"), No. 3:21-cv-01637-MO. Op. & Order of January 9, 2023, at 2-3; *see Bowman*, No. 3:21-cv-01637-MO, Compl. ("*Bowman* Compl."), ECF [1]. These individuals were later joined as plaintiffs by MPD, and similar to plaintiffs in *Mink*, the plaintiffs in *Bowman* alleged that the State of Oregon (the "State") held individuals found GEI for months in jail despite orders from state court judges directing these individuals' commitment to OSH. Op. & Order of January 9, 2023, at 3 (citing *Bowman* Compl.).

In December 2021, the parties in both *Mink* and *Bowman* entered into an interim settlement agreement and jointly moved to consolidate both cases and to appoint Dr. Debra A. Pinals ("Dr. Pinals") as a Neutral Expert in the consolidated cases. *Id.* (citing Stip. Mot. to Appoint Neutral Expert, ECF [238]). Judge Mosman noted that "Dr. Pinals is a scholar and practitioner in the field of public mental health services and the criminal justice system." *Id.* The parties agreed that Dr. Pinals would provide recommendations to address OSH's capacity issues and create a plan for both short- and long-term compliance with the Court's Permanent Injunction as applied to individuals found either unable to aid and assist or GEI. *Id.* On December 21, 2021, Judge Mosman granted the parties' motion, appointed Dr. Pinals as Neutral Expert, and consolidated the *Mink* and *Bowman* cases, designating *Mink* as the lead case. Order of December 21, 2021, ECF [240]. As a result of Judge Mosman's order, *Bowman* was reassigned to Judge Mosman from now-Senior District Judge Marco A. Hernandez. *Bowman*, No. 3:21-cv-01637-MO, Notice

of Case Reassignment, ECF [20]. The parties worked closely with Dr. Pinals to meet with stakeholders, analyze data, and craft changes to various systems and processes in an effort to achieve compliance with the Permanent Injunction, and Dr. Pinals provided expert reports in January and June of 2022 to track defendants' progress toward compliance. *See* Op. & Order of January 9, 2023, at 3. Together, Aid and Assist and GEI individuals are hereinafter referred to as the "*Mink-Bowman* class members."

In August 2022, the parties jointly moved for an order implementing Dr. Pinals' recommendations "without delay." Op. & Order of January 9, 2023, at 3 (citing Unopposed Mot. for Order to Implement Neutral Expert's Recs., ECF [252]). Judge Mosman granted in part the requested order, but only to the extent that it did not require contravening state law. *Id.* (citing Op. & Order of August 16, 2022, ECF [256]). The parties then provided supplemental briefing in support of a full adoption of Dr. Pinals' recommendations. *Id.* at 4. Several *amici*, including several counties[7] and district attorneys' offices[8] within the state, joined the action during this time, arguing against the full adoption of Dr. Pinals' recommendations and seeking to dissolve Judge Mosman's August 16, 2022, order adopting those recommendations in part. *Id.* After conducting a hearing with the parties and *amici*, Judge Mosman granted in full the parties' joint motion and, on September 1, 2022, entered a remedial order requiring the full implementation of Dr. Pinals' recommendations, including those recommendations that arguably override state law. *Id.* (citing Mins. of Proceedings of August 29, 2022, ECF [269]; Order of September 1, 2022, ECF [271]).

Thereafter, several Oregon state court judges[9] and health systems operating community

---

[7] Washington and Marion Counties were granted *amici* status on August 29, 2022, Mins. of Proceedings of August 29, 2022, ECF [269], and remain *amici*. Deschutes, Clackamas, and Yamhill Counties separately sought and were denied *amici* status. Order of May 30, 2023, ECF [396].

[8] District attorneys for Washington, Clackamas, and Marion Counties were granted *amici* status on August 29, 2022, Mins. of Proceedings of August 29, 2022, and remain *amici*.

[9] Oregon Circuit Court Judges Audrey Broyles, Matthew Donohue, Jonathan Hill, Kathleen Proctor, and Nan Waller were granted *amici* status on October 13, 2022. Order of October 13, 2022, ECF [299]. Judge Broyles's withdrawal as *amicus curiae* was granted on August 16, 2023, ECF [428]; and Judge Proctor's withdrawal as *amicus curiae* was granted on January 2, 2024, ECF [459]. Judges Donohue, Hill, and Waller remain *amici*.

hospitals within the state[10] joined the action as additional *amici*.[11]  *See* Order of October 13, 2022, ECF [299]; Op. & Order of May 25, 2023, ECF [395].  Upon joining the action, these additional interested parties, like the *amici* counties and district attorneys' offices, argued against implementing Dr. Pinals' recommendations and ultimately sought to dissolve both Judge Mosman's August 16, 2022, order and September 1, 2022, remedial order.  Op. & Order of January 9, 2023, at 4.  In addition to joining the action, the health systems simultaneously filed a separate lawsuit alleging various constitutional violations committed by the State against both the health systems themselves and their civilly committed patients.  *See Legacy Health System v. Allen*, No. 6:22-cv-01460-MO, Compl., ECF [1].  After conducting a hearing, Judge Mosman dissolved the August 16, 2022, order in its entirety, Mins. of Proceedings of October 25, 2022, ECF [306], and consolidated the newly filed suit, *Legacy Health System v. Allen* (hereinafter, "*Allen*"), with *Mink* and *Bowman*.  *See* Op. & Order of January 9, 2023, at 4.  As a result of this consolidation, *Allen* was reassigned to Judge Mosman from now-Chief District Judge Michael J. McShane.  *Allen*, No. 6:22-cv-01460-MO, Notice of Case Reassignment, ECF [9].  Then, after further briefing and oral argument on the motion to dissolve or modify Judge Mosman's September 1, 2022, remedial order implementing Dr. Pinals' recommendations in full, Judge Mosman issued an opinion and order finding that the September 1, 2022, remedial order was justified because less intrusive means had failed to remedy the ongoing constitutional violations at issue.  *See* Op. & Order of January 9, 2023, at 4; Mins. of Proceedings of October 25, 2022.

Litigation continued to progress thereafter.  Status conferences were held; motions to dismiss and to intervene were filed, ruled upon, and appealed; mediation efforts continued; and the parties continued to confer with Dr. Pinals in an effort to comply with Judge Mosman's September 1, 2022,

---

[10] The health systems include Legacy Emanuel Hospital & Health Center, Providence Health & Services – Oregon, Legacy Health Systems, PeaceHealth, and St. Charles Health System, Inc.

[11] The health systems initially filed a motion to intervene, which Judge Mosman granted.  *See* Order of October 13, 2022; Op. & Order of May 25, 2023, ECF [395], at 3.  Upon reconsideration, Judge Mosman construed the health systems' motion as a motion to appear as *amici* and, so construed, granted the motion.  Op. & Order of May 25, 2023, at 9.

remedial order to implement the recommendations set forth in Dr. Pinals' first and second expert reports. Judge Mosman's September 1, 2022, remedial order has since been twice amended. The first amended remedial order was issued on May 10, 2023, Am. Order to Implement Neutral Expert's Recs., ECF [387], and the second amended remedial order, which is the currently operative remedial order, was issued on July 3, 2023, 2d Am. Order to Implement Neutral Expert's Recs., ECF [416]. The second amended remedial order is currently set to expire on June 29, 2025. Order of March 26, 2025, ECF [595].

On March 6, 2024, *Mink*, *Bowman*, and *Allen* were reassigned from Judge Mosman to District Judge Adrienne Nelson. Notice of Case Reassignment, ECF [476]. Judge Nelson currently presides over these consolidated cases.

## C. 2024 to Present

Since its reassignment in 2024, litigation in this case has marched on. While a full summary of developments occurring in that time is unnecessary, the following facts are noteworthy and relevant: Oregon Crime Victims Law Center joined as additional *amici*; the parties continued mediation efforts until shortly prior to the filing of the contempt motion; and Dr. Pinals has continued to file supplemental reports on a periodic basis.

Dr. Pinals' recommendations are aimed at both achieving defendants' compliance with the Court's Permanent Injunction and establishing an understanding that the purpose of restoration services (*i.e.*, the prompt admission and treatment of *Mink-Bowman* class members) is to allow a criminal defendant to achieve capacity (*i.e.*, competency) to face charges. *See, e.g.*, Findings of Fact & Concls. of L. 11 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)) ("The state's interest in [detaining persons unfit to stand trial due to mental illness] is to assist in restoring competency[.]"). Put differently, restoration services are not intended to supplant an entire care and treatment system; rather, they are intended to restore criminal defendants to the requisite competency to stand trial. But the State has not treated restoration services this way. Instead, the State has consistently relied upon the criminal justice system as the State's default mental and behavioral health system. This has been true since at least the inception of this litigation in 2002 and, realistically, even prior to that. By so tightly intertwining restoration services with the constitutional

principle that a criminal defendant has a right to be tried as a competent person, and only while competent, the purpose of restoration services in the first instance has become muddled. Indeed, the State has failed to invest in community behavioral health systems such that for many individuals, the only opportunity to receive treatment is upon facing criminal charges. This is simply not what the criminal system was originally intended to do.

With little exception,[12] defendants have been persistently out of compliance with the Court's Permanent Injunction since 2018. Defendants have consistently failed to admit persons declared unfit to proceed to OSH or another suitable treatment facility, as soon as practicable, but no more than seven days following the entry of a court order finding an individual unfit to proceed. As a result, on January 7, 2025, DRO filed the instant motion for an order to show cause why defendants should not be held in contempt (the "contempt motion"), seeking civil contempt sanctions in the form of monetary fines and modification of the Court's remedial order currently in effect to include additional remedial measures aimed at effecting defendants' compliance with the Permanent Injunction.

On January 24, 2025, the Court held a status conference and heard testimony from then-Interim Superintendent of the OHA, Dr. Walker; now-Interim Superintendent of the OHA, Kristine Kautz; OSH staff member Samantha Byers; and Dr. Pinals. *See* Mins. of Proceedings of January 24, 2025, ECF [560]. The Court hereby incorporates this testimony by reference into this Opinion and Order, as requested by defendants on the first day of the contempt hearing next described.

On March 12 and 13, 2025, the Court held a two-day hearing on DRO's contempt motion and MPD's partial joinder to the same. During the contempt hearing, the Court heard argument from the parties and the *amici* health systems; received evidence; and heard testimony from Dr. Pinals, Dr. Walker, OHA Director Dr. Hathi, and OHA Behavioral Health Director Ebony Clarke. *See* Mins. of Proceedings of March 12, 2025, ECF [584]; Mins. of Proceedings of March 13, 2025, ECF [586]. The Court hereby

---

[12] For example, defendants briefly achieved compliance with the Permanent Injunction in early 2024 but fell back out of compliance by the summer of that year. As of November 2024, defendants were unable to provide the Court with any projection of when they might achieve short- or long-term compliance.

incorporates this testimony by reference into this Opinion and Order.

As of May 5, 2025, the date of Dr. Pinals' Eleventh Report, defendants remain out of compliance with the Court's Permanent Injunction. Debra A. Pinals, M.D., *Neutral Expert Eleventh (11th) Report Regarding the Consolidated* Mink *and* Bowman *Cases*, 11 (May 5, 2025) (hereinafter referred to as Dr. Pinals' "Eleventh Report") (provided to the Court *in camera* and publicly accessible at the following link:                            https://www.oregon.gov/oha/OSH/reports/Oregon_Mink-Bowman_11th_Neutral_Expert_Pinals_Report.pdf). While defendants have increased efficiencies as to some processes and trend toward compliance as to some recommendations, "none of the measured metrics are at 100 [percent] compliance." *Id.* at 25.

This factual backdrop, and especially the ebb and flow of defendants' action and inaction since approximately 2019, serves as the context for and basis of this Opinion and Order. Despite extensive mediation between the parties, no resolution has been achieved. Candidly, it is difficult to see how any resolution could be achieved where many interested parties, including various *amici*, remain inflexible and uncreative in their positions and take inconsistent positions depending on the setting or audience. Indeed, the role of many *amici* in this case has thus far only hindered resolution; these *amici* seek to be considered "friends of the Court" while actively opposing necessary legislative action and thereby thwarting the Court's efforts to aid defendants in achieving compliance. These *amici* have not offered viable solutions. While their concerns about the collateral effects of this Court's orders are understandable, they simply do not address the question currently before the Court.

For the reasons set forth herein, the Court makes the following findings of fact and conclusions of law and orders the implementation of monetary fines and the following remedial measures.

## FINDINGS OF FACT

1.     In 2002, the Court issued a Permanent Injunction requiring that defendants admit to OSH any detainee found unable to stand trial within seven days of the date of entry of the order finding that detainee unable.

2. Defendants stipulate that they are not in compliance with the Court's Permanent Injunction. Defendants do not contest that as of January 2025, data from OSH showed that the average length of detention before admission to OSH for all individuals found unable to aid and assist in their own defense was twenty-nine days. However, defendants argue that they have taken all reasonable steps to comply with the Permanent Injunction and that compliance has been hindered by factors beyond their control, primarily a lack of resources (*e.g.*, funding, bed capacity).

3. For individuals admitted to OSH between April 7 and April 20, 2025, the average waiting period until admission was 21.8 days. Eleventh Report 11. By April 20, 2025, sixty-eight people were waiting for admission, with an average active waiting period of 12.1 days. *Id.* As of the end of April, forty-six people were waiting for admission, with an average active waiting period of 9.6 days. *Id.* The average active waiting period for all individuals admitted in April 2025 was 20.7 days, down from March 2025's average active waiting period of 25.4 days. *Id.* This downward trend toward compliance, while not insignificant, does not change the fact that the average active waiting period is well beyond the seven-day requirement. *Id.*

4. At the end of March 2025, the number of individuals admitted to OSH for restoration services who had since been determined to be "Ready to Place" and no longer needing hospital level of care, yet who remained at OSH, was seventy-eight. *Id.* At the end of April 2025, this number was ninety-seven. *Id.*

5. The GEI admissions waitlist has remained fairly constant, most recently with four people waiting for admission and about thirty-seven people who OSH has determined no longer need hospital level of care yet who remain at OSH. *Id.*

6. In April 2025, OSH admitted 128 Aid and Assist individuals. *Id.* at 16. This number is tied for the highest number of Aid and Assist admissions in a month. *Id.* In April 2025, the average wait time for admission of Aid and Assist individuals was 20.7 days, down from March 2025's average wait time of 25.4 days. *Id.*

7.      Data related to the effect of the implementation of Judge Mosman's initial remedial order shows that there were predictions of admissions increases, though the actual increases have at times exceeded predictions. *Id.* at 17-19.

8.      Regarding civil expedited admission requests, defendants have undertaken efforts to track efficiencies in GEI processes, and the total time expected from referral for evaluation to discharge has lowered from 171 to 121 days. *Id.* at 24-25. However, defendants have yet to reach 100 percent compliance with any of the relevant metrics. *Id.* at 25.

9.      Data reported by defendants indicates that the seven-day limit imposed by the Permanent Injunction has created increased patient flow and increased admissions of *Mink-Bowman* class members to OSH by about thirty to thirty-five percent. *Id.* at 26.

10.     Legislation related to community restoration timelines was introduced as part of the 2025 legislative cycle in an effort to aid defendants in securing funding and moving toward compliance. However, data presented by OHA during legislative hearings that examined the two leading proposed statutes indicated that one of those proposals would create a significant backwards trend away from compliance, and that the other proposal, assuming everything else remain status quo, would also not achieve compliance on its own. *Id.* at 27, 38.

11.     Defendants have undertaken efforts to meet the recommendations delineated in the project tracker. However, they remain delayed on several recommendations and have not performed well on others, such as the development of the community restoration manual and data report on community restoration; coordination between OHA and Oregon Developmental Disability Services and the Office of Aging and People with Disabilities; and undertaking a full contract monitoring of the Northwest Regional Re-entry Center ("NWRRC") to achieve a census of thirty-five beds. *Id.* at 30-33.

12.     The census at NWRRC has not consistently been managed to full capacity. *Id.* at 28, 33.

13.     Personnel changes, especially in OHA and OSH leadership positions, have also affected defendants' compliance. *See id.* at 29, 34-35.

14.     Delays in Medicaid policy reform continue to prevent the implementation of rule changes and contractual requirements to enhance care coordination. *Id.* at 32.

15.     OSH has hired additional staff to conduct forensic evaluation services in an effort to reduce the backlog of individuals awaiting a scheduled evaluation. *Id.* at 37. As of January 22, 2025, the number of individuals awaiting a scheduled evaluation was 267. *Id.* As of April 23, 2025, the number was down to 150. *Id.*

## CONCLUSIONS OF LAW

1.     Defendants stipulate that they are not in compliance with the Court's specific and definite[13] Permanent Injunction. However, defendants argue that they should not be held in contempt because they have taken all reasonable steps to comply. Not so. It is true that defendants have taken many steps toward achieving compliance and have, by all appearances, made an effort to work with Dr. Pinals to move in that direction. Nevertheless, based on the testimony provided at the status hearing on January 24, 2025, and during the contempt hearing on March 12 and 13, 2025, the Court finds that defendants have not taken *all* reasonable steps to comply, and DRO has demonstrated by clear and convincing evidence that defendants are in contempt.

2.     Defendants' concessions that they lack resources, capacity, services, etc., are concessions not only that defendants are in ongoing violation of the Permanent Injunction but likewise that they are in contempt. Defendants' arguments center on the steps they have taken toward achieving compliance and the practical barriers they face in achieving compliance, but defendants simply have not established the high burden of showing that they have done and continue to do everything in their power to comply. Defendants' efforts are belated and appear to be largely in reaction to the Court's inquiries and the filing of the present contempt motion.

3.     Furthermore, as in *Trueblood*, the primary reason that class members have suffered and continue to suffer is the State's "lack of foresight, creativity, planning, and timely response to a crisis of its

---

[13] Defendants have not argued that the Permanent Injunction is not sufficiently definite and certain. For clarity, the Court notes that it is.

own making." *A.B. by & through Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 681 F. Supp. 3d 1149, 1155 (2023), *appeal docketed*, No. 23-35534 (9th Cir. Aug. 9, 2023).  In *Trueblood*, pretrial detainees suspected of being incompetent to face charges filed suit against the Washington State Department of Social and Health Services ("DSHS"), alleging unconstitutional wait times for statutorily required court-ordered competency restoration services.  *Id.*; *Trueblood*, 2016 WL 3632486, at *14.  DSHS argued that the actions the defendants had taken, which included investing $1.4 million in appropriate programs within the state and opening dozens of new beds at two alternative restoration facilities, demonstrated that they had substantially complied with the court's order requiring provision of timely services for the pretrial detainees. *Trueblood*, 2016 WL 3632486, at *2, *5.  Despite DSHS's efforts, the court found the defendants to be in contempt.  *Id.* at *9.  In so holding, the court emphasized that DSHS's efforts, which also included flawed strategic decisions such as awarding diversion program funds without conducting any research into successful methods of conducting diversion programs, ultimately led to inadequate results.  *Id.* at *5-6.  The court also emphasized a plain consequence of this inadequacy: that affected pretrial detainee class members' "immense suffering is both unnecessary and avoidable, and is a tragic result of [DSHS's] failure to implement the reforms necessary to deliver timely services."  *Id.* at *7.

4.     Defendants argue that their inability to achieve compliance is in part due to an unpredictable referral rate that is beyond their control.  However, this argument is identical to that raised and rejected in *Stone*.  In *Stone*, pretrial detainees filed suit against the City of San Francisco, objecting to their conditions of confinement including, most notably, overcrowding.  968 F.2d at 852-53.  The city argued, in relevant part, that that the rising jail population was "unforeseen."  *Id.* at 857.  However, there was evidence in the record that the city should have known that the jail population was going to increase. *Id.* at 857-58 (referencing several predictions so indicating).  In part for this reason, the court held that the city was in contempt, and the Ninth Circuit affirmed.  *Id.* at 865.  Similarly, in *Trueblood*, the court found that the significant increase in competency orders resulting from the pandemic was not altogether unexpected.  *A.B.*, 681 F. Supp. 3d at 1166.  Here, there have been similar predictions of referral rate increases which defendants did not prepare for.  Eleventh Report 18.  In sum, defendants have not

persuasively explained why adding more staff, funding, and capacity in anticipation of this increased need was impossible.

5.      Defendants also argue that they do not have sufficient funds to provide the services necessary to allow them to achieve compliance.  This argument is equally unpersuasive.  Indeed, this argument was also raised and rejected in *Stone*.  In that case, the city argued that it was facing a financial crisis and could not fund the programs necessary to remedy the constitutional violations occurring.  *Stone*, 968 F.2d at 858.  The court held—as federal courts have repeatedly held—that financial constraints do not allow states to deprive people of their constitutional rights.  *Id.*  The law on this topic has remained consistent; indeed, in 2002, Judge Panner concluded as a matter of law that "[t]he lack of funds, staff or facilities cannot justify defendants' failure to provide persons found unfit with the treatment that is necessary to attempt restoration of competency."  Findings of Fact & Concls. of L. 12.  Defendants have since clarified that they raise lack of resources as an issue that should inform the remedies that the Court may deem appropriate to adopt.  *See* Tr. of Contempt Hr'g (March 12, 2025), ECF [592], at 19:19-23.

6.      Defendants argue that they should not be found to be in contempt because they have taken substantial steps.  But this is, again, an argument that was raised and rejected in *Stone*, in which the defendants argued that they spent more than thirty million dollars on programs to help alleviate issues of overcrowding.  968 F.2d at 858-59.  The court responded that the defendants were frequently out of compliance and that it was obvious that the measures undertaken by defendants were inadequate and that stronger measures were necessary to achieve and maintain compliance.  *Id.*  The same is true here.

7.      Defendants further argue they have undertaken efforts to meet Dr. Pinals' recommendation to review existing contracts between OHA and Community Mental Health Providers and Coordinated Care Organizations, including County Financial Assistance Agreements, and that these efforts involve actions of third parties beyond OHA's control.  This argument also fails.  OHA cannot contract away its legal responsibility to provide community behavioral health services as a means to avoid a finding of contempt.  Even if such contracting was not undertaken for the express purpose of avoiding contempt, OHA has a statutory obligation that is nondelegable.  It is true that there are many stakeholders in the behavioral health

system with which OHA interacts. However, defendants are the only stakeholders subject to the Permanent Injunction and this Court's authority here. While other stakeholders may certainly affect defendants' ability to achieve and maintain compliance, the fact remains that defendants must satisfy their constitutional and statutory obligations.

8.    Ultimately, defendants' stipulation to the continued existence of constitutional violations, as well as the overall failure of less-intrusive measures to remedy those violations, indicate that the implementation of monetary sanctions and remedial measures is necessary to bring the State back into compliance with the Court's Permanent Injunction. The monetary sanctions imposed should be (and here are) reasonably tailored, and in determining the number of monetary sanctions to impose the Court has considered the character and magnitude of the harms threatened by defendants' continued noncompliance and the probable effectiveness of any such sanction.

9.    For the reasons stated above, the Court finds that defendants are in contempt and imposes monetary sanctions in the amount of $500.00 per class member per day to compel compliance with the Court's Permanent Injunction. The fines will begin to accrue the day after the date of this Opinion and Order and will continue to accrue each calendar day unless and until defendants achieve substantial compliance with the seven-day standard, thereby purging the contempt. The Court finds $500.00 per class member per day to be an appropriate monetary sanction based on the $500.00 per class member per day sanction issued in *Trueblood*. *See* 2016 WL 3632486, at *9; Pre-Hr'g Mem. of *Amicus* Marion County, ECF [358], at 2 n.1. The Court is persuaded by the *Trueblood* court's reasoning in imposing this amount of monetary sanction and finds that it is reasonably tailored to correlate to the number of class members facing these constitutional violations and resulting individualized harms. Indeed, each class member faces potential, if not actual, harm each day they remain in jail despite their known lack of competency to face charges and need for treatment.

10.    The contempt fines shall be reduced to judgment once per month. To facilitate payment of the fines, on the fifteenth day of every month, beginning in the month of June 2025, defendants shall submit to the Court the relevant dashboard data pertaining to the average active waiting period for *Mink-Bowman*

class members. In conjunction with this data, defendants shall submit a proposed calculation of contempt fines. The proposed calculation shall specify the amount of the fine to be imposed and contain all calculations performed by defendants in order to reach the proposed number. This monthly reporting requirement shall terminate upon defendants' achievement of substantial compliance with the Permanent Injunction.

11.     Upon receipt of defendants' monthly report, the Court will reduce the fine to judgment. Once reduced to judgment, pursuant to FRCP 67 and Local Rule 67, defendants shall pay all fines accrued via cashier's check or certified check, payable to the Clerk, U.S. District Court, in the amount stated in the judgment. These monies shall be deposited by the Clerk of Court into the Registry of this Court and then, as soon as the business of the Clerk's Office allows, the Clerk of Court shall deposit these funds into the interest-bearing Court Registry Investment System ("CRIS") administered by the Administrative Office of the United States Courts pursuant to 28 U.S.C. § 2045.

12.     Pursuant to Standing Order No. 2016-11, a CRIS fee for the management of investments in the CRIS and the registry fee for maintaining accounts deposited with the Court shall be deducted from the interest earnings on the funds deposited with the Court.

13.     The sum of monies invested in the interest-bearing CRIS fund shall remain on deposit until further order of this Court at which time the funds, together with interest thereon, shall be retrieved by the Clerk of Court and re-deposited into the non-interest-bearing Registry Fund of the Court for disposition pursuant to further order of the Court.

14.     The Clerk of Court, through the Financial Administrator, has pre-approved the form of this Opinion and Order pursuant to Local Rule 67-2.[14] The Clerk of Court is absolved of any liability by compliance with this Opinion and Order.

15.     All funds deposited shall be held for the benefit of *Mink-Bowman* class members in accordance with the Permanent Injunction. The parties are hereby ORDERED to confer and develop, in

---

[14] Specifically, the Director of Finance for the United States District Court for the District of Oregon has reviewed and approved the language herein.

consultation with Dr. Pinals, proposed plans for the expenditure of the funds. The plans shall be submitted within thirty days of the entry of the first judgment.

16.     The judgments shall bear interest at the federal statutory rate until satisfied.

17.     Because monetary sanctions are, standing alone, inadequate to achieve and then maintain compliance, the Court also finds it appropriate to, as outlined below, extend the remedial order currently in effect, ECF [416], and implement additional remedial measures. These additional remedial measures are narrowly tailored, necessary, specific, and clear, and together will expand defendants' ability to achieve and maintain compliance with the requirements of the Permanent Injunction. As noted below, the remedial order currently in effect, ECF [416], and the remedial measures delineated herein, shall be set to expire on June 30, 2026, to be renewed as necessary upon review of defendants' compliance.

## REMEDIAL MEASURES

1.     **Court Monitor.** Effective immediately, Dr. Pinals' role is changed from Neutral Expert to Court Monitor. Dr. Pinals' new role includes the ability to hire staff to assist her. This change is intended to further guide defendants' focus and efforts toward achieving and maintaining compliance with the Permanent Injunction. Defendants shall be responsible for the costs associated with implementing this remedial measure.

2.     **Periodic Status Conferences.** The Court will conduct a status conference with the parties every ninety days, beginning in September 2025 on a date to be set following consideration of the Court and parties' schedules.

3.     **Extension of Operative Remedial Order.** The Court's remedial order currently in effect, ECF [416], is extended for a period of one year, as modified to replace the term "Neutral Expert" with "Court Monitor," and is now set to expire on June 30, 2026.

4.     **Additional Remedies.**

   a.     *Limit Community Restoration Timelines.* Defendants are ordered to use all reasonable steps to impose limitations on community restoration consistent with Dr. Pinals' recommendations.

      b.     *Increase OHA's Authority to Discharge Patients.*  Defendants are ordered to use all reasonable efforts to facilitate and expedite discharges of patients no longer needing hospital level of care, including working with the local Community Mental Health Programs and the committing court[15] to expeditiously effect discharges.

      c.     *Increase Efficiency in Discharging Patients Committed Under GEI Orders.* Defendants are ordered to use all reasonable efforts to reduce delays at every step of the GEI discharge review and the "conditional release ready" discharge processes.

      d.     *Establish Sufficient Forensic Evaluator Capacity to Meet Demand.*  Defendants are ordered to use all reasonable efforts to eliminate the backlog of forensic evaluations within a reasonable time to be determined by Dr. Pinals and to ensure that there are sufficient long-term evaluator positions to maintain an ability to complete all ordered forensic evaluations in a timely manner.

      e.     *Review Needed Capacity.*  Defendants are ordered to hire an independent auditor, to be chosen and overseen by Dr. Pinals, to review how the State has spent funding dedicated to increasing the supply of behavioral health services in the community; identify what levels of care are still lacking and where; and provide this information in a public report to the Court, to be completed within ninety days of the date of this Opinion and Order.  Defendants shall be responsible for the costs associated with implementing this remedial measure.

     5.     **Declination to Adopt Certain Other Suggested Remedies.**  The Court declines to adopt the suggested remedies related to discharging and declining to admit misdemeanants.

     6.     **Adoption of Dr. Pinals' Eleventh Report.**  The Court hereby adopts the recommendations within Dr. Pinals' Eleventh Report to the extent that those recommendations remain aimed at achieving compliance with the Permanent Injunction.  For clarity, this includes an express adoption of the following recommendations: 1; 2(a), (c), and (d) (as modified); 6(a) and (b); 7(a)-(c); 8(a) and (c); 9(a)-(c); 10(a) and (b); 11; 13; and 14.  As used in Dr. Pinals' Eleventh Report, the term "courts" applies to all courts, including

---

[15] This includes municipal courts.

municipal courts.

## CONCLUSION

For the reasons stated above, plaintiff Disability Rights Oregon's Motion for a Rule to Show Cause Why Defendants Should Not be Held in Contempt, and for a Remedial Order, ECF [540], and plaintiff Metropolitan Public Defender Services, Inc.'s Partial Joinder to Disability Rights Oregon's Motion for Contempt and Remedial Order, ECF [557], are GRANTED.  The Court finds that defendants are in contempt; orders monetary sanctions in the amount of $500.00 per class member per day, to begin accruing the day after the date of this Opinion and Order, and to continue to accrue each calendar day unless and until defendants achieve substantial compliance with the Court's Permanent Injunction; and grants plaintiffs' request for a remedial order as outlined in this Opinion and Order.

IT IS SO ORDERED.

DATED this 6th day of June, 2025.

Adrienne Nelson
United States District Judge