DAN RAYFIELD
Attorney General
CARLA A. SCOTT #054725
SHEILA H. POTTER #993485
CRAIG M. JOHNSON #080902
Senior Assistant Attorneys General
JILL CONBERE #193430
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Carla.A.Scott@doj.oregon.gov
        Sheila.Potter@doj.oregon.gov
        Craig.M.Johnson@doj.oregon.gov
        Jill.Conbere@doj.oregon.gov

Attorneys for Defendants Patrick Allen, Sajel Hathi, Dolores Matteucci, and Sara Walker


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC., and A.J. MADISON, | Case No.  3:02-cv-00339-AN (Lead Case)<br>Case No.  3:21-cv-01637-AN (Member Case)<br>Case No.  6:22-CV-01460-AN (Member Case) |
| Plaintiffs, | DEFENDANTS' RESPONSE TO DISABILITY RIGHTS OREGON'S OBJECTION TO FIRST REPORT |
| v. | |
| SEJAL HATHI, in her official capacity as head of the Oregon Health Authority, and SARA WALKER in her official capacity as Interim Superintendent of the Oregon State Hospital, | |
| Defendants. | |
| JAROD BOWMAN, JOSHAWN DOUGLAS-SIMPSON, | Case No.  3:21-cv-01637-AN (Member Case) |
| Plaintiffs, | |
| v. | |
| SARA WALKER, Interim Superintendent of the Oregon State Hospital, in her official capacity, DOLORES MATTEUCCI, in her | |

individual capacity, SEJAL HATHI, Director
of the Oregon Health Authority, in her official
capacity, and PATRICK ALLEN in his
individual capacity,

        Defendants.

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH; and
PROVIDENCE HEALTH & SERVICES
OREGON,

        Plaintiffs,

    v.

SEJAL HATHI, in her official capacity as
Director of Oregon Health Authority,

        Defendant.

Case No.  6:22-CV-01460-AN (Member Case)

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II. ANALYSIS ................................................................................................................. 1

    A.  This Court has broad discretion to reduce fines and is not required to impose fines on days where a jail declines to transport. ................................................. 1

    B.  The *Mink* Injunction did not order OSH to be responsible for transport from county jails or provide that days when a jail declines to transport must be counted against OSH for measuring compliance .................................................................. 2

    C.  DRO's speculative concerns about OSH's incentives are belied by facts and can be addressed by a requirement that OSH provide the jails with timely notice when a bed is expected to become available ...................................................... 4

    D.  DRO's suggestion that OSH could simply provide transport from jails throughout the State of Oregon is not a reasonable step towards compliance. .................... 7

III. CONCLUSION ........................................................................................................ 11

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.    INTRODUCTION

The grounds for Disability Rights Oregon's (DRO) objections all stem from its contention that the Oregon State Hospital (OSH), not county sheriff or jail staff, is responsible for transport to avoid liability under the *Mink* Injunction.  These grounds are not well founded.  First, the original *Mink* Injunction was premised on an express factual finding that jails in Oregon were ready, willing, and able to transport aid-and-assist defendants to OSH with 24-hours' notice.  As explained below, that critical factual underpinning of the *Mink* Injunction is no longer true and there is no basis to conclude that the injunction imposed any transport obligations on OSH.  Second, also as explained below, a requirement that OSH go into the business of transporting defendants from around the state is not a reasonable step to comply with the *Mink* Injunction.  Such a requirement would materially interfere with OSH's core missions of making beds available to the populations it serves and ensuring a safe and secure environment for those patients.  This interference would hamper OSH's efforts to return to compliance with the seven-day admission timeframe.

Defendants, therefore, ask this Court reject DRO's objections and accept Defendants' proposed fine calculations.

## II.    ANALYSIS

### A.    This Court has broad discretion to reduce fines and is not required to impose fines on days where a jail declines to transport.

Courts have broad discretion regarding fines that are "imposed to obtain compliance with court orders."  *Spallone v. U.S.*, 487 U.S. 1251, 1256 (1988) (noting that the standard for reviewing the amount of civil contempt fines is abuse of discretion and that fines must be within "reasonable limits").  That broad discretion empowers a court to align its fine determination with the specific circumstances of the individual case, because "civil contempt sanctions are designed to secure future compliance with judicial decrees," *id.* at 1257, and the facts particular to each case affect what kinds of fines are more or less likely to secure compliance.  Additionally, "[a] court's power to impose coercive civil contempt depends on

Page 1 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

the ability of the contemnor to comply with the court's coercive order, something that may change over time." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 630 (9th Cir. 2016). Accordingly, when a court imposes civil sanctions, it does so with the goal of coercing compliance, not as a punitive measure that may lessen the sanctioned party's ability to comply with the underlying order. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th Cir. 1992) (explaining that a court imposing contempt sanctions should consider "the probable effectiveness of any suggested sanction in bringing about the result desired").

Not only is there no requirement that a court imposing monetary sanctions do so in any particular amount, courts have discretion to consider the negative as well as positive impacts a fine may have and tailor the imposition of fines to minimize harmful financial consequences to the contemnor while still encouraging compliance. In some districts, courts are required to consider "the contemnor's financial resources and the consequent seriousness of the burden on him" in imposing sanctions. *See, e.g., Telenor Mobile Communications AS v. Storm LLC,* 587 F.Supp.2d 594, 621 (S.D.N.Y. 2008), *aff'd* 351 Fed.Appx. 467 (2nd Cir. 2009) (approving a large and increasing fine against a contemnor "with enormous financial resources" that had "shown a willingness to bear significant expense" to avoid compliance). Although this district has not made that consideration a requirement, the Ninth Circuit has made clear that "[g]enerally, the minimum sanction necessary to obtain compliance is to be imposed," *Whittaker Corp*. 953 F.2d at 517, and that "federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies," *Stone v. City and County of San Francisco*, 968 F.2d 840, 861 (9th Cir. 1992), which includes minimizing the diversion of limited state agency funding from its current uses to pay fines.

**B.      The *Mink* Injunction did not order OSH to be responsible for transport from county jails or provide that days when a jail declines to transport must be counted against OSH for measuring compliance.**

DRO is correct that the original *Mink* litigation included a ruling that the seven-day timeframe is not measured from the time when OSH receives a commitment order but rather

Page 2 -    DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

from the date the order issued.  DRO asks this Court to *extend* that ruling to situations where OSH stands ready and able to admit but a third-party jail holding the defendant declines to transport, despite a circuit order requiring the jail to perform the transport.  A careful reading of the ruling in the original *Mink* litigation shows that such an extension is not warranted or appropriate.

The district court in the original *Mink* litigation ruled, as a matter of law, that inmates have "a right to a reasonably timely transport to a treatment facility." *Oregon Advocacy Ctr. v. Mink*, 2002 WL 35578910, at *6 (D. Or. May 10, 2002).  But the district court did *not* rule that patients had a right to receive transport from OSH itself, nor did it order the hospital to transport individuals, either expressly or implicitly.  To the contrary, it required only that the hospital provide "full admission" "not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial[.]" Oregon *Advocacy Ctr. v. Mink*, 2002 WL 35578910, at *7 (D. Or. May 10, 2002).

Significantly, the district court's order was based on specific factual findings that jails were able to provide transport to OSH within 24 hours:

> The jails have the capacity to transport inmates to a treatment facility within 24 hours.  The reason they do not transport the inmates is because defendants refuse to accept them.

*Id.* at *4.  Plaintiffs in the original *Mink* litigation sued OSH leadership because they maintained OSH was not upholding its obligation to timely admit aid-and-assist patients.  But the Court specifically tied its conclusion to its finding that the jails were ready, able, and willing to transport defendants to OSH within 24 hours; that finding is a material factual underpinning in the *Mink* Injunction.

That factual underpinning no longer holds true, at least with respect to DRO's desire to hold the hospital financially accountable under the contempt order:  In some cases, OSH stands willing and able to admit the patient, but the jail declines to transport within 24 hours and sometimes longer.  *See* Declaration of Brandy Eurto (Eurto Decl.) ¶¶ 5, 9, 11 & Exhs. 6-

Page 3 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

9.  Given the factual basis for the permanent injunction and the narrow remedy it ordered—admission upon transport by the jail—the hospital should not be financially penalized when the right at issue is the "right to a reasonably timely transport to a treatment facility," which is a responsibility that this Court has never ascribed to OSH.  To conclude otherwise would be to hold the hospital financially accountable for the actions (or inactions) of a fiscally and politically distinct entity that the hospital cannot control. OSH cannot force or "incentivize," as DRO suggests, a county body to engage in conduct.

Logically, this Court's order should result in the hospital being out of compliance only to the extent that inmates are waiting more than seven days *because there is no bed available*.  OSH should be considered to be in full compliance if is ready to provide full admission within seven days to a patient whom the jail will not transport.  OSH has not violated anyone's rights where OSH stands ready to receive the patient within the seven-day timeframe.

**C.     DRO's speculative concerns about OSH's incentives are belied by facts and can be addressed by a requirement that OSH provide the jails with timely notice when a bed is expected to become available.**

DRO speculates that "OSH staff could email the Coos County Sheriff at 3 pm on the seventh day" and thereby seek to avoid liability.  This scenario is not based on fact or reality and exists only in DRO's imagination.

In fact, as the below chart demonstrates, in each of the five individual circumstances that Defendants excluded from their proposed fine calculation at ECF No. 606 because the jail declined the transport, and OSH provided ample, timely notice to the appropriate jails that a transport was being requested:

Page 4 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT
CAS/j3b/993765800

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

| Patient # in Exhibit 2 to Defs' First Fine Calculation Report (ECF No. 606) | County | Admission Date | Day and Time of Transport Request to Jail | Outcome of Request | Reference |
|---|---|---|---|---|---|
| 9 | Lane | Tuesday, 06/10 | Friday, 06/06, 8:48 a.m. (requesting Monday transport) | Jail declined Monday transport, offered Tuesday instead | Exhibit 7 to Eurto Declaration |
| 10 | Jackson | Tuesday, 06/10 | Friday, 06/06, 9:46 a.m. (requesting Monday transport) | Jail declined Monday transport, offered Tuesday instead | Exhibit 6 to Eurto Declaration |
| 20<br>22<br>23 | Lane | Thursday, 06/12 | Friday, 06/06, 2:07 p.m. (requesting Wednesday transport) | Jail declined Wednesday transport, offered Thursday instead | Exhibits 8-9 to Eurto Declaration |

OSH is highly motivated to timely admit aid-and-assist patients and has business processes in place to promptly notify jails as soon as a bed becomes available. Eurto Decl. ¶ 4. OSH does not contact a county jail at 3 p.m. to ask for an admission same day. *Id.* Jails across the state would confirm that OSH does not request same day admissions unless there is an emergent reason to do so, which has happened only in extreme cases and usually stems from an expedited admission or other major medical concerns. *Id.*

Admissions are scheduled around discharges, which are largely unpredictable. Eurto Decl. ¶ 6. The Admissions Department schedules discharges around inpatient restoration limits, community restoration, and when there is a dischargeable finding from a forensic evaluation (i.e., the patient is found "able" or "never able"). *Id.* OSH is not able to anticipate and plan in advance with counties until discharges are known and planned. Eurto Decl. ¶ 8. For example, there is no way to know ahead of time when a court will find an aid-and-assist patient "able" or "never able," and OSH cannot reasonably predict when a bed will come open for an admission until a discharge is scheduled. *Id.*

Page 5 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

However, OSH plans admissions in advance where possible. Eurto Decl. ¶ 7. For example, OSH plans a couple of days in advance to arrange for transport to fill beds that will become available when patients discharge because they will reach the end of their restoration limit under the operative federal court remedial order (ECF No. 416) or statutory end of jurisdiction. *Id.* OSH coordinates in advance with the jails in these circumstances but also must be cautious as extensions to keep patients longer can occur, which then leads to cancelled admissions. *Id.*

When any discharge is planned, OSH schedules an admission to backfill the bed. Eurto Decl. ¶ 9. If a jail declines to transport, or the jail does not respond, OSH moves to the next person on the list and circles back around to offer a bed when the next bed is available. Eurto Decl. *Id.* OSH does not assume that a jail will transport until it has direct confirmation that they will. *Id.* OSH often schedules at least 1-2 days out as it is coordinating around discharges and admissions. *Id.* For purposes of planning for admissions internally, OSH generally stops scheduling admissions around noon-1 p.m. in order to notify departments of incoming admissions for the next day so that the bed and staffing assignments can be readied for the incoming patient. Eurto Decl. ¶ 10.

Jails delay transport to OSH for various reasons, including the following:

- There are a number of counties that have a transport team designated specifically to transport people to OSH and other facilities. Though some of the counties that are further away have a transport team, they will only transport on certain days.

- Often jails are transporting other individuals across the state and will combine trips with OSH and other prisons for drop-offs. These are generally the counties that are further away. OSH experiences a delay in these cases when the jail holds off until the next combined transport. (Klamath, Jackson, Douglas, Coos, Curry, and Lane will only transport on certain days of the week regardless of when a bed is offered). Some of the counties will combine with each other to help with transport.

Page 6 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- Some of the smaller counties do not have transport teams and use their jail staff to transport.

- Some jails (Hood River for example), bid for overtime for transport. There are often delays in these cases by a day or two until the jail is able to identify which staff will be transporting.

- The jails may be transporting a very violent individual and need to coordinate their own resources for safety and have additional staff or a chase vehicle assist with transport.

Eurto Decl. ¶ 11.

To the extent that the Court shares DRO's concern that OSH might suddenly start giving too little notice to the jails sometime in the future, this Court could impose a requirement that OSH notify the jail by a particular time the day before transport to an available bed is needed.

> ### D. DRO's suggestion that OSH could simply provide transport from jails throughout the State of Oregon is not a reasonable step towards compliance.

By way of background, when an Oregon circuit court issues an order committing an aid-and-assist defendant to OSH, it generally orders the county sheriff's office to provide the transport. *See* Declaration of Brandy Eurto (Eurto Decl.) ¶ 3 & Exhs 1-5. The same is true for the instances listed in the above chart. Eurto Decl. at ¶ 5. The legal obligation to transport has always fallen on the county sheriff and jail staff, not OSH.

DRO counters, however, that "[t]he fact that OSH has historically not transported patients to and from jails does not mean that it is unreasonable for OSH to do so on a case-by-case basis as needed to comply with the federal order." This argument does not support a conclusion that requiring OSH to begin to provide transport from and to jails is a necessary reasonable step toward compliance. First, for just the five patients where the jail declined transport included in Defendants' First Report Regarding Proposed Calculation of Fines

Page 7 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(ECF No. 606) for the time period of June 7 to June 15, 2025, it would have taken three round trips and a total of 11.3 hours for OSH to transport them when a bed became available. If the same pace of jail transport declines continued through June 2026, OSH would spend approximately 610.2 hours over that full 54-week period or roughly 49 hours per month. Hillier Decl. ¶ 3.

Second, if OSH begins transporting from jails, it is likely that jails will decline to transport to and from OSH more often than they already do and may even try to stop altogether.  Given the current level of animus from some counties and financial incentive for counties to slow or cease transports altogether, this is a very real concern.  Indeed, the Klamath County Sheriff's Office is currently declining to transport an aid-and-assist defendant who has been found "able" from OSH to Klamath County, contrary to the operative federal remedial order.  ECF No. 416, 445.  OSH is now exhausting all efforts to work with that county to resolve the transport issue but may need to file a notice of inability to comply with this Court's remedial order similar to the one filed at ECF No. 515. (In that instance, because the Marion County Sheriff's Office declined to transport, OSH was ultimately forced to transport the defendant from OSH to the Marion County jail.  ECF No. 517.)

Data for 2024 shows that, if OSH had had to perform all aid-and-assist transports during that year, it would have needed to complete 184 round-trip transports *every month* (for admissions and discharges, combined), with an estimated total of 527.2 hours of driving time per month.  *See* Hillier Decl., Exh. 1.

OSH does not have the staff needed to perform transports from and to jails. Declaration of Jim Aguilar (Aguilar Decl.) ¶ 3.  Currently, OSH has 17 Mental Health Security Technicians (MHST) on its Patient Movement Team.  *Id.* The Patient Movement Team is tasked with all exterior/interior patient medical trips.  *Id.*  These trips are for both patients with privileges, which means they do not require secure transport restraints (STRs)

Page 8 -   DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT
CAS/j3b/993765800

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and those without privileges, who do require STRs. *Id.* The aid-and-assist patient population currently being transported by law enforcement all require STRs. *Id.* ¶ 4.  OSH requires two trained MHSTs for every patient in STRs needing transport for safety. *Id.*  So anytime OSH transports patients without privileges it must provide, at minimum, two MHSTs. *Id.* For those patients who have privileges and need outside medical transport, OSH requires one trained MHST to accompany one unit staff member. Security does the driving on all non-STR trips. *Id.*

OSH estimates that if it were required to transport all aid-and-assist defendants from and to jail, it would cost over $11 million per biennium.  Declaration of Karen Jameison ¶ 3 & Exhibit 1.  But costs are not the only problem with requiring OSH to transport aid-and-assist defendants.

Safety and security are paramount.  OSH has a trained Patient Movement Team, but it does not have the law enforcement officers that counties do, nor do they have the tools available to them that law enforcement has.  Aguilar Decl. ¶ 9.  Under current protocol for OSH Security regarding patient movement, if the patient's acuity level is such that they cannot be transported in a calm manner, and/or able to participate in their treatment, the trip must be canceled because of the risk of injury to an agitated patient or to the staff. *Id.* A large majority of the aid-and-assist defendants coming to OSH are under-medicated and extremely physically assaultive. *Id.* ¶ 10.  A number of these defendants have to be physically extracted from their jail cell in order to be moved through that facility to the transport vehicles. *Id.*  Subsequently, they arrive at OSH and are immediately combative. *Id.* OSH Security is not trained in active counter measures or other defensive tactics techniques utilized by law enforcement. *Id.*  OSH's hands-on Safe Together program utilizes—*at minimum*—four trained OSH team members to physically intervene when a patient is having an acuity event, and that is for events occurring in the safe confines of the hospital grounds. *Id.*

Page 9 -    DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT
CAS/j3b/993765800

If OSH were to transport from/to a jail and the patient were physically violent and in need of further restraint, OSH would not have the resources to deal with that incident by themselves. *Id.* ¶ 11. The people who are trained for such a situation are members of law enforcement. OSH does not have a chemical agent/less-lethal training option available to them like trained and certified law enforcement transport officers do. *Id.* Setting up such a program at OSH would be extremely time-intensive, as OSH would need to send training instructors to certification schools, purchase training and live chemical agents and tasers, train all MHST's in the use of those tools, and conduct at minimum yearly recertification programs for each tool selected for use. *Id.* The OSH Security Team does not have such activity as part of its current position descriptions, and something of this magnitude would certainly need to be vetted through the collective bargaining process and would take substantial time to stand up. *Id.*

In short, requiring OSH to enter the business of transport from and to jails would divert its attention from its core mission: making beds available for the populations it serves and ensuring patient care and safety while at OSH. And it would hamper OSH's efforts to return to compliance with the *Mink* Injunction.

Finally, DRO argues that nothing prevents OSH from transporting aid-and-assist defendants from and to jail since OSH does sometimes transport them for medical appointments. That argument does not support a conclusion that requiring OSH to transport from and to jails would be a reasonable step. Such transports occur locally near OSH's campuses in the Salem and Junction City areas, and managing these primarily medical transports requires significant resources. *Id.* at ¶ 12. That is a far cry from OSH transporting defendants from and to jails a*cross the entire State of Oregon*. As explained above, even doing so in only some cases, let alone more would not be a reasonable step to comply with the *Mink* Injunction, which was premised on the express material finding of fact that jails were able, willing, and ready to transport defendants to OSH within 24 hours' notice.

Page 10 -  DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTION TO FIRST REPORT

## III.    CONCLUSION

For the reasons stated above, Defendants ask this Court to approve their proposed calculation of fines.

DATED June  27, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General


_s/ Carla A. Scott_
CARLA A. SCOTT #054725
CRAIG M. JOHNSON #080902
SHEILA H. POTTER #993485
Senior Assistant Attorneys General
JILL CONBERE # 193430
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Carla.A.Scott@doj.oregon.gov
Sheila.Potter@doj.oregon.gov
Craig.M.Johnson@doj.oregon.gov
Jill.Conbere@doj.oregon.gov
Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000